# EXHIBIT 1

# B R A U N **H A G E Y** & B O R D E N LLP

San Francisco & New York

**J. Noah Hagey, Esq.**
Managing Partner
hagey@braunhagey.com

November 23, 2015

**PRIVILEGED & CONFIDENTIAL SETTLEMENT COMMUNICATION – CEC 1512 ET SEQ. AND FRE 408**

**VIA EMAIL AND FEDEX OVERNIGHT**

David Shen
President and Founder
Suzhou Synta Optical Technology Co., Ltd.
No. 65 Yushan Road, New District
Suzhou, China 215011
Email: synta@vip.sina.com
        syntadavid@163.com

Victor Aniceto
President
Meade Instruments Corp
27 Hubble
Irvine, CA 92618
Email: VANICETO@celestron.com
        Victor.Aniceto@meade.com

Peter Ni
President
Ningbo Sunny Electronics Co., Ltd.
288 Xinjian North Road, YuYao,
Zhejiang, China
Postcode: 315400
Email: nbsunny@vip.sina.com

Dave Anderson
President and CEO
Celestron, LLC
2835 Columbia St.
Torrance, CA 90503
Email: danderson@celestron.com

> **Re:** **Antitrust Complaint,** *Imaginova Corp., et al. v. Suzhou Synta Optical Technology Co., Ltd., et al.*

Dear Sirs:

We have been retained as litigation counsel for Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars (for convenience, "Orion") in connection with the appended draft antitrust complaint against your companies. The complaint, which we are intending to file next week, seeks compensatory and punitive relief, along with equitable divestiture of certain assets, relating to your efforts to monopolize and destroy competition in the manufacturing and sales of U.S. astronomical telescopes.

We understand the parties have previously discussed some of these issues informally but without success. We write to provide further notice of Orion's claims and to determine whether

**San Francisco**
220 Sansome Street, 2nd Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210

**New York**
80 Broad Street, Suite 1302
New York, NY 10004
Tel. & Fax: (646) 829-9403

November 23, 2015
Page 2

you are interested to resolve the dispute on a pre-litigation basis. Our client seeks modest and reasonable commercial protections regarding the following issues:

1.  Your dumping of below cost products in the U.S. through Sky-Watcher Telescopes ("Sky-Watcher"), the wholly owned subsidiary of Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta").

2.  Your anti-competitive acquisition of Hayneedle's confusingly similar website URLs, including telescopes.com, orchestrated through the coordinated efforts of Suzhou Synta and its affiliate Ningbo Sunny Electronic Limited ("Ningbo Sunny").

3.  Your collective actions to monopolize and divide the manufacturing and sales markets for astronomical telescopes, including by price-fixing, charging and maintaining supracompetitive prices and allocating channels amongst your wholly-owned (and market dominant) brands, Celestron, Sky-Watcher and Meade.

Due to the time-sensitive nature of these claims, on or before **Monday, November 30, 2015**, please have your respective counsel inform us whether you are interested to pursue a pre-litigation settlement dialogue. As part of any negotiation, in order to protect the parties' respective interests, Orion will require a written Standstill and Tolling Agreement (preserving the parties' claims and defenses), together with a moratorium on Sky-Watcher's illegal dumping campaign. Should you fail to respond or if you reject these terms, Orion will have no choice but to proceed with its complaint.

In addition to the foregoing, please also confirm that you and your domestic and foreign corporate affiliates have preserved all documents and things in any way related to the claims, allegations and issues set forth in the appended complaint. This includes, without limitation, all electronically stored information ("ESI") in your possession, custody or control stored on computer servers, personal computers, the "cloud", smart phones, portable storage media and similar devices. Failure to promptly and adequately preserve such material may result in additional sanction or adverse inference in the litigation itself. *See, e.g.,* Fed. R. Civ. P. 37 (providing remedies for a party's failure to preserve ESI).

You may reach me at hagey@braunhagey.com or (415) 599-0211.

Very truly yours,

J. Noah Hagey

Encl.

Cc:    San San Lee (Celestron's Registered Agent for Service of Process), via FedEx

1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  Eva Schueller, Esq. (SBN: 237886)
       schueller@braunhagey.com
4  BRAUNHAGEY & BORDEN LLP
   220 Sansome Street, Second Floor
5  San Francisco, CA 94104
   Telephone:  (415) 599-0210
6  Facsimile:  (415) 276-1808

7  ATTORNEYS FOR PLAINTIFF
   OPTRONIC TECHNOLOGIES, INC.
8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11              **SAN FRANCISCO DIVISION**

12
   OPTRONIC TECHNOLOGIES, INC., a            )
13 California corporation,                    )   Case No. _____
                                             )
14            Plaintiffs,                     )   **COMPLAINT FOR VIOLATIONS OF**
                                             )   **SHERMAN ACT §§ 1 AND 2;**
15        v.                                  )   **ROBINSON-PATMAN ACT;**
                                             )   **CARTWRIGHT ACT; UNFAIR**
16 SUZHOU SYNTA OPTICAL TECHNOLOGY           )   **PRACTICES ACT; UNFAIR**
   CO. LTD., CELESTRON ACQUISITION LLC,      )   **COMPETITION LAW; LANHAM ACT;**
17 NINGBO SUNNY ELECTRONIC CO., LTD.,        )   **TORTIOUS INTERFERENCE**
   MEADE INSTRUMENTS CORP., DOES 1 - 25,     )
18            Defendants.                     )   **JURY TRIAL DEMANDED**
                                             )
19 _____  )

20

21

22

23

24        <span style="color:red">**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND**
          **CALIFORNIA EVIDENCE CODE §§ 1512 *ET SEQ.***</span>

25

26

27

28

                                                      Case No. _____
_____
                             COMPLAINT

Plaintiff Optronic Technologies, Inc. dba Orion Telescopes & Binoculars ("Orion") alleges as follows:

## INTRODUCTION

1.      Plaintiff Orion has been selling telescopes to U.S. stargazers since 1975, when its founder launched the business from his garage in Santa Cruz, California.  Orion brings this action against its supplier/competitor, Defendant Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta") and Suzhou Synta's subsidiaries and affiliates, which have monopolized and attempted to monopolize the manufacturing and distribution of consumer telescopes in the U.S., fixed and raised prices and restricted output, divided the market among themselves and are dumping below-cost goods in the U.S. in an effort to destroy Orion's longstanding business.

2.      Defendant Suzhou Synta dominates the manufacturing of the telescopes and components, *e.g.*, lenses, mounts and tubes, sold in the U.S. by Orion.  Suzhou Synta has conspired with the second largest supplier of U.S. telescopes and components, its affiliate and business partner, Defendant Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny"), to allocate the sales of telescopes in the U.S., control the variety and quality of those products and engage in coordinated price fixing in the market.

3.      Defendants' illegal conspiracy includes their systematic acquisition of key U.S. distributors and brands to create a vertically integrated manufacturing, distribution and sales conglomerate.  Suzhou Synta and Ningbo Sunny have conspired to evade U.S. antitrust regulations, including objections issued by the U.S. Federal Trade Commission ("FTC"), to acquire the other two major U.S. telescope manufacturers, distributors and brands: Defendant Celestron Acquisition, LLC ("Celestron") and Defendant Meade Instruments ("Meade").  Defendants then coordinated in 2014 to purchase the last remaining independent website of telescope products, telescopes.com.

4.      Defendants' resulting monopoly has dramatically concentrated the relevant manufacturing and sales markets, allowing them to accomplish precisely what the FTC sought to prevent several years ago when it warned that "the potential combination of Meade and Celestron would raise significant competitive concerns and would violate the FTC Act and Section 7 of the Clayton Act." F.T.C., Press Release Describing Authorization for Injunction to Pre-empt Meade

1  Instruments' Purchase of Celestron International (May 29, 2002), https://www.ftc.gov/news-
2  events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-meade-instruments-purchase-all.

3        5.      In furtherance of their concerted actions and monopoly, Suzhou Synta and Ningbo
4  Sunny have agreed not to compete with one another and routinely share confidential business
5  information about pricing, operations, manufacturing, IP and product development.  Suzhou Synta
6  even sells products for Ningbo Sunny, and Ningbo Sunny supplies Suzhou Synta's U.S. distributors
7  with certain types of telescopes.  The conspiracy even includes the method through which
8  payments are received, where Orion has been required to wire money to Suzhou Synta's bank to
9  pay for goods manufactured by Ningbo Sunny.

10       6.      Orion meanwhile is powerless to prevent Defendants from retaliating in the event it
11 tries to engage in competitive activity.  Ningbo Sunny and Suzhou Synta have coordinated to
12 retaliate against Orion by coordinating to fix the price of credit terms for Orion's products in
13 response to Orion's competition.

