# EXHIBIT 2

1   J. Noah Hagey, Esq. (SBN: 262331)
      hagey@braunhagey.com
2   Matthew Borden, Esq. (SBN: 214323)
      borden@braunhagey.com
3   Eva Schueller, Esq. (SBN: 237886)
      schueller@braunhagey.com
4   BRAUNHAGEY & BORDEN LLP
  220 Sansome Street, Second Floor
5   San Francisco, CA 94104
  Telephone: (415) 599-0210
6   Facsimile: (415) 276-1808

7   Attorneys for Plaintiff OPTRONIC
  TECHNOLOGIES, INC. d/b/a ORION
8   TELESCOPES & BINOCULARS ®

9

           **UNITED STATES DISTRICT COURT**

10

          **NORHTERN DISTRICT OF CALIFORNIA**

11

12   OPTRONIC TECHNOLOGIES, INC., d/b/a
  Orion Telescopes & Binoculars ®, a California
13   corporation,

        **COMPLAINT FOR VIOLATIONS OF**
        **SHERMAN ACT §§ 1 & 2; CLAYTON**
14             **ACT; CARTWRIGHT ACT; UNFAIR**
           **COMPETITION (BUSINESS &**
15        v.           **PROFESSIONS CODE § 17200** *et seq.***)**

        Plaintiff,

16   NINGBO SUNNY ELECTRONIC CO., LTD.,
  SUNNY OPTICS, INC., MEADE
17   INSTRUMENTS CORP., and DOES 1 - 25,       **JURY TRIAL DEMANDED**

18        Defendants.

19

20

21

22

23

24

25

26

27

28

Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars ® ("Orion") alleges as follows:

## INTRODUCTION

1.     Plaintiff Orion has been selling telescopes since 1975, when its founder launched the business from his garage in Santa Cruz, California.  It is the last significant U.S. independent telescope brand and brings this action to remedy efforts by one of the world's largest telescope manufacturers and its affiliates to fix prices, divide markets and monopolize the U.S. recreational telescope market.

2.     Defendants are the Chinese telescope manufacturer, Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") and its U.S. subsidiaries, Sunny Optics, Inc. ("Sunny Optics") and Meade Instruments Inc. ("Meade").  For years, Defendants have colluded and conspired with third party telescope manufacturers in China to fix prices, control and restrict output, and divide the $200 million market for manufacturing and distribution of recreational telescopes and components sold in the U.S.  Those third parties already have settled such claims.[1]

3.     Defendants' concerted action included systematic acquisition of key U.S. distributors and brands to create a vertically integrated manufacturing, distribution, and sales conglomerate.  In 2013, Ningbo Sunny acquired Meade despite regulators' concerns regarding such combinations.  Their collusion with the Settling Parties has allowed them to accomplish precisely what the U.S. Federal Trade Commission ("FTC") sought to prevent years ago when it blocked the concentration of foreign telescope manufacturers and brands.  *See* F.T.C. Press Release (May 29, 2002), https://www.ftc.gov/news-events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-meade-instruments-purchase-all.

4.     Defendants also used their dominant position as both supplier and competitor to unfairly compete – harming consumers and damaging Orion's business.  In this litigation, Orion seeks compensatory, treble and punitive damages in excess of $10,000,000, injunctive relief, divestiture of Defendants' illegally acquired assets, and all of its attorney's fees and costs.

---

[1]   The other participants in this antitrust conspiracy have not been named as defendants because they confidentially settled and resolved claims relating to their involvement in the conduct at issue. For convenience, those parties are referred to as the "Settling Parties".

**JURISDICTION AND VENUE**

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claim is based occurred in this district. Under N.D. Cal. Civil L.R. 3-2(c), (e), because a substantial part of the events or omissions alleged occurred in Santa Cruz County, the case should be assigned to the San Jose Division.

7.      The Court has personal jurisdiction over the Defendants because they directed their tortious conduct at persons and activities within the State of California.  The Court further has jurisdiction over Defendant Meade, because its headquarters are in California. The Court further has jurisdiction over Defendants Ningbo Sunny and Sunny Optics Inc. because they share a principal with Meade, as described further below.

**THE PARTIES**

8.      Plaintiff Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars is a U.S. corporation that imports and sells telescopes, binoculars and accessories online, through a network of dealers, and through its catalog.  It was founded in 1975 and has corporate offices in Watsonville, California with a retail store in Cupertino, California.  The company has built substantial goodwill over its 40 years in business.

9.      Defendant Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") is a company located Yuyao, Zhejiang, China.  Ningbo Sunny's Chairman and/or President is Peter Ni.

a.      The principal of Ningbo Sunny's primary manufacturing competitor, one of the Settling Parties, has claimed in the past to have co-founded and own 48% of Ningbo Sunny.  This cross-ownership has enabled Ningbo Sunny to coordinate its pricing, sales and manufacturing practices with the Settling Parties to effectively monopolize the U.S. market.

b.      Orion has been forced by Ningbo Sunny to make payments through one of the Settling Parties, even though Ningbo Sunny and the Settling Parties hold themselves out as competitors in the market.

c.      Ningbo Sunny also appears to be an operating company that is part of a group of entities owned and/or controlled by Sunny Optical Technology Co., Ltd. According to a financial report filed by Sunny Optical Technology Co., Ltd., Ningbo Sunny is "controlled by a close family member of the Company's director and ultimate controlling shareholder, Mr. Wang Wenjian."

d.      Ningbo Sunny has exported and sold telescopes in this District through its U.S. subsidiary, Meade.