14       7.      Having gained a stranglehold on supply, distribution and sales, Defendants are now
15 trying to put Orion out of business by dumping significantly below-cost telescopes into the U.S.
16 market during the critical holiday season.  Starting this October 2015, Suzhou Synta, through
17 Celestron, began selling below-cost Suzhou Synta Sky-Watcher product into the U.S.  Suzhou
18 Synta and Celestron have used the dumping campaign to target Orion's most popular telescopes by
19 offering steep promotional prices and dealer incentives that Orion could never match lest it go out
20 of business.

21       8.      To redress Defendants' unlawful and intentional violations of U.S. antitrust and
22 related unfair competition laws, Orion seeks over $5 million in compensatory damages, treble and
23 punitive damages of at least $15 million, injunctive relief involving the divestiture of Defendants'
24 illegally acquired monopoly assets, and all of Orion's attorney's fees and costs.

25                              **JURISDICTION AND VENUE**

26       9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337
27 and 15 U.S.C. § 15. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

28       10.     Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. § 22.

**THE PARTIES**

11.    Plaintiff Optronic Technologies, Inc. dba Orion Telescopes & Binoculars ("Orion") is a U.S. corporation that imports and sells telescopes, binoculars and accessories online, through a network of dealers, and through its catalog.  It was founded in 1975 and has corporate offices in Watsonville, California with a retail store in Cupertino, California.  The company has built substantial goodwill over its 40 years in business.

12.    Defendant Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta") is company located in Suzhou, Jiangsu, China and Taiwan.  Suzhou Synta is the largest manufacturer of telescopes sold in the U.S. market.  Suzhou Synta has exported and sold telescopes in this District through its U.S. subsidiaries.  Its founder, principal and President Dazhong ("David") Shen regularly comes to Watsonville, California and other places in the U.S. to meet with U.S. distributors of Suzhou Synta products.

13.    Defendant Celestron Acquisition, LLC ("Celestron"), is a wholly owned subsidiary of Suzhou Synta, located in Torrance, California.  Celestron is the largest importer and seller of telescopes in the U.S. and abroad.  Celestron imports and sells Suzhou Synta telescopes in this District.

14.    Defendant Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") is a company located Yuyao, Zhejiang, China.  Ningbo Sunny's Chairman is Peter Ni.

      a.    Suzhou Synta's President David Shen has claimed in the past to own 48% of Ningbo Sunny and, more recently, to have transferred that interest to a close family member.  Upon information and belief, Mr. Shen uses that direct or indirect ownership to coordinate the activities of his companies.

      b.    Ningbo Sunny appears to be an operating company that is part of a group of entities owned and/or controlled by Sunny Optical Technology Co., Ltd.  According to a financial report filed by Sunny Optical Technology Co., Ltd., Ningbo Sunny is "controlled by a close family member of the Company's director and ultimate controlling shareholder, Mr. Wang Wenjian."

Case No. _____

c.    Ningbo Sunny has exported and sold through its U.S. subsidiary telescopes in this District.

15.    Defendant Meade Instruments Corp. ("Meade") is Delaware Corporation with its principal place of business in Irvine, California.  It is a wholly-owned subsidiary of Ningbo Sunny.

16.    Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

17.    Defendants actively conspired with one another and are liable for each's acts and omissions alleged herein.  Each Defendant acted with knowledge of the conspiracy to monopolize the market for telescopes and worked with each other and unknown third parties to accomplish their objective.  Each Defendant acted as the principal, agent or joint venturer of, and on behalf of the other Defendants, regarding the acts, violations, and common course of conduct alleged herein.

18.    Each Defendant headquartered outside the United States relied upon its domestic agents, employees and affiliates, including without limitation their respective wholly owned subsidiaries in the United States, to help implement and conceal the anticompetitive activities alleged herein, including the market division alleged below.

19.    The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals, under the control and explicit authority, implied authority or apparent authority of their principals.  Accordingly, the Defendant principals are liable for the acts of their agents.  Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## FACTS

### A.    Consumer Telescopes

20.    Many Americans enjoy astronomy as a hobby.  The U.S. is one of the largest, if not the largest, market for consumer astronomical telescopes (to be distinguished from advanced

1  telescopes used at universities and observatories) and generates well over $100 million in telescope

2  sales annually.

3       21.     Consumers use many different types of telescopes.  Generally, however, a telescope

4  is comprised of two convex lenses:  the "objective" lens and the eyepiece lens. The objective lens

5  has a larger aperture than the eyepiece.  Usually, the objective and the eyepiece are actually made

6  of two convex lenses pressed together to make the image better.

7       22.     Telescopes often have additional optical components.  For example, reflector

8  telescopes use mirrors to help create the image seen by the user.  Some telescopes contain meniscus

9  correctors, which are lenses used to correct spherical aberration, an incorrect image resulting from

10  light refraction.

11       23.     In addition to optical components, telescopes have mounts that enable the user to

12  move the telescope.  Some telescopes employ motorized mounts and software that can

13  automatically move the telescope to point at objects in the sky, such as Orion's GoTo telescopes.

14  **B.     The Relevant Market**

15       24.     Orion sells telescopes for recreational use by consumers, including first-time

16  purchasers, beginners and intermediate-to-advance users.  The relevant market in this action is for

17  telescope sales to consumers in the U.S., including a sub-market for first-time through intermediate

18  users comprising over 90% of U.S. sales.

19       25.     Orion selects or creates the design for a telescope it wants to sell.  It then works with

20  a contract-manufacturer to build the telescope and any relevant components.

21       26.     As is typical in a contract-manufacturing setting, Orion establishes credit terms with

22  its supplier, providing a period of time (30-90 days) from which to remit payment on orders it

23  receives.  This is an important element of the buyer-seller relationship and critical to smoothing

24  cash flow to ensure the buyer has proceeds from its own sales before payment is due to the

25  supplier.  As noted below, Defendants have used this credit relationship as a weapon against Orion

26  in circumstances where it has engaged in competitive activity, for example in seeking to purchase

27  an asset.

28

27.     Orion purchases most of its assembled telescopes and accessories from the dominant manufacturer based in China, Defendant Suzhou Synta, or from the second largest supplier, also based in China, Defendant Ningbo Sunny.  The two suppliers make up the vast majority of Orion's supply, and there is no alternative manufacturer capable of meeting Orion's demands.

28.     Orion sells its telescopes to consumers via the internet and mail orders, to third party dealers and through other retail outlets, and to and through Amazon.

29.     Suzhou Synta, working in concert with Ningbo Sunny, leverages its dominance over telescope manufacturing to control the pricing and supply of telescopes.  It also has conspired to monopolize the market by integrating its manufacturing businesses with former U.S. distributors and brands in the U.S., including Defendants Celestron, which is the dominant telescope brand now owned by Suzhou Synta.

30.     The market thus is controlled by Suzhou Synta, its subsidiaries and affiliates, which have divided supply and distribution among themselves, causing significant harm to Orion and to consumers.

### 1.     Telescope Supply

31.     There are two dominant telescope manufacturers in the world:  Suzhou Synta and Ningbo Sunny.  A third manufacturer, Jinghua Optics and Electronics Co., Ltd. ("JOC"), also supplies telescopes but lacks the capacity, technology and vertical integration of Suzhou Synta and Ningbo Sunny.

32.     Suzhou Synta is the largest supplier of U.S. (and worldwide) consumer telescopes. It supplies Celestron, Sky-Watcher, Orion and, as of late, Meade – the four most prominent brands in this market.  It supplies the majority of all consumer telescopes sold in the U.S.

33.     Ningo Sunny is the second largest supplier of U.S. consumer telescopes.  However, it is smaller than Suzhou Synta.

34.     JOC is the third largest supplier of U.S. consumer telescopes.  On information and belief, JOC supplies about 1/10 as many consumer telescopes sold in the U.S. as does Suzhou Synta.  JOC makes very few intermediate telescopes and does not manufacture high-end telescopes or components and does not compete with Suzhou Synta or Ningbo Sunny in that space.

35.    A snapshot of the supply looks approximately as follows:



**Defendants' Dominance of Telescope Manufacturing**

■ Suzhou Synta    ■ Ningbo Sunny    ■ JOC

36.    Despite being the first and second largest suppliers, Suzhou Synta and Ningbo Sunny do not compete in the supply market – at least as far as Orion products.  When Ningbo Sunny began supplying Orion, Suzhou Synta decided that it would supply the more high-end telescopes, and Ningbo Sunny would supply simpler, lower-end models.  Thereafter, Suzhou Synta transferred the specifications, dies and molds used to make certain of Orion's lower-end models to Ningbo Sunny.  Per the arrangement between Suzhou Synta and Ningbo Sunny, Orion purchases its more complicated telescopes (*e.g.*, Orion's XX14g GoTo Dobsonian and all of its other Dobsonian telescopes, Orion's 10" f/3.9 Newtonian Astrograph telescopes and Orion's SS IV 80mm Refractor GoTo telescopes) from Suzhou Synta and certain less complicated models (*e.g.*, Orion's Funscope 76mm Reflector Kits and Observer 60 Altaz Refractor telescopes) from Ningbo Sunny.