10.      Defendant Sunny Optics Inc. is a Delaware corporation formed for the purpose of merging with Meade Instruments Corp. ("Meade"). Upon information and belief, it is a subsidiary of Ningbo Sunny.

11.      Defendant Meade Instruments Corp. is Delaware Corporation with its principal place of business in Irvine, California. It is a wholly-owned subsidiary of Ningbo Sunny. Meade operates or has operated a factory in Tijuana, Mexico. Peter Ni is Meade's Chief Executive Officer.

12.      The Settling Parties are a manufacturer of recreational telescope products ("Settling Manufacturer") and two of the Settling Manufacturer's wholly owned brands ("Settling Distributors"). The Settling Parties have participated as partners in the conduct alleged herein but have settled and resolved Orion's claims and are therefore not named as parties. *Ward v. Apple Inc.*, 791 F.3d 1041, 1048-49 (9th Cir. 2015) (unnecessary to sue joint tortfeasors in antitrust case).

13.      Defendants are controlled by their Chairman, CEO and/or president Wenjun ("Peter") Ni. Through Mr. Ni and other agents, Defendants conspired with one another and the Settling Parties to engage in the acts and omissions alleged herein. Each Defendant acted with knowledge of the conspiracy to monopolize the market for telescopes and worked with each other and unknown third parties to accomplish their objective. Each Defendant acted as the principal, agent or joint venturer of, and on behalf of the other Defendants, regarding the acts, violations, and common course of conduct alleged herein.

## SERVICE OF PROCESS ON CALIFORNIA-BASED AGENTS
## IS EFFECTIVE AS TO THE FOREIGN DEFENDANTS

14. Defendant Ningbo Sunny's subsidiary, Meade, is located in Irvine, California, and is registered as a corporation doing business in California.

15. Defendant Peter Ni is the CEO of Meade and the Chairman/President of Ningbo Sunny.

16. Meade is of sufficient rank and character to make it reasonably certain that Defendant Ningbo Sunny will be appraised of the service of this Complaint on Meade. The relationship between Meade and Ningbo Sunny is extensive:

    a. Ningbo Sunny controls the operations, business decisions of the U.S.-based Sunny Optics and Meade.

    b. Ningbo Sunny has a financial interest in Sunny Optics and Meade's California and U.S. operations.

    c. Ningbo Sunny benefits from the sale of Meade products in California and throughout the U.S.

    d. Ningbo Sunny's arrangement with Meade offers Ningbo Sunny the same business advantages it would have if Ningbo Sunny opened its own offices or hired its own agents in California.

    e. Meade offers Ningbo Sunny the opportunity for regular contact with California customers.

    f. Meade offers Ningbo Sunny a channel for the continuous flow of business into California.

    g. There is regular, frequent contact between Meade and Ningbo Sunny.

17. Sunny Optics is a shell holding company created by Ningbo Sunny for purposes of completing Ningbo Sunny's merger with Meade in 2013.

18. Ningbo Sunny and Ni relied upon their domestic agents, employees and affiliates, including without limitation Meade and Sunny Optics, to help implement and conceal the anticompetitive activities alleged herein, including the market division alleged below.

19.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals, under the control and explicit authority, implied authority or apparent authority of their principals.  Accordingly, the Defendants' principals are liable for the acts of their agents.  Likewise, the Defendants' agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## FACTS

### A.     Consumer Telescopes and the Relevant Market

20.     Astronomy is a popular hobby for many Americans.  The U.S. is one of the largest, if not the largest, market for consumer astronomical telescopes (to be distinguished from advanced telescopes used at universities and observatories) and generates well over $100 million in telescope sales annually.

21.     Telescopes have two main optical components: the objective and the eye lens. A reflector telescope uses mirrors to collect and focus light, and a refractor uses a concave lens.  In addition to optical components, telescopes have mounts that enable the user to move the telescope.  Some telescopes employ motorized mounts and software that can automatically move the telescope to point at objects in the sky.

22.     Orion sells telescopes for recreational use by consumers, including first-time purchasers, beginners and intermediate-to-advanced users.  Orion selects or creates the design for a telescope it wants to sell.  It then works with a contract-manufacturer to build the telescope and its relevant components.

23.     Almost all recreational telescopes sold in the U.S. market are made by Ningbo Sunny and the Settling Manufacturer.

24.     The relevant market in this action is for telescopes for beginner to intermediate consumers, comprising over 90% of U.S. recreational telescope sales.

25.     Upon information and belief, Defendant Ningbo Sunny controls the manufacture of approximately 75% of the beginner to low-intermediate consumer telescope market in the U.S.