37.    Although JOC has telescope manufacturing capabilities, it does not sell intermediate or high-end products and has not been a viable alternative source of supply for Orion.  Because there is no effective competition, Suzhou Synta and Ningbo Sunny have a monopoly over the respective products each sells Orion.

38.    Suzhou Synta and Ningbo Sunny have, on information and belief, restricted supply and charged monopoly prices because they have agreed to divide the supply market between themselves to eliminate any competition.  Moreover, demand is inelastic for telescopes.  Because there are few or no substitutes for the products made by Suzhou Synta, purchasers like Orion have little choice but to pay higher prices.

39.     Suzhou Synta has maintained its dominance in telescope manufacturing for many years without new entrants into the market.  In fact, over the last fifteen years, the number of potentially competitive manufacturers has decreased, often as a direct result of Syzhou Synta's anti-competitive actions.  Most recently, Suzhou Synta shut down Celestron's U.S. manufacturing facility and Ningbo Sunny, on information and belief, is planning to dismantle the Meade Mexico facility.

40.     Given that Suzhou Synta and Ningbo Sunny have illegally agreed not to compete against one another, the effective supply market is as follows:



41.     Note, because JOC does not produce many of the key telescopes sold by Orion, there are few if any alternatives to Suzhou Synta / Ningbo Sunny in the market.

### 2.     U.S. Telescope Distributors and Brands

42.     Suzhou Synta and Ningbo Sunny do not sell telescopes directly to U.S. consumers. Instead, they sell to distributors through distributor brands, which then sell the telescopes through stores, dealers, and the internet to astronomy enthusiasts in the U.S.  There are three or four major telescope distributors in the U.S.

43.     Defendant Celestron is a wholly-owned subsidiary of Defendant Suzhou Synta and is the leading U.S. distributor and brand.  It controls at least 60% of U.S. sales under its flagship CELESTRON ® brand.

44.     In 2005, Suzhou Synta acquired Celestron, which formerly manufactured some of its own telescopes.  After shutting Celestron's U.S. manufacturing plant, Suzhou Synta proceeded to use its vertical integration with Celestron to dominate the U.S. market.

45.    Behind Orion, the other U.S. distributor and brand is Meade.  As recently as four years ago, Meade was one of Celestron's largest competitors.  In 2013, Meade was purchased by Sunny Ningbo as part of a joint effort to prevent its assets from being acquired by Orion or any other competitor.

46.    Due to their parents' coordination of manufacturing and sales activities, Celestron and Meade have not seriously competed with each other.  Meade now accounts for around only 10% of U.S. sales.

47.    Sky-Watcher also is a brand owned by Suzhou Synta.  Sky-Watcher has significant sales in China and Europe, and has been increasing its share of U.S. sales, which are handled by Celestron.

48.    Because Celestron, Meade and Sky-Watcher all are wholly-owned subsidiaries of Suzhou Synta and Ningbo Sunny, the actual distribution involves Defendants' complete dominance of the market through their Celestron, Meade and Sky-Watcher brands:

49.    Orion, with approximately 15% of U.S. sales, is the only significant competitor to Defendants' brands, Celestron, Sky-Watcher and Meade.  The remainder of sales in the U.S. are by a handful of other small brands, including Explore Scientific, Bresser and others.



50.    Telescope distribution was not historically this concentrated.  But Suzhou Synta transformed the market through its supply monopoly.  As a result, Suzhou Synta controls the supply and distribution of consumer telescopes in the U.S.

### a.    The Relevant Products

51.    Telescopes for beginners through intermediate users in the U.S. can be divided into five major sub-categories:  (1) reflector telescopes, (2) Dobsonian telescopes (which are actually a type of reflector telescope), (3) refractor telescopes, (4) Maksutov-Cassegrain ("Mak-Cass") telescopes, and (5) Schmidt-Cassegrain telescopes.  **Figure 1** shows which distributors sell these products.

### Fig. 1 – Relevant Products

|              | Celestron | Meade   | Orion | Sky-Watcher |
|--------------|-----------|---------|-------|-------------|
| Reflector    | YES       | YES     | YES   | YES         |
| Dobsonian    | NO        | (minor) | YES   | YES         |
| Refractor    | YES       | YES     | YES   | YES         |
| Mak-Cass     | YES       | YES     | YES   | YES         |
| Schmidt-Cass | YES       | YES     | NO    | NO          |

52.    On information and belief, Suzhou Synta and Ningbo Sunny have agreed to divide telescope distribution, just as they have done with telescope production.

53.    For example, Orion sells a product for beginners called FunScope.  Celestron sells a competing product, FirstScope.  Meade, however, does not sell any competitive product in this space, even though Ningbo Sunny (which owns Meade) is making such a product and selling it to Orion, and, on information and belief, to Celestron.

54.    The foregoing are merely examples of how Suzhou Synta and Ningbo Sunny and their respective subsidiaries have divided U.S. telescope distribution.

### b.    The Distribution Channels

55.    Telescopes are sold through four main channels:  (1) direct to consumers via internet and mail-order catalogue, (2) dealers, hobby stores and independent retailers, (3) "big box" stores such as Target, Sears, Walmart and Best Buy, and (4) Amazon.  Defendants sell in all four channels.  Orion sells its products in all the channels but the "big box" retail stores.

### C.    Defendants' Anticompetitive Conduct

56.    Defendants have conspired and combined to dominate and monopolize both the telescope supply market and the telescope distribution market.  They have engaged in anticompetitive acts, including without limitation, market division and price maintenance, the

1   anticompetitive acquisition of competitors, conspiring to prevent Orion from obtaining market

2   share and tortiously interfering with Orion's ability to do so, providing discriminatory promotions

3   and allowances, and dumping telescopes.  On information and belief, Defendants are engaged in

4   similar anticompetitive conduct with regard to the supply and sales of telescopes in Europe.

5          **1.**    **Suzhou Synta and Ningbo Sunny Have Conspired Together**

6         57.    In its SEC filing disclosing its acquisition of Meade, Ningbo Sunny represented

7   there was no common ownership between it and Suzhou Synta.  However, the principal of Suzhou

8   Synta Dazhong ("David") Shen told Orion's President that Shen owned 48% of Ningbo Sunny.

9         58.    On July 21, 2013, Shen stated that he had transferred his interest in Ningbo Sunny to

10   a sister-in-law, who held the interest in her maiden name to mask the ownership.  On that basis, and

11   for the reasons below, Orion is informed, and thereby alleges, that Suzhou Synta and Ningbo

12   Sunny have at least some common ownership and are operated for the benefit of at least some of

13   the same individuals.

14         59.    Regardless of ownership, substantial evidence points to an anticompetitive alliance

15   between Suzhou Synta and Ninbgo Sunny, including without limitation:

16             a.    Suzhou Synta and Ningbo Sunny share operations and coordinate in the

17                manufacture of different lines of telescopes so as not to compete with one

18                another.

19             b.    Suzhou Synta and Ningbo Sunny share non-public, sensitive information

20                about their businesses with each other, including intellectual property,

21                business plans, and product pricing.

22             c.    Suzhou Synta and Ningbo Sunny conspire to fix the prices of their products,

23                including the credit terms offered thereon.

24             d.    Suzhou Synta's subsidiary Celestron sent officers to work for Ningbo

25                Sunny's subsidiary immediately upon Ningbo Sunny's acquisition

26             e.    Ningbo Sunny manufactures products for Suzhou Synta.

27             f.    Suzhou Synta and Ningbo Sunny have acted in concert to retaliate against

28                Orion for trying to compete.

60.     Through such activities, Suzhou Synta and Ningbo Sunny have illegally combined and conspired together instead of competed against one another.

### a.     Suzhou Synta Sells Products for Ningbo Sunny

61.     Instead of trying to sell its products and prevent its customers from buying from the competition, Suzhou Synta actually sells products for Ningbo Sunny.  This underscores that Suzhou Synta is colluding with Ningbo Sunny rather than competing against Ningbo Sunny.

62.     When Orion wants to purchase telescopes from Suzhou Synta, it does so through Joyce Huang.  Similarly, when Orion wants to purchase telescopes from Ningbo Sunny, Orion also does so through Huang.  Huang, however, works for Synta Technology Corp. (Suzhou Synta's corporate parent) as "Assistant to General Manager."  She uses various Synta email addresses.  Her business cards state she works for Synta Technology Corp., show addresses for Suzhou and Taiwan where Suzhou Synta is located, lists a Synta email address and contains the website of Suzhou Synta's wholly-owned telescope distributor, SkyWatcherTelescope.Net.