Ningbo Sunny and the Settling Manufacturer control over 90% of the entire telescope manufacturing market for sales in the U.S. Aside from these two dominant suppliers, there is no alternative manufacturer capable of meeting Orion's demands.

26. As is typical in a contract-manufacturing setting, Orion establishes credit terms with its supplier, providing a period of time (30-90 days) from which to remit payment on orders it receives. This is an important element of the buyer-seller relationship and critical to smoothing cash flow to ensure the buyer has proceeds from its own sales before payment is due to the supplier. Defendants have used this credit relationship as a weapon against Orion, as described in greater detail below.

27. Orion sells its telescopes to consumers through a number of channels, including direct to consumer via the internet and mail orders, to third party dealers and through other retail outlets.

**1. Telescope Supply**

28. According to Panjiva Inc., which provides a subscription-based website with import and export details on commercial shipments worldwide, Ningo Sunny is the largest supplier of U.S. consumer telescopes and possesses monopoly power over the manufacture of beginner to low-intermediate telescopes for sale in the U.S.:



29.     Ningbo Sunny's primary competitor in the manufacturing space is the Settling Manufacturer.  Those two companies do not act independently and have agreed not to compete in the supply market – at least as far as Orion products.  When Ningbo Sunny began supplying Orion, it stated that it would take over all manufacture of the simpler, lower-end models, and that the Settling Manufacturer would supply the more advanced telescopes.  Thereafter, the Settling Manufacture transferred the specifications, dies and molds used to make certain of Orion's lower-end models to Ningbo Sunny.

30.     Because there is no effective competition, and due to significant market entry barriers such as high capital investment costs, and key intellectual property rights, Ningbo Sunny and the Settling Manufacturer have a monopoly over the respective products each sells Orion.

31.     In fact, Defendants' ability to control prices and influence output and charge supracompetitive rates is likely to last for years because significant barriers to entry exist.  At the manufacturing level, these barriers include Ningbo Sunny's longstanding and increasing dominance, particularly in the market for beginner and entry-level telescopes and accessories.  Additional factors include:  the significant capital costs and time of acquiring and building a suitable factory, and the technical process of producing quality optics and telescope parts.

32.     Ningbo Sunny and the Settling Manufacturer have, on information and belief, restricted supply and charged monopoly prices because they have agreed to divide the supply market between themselves to eliminate any competition.  Moreover, demand is inelastic for telescopes.  Because there are few or no substitutes for the products made by Ningbo Sunny and the Settling Manufacturer, purchasers like Orion have little choice but to pay higher prices.

### 2.     U.S. Telescope Distributors and Brands

33.     The monopoly over telescope supply has impacted telescope distribution.  Ningbo Sunny sells its telescopes to distributors through distributor brands, which then sell the telescopes through stores, dealers, and the internet to astronomy enthusiasts in the U.S.  There are three or four major telescope distributors in the U.S, including Orion, which is currently the only remaining independent distributor with significant market share.

34.     In 2005, the Settling Manufacturer acquired one of the Settling Distributors, the largest telescope distributor in the U.S. market.  As a result, until four years ago, the only other major independent distributor of telescopes in the U.S. market aside from Orion was Meade.  In 2013, Meade was purchased by Ningbo Sunny as part of a joint effort to prevent its assets from being acquired by Orion or any other competitor.

35.     This vertical integration took place alongside Ningbo Sunny's coordination of manufacturing and sales activities with its only competitor, including their agreement to divide the market by product type.  As a result, Meade has not seriously competed with any other major U.S. brand other than Orion since the Ningbo Sunny acquisition and has not used its manufacturing capabilities to diversify the supply of telescopes.

36.     Through vertical integration, Defendants and the Settling Parties leveraged their control over telescope supply to completely dominate U.S. telescope distribution.  Orion, with approximately 15% of U.S. sales, is the only significant competitor to Defendants' brands.  The remainder of sales in the U.S. is by a handful of other small brands, including Explore Scientific, Bresser and others, which together account for less than 10% of the market.

37.     Telescope distribution was not historically this concentrated.  But Ningbo Sunny and the Settling Parties transformed the market through their supply monopoly.

### 3.     The Relevant Products

38.     Telescopes for beginners through intermediate users in the U.S. can be divided into five major sub-categories:  (1) reflector telescopes, (2) Dobsonian telescopes (which are actually a type of reflector telescope), (3) refractor telescopes, (4) Maksutov-Cassegrain ("Mak-Cass") telescopes, and (5) Schmidt-Cassegrain telescopes.

39.     On information and belief, Ningbo Sunny has conspired to divide telescope distribution market, just as it has done with telescope production.

40.     For example, Meade has consistently avoided producing products that would compete with the Settling Parties, including in the entry-level Reflector telescopes – even though it often made such products for the Settling Parties.

**4.    Defendants' Anticompetitive Conduct**

41.    Defendants have conspired and combined to dominate and monopolize telescope supply and distribution.  They have engaged in anticompetitive acts, including without limitation, market division and price maintenance, the anticompetitive acquisition of competitors, conspiring to prevent Orion from obtaining market share and tortiously interfering with Orion's ability to do so, providing discriminatory promotions and allowances, and dumping telescopes.  On information and belief, Defendants have or were engaged in similar anticompetitive conduct with regard to the supply and sales of telescopes in Europe.