63.     Although she works for Suzhou Synta, Huang quotes manufacturing prices and takes sales orders for Ningbo Sunny.  For example, on December 20, 2014, Orion inquired about pricing from Junwen ("James") Chiu, Vice President of Marketing of Ningbo Sunny, asking for quotes on "pricing, MOQ and lead time for 3 products."

**From:** Jason Espinosa
**Date:** 2014-12-20 06:30
**To:** 'James-Junwen Chiu'
**Subject:** Quote for 1.25 EP kit - StarBlast 4.5 EQ Reflector - Funscope 76mm Reflector Kit

Hello James,

Hope you are doing well. I hope your 2014 was great and I hope 2015 will be just as great or even better.

Would you be able to quote me on pricing, MOQ and lead time for 3 products. I know we had discussed on my last visit and it has been difficult to get on top of this from my end.

Images are attached below for your reference.

1. Funscope 76mm Reflector Kit
2. StarBlast 4.5 EQ Reflector
3. TAK 1.25"

64.     The next day, Vice President Chiu responded on his Ningbo Sunny email account, asking for specifications on the telescope from which a quote by Ningbo Sunny would be derived:

**From:** James-Junwen Chiu [mailto:jameschiu@sunnyoptics.com.cn]
**Sent:** Sunday, December 21, 2014 10:28 PM
**To:** Jason Espinosa
**Subject:** Re: Quote for 1.25 EP kit - StarBlast 4.5 EQ Reflector - Funscope 76mm Reflector Kit

Dear Jason,

Greetings!

Could you send me the specifications? Then I will quote you.

James

65.     A little over a week later, Orion received its price quote back.  However, instead of from Ningbo Sunny, the quote was received from Suzhou Synta's representative Huang, who responded to the inquiry from her Suzhou Synta email address.  She then proceeded to detail the price quotes and availability for each requested Ningbo Sunny product, ***even though she was clearly Suzhou Synta's representative***:

1

2

**From:** joyce [mailto:hcsynta@sysnix.com.tw]
**Sent:** Sunday, January 04, 2015 7:13 PM
**To:** Jason Espinosa <jasona@telescope.com>
**Subject:** Fw: Quote for 1.25 EP kit - StarBlast 4.5 EQ Reflector - Funscope 76mm Reflector Kit

3

Dear Jason,

4

I hope this message finds you well, and Orion a more prosperous business prospect in 2015.

5

Please find your pricing requrement as below:

6

1, 1.25 EP kit-
a. Our best price is US$35.80 FOB Ningbo.

7

b. For the time being, Sunny doesn't have PL7.5mm available , but PL6.3mm and PL10mm can be provided . Could you please consider taking these instead of PL7.5mm ?

8

   If PL7.5mm is a must, we would like to know  your yearly demand quantity of such an EP kit for reference so as to make the PL7.5mm to meet your need.

9

2, StarBlast 4.5 EQ Reflector-
Our best price is US$117.- FOB Ningbo.

10

3, Funscope 76mm Reflector Kit -
Our best price is US$29.- FOB Ningbo.

11

12

If you have any further question about the aforesaid offer, don't hesitate to let me know.

13

Regards,
Joyce

14

15        66.      In addition to showing the basic operational overlap and coordination between the

16  nominal competitors, Huang's email demonstrates a clear sharing and cooperation at the most basic

17  business level of transmitting and receiving sensitive customer orders.

18        67.      In addition to overseeing manufacturing questions and new product quotes, Suzhou

19  Synta's representatives are responsible for announcing Ningbo Sunny's pricing policies to Orion.

20  For example, Suzhou Synta is responsible for delivering Ningbo Sunny's annual price list to Orion,

21  from a Suzhou Synta email address:

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10

**From:** joyce [mailto:hcsynta@sysnix.com.tw]
**Sent:** Thursday, December 18, 2014 8:03 PM
**To:** Jason Espinosa
**Subject:** 2015 Ningbo price list


Dear Jason,

The year is coming to the end shortly. I believe Orion had a successful 2014 and a more prosperous 2015 can be greatly expected too.

I would like to announce that the 2015 pricing for the Ningbo products will remain the same as you have already had for the 2014. I hope this will be helpful to your business development in the coming new year.

68.     Orion even has been forced to negotiate its Ningbo Sunny credit terms with Suzhou Synta's CEO, Michael Sun.  For example, in the email below Orion asks Huang and Nancy Liu (CEO Sun's assistant) for a special $250,000 credit line from Ningbo Sunny:

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**From:** Peter Moreo [mailto:peterm@telescope.com]
**Sent:** Wednesday, July 27, 2011 11:47 AM

2
**To:** 'Nancy Liu' <synta@vip.sina.com>; 'Huang Joyce' <synta@ms61.hinet.net>
**Subject:** Orion Holiday Purchase Orders

3
Dear Michael and Joyce,

4

5
As I mentioned when I visited China recently, I would like to follow up on our mutual holiday
planning.  By now, you have received our holiday purchase orders for Suzhou Synta and Synta

6
Technologies.  In the first half of 2011, Orion increased its purchases from both firms and our
2H purchases should provide significant y/y growth for our partnership.  Based upon the

7
purchase orders that we just placed, Orion would deliver 16% y/y increase in purchases from
Suzhou and 89% y/y increase for Sunny (and very close to the $500,000 level that I discussed

8
with Mr. Ni).

9
In this spirit of partnership, I want to avoid the payment issues that we experienced in

10
2010.  While we have a new and much more attractive bank line of credit in place, I want to be
conservative and make sure that Orion meets its commitment.

11

12
With this in mind, I am requesting the following assistance. On the attached MS Excel file, we
have listed the purchase orders that Orion has placed with Suzhou and Sunny:

13
   1)  Suzhou

14
      a.  As you can see, the sum of the October shipments is $903,165 and November is
        $887,671.

15
      b.  Currently, we have a $500,000 credit line.
      c.  I am requesting a temporary $2,000,000 credit line for October and November

16
        shipments, which will facilitate uninterrupted shipments.
      d.  Currently, we have Net 30 day payment terms.

17
      e.  I am requesting that the October shipment invoices be given special terms of Net
        December 1, 2011, which means a range of Net 37 to Net 60 day terms, or ~ Net

18
        45 day terms on average per invoice.
      f.  The November shipments would keep their normal payment terms of Net 30

19
        days.

20
   2)  Sunny
      a.  As you can see, the sum of the October, November and December shipments is ~

21
        $250,000.
      b.  Currently, we have a $100,000 credit line.

22
      c.  I am requesting a temporary $250,000 credit line, which will facilitate

23
        uninterrupted shipments.
      d.  Currently, we have Net 60 day payment terms.  If the credit line request above

24
        can be met, then the normal payment terms of Net 60 days will be sufficient.

25
      69.     If Suzhou Synta and Ningbo Sunny were true competitors and did not have an

26
unlawful agreement to engage in concerted activity and suppress competition, they would not force

27
client such as Orion to work through each other's officers.  Nor would they so blatantly share non-

28
public pricing and credit information with each other.  Likewise, Suzhou Synta's employee Joyce

1  Huang would not be assisting Ningbo Sunny to obtain Orion's business; she would be trying to

2  compete for it.  And Suzhou Synta's CEO would not be in a position to offer lines of credit on

3  behalf of Ningbo Sunny.

4          **b.    Orion Has Been Forced to Wire Money to Suzhou Synta's Bank
               to Pay for Goods Made By Ningbo Sunny**

5

6          70.    The concerted action between Suzhou Synta and Ningbo Sunny also involves

7  demanding that clients such as Orion pay for goods made by one supplier to the other, including by

   money transfers made over the wire and instrumentalities in interstate and foreign commerce.

8
          71.    For example, Suzhou Synta and Ningbo Sunny have required Orion to wire money
9
   to the bank of Suzhou Synta's affiliate, Synta Canada Int'l Enterprises Ltd., in Taiwan to pay for
10
   goods manufactured by Ningbo Sunny in China.  Attached as **Exhibits A - E**, respectively, are
11
   exemplars of a purchase order, a wire transfer, an invoice, a packing list and a waybill documenting
12
   such payments.
13
          72.    To make such purchase, Orion contacted Suzhou Synta employee Joyce Huang and
14
   ordered the goods from Ningbo Sunny.  The purchase order from Orion lists products that Orion
15
   purchases from Ningbo Sunny.  Once the goods were shipped, Orion received an invoice, the
16
   packing list and bill of lading for clearance of goods and payment.  The invoice is from Suzhou
17
   Synta's parent company, Synta Technology Corp., at No. 89 Lane 4 Chia-An W. Road Lung-Tan
18
   Taoyuan Taiwan R.O.C.
19
          73.    The packing list, however, is from Ningbo Sunny, listing the same inventory
20
   identified in Suzhou Synta's invoice and requested in Orion's purchase order.  The waybill
21
   identifies Ningbo Sunny as the shipper.  Even though the goods were ordered from Ningbo Sunny
22
   and shipped by Ningbo Sunny, Orion wired $5,088.70 to the bank of Suzhou Synta's affiliate in
23
   Taiwan to pay for the shipment, as shown in the wire transfer.
24
          74.    This payment practice has continued to the present, although now the wire transfer
25
   goes to, and the invoice comes from, a company called "Good Advance Industries Limited," which
26
   has the same address as Suzhou Synta in Taiwan, No. 89 Lane 4 Chia-An W. Road Lung-Tan
27
   Taoyuan Taiwan R.O.C.  Attached as **Exhibit F** is a purchase order, a wire transfer, an invoice, a
28

1    packing list and a waybill for a purchase made on November 6, 2015, documenting how such

2    purchases are now made.