**B.    Ningbo Sunny's Antitrust Conspiracy**

42.    In its SEC filing disclosing its acquisition of Meade, Ningbo Sunny represented there was no common ownership between it and its main competitor, the Settling Manufacturer.  However, the competitor has told Orion's President that is not true.  In fact, on July 21, 2013, the Settling Manufacturer's principal told Orion that he had transferred his interest in Ningbo Sunny to a sister-in-law, who held the interest in her maiden name to mask the ownership.  On that basis, and for the reasons below, Orion is informed, and thereby alleges, that Ningbo Sunny and its purported competitor have at least some common ownership and are operated for the benefit of at least some of the same individuals.

43.    Regardless of ownership, substantial evidence points to an anticompetitive alliance between Ningbo Sunny and its purported competitor, including without limitation:

a.    The two share operations and coordinate in the manufacture of different lines of telescopes so as not to compete with one another.

b.    They share non-public, sensitive information about their businesses with each other, including intellectual property, business plans, and product pricing.

c.    They conspire to fix the prices of their products, including the credit terms offered thereon.

d.    The purported competitor sent officers to work for Ningbo Sunny's subsidiary Meade immediately upon Ningbo Sunny's acquisition of Meade.

e.    Ningbo Sunny manufactures products for its purported competitor.

COMPLAINT

f.     Ningbo Sunny and its competitor have acted in concert to retaliate against Orion for trying to compete.

44.     Through such activities, Ningbo Sunny has illegally combined and conspired with the only other major manufacturer of telescopes instead of competing against it.

### 1.     Ningbo Sunny's Purported Competitor Sells Products for Ningbo Sunny

45.     Instead of trying to sell its products and prevent its customers from buying from the competition, Ningbo Sunny shares sales staff with its supposed competition. This underscores that Ningbo Sunny is colluding with, rather than competing against, its supposed rival.

46.     When Orion wants to purchase telescopes from Ningbo Sunny, Orion has done so through Joyce Huang. Huang, however, works for Ningbo Sunny's ostensible competitor, the Settling Manufacturer, as is evinced by her email and physical addresses listed on her business cards, as well as websites.

47.     Although she works for Ningbo Sunny's competitor, Huang quotes manufacturing prices and takes sales orders for Ningbo Sunny. For example, on December 20, 2014, Orion inquired about pricing from Junwen ("James") Chiu, Vice President of Marketing of Ningbo Sunny, asking for quotes on "pricing, MOQ and lead time for 3 products."

48.     The next day, Vice President Chiu responded on his Sunny Optics email account, asking for specifications on the telescope from which a quote by Ningbo Sunny would be derived.

49.     A little over a week later, Orion received its price quote back. However, instead of coming from Ningbo Sunny, the quote came from Huang. She then proceeded to detail the price quotes and availability for each requested Ningbo Sunny product, even though she was clearly the purported competitor's representative.

50.     In addition to showing the basic operational overlap and coordination between the nominal competitors, Huang's email demonstrates that Ningbo Sunny and the Settling Manufacturer were sharing and cooperating at the most basic business level of transmitting and receiving sensitive customer orders and pricing information.

51.     Defendants' collusion is not limited to specific customer orders; upon information and belief they set their prices together. Indeed, one company's representatives are responsible for

1    announcing the other's pricing policies to Orion. The purported competitors even coordinate their

2    negotiations regarding customer credit terms – a key component of pricing. For example, when

3    Orion sought to negotiate its Ningbo Sunny credit terms, it did so not with a Ningbo Sunny

4    representative but with the Settling Manufacturer's CEO.

5           52.    If Ningbo Sunny did not have an unlawful agreement to act in concert and suppress

6    competition with its only manufacturing rival, their officers would not jointly correspond with each

7    other's clients regarding sales orders, expected sales volumes, and credit terms. Nor would they

8    routinely share non-public pricing and credit information with each other. Likewise, Joyce Huang

9    would not be assisting Ningbo Sunny to obtain Orion's business; she would be trying to compete

10   for it.

11          **2.     Ningbo Sunny Coordinates Business Operations and Banking with Its
                     Purported Competitor**

12

13          53.    The concerted action between Ningbo Sunny and its only rival also involves

14   integrating the booking of purchase orders, processing payment for such orders, and coordinating

15   the shipping of product to customers. Ningbo Sunny and the Settling Manufacturer routinely

16   required Orion send money to one company's bank for goods ordered from, and made by, the

17   other, including by money transfers made over the wire and instrumentalities in interstate and

18   foreign commerce.

19          54.    Obviously, if Ningbo Sunny was a lawful competitor with its rival and did not have

20   an illegal agreement to suppress competition, they would not share a bank account. They would

21   not work together to facilitate payments through Taiwan. Nor would a true competitor help with

22   Ningbo Sunny's shipment of competitive products and fix the prices thereof; rather, it would be

23   trying to compete for Orion's business.