3        75.    Obviously, if Suzhou Synta and Ningbo Sunny were lawful competitors and did not

4    have an illegal agreement to suppress competition, they would not share a bank account.  They

5    would not work together to facilitate payments through Taiwan.  Nor would Suzhou Synta help

6    with Ningbo Sunny's shipment of competitive products and fix the prices thereof; rather, Suzhou

7    Synta would be trying to compete for Orion's business.

8              **c.    Suzhou Synta Sent Celestron Officers to Work for Meade Right
                       after Ningbo Sunny Purchased Meade**

9        76.    In addition to sharing business operations and banking, Suzhou Synta also provided

10   the top officers from Celestron to Ningbo Sunny at the time Ningbo Sunny acquired Meade to help

11   the transition.  That Suzhou Synta sent Celestron's top management to work for a "competitor" is

12   further evidence that Suzhou Synta and Ningbo Sunny have an anticompetitive alliance.

13       77.    When Ningbo Sunny acquired Meade, it replaced Meade's management with

14   officers from Suzhou Synta's wholly owned subsidiary, Celestron.  For example, on July 26, 2013,

15   Joseph Lupica, who up until that time had been Celestron's CEO, signed the Schedule 13D filed by

16   Ningbo Sunny in conjunction with the Meade acquisition in his capacity as Ningbo Sunny's

17   "authorized signatory" (representing, falsely, that there was no relationship between Suzhou Synta

18   and Ningbo Sunny).  Lupica then became Meade's CEO.

19       78.    At the same time Ningbo Sunny replaced Meade's President with Celestron's

20   former CEO, Ningbo Sunny also made Celestron's Vice President of Sales, Victor Aniceto, the

21   Vice President of Sales for Meade.  Subsequently, Aniceto was promoted to President of Meade

22   when Lupica retired.

23             **d.    Ningbo Sunny Manufactures Products for Suzhou Synta**

24       79.    On information and belief, Ningbo Sunny manufactures low-end products for

25   Suzhou Synta that are distributed by Celestron, *e.g.*, the FirstScope, and also for low-end Sky-

26   Watcher products.  Given that Suzhou Synta could manufacture such products, this is further

evidence that Suzhou Synta and Ningbo Sunny are cooperating and allocating the market, rather than competing with one another.

**e.    Suzhou Synta and Ningbo Sunny Share Non-Public, Sensitive Information about Their Business Operations**

80.    Suzhou Synta and Ningbo Sunny share confidential information that competitors would not share.  For example, Ningbo Sunny's Chairman Peter Ni took Orion's President and Suzhou Synta's President on a tour of Ningbo Sunny's factory, where they viewed Ningbo Sunny's production capabilities and floor plan, which are precisely the type of information manufacturers vigorously protect from competitor scrutiny.

81.    Similarly, as noted in the emails from Huang above, Ningbo Sunny and Suzhou Synta share information about the pricing of products, which again is the type of information competitors seek to keep secret from one another.

82.    At an October 17, 2015, meeting between Orion's President and Suzhou Synta's President Shen in Watsonville, California, Shen stated that Ningbo Sunny had invested $10 to $14 million on Meade, since acquiring Meade for a price in the $5.5 to $6 million range.  Ningbo Sunny would not disclose information about its business operations and losses to Shen unless there was some type of relationship and/or agreement between the companies.

**f.    Suzhou Synta and Sky-Watcher Offer Allowances and Discounts to Orion's Competitors That They Do Not Offer Orion**

83.    Suzhou Synta, through Sky-Watcher, ships product to dealers with free shipping at a minimum order size, and drop ships to dealers' end user customers with free shipping on all order sizes.  This allowance results in a substantial discount to dealers that is not available to Orion.

84.    Suzhou Synta, through Sky-Watcher, also offers substantially better payment terms and additional steep discounts to dealers – neither of which are offered to Orion on the same or substantially similar products.

**g.    Suzhou Synta and Ningbo Sunny Acted in Concert to Aid Suzhou Synta's Acquisition of the Hayneedle Assets**

85.    As detailed further below, Ningbo Sunny coordinated with Suzhou Synta to retaliate against Orion for trying to compete against Suzhou Synta for the Hayneedle Assets.  That Ningbo

1   Sunny aided Suzhou Synta's purchase of the Hayneedle assets and frustrated Orion's purchase

2   efforts is further proof that Suzhou Synta and Ningbo Sunny combined to restrain trade.

3             **2.      Suzhou Synta and Ningbo Sunny Are Engaged in Market Division, Monopoly Pricing and Price Maintenance**

4           86.     As noted above, Suzhou Synta and Ningbo Sunny have divided telescope supply by

5   agreeing which products each would sell to Orion.  As a result of this agreement, Orion has no way

6   to negotiate a better price with Suzhou Synta or Ningbo Sunny – the only available sources of

7   supply.  Attached as **Exhibits G** and **H** are price lists from both Suzhou Synta and Ningbo Sunny.

8   As seen therein, there is no product overlap.

9           87.     Suzhou Synta is aware of the prices charged by Ningbo Sunny.  On information and

10  belief, such prices are fixed, dictated and/or approved of by Suzhou Synta.

11          88.     As a result of having no competition, both Suzhou Synta and Ningbo Sunny have

12  the ability to unilaterally set supracompetitive prices far above what they could command in a

13  competitive market.  By way of example, Suzhou Synta and Ningbo Sunny have maintained the

14  same prices for their goods, notwithstanding the massive devaluation of Chinese currency.  As a

15  basic principle of economics, the devaluation of a country's currency will make exports much

16  cheaper in terms of the price paid in foreign currency.

17          89.     On information and belief, Defendants have also conspired with one another to set

18  prices at the distribution level.  For example, as seen below, Suzhou Synta has at times demanded

19  that Orion raise its prices so as not to compete with Suzhou Synta's distributor, Celestron.

20

21  -----Original Message-----
    From: shentakuo@gmail.com [mailto:shentakuo@gmail.com] On Behalf Of sylvia Shen

22  Sent: Wednesday, August 05, 2009 10:07 PM
    To: Peter Moreo

23  Cc: sylvia Shen; David Shen SZ
    Subject: funscope

24

25  Dear Peter,

26  I hope that you can help us in this matter.

27  I saw your FunScope was advertised as USD49.99 in a magazine.  That

28

**COMPLAINT**

surprised me. As you know, your FunScope is equivelent to Celestron's Firscope 76 but with more accessories, an extra eyepiece and a reddot finder. For the diferences, we think the retail price should be about $10 more but you retailed it at the exactly same price as celestron's.

Furthermore, you are selling it in the same channel, amazon.com. It makes David even more difficult to understand your intention. We wish that you are not competing the price head to head with more features in the same channel. Since Celestron's Firstscope 76 came to the market much earlier than you, it is not difficult for you to take their price as reference and avoid this embarassment. Don't you think so?

90.     As also seen in the email above, in addition to price maintenance, Suzhou Synta has sought to eliminate competition in various channels to ensure products are not competing "head to head." This is reinforced by the actual structure of the market, which Defendants have orchestrated to eliminate competition by stopping "head to head" competition between Suzhou Synta and Ningbo Sunny and their respective distributors. For example, as noted above, Meade does not sell a product like the Orion FunScope – even though Ningbo Sunny manufactures the FunScope – so as not to compete with Celestron. This is the result of an agreement to suppress competition.

**3.     Ningbo Sunny Acquired Meade after the FTC Prohibited Suzhou Synta's Wholly-Owned Subsidiary Celestron from Merging with Meade**

91.     In 2002, the FTC formally blocked Celestron and Meade's efforts to merge because it found "the potential combination of Meade and Celestron would raise significant competitive concerns and would violate the FTC Act and Section 7 of the Clayton Act." The FTC contended that "the two companies together would monopolize the market for Schmidt-Cassegrain telescopes and would eliminate substantial actual competition between Meade and Celestron in the market for performance telescopes." The FTC further found that the proposed merger "would likely result in anticompetitive activity in the two markets at issue" and "that entry into the relevant telescope markets sufficient to deter or counteract the anticompetitive effects of the proposed acquisition is unlikely to occur."