24          **3.     Ningbo Sunny's Rival Sent Officers to Work for Meade Right after
                     Ningbo Sunny Purchased Meade**

25          55.    In addition to sharing business operations and banking, Ningbo Sunny and the

26   Settling Parties have shared top officers, a fact which provides further evidence that they have an

27   anticompetitive alliance.

28

56.     When Ningbo Sunny acquired Meade, it replaced Meade's management with officers from the Settling Distributor.  On July 26, 2013, Joseph Lupica signed the Schedule 13D filed with the U.S. Securities and Exchange Commission by Ningbo Sunny in conjunction with the Meade acquisition in his capacity as Ningbo Sunny's "authorized signatory" (representing, falsely, that there was no relationship between Ningbo Sunny and the Settling Parties).  Lupica then became Meade's CEO.  Less than a month earlier, Lupica had been the decades' long top executive at the Settling Distributor.

57.     At the same time, Ningbo Sunny also made the Settling Distributor's Vice President of Sales, Victor Aniceto, the Vice President of Sales for Meade.  Subsequently, Aniceto was promoted to President of Meade when Lupica retired.

### 4.     Ningbo Sunny Manufactures Products for its Purported Competitor

58.     On information and belief, Ningbo Sunny now manufactures low-end products for at least one of the Settling Distributors, which could have such products made by its parent company, the Settling Manufacturer, rather than buying them from a competitor.  This is further evidence that they are cooperating and allocating the market, rather than competing with one another.

### 5.     Ningbo Sunny and its Purported Competitor Share Non-Public, Sensitive Information about Their Business Operations

59.     Competitors typically go to great lengths to prevent competitors from knowing non-public information regarding their business operations.  Such secrecy can offer a competitive advantage in the marketplace.  Ningbo Sunny and the Settling Manufacturer, however, share confidential information that competitors would not share.  For example, they share information about the pricing of products, as well as credit arrangement and order forecasts, which again is the type of information competitors seek to keep secret from one another.

60.     Ningbo Sunny also shares confidential information about its most basic business capabilities with its purported competitor, the Settling Manufacturer.  Indeed, Ningbo Sunny's Chairman Peter Ni took Orion's President and the Settling Manufacturer's President on a tour of Ningbo Sunny's factory, where they viewed Ningbo Sunny's production capabilities and floor plan,

1 which are precisely the type of information manufacturers vigorously protect from competitor
2 scrutiny.

3     61.     The Settling Manufacturer's President also previously claimed to have a co-
4 ownership stake in one or more of Defendants.

5     62.     At an October 17, 2015 meeting between Orion's President and the Settling
6 Manufacturer's President in San Jose, California, Orion learned that Ningbo Sunny had invested
7 $10 to $14 million in Meade since acquiring it. Upon information and belief, Ningbo Sunny
8 provided this information to the Settling Manufacturer because of their close business relationship
9 and co-ownership structure.

10     **6.**     **Ningbo Sunny Conspired with its Purported Competitor to Interfere with Orion's Purchase of the Hayneedle Assets**

11

12     63.     As detailed further below, Ningbo Sunny coordinated with its competitor to retaliate
13 against Orion for trying to compete for the Hayneedle Assets. That Ningbo Sunny conspired with
14 its purported competitor to frustrate Orion's purchase efforts evidences their agreement to assist
one another and monopolize the market.

15

16     **C.**     **Ningbo Sunny Is Engaged in Market Division, Monopoly Pricing and Price Maintenance**

17     64.     As noted above, Ningbo Sunny and its would-be competitor, the Settling
18 Manufacturer, divided telescope supply by agreeing which products each would sell to Orion. As a
19 result of this agreement, Orion has no way to negotiate a better price with either company – and
20 they are the only available sources of supply.

21     65.     On information and belief, each company's prices have been fixed, dictated and/or
22 approved of by the other.

23     66.     As a result of having no competition, both manufacturers have the ability to
24 unilaterally set supracompetitive prices far above what they could command in a competitive
25 market. By way of example, they have both maintained the same prices for their goods,
26 notwithstanding the massive devaluation of Chinese currency. Absent an agreement to fix prices,
27 the devaluation of a China's Renminbi would have made Defendants' exports much cheaper in U.S
28 dollars.

67.     On information and belief, Defendants have also conspired with one another to set prices at the distribution level.

68.     In addition to price maintenance, Ningbo Sunny has conspired with the Settling Manufacturer to eliminate competition in various product channels to ensure products are not competing "head to head." This is reinforced by the actual structure of the market, which Defendants have orchestrated to eliminate competition by stopping "head to head" competition between the two manufacturers and their respective distributors. For example, as noted above, Ningbo Sunny manufactures a beginner telescope, which it sells to its competitor's subsidiary. Yet Meade, which is owned by Ningbo Sunny, does not sell any competitive product in this space.