92.     Notwithstanding the FTC's position, Ningbo Sunny purchased Meade without disclosing to U.S. regulators Shen's interest in Ningbo Sunny, or any of the other affiliations

between the companies noted above, *e.g.*, that Suzhou Synta and Ningbo Sunny were sharing

operations, employees and pricing information.

93.    Ningbo Sunny's acquisition of Meade has harmed competition because it transferred

valuable intellectual property and manufacturing capability that competitors, such as Orion or JOC

(both of whom bid on purchasing Meade), could have used to compete against Suzhou Synta and

Ningbo Sunny.  It further transferred market share Ningbo Sunny, which is working with Suzhou

Synta to control both supply and distribution.  Moreover, since it was acquired by Ningbo Sunny,

Meade has begun to avoid competing with Suzhou Synta.

### 4.    Defendants' Tortious and Anticompetitive Acts to Undermine Orion's Acquisition of the Hayneedle Assets

94.    Defendants acted to retaliate against Orion and fix prices for credit after they

discovered Orion's opportunity to purchase competing website URL addresses in 2014.

95.    Hayneedle.com is an e-commerce company where users can buy household goods,

home décor and other items, including telescopes.  In 2014, Hayneedle decided to sell several of its

URLs, including telescopes.com and binoculars.com, along with other assets (the "Hayneedle

Assets").  Orion was interested in buying the URLs because it already owned the URLs

telescope.com, wanted to avoid confusion among internet users searching for Orion products, and

wanted to keep its foothold in e-commerce so it did not lose business to Suzhou Synta's and

Ningbo Sunny's wholly-owned distributor subsidiaries Celestron and Meade.

96.    Before Orion bid on the Hayneedle Assets, President Shen told Orion's President

that Suzhou Synta was "very nervous" about Orion bidding on the Hayneedle Assets and tried to

pressure Orion not to do so.

97.    Orion bid on the Hayneedle Assets anyway.  Suzhou Synta's subsidiary Celestron

bid against Orion, but Orion had the highest bid.  Orion then executed a letter of intent with

Hayneedle, giving Orion an exclusivity period to do due diligence on the purchase, where nobody

else could buy the Hayneedle Assets but Orion.

98.    Thereafter, Michael Sun, Suzhou Synta's CEO wrote to Orion stating that Suzhou

Synta was surprised that Orion wanted to buy Hayneedle.  Sun further explained that Suzhou Synta

was immediately revoking Orion's credit line and cutting off its supply until Orion paid off all its

outstanding invoices.  Sun further threatened that "David [Shen] told me that if Orion really buys

Hayneedle, this will be the beginning of a hazard," and stated that Orion's credit line would not be

reinstated if Orion continued to pursue the Hayneedle acquisition:

**From:** 销售课/刘蓄芳 [mailto:fanfang.liu@synta-cn.com]
**Sent:** Wednesday, June 4, 2014 4:01 AM
**To:** Peter Moreo
**Cc:** syntadavid@163.com; 孙玉峰
**Subject:** Hayneedle

Dear Peter,

This message is written under thoroughly consideration, and is our genuine thought to your company.

In May we had a meeting in the USA, I had expressed my thought that we were worried about the cash flow in your company if you bought Hayneedle. We are surprised to know that Orion still want to buy Hayneedle.  Since it seems that you still want to carry on this project, so we have to protect ourselves to avoid any possible risk and stop your credit amount immediately.

According to the previous bad bankrupt experience of Tasco company,  Synta had lost a lot. We have to make this decision, from now one we will not give Orion any credit amount. Please wire us all open invoices immediately.  Before we receive all these wire payments (nearly 500k us dollars), we will not make any shipments. Also we do not think there is any need to negotiate it once more face to face.

David told me that if Orion really buys Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more.
We will have to require that  for any future shipment, the payment should be paid  in advance.

99.    The same day, Orion received an identical email from Ni Wen Jun at Ningbo Sunny,

immediately cutting off Orion's line of credit and supply.  The email used the same exact phrasing

as the one from Suzhou Synta, *e.g.*, "David told me that if Orion really buys Hayneedle, this will be

the beginning of a hazard."  The email even included the same typographical errors:

**From:** nbsunny [mailto:nbsunny@vip.sina.com]
**Sent:** Wednesday, June 4, 2014 11:13 PM
**To:** peterm <peterm@telescope.com>
**Cc:** Ningbo Sunny <nbsunny@vip.sina.com>
**Subject:** Hayneedle

Dear Peter,

This message is written under thoroughly consideration, and is our genuine thought to your company.

In May David had a meeting in the USA, he had expressed his thought that we were worried about the cash flow in your company if you bought Hayneedle. We are surprised to know that Orion still want to buy Hayneedle. Since it seems that you still want to carry on this project, so we have to protect ourselves to avoid any possible risk and stop your credit amount immediately.

According to the previous bad bankrupt experience of Tasco company, Sunny had lost a lot. We have to make this decision, from now one we will not give Orion any credit amount. Please wire us all open invoices immediately (SEE ATTACHED). Before we receive all these wire payments, we will not make any shipments. Also we do not think there is any need to negotiate it once more face to face.

David told me that if Orion really buys Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more.

We will have to require that for any future shipment, the payment should be paid in advance.


NI WEN JUN
SENT BY JAMES

100.    Shortly thereafter, when Orion tried to order telescopes from Ningbo Sunny, Suzhou Synta's employee Huang confirmed that Ningbo Sunny had cut off Orion's credit. As seen below, Huang did so by forwarding Orion an email that Ningbo Sunny had separately sent to Suzhou Synta two days earlier, explaining that Ningbo Sunny was cutting off all credit and would only ship telescopes "after the corresponding payment is received." This made it even more obvious that Ningbo Sunny was coordinating with Suzhou Synta in its efforts to punish Orion for trying to compete against Suzhou Synta for the Hayneedle Assets.

**From:** joyce [mailto:hcsynta@sysnix.com.tw]
**Sent:** Sunday, June 15, 2014 7:58 PM
**To:** Jason Espinosa <jasona@telescope.com>
**Subject:** Fw: 回復: Fwd: REQ 49202

**From:** nbsunny
**Sent:** Friday, June 13, 2014 10:21 AM
**To:** hcsynta
**Subject:** 回復: Fwd: REQ 49202

Dear Jason,

Delivery can be made at end-August.

As per Sunny's decision, Orion has to pay out all the pending invoices right now. Besides, starting from now on, all orders will be shipped only after the corresponding payment is received. Please understand and confirm that you will do as required.

Regards,
Joyce

101.    Even though Suzhou Synta and Ningbo Sunny cut off Orion's credit and supply to try to prevent Orion from consummating the deal, Orion continued to do its due diligence during the exclusivity period so that it could make the acquisition.  At that point, all material terms of the deal had been agreed to by both parties, including the fact that Hayneedle would no longer sell telescope products through the URLs it was retaining.

102.    However, right before the deal was set to close, Hayneedle suddenly asserted that it had never agreed to this previously uncontroversial non-compete term.  Hayneedle's bizarre about face on this term occurred because, on information and belief, Suzhou Synta and/or its agents were communicating with Hayneedle and threatening Hayneedle to not go through with the sale.

103.    After the exclusivity period expired, Hayneedle insisted Orion would have to pay more for a non-compete notwithstanding the deal the parties already had agreed upon.  Orion had no additional funds to offer Hayneedle because Suzhou Synta and Ningbo Sunny had cut off Orion's lines of credit.  As a result, Orion was unable to close.

104.    During Orion's continued negotiations with Hayneedle, Suzhou Synta through Celestron and the creation of a new entity, Atlas Ecommerce, made a deal with Hayneedle and

acquired the Hayneedle Assets.  Almost immediately thereafter, Suzhou Synta and Ningbo Sunny both restored Orion's lines of credit.

105.   In fact, the restoration of Ningbo Sunny's line of credit and the terms were communicated to Orion by Suzhou Synta.  As seen below, Huang explains Chairman Ni's decision for Sunny, noting that it follows President Shen's agreement with Orion ("Following David's agreement with you, Mr. Ni. confirms 60 days payment terms"):

**From:** Joyce [mailto:hcsynta@sysnix.com.tw]
**Sent:** Saturday, September 20, 2014 12:09 AM
**To:** Peter Moreo <peterm@telescope.com>
**Cc:** Jason Espinosa <jasona@telescope.com>; James-Junwen Chiu <jameschiu@sunnyoptics.com.cn>
**Subject:** Re: Orion Synta Holiday Payment Terms

Dear Peter,

Following David's agreement with you, Mr. Ni confirms the 60 days payment terms effective with the shipments between September 15 and December 15.