### D.     Ningbo Sunny Acquired Meade after the FTC Prohibited Its Competitor from Acquiring Meade

69.     In 2002, the FTC formally blocked Meade's efforts to merge with Ningbo Sunny's competitor's subsidiary (one of the Settling Distributors) because it found "the potential combination … would raise significant competitive concerns and would violate the FTC Act and Section 7 of the Clayton Act." The FTC contended that "the two companies together would monopolize the market for Schmidt-Cassegrain telescopes and would eliminate substantial actual competition … in the market for performance telescopes." The FTC further found that the proposed merger "would likely result in anticompetitive activity in the two markets at issue" and "that entry into the relevant telescope markets sufficient to deter or counteract the anticompetitive effects of the proposed acquisition is unlikely to occur."

70.     Notwithstanding the FTC's position, Ningbo Sunny purchased Meade without disclosing to U.S. regulators the Settling Manufacturer's interest in Ningbo Sunny, or any of the other affiliations between the companies noted above, e.g., that the two companies were sharing operations, banking, employees, and pricing information.

71.     Ningbo Sunny's acquisition of Meade has harmed competition because it transferred valuable intellectual property and manufacturing capabilities that competitors such as Orion or JOC, a low-end telescope manufacturer with little market share (both of whom bid on purchasing Meade), could have used to compete against Ningbo Sunny and the Settling Parties. It further

1  transferred market share to Ningbo Sunny, which is working with the Settling Parties to control

2  both supply and distribution in the relevant market.

3  72.    Moreover, since it was acquired by Ningbo Sunny, Meade has avoided competing

4  with the Settling Parties – yet further evidence that Ningbo Sunny is colluding to illegally divide

5  the market.

6  **E.    Defendants' Tortious and Anticompetitive Acts to Undermine Orion's Acquisition of the Hayneedle Assets**

7  73.    Orion makes a significant percentage of its sales in the U.S. market via the internet.

8  In 2014, Orion sought to purchase competing website URL addresses to bolster its sales.

9  74.    Defendants acted to retaliate against Orion and fix prices for credit after they

10  discovered Orion's opportunity to purchase these URLs.

11  75.    Hayneedle.com is an e-commerce company where users can buy household goods,

12  home décor and other items, including telescopes.  In 2014, Hayneedle decided to sell several of its

13  URLs, including telescopes.com and binoculars.com, along with other assets (the "Hayneedle

14  Assets").  Orion was interested in buying the URLs because it already owned the URL

15  telescope.com, wanted to avoid confusion among internet users searching for Orion products, and

16  wanted to keep its foothold in e-commerce.

17  76.    Before Orion bid on the Hayneedle Assets, the Settling Manufacturer's President

18  told Orion's President that it was "very nervous" about Orion bidding on the Hayneedle Assets and

19  tried to pressure Orion not to do so.

20  77.    Orion bid on the Hayneedle Assets anyway and had the highest bid.  Orion then

21  executed a letter of intent with Hayneedle, giving Orion an exclusivity period to do due diligence

22  on the purchase.  During the exclusivity period, nobody else could buy the Hayneedle Assets but

23  Orion.

24  78.    Thereafter, the Settling Manufacturer sent Orion an email immediately revoking

25  Orion's credit line and cutting off its supply until Orion paid off all its outstanding invoices.  The

26  email stated that "if Orion really buys Hayneedle, this will be the beginning of a hazard," and

27

28

1 | further warned that Orion's credit line would not be reinstated if Orion continued to pursue the

2 | Hayneedle acquisition.

3 |      79.     The same day, Orion received an identical email from Wen Jun (Peter) Ni at Ningbo

4 | Sunny, immediately cutting off Orion's line of credit and supply. The email used the same exact

5 | phrasing as the one from Ningbo Sunny's competitor, *e.g.*, "if Orion really buys Hayneedle, this

6 | will be the beginning of a hazard." The email even included the same typographical errors.

7 |      80.     Shortly thereafter, when Orion tried to order telescopes from Ningbo Sunny, Joyce

8 | Huang, an employee of the Settling Manufacturer, confirmed that Ningbo Sunny had cut off

9 | Orion's credit. Huang did so by forwarding Orion an email that Ningbo Sunny had separately sent

10 | to its competitor two days earlier, explaining that Ningbo Sunny was cutting off all credit and

11 | would only ship telescopes "after the corresponding payment is received."

12 |      81.     Even though Ningbo Sunny conspired with its competitor to simultaneously cut off

13 | Orion's credit and supply to try to prevent Orion from consummating the Hayneedle deal, Orion

14 | continued to do its due diligence during the exclusivity period so that it could make the acquisition.

15 | At that point, all material terms of the deal had been agreed to by both parties, including that

16 | Hayneedle would no longer sell telescope products through the URLs it was retaining.

17 |      82.     However, right before the deal was set to close, Hayneedle suddenly asserted that it

18 | had never agreed to the previously uncontroversial non-compete term. Hayneedle's bizarre about

19 | face on this term occurred because, on information and belief, Ningbo Sunny's competitors and/or

20 | their agents were communicating with Hayneedle and threatening Hayneedle to not go through

21 | with the sale.

22 |      83.     After the exclusivity period expired, Hayneedle insisted Orion would have to pay

23 | the higher original bid price, and refused to agree to a non-compete notwithstanding the deal the

24 | parties already had agreed upon. Orion had no additional funds to offer Hayneedle because of the

25 | conspiracy to cut off Orion's lines of credit. As a result, Orion was unable to close.