As for the credit line of one million US dollars, It is for Suzhou shipment only, Sunny never offered this term previously, so it won't be done afterwards either.

Best regards,
Joyce

106.   These events make clear that Suzhou Synta and Ningbo Sunny colluded together and used their monopoly power to gain further market share and make clear that Orion would be punished by both of them for trying to compete against either one.

107.   Defendants' actions further show that these nominal "competitors" actively conspired with one another to fix the price of credit terms relating to Orion's purchase of telescopes.

### 5.   Defendants Are Dumping Below-Cost Products into the U.S. Market

108.   In its quest to further misuse its monopoly power to take market share from Orion, beginning in October 2015, Suzhou Synta began dumping Sky-Watcher products into the U.S. market at prices below its cost.  This conduct was facilitated through Suzhou Synta's U.S. distributor, Celestron.

109.    The last quarter of the year is the biggest quarter for consumer telescope sales, accounting for roughly 40% of Orion's yearly sales. This year, Defendants commenced a sale of at least 28 separate Sky-Watcher products. The price list for this sale is attached as **Exhibit I**.

110.    As seen on the price list, Sky-Watcher is selling its products at below its own cost. The prices are so far below cost that this sale only could have been commenced with the intent of damaging Orion's ability to compete. For example, Sky-Watcher offered its 8" Traditional Dobsonian telescope at a "sale price" that is causing Sky-Watcher to lose as much as $90.33/unit at as much as a -28.7% margin.

111.    As seen in the attached snapshot of the advertisement, the cost to a dealer (i.e., a hobby store that sells telescopes) for the Sky-Watcher 8" Traditional Dobsonian is $230.

| SKU | Description | Standard PREMIER | Standard MAP | Sale PREMIER | Sale MAP |
|---|---|---|---|---|---|
| S11600 | 6" Traditional Dobsonian | $ 215.00 | $ 305.00 | $ 190.00 | $ 275.00 |
| S11610 | 8" Traditional Dobsonian | $ 265.00 | $ 355.00 | $ 230.00 | $ 315.00 |

112.    Because Defendants are offering free shipping, they also have to pay for outbound freight. That would cost Defendants an additional $51.00, which is the same rate paid by Orion for its comparable product. As a result, Defendants would receive $179 per unit – $5.75 more than Orion's landed cost in Watsonville (cost of product after it is shipped from China) of $173.25. To actually sell the products, however, Defendants would incur additional costs. One such cost is fulfillment (pick/pack), which is the cost of packaging and shipping orders. Such costs are about 3.5% of the sale price, or $11.03 per unit. There are also marketing costs of 5% of the sale price, $15.75 per unit; labor costs of 18% of the sale price, $56.70 per unit; and operating costs of 4% of the sales price, $12.60 per unit.

113.    Taken together, this amounts to a loss of over $90.33 per unit, a -28.7% margin. This loss is so profound that it could not be a result of accident or efficiency. It is a deliberate effort to destroy Orion's business. Orion sells 3,230 units of its comparable products, the XT8 Classic Dobsonian line to dealers/retailers per year.

114.    The "sale" price of the Sky-Watcher 8" Traditional Dobsonian is also below cost at the retail level, for example on Celestron's website, telescopes.com. While the price Defendants

receive is $315 instead of $230, using the same shipping costs and percentages for pick/pack, marketing, labor and operating costs as above, this would yield a loss $27.38 per unit, at a -8.7% margin.  Orion sells 1,950 units of the XT8 Classic Dobsonian line per year in retail channels.

115.    Using similar calculations based on the "sale" prices offered by Sky-Watcher, virtually every product is priced below cost.  By way of example, the following five key products are priced below cost as follows:

        a.    The Sky-Watcher 6" Traditional Dobsonian, comparable to the Orion XT6 Classic Dobsonian (Solid Tube), is sold at the wholesale level at a loss of $76.24/unit, at a -27.7% margin.  At the retail level it is sold for a loss of $10.49/unit, at a -3.8% margin.

        b.    The Sky-Watcher 10" Traditional Dobsonian, comparable to the Orion XT10 Classic Dobsonian (Solid Tube), is sold at the wholesale level at a loss of $139.76/unit, at a -26.1% margin.  At the retail level it is sold for a loss of $42.21/unit, at a -7.9% margin.

        c.    The Sky-Watcher 14" GoTo Collapsible Dobsonian, comparable to the Orion XX14g GoTo Truss Tube Dobsonian, is sold at the wholesale level at a loss of $393.34/unit, at a -16.7% margin.  At the retail level it is sold for a loss of $83.18/unit, at a -3.5% margin.

        d.    The Sky-Watcher EQ6 Mount, the analog to the Orion Atlas EQ-G Mount, is sold at the wholesale level at a loss of $160.45/unit, at a -13.9% margin.  At the retail level it is sold for a loss of $11.30/unit, at a -1% margin.

        e.    The Sky-Watcher 12" GoTo Collapsible Dobsonian, comparable to the Orion XX12g GoTo Truss Tube Dobsonian, is sold at the wholesale level at a loss of $347.82/unit, at a -19.3% margin.  At the retail level it is sold for a loss of $89.16/unit, at a -4.9% margin.

116.    The foregoing products are Orion's most important items.  Orion could not sell its comparable products at the prices offered by Sky-Watcher without losing money.

117.    In addition to selling products below cost, Suzhou Synta, through Celestron, has falsely offered products for sale, but when a consumer attempts to purchase the products at the sale price, the product is "out of stock."  For example, the snapshot below was taken from the Celestron portal on November 16, 2015:



118.    The purpose of this false advertising is to bait and switch consumers, unfairly compete against Orion and reset retail prices to a level where Orion would have to sell at a loss to compete.

**D.    The Harm Defendants' Conduct Has Caused to Orion and to Competition**

119.    As a result of Defendants' conduct, there is only one significant remaining independent U.S. telescope brand, Orion.

120.    Defendants' conduct has caused injury to both Orion and the relevant market.  Orion has been injured because it is paying supra-competitive, arbitrarily inflated prices for telescopes.  It has further been injured because it cannot compete against Defendants' below cost pricing.  Orion is also damaged by not having the Hayneedle Assets, which would rightfully belong to Orion absent Defendants' conspiracy to suppress competition and tortious interference.  As a direct result of such conduct, Orion is losing sales, goodwill and market share.

121.    In telescope manufacturing, price competition has been restrained or eliminated, particularly, as alleged above, for products where Suzhou Synta and Ningbo Sunny have agreed to divide the market between themselves.  As a result, output has been restricted, and the prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels, and purchasers of telescopes, including Orion and downstream consumers, have been deprived of free

and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

122.   The demise of Celestron's independent manufacturing and Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities and lack of emergence of any replacement suppliers demonstrates that the barriers to entry into the supply market, combined with Defendants' anticompetitive conduct, has and will effectively foreclose competition at supply level.

123.   At the telescope distribution level, price competition has been restrained or eliminated, particularly, as alleged above, for products where Suzhou Synta and Ningbo Sunny, through their wholly-owned distributor subsidiaries Celestron, Meade and Sky-Watcher, have agreed to divide the market between themselves.  Competition and consumer choice have also been restrained where Defendants unlawfully combined to prevent Orion from using distribution channels, such as the Hayneedle URLs, to compete against Defendants.

124.   Competition and consumer choice have also been restrained due to Ningbo Sunny's acquisition of Meade.  Since Ningbo Sunny acquired Meade, Meade has not seriously competed with Celestron because the two former largest competitors in the market are now subject to an unlawful agreement not to compete between competitors.  Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, including Orion, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

125.   As a result of the conduct alleged herein, competition has been stifled, the prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels, and consumers have been deprived of free and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

126.   Through their domination of the supply chain, Defendants have effectively prevented new market entrants at the distribution level, thereby continuing to inhibit and restrict competition.  On information and belief, Defendants intend to raise prices and recoup their losses if they succeed in eliminating Orion through their below-cost sales, as they will have eliminated their last healthy competitor at the distribution level.

**E.    Defendants' Conduct Has Substantially Impacted Commerce**

127.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and have a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for telescopes and diminishing competition throughout the United States.

## CAUSES OF ACTION

### First Cause of Action
### Violation of the Sherman Act Section 1, 15 U.S.C. § 1

128.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

129.    Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

130.    By engaging in the conduct described above Defendants have knowingly and intentionally combined and conspired with each other with the specific intent to unreasonably restrain trade in the market for beginner to high-end consumer telescopes in the U.S., in which they already have dominant market power.

131.    Defendants Suzhou Synta and Ningbo entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of telescopes directly sold to United States purchasers, including Orion, combining and conspiring to raise, fix, maintain or stabilize the prices of telescopes sold to United States purchasers, fixed credit prices and terms as to Orion, agreeing to divide the market between themselves to eliminate competition, selling telescopes to distributors in the United States, including Orion, at noncompetitive and artificial prices, and combining and conspiring to eliminate competition by depriving Orion of the Hayneedle Assets to prevent competition and solidify their monopoly power.