26 |      84.     During Orion's continued negotiations with Hayneedle, the Settling Parties acquired

27 | the Hayneedle Assets. Almost immediately thereafter, both companies restored Orion's lines of

28 | credit.

85.     In fact, the restoration of Ningbo Sunny's line of credit and the terms were communicated to Orion by the Settling Manufacturer.

86.     The timing of these events – threatening to remove and then removing Orion's line of credit to starve it of the capital needed to close its acquisition of the Hayneedle's assets, interfering with that acquisition and subsequently purchasing the assets for themselves, and then immediately restoring Orion's line of credit via single email applicable to both Ningbo Sunny and the Settling Manufacturer – make clear that (a) Ningbo Sunny and its purported competitor colluded together and used their monopoly power to gain further market share and (b) that they would work to together to punish Orion for trying to compete against either one.

87.     Defendants' actions further show that these nominal "competitors" actively conspired with one another to fix the price of credit terms relating to Orion's purchase of telescopes.

**F.     Defendants' Conduct Has Harmed Orion and Competition in the Relevant Market**

88.     As a result of Defendants' conduct, there is only one significant remaining independent U.S. telescope brand, Orion.

89.     Defendants' conduct has caused injury to both Orion and the relevant market. Orion has been injured because it is paying supra-competitive, arbitrarily inflated prices for telescopes. It has further been injured because it cannot compete against Defendants' below cost pricing. Orion is also damaged by not having the Hayneedle Assets, which would rightfully belong to Orion absent Defendants' conspiracy to suppress competition and tortiously interfere with Orion's exclusive negotiations with Hayneedle. As a direct result of such conduct, Orion is losing sales, goodwill and market share.

90.     In telescope manufacturing, price competition has been restrained or eliminated, particularly, as alleged above, for products where Ningbo Sunny and the Settling Parties have agreed to divide the market between them. As a result, output has been restricted, and the prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels, and purchasers of telescopes, including Orion and downstream consumers, have been deprived of free

1 and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to

2 punish and prevent.

3      91.    Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities,

4 and the lack of emergence of any replacement suppliers, demonstrates that the barriers to entry into

5 the supply market, combined with Defendants' anticompetitive conduct, has and will effectively

6 foreclose competition at the supply level.

7      92.    At the telescope distribution level, price competition has been restrained or

8 eliminated, particularly, as alleged above, for products where Ningbo Sunny and the Settling

9 Manufacturer, through their wholly-owned distributor subsidiaries, have agreed to divide the

10 market between them.  Competition and consumer choice have also been restrained where

11 Defendants unlawfully combined to prevent Orion from using distribution channels, such as the

12 Hayneedle URLs, to compete against Defendants.

13      93.    Competition and consumer choice have also been restrained due to Ningbo Sunny's

14 acquisition of Meade.  Since Ningbo Sunny acquired Meade, Meade has not significantly competed

15 with its formerly largest competitor, because the two brands are now subject to an unlawful

16 agreement not to compete.  Moreover, the acquisition of Meade prevented companies that are

17 trying to compete against Defendants, including Orion, from obtaining a potential manufacturing

18 facility and important intellectual property that would have increased competition.

19      94.    As a result of the conduct alleged herein, Defendants have stifled competition, fixed,

20 raised, stabilized, or maintained at artificially inflated levels, and deprived consumers of free and

21 open competition.  This is an antitrust injury of the type that the antitrust laws were meant to

22 punish and prevent.

23      95.    Through their domination of the supply chain, Defendants (acting in concert with

24 the Settling Parties) have effectively prevented new market entrants at the distribution level,

25 thereby continuing to inhibit and restrict competition.  On information and belief, Defendants

26 intend to raise prices and recoup their losses if they succeed in eliminating Orion through their

27 below-cost sales, as they will have eliminated their last healthy competitor at the distribution level.

28

**G.    Defendants' Conduct Has Substantially Impacted Commerce**

96.    Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and have a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for telescopes and diminishing competition throughout the United States.

**CAUSES OF ACTION**

**First Cause of Action**
**Against All Defendants**
**Price Fixing and Collusion**
**(Violation of the Sherman Act Section 1, 15 U.S.C. § 1)**

97.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

98.    Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

99.    By engaging in the conduct described above, Defendants have knowingly and intentionally combined and conspired with each other with the specific intent to unreasonably restrain trade in the market for beginner to high-end consumer telescopes in the U.S., in which they already have dominant market power.

100.    Defendants Ningbo Sunny and Sunny Optics, Inc. entered into a continuing combination or conspiracy with the Settling Parties to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of telescopes directly sold to United States purchasers, including Orion; combining and conspiring to raise, fix, maintain or stabilize the prices of telescopes sold to United States purchasers; fixing credit prices and terms as to Orion; agreeing to divide the market between themselves to eliminate competition; selling telescopes to distributors in the United States, including Orion, at noncompetitive and artificial prices; and combining and conspiring to eliminate competition by depriving Orion of the Hayneedle Assets to prevent competition and solidify their monopoly power.