132.    Defendants Suzhou Synta, Ningbo Sunny, Meade and Celestron further combined and conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by dividing distribution so as to eliminate competition among themselves, selling and distributing telescopes in the United States at prices below cost to eliminate competitors, including Orion, and by completing the merger between Ningbo Sunny and Meade with the intent and effect to lessen

competition, control potentially competitive manufacturing capability and create a monopoly.  The effect of that merger has already lessened competition, raised barriers to entry and tended to create a monopoly in numerous markets and submarkets involving the manufacture and sale of telescopes in the U.S.

133.    Defendants' conduct has harmed competition in the U.S. for recreational telescopes by increasing the prices paid by telescope distributors such as Orion, increasing the prices paid by U.S. consumers, reducing consumer choice, increasing barriers to entry, and stifling innovation.

134.    Orion was and continues to be injured in fact by the conspiracies of Defendants and other coconspirators.

135.    Orion and U.S. consumers have suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants and the co-conspirators, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial under Section 15 of the Clayton Act, 15 U.S.C. §15.

## Second Cause of Action
### Violation of Sherman Act § 2, 15 U.S.C. § 2 and Clayton Act § 7, 15 U.S.C. § 18

136.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

137.    Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

138.    Defendants have monopolized, attempted to monopolize, and/or conspired to monopolize the supply and distribution markets for telescopes in the United States.  By engaging in the conduct above Defendants are willfully maintaining and abusing a monopoly, leveraging their supply monopoly to control distribution and price, preventing other market participants, including Orion, from acquiring competitive manufacturing potential by acquiring Meade, blocking Orion from competing at the distribution level by taking the Hayneedle Assets to eliminate that channel of competition, selling and offering to sell products in the U.S. market below cost, allocating the

supply and distribution markets among themselves, selling goods below cost, offering steep discounts and allowances to Orion's competitors but not Orion and falsely advertising sales.

139.    Defendants' willful conduct as described above has given Defendants the ability to control prices and exclude competition.

140.    Defendants' willful conduct as described above has a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power.

141.    Defendants' conduct described above has caused antitrust injury.

142.    As a result of Defendants' actions in violation of 15 U.S.C. § 2, Orion has been injured and continues to be injured in its business and property in an amount to be determined at trial, which amount is to be trebled in accordance with 15 U.S.C. § 15.

**Third Cause of Action**
**Violations of the Robinson-Patman Act § 13(a), 15 U.S.C. § 13(a)**

143.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

144.    Defendants' sales are made in interstate commerce.

145.    The commodities Defendants sold to Orion were of the same grade and quality as those sold to its competitors.

146.    Defendants discriminate in price between Orion and other purchasers.

147.    The price discrimination has a prohibited effect on competition and has caused harm to Orion in an amount to be proven at trial.

**Fourth Cause of Action**
**Violations of the Robinson-Patman Act § 1(d, e), 15 U.S.C. § 13(d, e)**

148.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

149.    Orion purchases commodities from Defendants.

150.    Defendants discriminate in allowances and discounts, such as free shipping, that they provide to purchasers/dealers who buy for resale in the same geographic area as Orion.

151.    Defendants' conduct has a prohibited effect on competition and has caused harm to Orion in an amount to be proven at trial.

### Fifth Cause of Action
### Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*

152.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

153.    California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price maintenance.

154.    Defendants knowingly and intentionally conspired with each other with the specific intent to sell Defendants' telescopes below-cost at predatory levels in the U.S. market, and for the purposes of destroying fair competition.

155.    In furtherance of Defendants' conspiracy, they collectively agreed to price, offer for sale, and did sell telescopes below cost in the U.S.

156.    Defendants have erected effective barriers to entry into the U.S. consumer telescope market.

157.    The Defendants' conspiracy to sell telescopes below cost in the United States violates California's Cartwright Act.

158.    Orion has suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants and their co-conspirators, and Defendants are therefore liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

### Sixth Cause of Action
### Violations of Sections 17043 and 17044 of the
### California Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 *et seq.*

159.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

160.    California Business and Professions Code section 17043, which is part of California's Unfair Practices Act, prohibits any person engaged in business in California from selling or offering to sell "any article or product at less than the cost thereof to such vendor, or to

give away any article or product, for the purpose of injuring competitors or destroying competition."

161.    Section 17044 of California's Unfair Practices Act prohibits any person engaged in business in California from selling or using any article or product as a "loss leader," defined in section 17030 as including any article or product sold at less than cost where the "effect is to divert trade from or otherwise injure competition."

162.    Defendants are engaged in business in California, and have sold or offered to sell their telescopes at below-cost prices to customers in the U.S. for the purposes of injuring Orion, destroying fair competition in the market, and gaining monopoly power.

163.    Defendants have sold or offered to sell their telescopes at less than cost with the effect of diverting trade from and otherwise injuring competition.

164.    As a result of Defendants' predatory pricing and sales as a "loss leader," Orion has lost customers, sales, and profits.

165.    Defendants' below cost pricing of telescopes violates sections 17043 and 17044 of the California Business and Professions Code.

166.    Because Orion has suffered injury to its business as a result of Defendants' sales and promotions selling telescopes below cost, Defendants are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial pursuant to California Business and Professional Code section 17082.

### Seventh Cause of Action
### Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* (Unfair Competition)

167.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

168.    The Defendants' conduct violates federal and state law as described above and constitutes unfair, unlawful, and fraudulent competition against Orion.

169.    As a result of Defendants' unfair, unlawful and fraudulent competition, Orion has lost money and customers, and continues to do so.

Case No. _____
COMPLAINT

**Eighth Cause of Action**
**Violation of the Lanham Act § 43, 15 U.S.C. § 1125**

170.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

171.    Defendants Suzhou Synta and its distributor Celestron made false statements to consumers by advertising products for sale while failing to make inventory available, so as to injure Orion's ability to compete.

172.    The above false statements were made in advertising,

173.    The advertisements actually deceived and/or have the tendency to deceive a substantial segment of their audience because consumers have no reason to be aware that Defendants never intended to sell products at the "sale" price.

174.    The false statements were likely to influence consumers' purchasing decision because price is a key component in deciding to buy any product, especially telescopes.

175.    Defendants caused the false advertisements to enter interstate commerce.

176.    Orion has been injured as a direct result thereof through the diversion of sales and inability to compete at the falsely advertised price point.

**Ninth Cause of Action**
**Tortious Interference**

177.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

178.    Orion and Hayneedle had a contract and/or were in an economic relationship that would have resulted in an economic benefit to Orion;

179.    Defendants knew of the contract and/or economic relationship between Orion and Hayneedle.

180.    Defendants intended to interfere with the contract and/or relationship and engaged in wrongful conduct including their anticompetitive conspiracies, misrepresentations, and monopolistic conduct.

1    181.    Defendants had no justification or privilege to interfere with Orion's contract and/or

2    relationship.

3    182.    Due to Defendants' wrongful conduct, the contract and/or economic relationship

4    between Orion and Hayneedle was disrupted, and Orion suffered significant harm, including

5    without limitation lost sales, lost market share, and irreparable and intangible harm to its goodwill

6    and reputation by consumers being confused by the URLs telescopes.com, which is almost

7    identical to Orion's URLs telescope.com.

8    183.    Defendants' wrongful conduct was a substantial factor in causing Orion's harm.

9    184.    In interfering with Orion's contract and/or relationship, Defendants acted with

10   malice, fraud and oppression, and in conscious disregard of Orion's rights. Accordingly, Orion is

11   entitled to recover exemplary damages in an amount to be proven at trial.

12                                **PRAYER FOR RELIEF**

13   WHEREFORE, Plaintiffs pray that the Court issue the following relief:

14   A.    Equitable relief, including without limitation, an injunction prohibiting Defendants'

15   illegal practices;

16   B.    Compensatory damages in the amount of at least $5 million;

17   C.    Treble damages of at least $15 million;

18   D.    Restitution;

19   E.    Disgorgement of ill-gotten assets and property, including the Hayneedle Assets

20   described herein;

21   F.    Punitive Damages;

22   G.    Attorney's fees and costs; and

23   H.    All such other and further relief as the Court may deem just, proper, and equitable.

24

25

26

27

28

1    Dated:  November 23, 2015                        BRAUNHAGEY & BORDEN LLP

2

3                                                     By:    /s/ J. Noah Hagey
                                                              J. Noah Hagey

4                                                     Attorneys for Plaintiff OPTRONIC
                                                      TECHNOLOGIES, INC. dba Orion
5                                                     Telescopes & Binoculars

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____
                                         COMPLAINT