101.    Defendants Ningbo Sunny and Meade further combined and conspired with the Settling Parties to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by dividing distribution so as to eliminate competition among themselves; selling and distributing

1   telescopes in the United States at prices below cost to eliminate competitors, including Orion; and

2   by completing the merger between Ningbo Sunny and Meade with the intent and effect to lessen

3   competition, control potentially competitive manufacturing capability and create a monopoly. The

4   effect of that merger has already lessened competition, raised barriers to entry and tended to create

5   a monopoly in the market for beginner and intermediate telescopes in the U.S.

6         102.    Defendants' conduct has harmed competition in the U.S. for recreational telescopes

7   by increasing the prices paid by telescope distributors such as Orion, increasing the prices paid by

8   U.S. consumers, reducing consumer choice, increasing barriers to entry, and stifling innovation.

9         103.    Orion was and continues to be injured in fact by the conspiracies of Defendants and

10   the Settling Parties.

11         104.    Orion and U.S. consumers have suffered an antitrust injury as a direct and proximate

12   result of the combination and conspiracy between Defendants and the Settling Parties, and

13   Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be

14   proven at trial under Section 15 of the Clayton Act, 15 U.S.C. § 15.

15                       **<u>Second Cause of Action</u>**

                       **Against All Defendants**

16      **Attempted Monopolization and Conspiracy to Monopolize**

17   **(Violation of Sherman Act § 2, 15 U.S.C. § 2 and Clayton Act § 7, 15 U.S.C. § 18)**

18         105.    Plaintiff repeats and realleges the allegations of the Paragraphs above as if fully set

19   forth herein.

20         106.    Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or

21   attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

22   any part of the trade or commerce among the several States, or with foreign nations."

23         107.    Defendants and the Settling Parties have monopolized, attempted to monopolize,

24   and/or conspired to monopolize the supply and distribution markets for telescopes in the United

25   States. By engaging in the conduct above Defendants are willfully maintaining and abusing a

26   monopoly; leveraging their supply monopoly to control distribution and price; preventing other

27   market participants, including Orion, from acquiring competitive manufacturing potential by

28   acquiring Meade; blocking Orion from competing at the distribution level by taking the Hayneedle

Assets to eliminate that channel of competition; and allocating the supply and distribution markets among themselves.

108.    Defendants' willful conduct as described above has given them the ability to control prices and exclude competition.

109.    Defendants' willful conduct as described above has a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power.

110.    Defendants' conduct described above has caused Orion antitrust injury.

111.    As a result of Defendants' actions in violation of 15 U.S.C. § 2, Orion has been injured and continues to be injured in its business and property in an amount to be determined at trial, which amount is to be trebled in accordance with 15 U.S.C. § 15.

112.    Because Orion has suffered injury to its business as a result of Defendants' sales and promotions selling telescopes below cost, Defendants are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial pursuant to California Business and Professional Code section 17082.

**Third Cause of Action**
**Against All Defendants**
**Unfair Competition**
**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

113.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

114.    The Defendants' conduct violates state law as described above and constitutes unfair, unlawful, and fraudulent competition against Orion.

115.    As a result of Defendants' unfair, unlawful and fraudulent competition, Orion has lost money and customers, and continues to do so.

**Fourth Cause of Action**
**Against All Defendants**
**Collusion to Restrain Trade**
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*)**

116.    Orion repeats and realleges the allegations of the Paragraphs above as if fully set forth herein.

COMPLAINT

117.    California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price maintenance.

118.    Defendants knowingly and intentionally conspired with each other with the specific intent to sell Defendants' telescopes below-cost at predatory levels in the U.S. market, and for the purposes of destroying fair competition.

119.    In furtherance of Defendants' conspiracy, together the Settling Parties, they collectively agreed to price, offer for sale, and did sell telescopes below cost in the U.S.

120.    Defendants have erected effective barriers to entry into the U.S. consumer telescope market.

121.    The Defendants' conspiracy to sell telescopes below cost in the United States violates California's Cartwright Act.

122.    Orion has suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants and the Settling Parties, and Defendants are therefore liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court issue the following relief:

A.    Equitable relief, including without limitation, divestiture and an injunction prohibiting Defendants' illegal practices;

B.    Compensatory damages in the amount of at least $5,000,000;

C.    Treble damages of at least $15,000,000;

D.    Restitution;

E.    Disgorgement of ill-gotten assets and property;

F.    Punitive Damages;

G.    Attorney's fees and costs; and

H.    All such other and further relief as the Court may deem just, proper, and equitable.

Dated: November 1, 2016

BRAUNHAGEY & BORDEN LLP

By:    /s/ *J. Noah Hagey*
                        J. Noah Hagey

Attorneys for Plaintiff OPTRONIC
TECHNOLOGIES, INC. d/b/a Orion
Telescopes & Binoculars

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial of all claims and causes of action triable before a jury.

Dated:  November 1, 2016

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:     /s/ *J. Noah Hagey*
J. Noah Hagey

Attorneys for Plaintiff OPTRONIC
TECHNOLOGIES, INC. d/b/a Orion
Telescopes & Binoculars