United States District Court<br>Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DANIEL HIGHTOWER, et al.,

Plaintiffs,

v.

CELESTRON ACQUISITION, LLC, et al.,

Defendants.

Case No.   5:20-cv-03639-EJD

**ORDER GRANTING IN PART AND DENYING DEFENDANTS' MOTIONS TO DISMISS; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE**

Re: Dkt. Nos. 115, 116, 134, 135

Plaintiff Daniel Hightower and a group of several indirect purchasers of consumer telescope products ("Plaintiffs" or "IPPs") brought this putative class action against Defendants (1) Synta Technology Corp. ("Synta Tech"), (2) Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta"), (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong Schmidt"), (4) Synta Canada International Enterprises Ltd. ("Synta Canada"), (5) Pacific Telescope Corp. ("Pacific Telescope"), (6) Olivon Manufacturing Group Ltd. ("Olivon Manufacturing"), (7) SW Technology Corp. ("SW"), (8) Celestron Acquisition, LLC ("Celestron"), (9) Olivon USA LLC ("Olivon USA"), (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson, and (13) Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny") (collectively, "Defendants") alleging antitrust violations arising out of a conspiracy to unlawfully monopolize and fix prices in the telescope market.

On November 6, 2020, IPPs filed an Amended Consolidated Class Action Complaint ("CCAC").  Dkt. No. 113.  On November 16, 2020, Defendants Celestron, SW, Olivon USA, Mr.

Anderson, and Mr. Lupica filed (1) a Motion to Strike Allegations in the CCAC ("Motion to Strike"), and (2) a Motion to Dismiss the CCAC pursuant to Federal Rule of Civil Procedure 12(b)(6) ("First Motion to Dismiss"). Dkt. Nos. 115, 116. The remaining Defendants later joined in the Motion to Strike, with the exception of Ningbo Sunny which has not appeared in this action.

On January 20, 2021, Defendants Shen, Suzhou Synta, Nantong Schmidt, Synta Tech, Olivon Manufacturing, and Pacific Telescope filed a Motion to Dismiss the CCAC ("Second Motion to Dismiss"), raising substantially the same arguments as the First Motion to Dismiss. Dkt. No. 134. On the same day, Defendant Synta Canada filed a separate Motion to Dismiss for Lack of Personal Jurisdiction (FRCP 12(b)(2)) and for Failure to State a Claim for Which Relief Can Be Granted (FRCP 12(b)(6)) ("Synta Canada Motion"). Dkt. No. 135. Following jurisdictional discovery, Synta Canada withdrew its motion as to personal jurisdiction. The remainder of the Synta Canada Motion raises substantially the same arguments as the First and Second Motions to Dismiss. The Court, therefore, considers all three motions to dismiss together.

The Court took all four motions under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART the Motions to Dismiss and GRANTS IN PART and DENIES IN PART the Motion to Strike.

## I.     BACKGROUND

The CCAC alleges that Synta Tech and its affiliates (collectively, "Synta" or "the Synta Entities")[1] participate in a long-running conspiracy with Ningbo Sunny and its affiliates (collectively, "the Ningbo Sunny Entities") to "unlawfully fix or stabilize prices, rig bids, and

---

[1] The Complaint regularly refers to "Synta," defined as Synta Tech, Suzhou Synta, Nantong Schmidt, Synta Canada, Pacific Telescope, Olivon Manufacturing, SW, Celestron, Olivon USA, Mr. Shen, Mr. Lupica, and Mr. Anderson. Defendants challenge the use of "Synta" and, as discussed further below, argue that such allegations do not adequately distinguish among corporate affiliates. In summarizing the allegations of the Complaint and without prejudging the arguments, the Court refers to Synta where no affiliate is specified.

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

2

United States District Court
Northern District of California

1    allocate the market and customers, and gain an unlawful monopoly in the United States in the

2    market for telescopes, causing the prices of telescopes to be raised above competitive levels."

3    CCAC ¶ 1.

4         Both the Synta Entities and the Ningbo Sunny Entities are vertically integrated corporate

5    families, consisting of a parent company (e.g., Synta Tech), a subsidiary responsible for

6    manufacturing consumer telescopes (e.g., Suzhou Synta) and various subsidiaries responsible for

7    distributing, marketing, and selling those telescopes around the world (e.g., Celestron).  *See*

8    *generally id.* ¶¶ 78-92.  The Synta Entities operate and hold themselves out as a "single, integrated

9    enterprise" and did generally did not distinguish among entities in internal or external interactions.

10   *Id.* ¶¶ 84-92.

11        The Synta Entities and Ningbo Sunny Entities effectively divided the telescope market by

12   agreeing that Synta would manufacture and supply higher-end telescopes, that Ningbo Sunny

13   would manufacture and supply lower-end telescopes, and that they would not compete.  *Id.* ¶ 111;

14   *see also id.* ¶ 131 (email from Synta's CEO Mr. Shen informing Ningbo Sunny's CEO Peter Ni

15   and Celestron's CEO Mr. Anderson that "[t]he best way in the future is to divide the products and

16   sell them into different markets to reduce conflicts").  By dividing the market in this way, Ningbo

17   Sunny and Synta together have controlled between 65% and 90% of the market for telescopes in

18   the United States since 2005.  *Id.* ¶¶ 101, 142, 122, 192.

19        This scheme began when Synta acquired Celestron, the largest distributor of telescopes in

20   the United States at that time.  *Id.* ¶¶ 109, 230.  At that time, Celestron's primary competitor was

21   Meade Instruments Corp. ("Meade"), a leading American telescope manufacturer and supplier.  *Id.*

22   ¶ 112.  When Meade was offered for sale in 2013, a smaller manufacturer of telescopes, Jinghua

23   Optical Co. Ltd. ("Jinghua"), made a bid to purchase it.  *Id.* ¶ 113.  Knowing that Jinghua's

24   purchase of Meade would have allowed Jinghua to more substantially compete in the market,

25   Ningbo Sunny and Synta conspired to prevent the acquisition.  *Id.* ¶¶ 113-114.  Because Synta

26   owned Celestron, a direct competitor of Meade, it could not purchase Meade directly.  Instead,

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE

United States District Court
Northern District of California

1    Ningbo Sunny's Mr. Ni, and Synta's Mr. Chen agreed that Ningbo Sunny would purchase Meade

2    with financial and other assistance from Synta.  *Id.*  In exchange for its financial assistance,

3    Ningbo Sunny offered Celestron equity in Meade, provided Celestron and Synta with access to

4    Meade's intellectual property rights, and shared its customers' data—including pricing data—with

5    Celestron and Synta, thus essentially eliminating competition between Celestron and Meade and

6    enabling price fixing by the two corporate families.  *Id.* ¶ 116.

7        Ningbo Sunny concealed Synta's and Celestron's involvement in the acquisition of Meade

8    from the Federal Trade Commission ("FTC").  *Id.*  In 2013, when the FTC inquired into whether

9    Mr. Shen (Synta) was involved in any way in the deal, Ningbo Sunny's outside counsel

10   responded: "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . .

11   ., David Shen ha[d] no role in the proposed acquisition of Meade."  *Id.* ¶ 128.  Ningbo Sunny also

12   failed to disclose Synta's or Celestron's involvement in the acquisition in its public filings with the

13   Securities and Exchange Commission ("SEC").  *Id.* ¶ 210.

14       After the acquisition, Celestron was able to acquire key business information about its

15   competitors from Ningbo Sunny, which manufactured and sold telescopes to those competitors.

16   *Id.* ¶ 133.  For example, in 2015, Ningbo Sunny provided Celestron CEO Corey Lee with detailed

17   data for several years of recent orders from Optronic Technologies, Inc. ("Orion"), an independent

18   telescope retailer.  *Id.*  By sharing this confidential business information, Ningbo Sunny and Synta

19   prevented independent distributors from fairly competing and raised already-high barriers to entry

20   in the market.  *Id.* ¶¶ 145-149, 189.

21       On November 1, 2016, Orion filed suit in this District against its competitors Ningbo

22   Sunny, Meade, and affiliate Sunny Optics, Inc. ("the *Orion* Action").  *See Optronic Techs. Inc. v.*

23   *Ningbo Sunny et al.*, No. 5:16-cv-06370-EJD (N.D. Cal.).  The *Orion* Action involved largely the

24   same causes of action and factual allegations described in the CCAC.  After a six-week trial in the

25   *Orion* Action, a jury found Ningbo Sunny liable for violations of the Sherman Act and Clayton

26   Act.  *Optronic Techs. Inc. v. Ningbo Sunny et al.*, No. 5:16-cv-06370-EJD, Dkt. No. 501 (N.D.

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE

United States District Court
Northern District of California

Cal. Nov. 26, 2019).  While the *Orion* Action is relevant to the extent it affects the IPPs' knowledge of the underlying factual allegations, none of the moving Defendants were parties to the Orion Action, and the holdings of that case are not binding on this one.

Following the *Orion* Action trial, several indirect purchasers from multiple states filed complaints, which were consolidated into the present action.  Dkt. Nos. 55, 56, 98, 103.  On October 19, 2020, the IPPs filed a consolidated complaint.  Dkt. No. 105.  Shortly thereafter, IPPs filed the amended CCAC, which is the operative complaint and the subject of the present Motions to Dismiss and to Strike.  Dkt. No. 113.  A group of direct purchasers ("DPPs") filed a separate related action against largely the same defendants, which is currently pending before this Court ("the DPP Action").  *Spectrum Scientifics, LLC et al v. Celestron Acquis., LLC et al*, 5:20-cv-03642-EJD (N.D. Cal.).  Defendants filed similar motions to dismiss in the DPP Action.

Plaintiffs in this case seek to represent several classes of indirect telescope purchasers, including a proposed nationwide class seeking only equitable relief ("Nationwide Injunctive Class"), a proposed class consisting of purchasers from one of 33 states seeking damages under California law ("Damages Class"), and 33 state-specific proposed classes seeking damages under relevant state laws ("State Damages Classes").[2]  CCAC ¶¶ 161-184.  Plaintiffs assert four causes of action on behalf of the Nationwide Injunctive Class: (1) restraint of trade in violation of § 1 of the Sherman Act (15 U.S.C. § 1); (2) monopolization in violation of § 2 of the Sherman Act (15 U.S.C. § 2); (3) attempted monopolization in violation of § 2 of the Sherman Act (15 U.S.C. § 2); and (4) violation of § 7 of the Clayton Act (15 U.S.C. § 18).  On behalf of the Damages Class, or alternatively, the State Damages Class, Plaintiffs further assert claims for: (5) violation of state antitrust laws in 25 states; (6) violation of state consumer protection laws in 14 states; and (7)

---

[2] The 33 states are: Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

United States District Court
Northern District of California

unjust enrichment under the laws of 33 states.

## II.     LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully," the plausibility standard "is not akin to a probability requirement."  *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court need not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).  The Court may also "look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment.  *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir.1995).

## III.     MOTION TO DISMISS

Defendants seek to dismiss the CCAC on three grounds: (1) all of Plaintiffs' claims are barred by the doctrine of laches or the applicable statutes of limitation; (2) Plaintiffs fail to raise sufficient allegations as to several named defendants; and (3) Plaintiffs fail to sufficiently allege claims under the Sherman Act, the Clayton Act, or the relevant state laws.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.    Laches (First, Second, Third, and Fourth Causes of Action)

Plaintiffs seek only injunctive relief for their Sherman Act and Clayton Act claims.  Where a plaintiff seeks injunctive relief for an antitrust violation, "'there is no statute of limitations' per se." *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-CV-07651-EMC, 2020 WL 6390499, at *20 (N.D. Cal. July 15, 2020) (quoting *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085–86 (9th Cir. 2014). Rather, such claims are "subject to the equitable defense of laches."  *Oliver*, 751 F.3d at 1085. Under the doctrine of laches, "a suit seeking equitable relief will be barred if a party has inexcusably delayed pursuing his claim and his adversary has been prejudiced as a result."  *Id.* Thus, "in computing the laches period," courts use the Clayton Act's four-year statute of limitations as a "guideline."  *Id.* at 1086 ("[I]n applying laches, we look to the same legal rules that animate the four-year statute of limitations under [the Clayton Act § 4]."); *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014).  "Ordinarily, [a] cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act."  *Oliver*, 751 F.3d at 1086 (internal quotation marks omitted); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) ("An antitrust cause of action generally accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (internal quotation marks omitted).

Defendants argue that the claims for injunctive relief claims are barred because Plaintiffs do not allege any wrongful acts within four years of when this action was first filed on June 1, 2020.  Defendants further argue that Plaintiffs' delay in bringing suit has prejudiced Defendants because many key documents and witnesses are likely now unavailable, difficult to find, or outside of the Court's jurisdiction.  Plaintiffs do not dispute that there are no specific allegations of conspiratorial conduct after 2015, but argue that the CCAC nonetheless sufficiently alleges a "continuing conspiracy" such that allegations of ongoing sales of price-fixed products are sufficient to restart the statute of limitations or laches period.

"In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendant[ ] a cause of action accrues to him to recover the

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

damages caused by that act." *Oliver*, 751 F.3d at 1086 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). "[A]s to those damages, the statute of limitations runs from the commission of the act." *Id.* To restart the statute of limitations, there must be a new overt act that: (1) is "new and independent . . . [and] not merely a reaffirmation of a previous act," and (2) "inflict[s] new and accumulating injury on the plaintiff." *Id.* (citing *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). "[T]he Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act." *Id.*

Plaintiffs argue that they have sufficiently alleged a continuing conspiracy, pointing to allegations asserting that (1) the conspiracy occurred "during the Class Period," which is defined as January 1, 2005 through the present, or (2) Defendants have been engaged in unlawful activity "since" a certain time, implying that they are still engaging in that activity. *See, e.g.*, CCAC ¶ 4 (alleging that consumers paid inflated prices "during the period from and including January 1, 2005 *through the present*"); *id.* ¶ 156 ("Neither Celestron nor Meade have seriously competed *since* Ningbo Sunny's acquisition of Meade"); *id.* ¶ 192 ("Ningbo Sunny and Synta have collectively controlled at least 65 percent of the global telescope market *since* 2012") (emphases added). The Court agrees that at the pleading stage, these allegations are sufficient to plausibly plead continuing violations.

Defendants argue that the Court should not interpret *Oliver* to mean that "each sale of a price-fixed product constitutes an overt act that resets the underlying statute of limitations." Dkt. No. 147, Reply in Supp. of Mot. to Dismiss IPP Consol. Compl. ("Second Reply"), at 4. But that is precisely what the Ninth Circuit held. *Oliver*, 751 F.3d at 1086 ("[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."); *see also In re Cal. Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *19 (N.D. Cal. Apr. 13, 2020) (relying on *Oliver* in

1    holding that "each sale of a bail bond that was artificially inflated as a result of the alleged

2    conspiracy thus constitutes an overt act restarting the statute of limitations").

3            Defendants cite to *In re Packaged Seafood Products Antitrust Litigation*, 242 F. Supp. 3d

4    1033 (S.D. Cal. 2017), in which the Southern District of California declined to extend *Oliver*'s

5    reasoning to a damages claim under the Sherman Act.  The Court does not find that case

6    persuasive in the context of Plaintiffs' claims for injunctive relief.

7            Because Plaintiffs have sufficiently alleged a continuing conspiracy, the Court finds that

8    the doctrine of laches does not bar Plaintiffs' injunctive relief claims.  *In re Lithium Ion Batteries*

9    *Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014)

10   (denying motion to dismiss later portion of alleged class period despite "sparse" allegations,

11   because ongoing conspiracy remained plausible); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-

12   02311, 2017 WL 7689654, at *2 (E.D. Mich. May 5, 2017) (statute of limitations did not preclude

13   2016 antitrust claims "in spite of the lack of pleadings addressing specific conspiratorial acts after

14   July 2011" because "it remains plausible that the conspiracy continued after this date" and the

15   complaint did not "limit the time period" to that date).

16        **B.    Statutes of Limitations (Fifth, Sixth, Seventh Causes of Action)**

17           Defendants next argue that Plaintiffs' claims under various state antitrust and consumer

18   protection statutes are barred under the applicable statutes of limitations.  Except for three asserted

19   state law claims (under Maine, Vermont, and Wisconsin law), the statute of limitations for each

20   state antitrust claim is either three or four years.  *See* First Mot. to Dismiss at 8–10 (providing a

21   chart of statutes of limitations).  Except for four asserted state law consumer protection claims

22   (under Arkansas, Missouri, Rhode Island, and Vermont law), the statute of limitations for each

23   claim is two to four years.  *Id.*

24           As discussed above, the CCAC does not raise any allegations of specific unlawful acts in

25   the four years prior to filing.  Plaintiffs argue that because they allege a continuing conspiracy,

26   each time a price-fixed product was purchased, the applicable statute of limitations reset.  As

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs recognize, however, a continuing conspiracy does not entitle Plaintiffs to recover for all past injuries; rather, each new price-fixed sale triggers a new limitations period for Plaintiffs to recover "the damages caused by that act." *Zenith Radio Corp.*, 401 U.S. at 338–39; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *In re Packaged Seafood*, 242 F. Supp. 3d at 1098 n.24 ("It does not therefore necessarily follow that each new injury constitutes Sherman-Act-compensable harm that—when timely litigated—provides an avenue of redress for past, non-timely-pursued harms."). Thus, Plaintiffs' continuing conspiracy allegations only entitle them to damages for misconduct throughout the last four years.

To state claims for damages arising out of conduct that occurred before June 1, 2016, Plaintiffs must establish that the applicable statutes of limitations were tolled. *Hinton v. Pac. Enterprises*, 5 F.3d 391, 395 (9th Cir. 1993) ("The burden of alleging facts which would give rise to tolling falls upon the plaintiff."). However, "because resolving tolling disputes is a fact-intensive process, statute of limitations defenses 'may not be raised by motion to dismiss' unless they include 'no disputed issues of fact.'" *In re Cal. Bail Bond*, 2020 WL 3041316, at *17 (citing *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984)).

Plaintiffs argue that they have sufficiently pleaded allegations that their claims are timely under two doctrines of equitable tolling: (1) fraudulent concealment, and (2) the discovery rule.

### 1. Fraudulent concealment

To toll the statute of limitations under a theory of fraudulent concealment, a plaintiff "must do more than show that it was ignorant of its cause of action. *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re Cathode Ray Tube II*"), No. C-07-5944 JST, 2016 WL 8669891, at *4 (N.D. Cal. Aug. 22, 2016). A plaintiff asserting fraudulent concealment must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise to its claim; and (3) the plaintiff acted diligently in

1   trying to uncover the facts giving rise to its claim.  *In re Animation Workers Antitrust Litig.*, 123

2   F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d

3   1055, 1060 (9th Cir. 2012)).  Allegations of fraudulent concealment must be pled with

4   particularity; conclusory statements are insufficient.  *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858

5   F.2d 499, 502 (9th Cir. 1988); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981,

6   992 (N.D. Cal. 2020) (citing *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885 (N.D. Cal. 2015)).

### a.      Affirmative acts

8   With respect to the first element, Plaintiffs argue that they sufficiently allege several

9   affirmative acts that Defendants took to mislead Plaintiffs.  Plaintiffs broadly allege "[o]n

10   information and belief, Defendants met and communicated in secret and agreed to keep the facts

11   about [their] collusive conduct from being discovered by any member of the public or by

12   distributors, retailers, and other direct purchasers with whom they did business."  CCAC ¶ 211.

13   Specifically, they point to the following factual allegations:

- "Mr. Shen also owned 26 percent of Ningbo Sunny until 2005, at which time he transferred his shares to his sister-in-law" before Synta's acquisition of Celestron. *Id.* ¶ 74.

- Mr. Anderson wrote in an undated email that "[s]ince July Celestron has made $10 million in anticipated payments to Ningbo Sunny.  This represents a majority of the monies that will be paid to Ningbo Sunny this year.  If Celestron continues with this payment pattern it will need to disclose this arrangement to its auditors and its bank.  Though we see this as temporary an outside group (such as the bank or auditing firm) will interpret it as a significant change due to the fact that the majority of payments for the last 7 months were made in anticipation with no discernable benefit to Celestron." *Id.* ¶ 207.

- "[A]s part of Synta and Ningbo Sunny's collusion regarding Meade, Celestron took equity in Meade, which is memorialized in Defendants and Co-Conspirators' shadow books." *Id.* ¶ 209.

- "When the FTC inquired into whether Synta's Mr. Shen was involved in any way in Ningbo Sunny's Meade acquisition, . . . the FTC was advised by the law firm that 'except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade' on August 22, 2013.  This statement was false given that Ningbo Sunny's Mr. Ni and

United States District Court
Northern District of California

Synta's Mr. Shen had agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition." *Id.* ¶ 128 (emphasis original).

- "Defendants and Co-Conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Mr. Shen, Synta, and Celestron's involvement and role in the Meade acquisition." *Id.* ¶ 210.

As an initial matter, the Court notes that the only allegation of fraudulent concealment dating back to the beginning of the proposed class period is that Mr. Shen transferred shares in Ningbo Sunny to his sister-in-law before Synta acquired Celestron.  The inference Plaintiffs ask this Court to make is that Mr. Shen divested his interest in Ningbo Sunny so as to not raise any antitrust concerns at the FTC about Synta's acquisition of Ningbo Sunny's competitor.  Even accepting this allegation and inference as true, the Court declines to make the additional necessary inference that there was something nefarious in Mr. Shen's transfer of interest.  Indeed, merging or acquiring companies regularly divest assets in order to decrease relevant market share in anticipation of antitrust concerns.  The fact that Mr. Shen transferred the interest to his sister-in-law does not, without more, plausibly suggest that he was fraudulently concealing misconduct.

Moreover, nothing about Synta's acquisition of Celestron itself suggests fraudulent concealment.  The transaction was public, and competitors contemporaneously recognized its potential impact on the market.  *See* Dkt. No. 117, Request for Judicial Notice, Exs. 3-6.[3]  The

---

[3] Defendants request judicial notice of three news articles and Form 10-K Meade filed with the Securities and Exchange Commission ("SEC") as evidence of what information was in the public at the time of the Celestron acquisition.  "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1061 (N.D. Cal. 2016) (taking judicial notice of newspaper article).  Thus, the Court finds it appropriate to take judicial notice of the articles only as evidence that the Celestron acquisition was public knowledge, not for the truth of any facts therein.  Likewise, the Court takes judicial notice of the documents filed with the SEC.  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 863 (N.D. Cal. 2004) (finding that "the court is authorized to take judicial notice of documents filed with the SEC.").

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

United States District Court
Northern District of California

1   remainder of the allegations regarding fraudulent concealment involve the alleged conspiracy to

2   acquire Meade, which began in 2013.  Therefore, the Court finds that Plaintiffs failed to raise any

3   allegations of fraudulent concealment before 2013.

4         The allegations that Defendants avoided disclosing payments to auditors or banks,

5   maintained "shadow books," made misrepresentations to the FTC, and failed to disclose

6   misconduct to the SEC present a closer question.  Although the affirmative acts necessary to show

7   fraudulent concealment "can be integral to the underlying conspiracy itself . . . passive

8   concealment is not enough." *In re Cathode Ray Tube II*, 2016 WL 8669891, at *4.  "Passive

9   concealment of information is not enough to toll the statute of limitations, unless the defendant

10  had a fiduciary duty to disclose information to the plaintiff." *Reveal Chat*, 471 F. Supp. 3d at

11  992–93.  "An affirmative act of denial . . . is enough if the circumstances make the plaintiff's

12  reliance on the denial reasonable." *Id.*  "[T]he line between active and passive concealment,"

13  however, "is very fine indeed." *In re Cathode Ray Tube II*, 2016 WL 8669891, at *4.

14        By these standards, Defendants' failure to disclose details of the Meade transaction in

15  public SEC filings is merely passive concealment, not an affirmative act.  *See Volk v. D.A.*

16  *Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) ("[A]ppellees passively concealed the

17  reports by not disclosing them to the investors.  In such situations, the federal tolling doctrine does

18  not apply."); *Reveal Chat*, 471 F. Supp. 3d at 992–93 ("[T]he mere failure to own up to illegal

19  conduct in response to an inquiry about whether the defendant engaged in illegal antitrust activity

20  is not sufficient for fraudulent concealment, and to find otherwise would effectively nullify the

21  statute of limitations in these cases.") (internal quotation marks omitted).

22        Ningbo Sunny's affirmative misrepresentation to the FTC regarding Mr. Shen's

23  involvement, however, implies more than mere passive concealment.  It is plausible that this

24  affirmative misrepresentation to the FTC was calculated to avoid government scrutiny of the

25  transaction and thereby to hide the alleged antitrust violations from the public.  The Court finds

26  that this allegation constitutes an affirmative act to mislead Plaintiffs.  Similarly, the fact that

27

28  Case No.: 5:20-cv-03639-EJD
    ORDER GRANTING IN PART MOTS. TO DISMISS
    AND MOT. TO STRIKE
                              13

United States District Court
Northern District of California

1   Celestron took equity in its competitor Meade but only maintained records of that transaction in

2   "shadow books," and the fact that Celestron allegedly structured its payments to Ningbo Sunny to

3   avoid raising red flags with its bank or auditors constitute affirmatively misleading conduct

4   "above and beyond" the alleged conspiracy itself. *In re Animation Workers*, 87 F. Supp. 3d at

5   1215 (N.D. Cal. 2015) (citing *Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2006)).

6         Thus, the Court finds that Plaintiffs have sufficiently alleged affirmative acts to support the

7   first element of fraudulent concealment.

### b.    Actual or constructive knowledge

9         Plaintiffs allege that they "and the members of the Classes had no knowledge of the

10   combination or conspiracy alleged." CCAC ¶ 200. Plaintiffs in this case are indirect purchasers—

11   in other words, consumers. They allege that they "had no direct contact or interaction with

12   Defendants and had no means from which they could have discovered" the conspiracy before

13   details of the Orion Action became public in 2019. *Id.* ¶ 201. Defendants do not raise any

14   arguments to the contrary. Thus, the Court finds that Plaintiffs sufficiently alleged that they did

15   not actually or constructively know about the alleged conspiracy.

### c.    Diligence

17         Defendants argue that Plaintiffs failed to plead specific "acts of diligence." First Mot. to

18   Dismiss at 14. Plaintiffs contend that diligent inquiry is only required "where facts exist that

19   would excite the inquiry of a reasonable person." *Reveal Chat*, 471 F. Supp. 3d at 994. The Court

20   agrees with Plaintiffs. *Conmar Corp.*, 858 F.2d at 504. In the absence of any allegations in the

21   CCAC that would raise the suspicions of a reasonable consumer, the Court finds that Plaintiffs

22   were not required to plead specific acts of diligence. *See In re Animation Workers*, 123 F. Supp.

23   3d at 1205 (noting "courts have been hesitant to dismiss an otherwise fraudulently concealed

24   antitrust claim for failure to sufficiently allege due diligence, because questions of inquiry notice

25   are necessarily bound up with the facts of the case") (internal quotation marks omitted).

26         Accordingly, the Court finds that Plaintiffs have plausibly alleged that Defendants'

United States District Court
Northern District of California

1    fraudulent concealment tolled the statutes of limitations as to claims arising out of conduct in 2013

2    or later.

3                        **2.        Discovery rule**

4            Plaintiffs argue that several states employ the "discovery rule" in determining when the

5    statutes of limitations begin to run on state antitrust or state consumer protection claims.  Because

6    the Court found that fraudulent concealment tolls the statutes of limitations for Plaintiffs' claims

7    from 2013 onward, the Court considers only whether the discovery rule applies to revive

8    Plaintiffs' claims based on conduct before 2013.

9            Although a claim ordinarily accrues on the date of a plaintiff's injury, "under the discovery

10   rule 'accrual is postponed until the plaintiff either discovers or has reason to discover,' by exercise

11   of reasonable diligence, all the elements of a cause of action."  *In re Packaged Seafood*, 242 F.

12   Supp. 3d at 1099 (citing *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th

13   Cir. 2008)).  "The rule requires a plaintiff to inquire into the existence of a cause of action when

14   the plaintiff has access to information that would prompt a reasonable party to do so."  *Fenerjian*

15   *v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1077 (N.D. Cal. 2014) (citing *Aloe Vera of Am., Inc. v.*

16   *United States*, 699 F.3d 1153, 1159 (9th Cir. 2012)).

17           As an initial matter, the discovery rule does not apply in all states.  Rather, both parties

18   appear to acknowledge that the rule only applies in Mississippi, Nebraska, Nevada, New Mexico,

19   North Carolina, North Dakota, Oregon, Utah, Vermont, West Virginia, and Wisconsin.  *In re*

20   *Packaged Seafood*, 242 F. Supp. 3d at 1104, 1100 n.26 (analyzing the state-by-state application of

21   the discovery rule); *Raddin v. Manchester Educ. Found., Inc.*, 175 So. 3d 1243, 1249 (Miss. 2015)

22   (applying a limited discovery rule in Mississippi).

23           Plaintiffs generally allege that they could not have detected the alleged conspiracy until

24   September 2019 at the earliest, when evidence of Defendants' conspiracy was first made public in

25   the Orion Action.  CCAC ¶ 200.  Thus, Plaintiffs argue that their claims, arising out of conduct

26   alleged to have occurred starting in 2005, did not accrue until 2019.

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE

                                                   15

United States District Court
Northern District of California

United States District Court
Northern District of California

As noted above, the only pre-2013 conduct alleged in the CCAC is Synta's acquisition of Celestron in 2005.  CCAC ¶ 109.  Defendants argue that where the discovery rule applies, the state law claims are still time-barred because the 2005 transaction was "indisputably public."  Second Mot. to Dismiss at 10.  Even assuming that the transaction was public, that alone does not necessarily imply that Plaintiffs had reason to know of their potential claims.  *Fenerjian*, 72 F. Supp. 3d at 1078 (rejecting argument that "newspaper articles . . . about the FTC's investigation gave Plaintiffs sufficient reason in 2008 to inquire into the existence of a conspiracy to raise prices"); *In re Animation Workers*, 123 F. Supp. 3d at 1204 (finding "widely read publications" reporting a DOJ investigation of "high tech firms" insufficient to show that plaintiffs artists and engineers of said firms should have been on inquiry notice of their claims).  Plaintiffs in this case are consumers.  To find that consumers were on inquiry notice of antitrust violations solely because an acquisition in the telescope market was made public would be to hold consumers to the FTC's level of sophistication.

Accordingly, the Court finds that the allegations regarding the acquisition of Celestron in 2005 are insufficient to establish that Plaintiffs should have discovered the alleged conspiracy.  To the extent Plaintiffs' claims are based on pre-2013 conduct, such claims did not accrue until Plaintiffs' alleged discovery in 2019.

### C.    Individualized Allegations

Defendants argue that Plaintiffs fail to state any valid claims against the majority of Synta affiliates and certain individual defendants because they do not allege any misconduct or participation in the conspiracy specific to each defendant.

"Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations; instead they require plaintiffs 'to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'"  *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re Cathode Ray Tube I*"), 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010).  An antitrust complaint "must allege that each individual defendant joined

Case No.: 5:20-cv-03639-EJD
ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

1   the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an

2   agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel)*

3   *Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).

4          In the First Motion to Dismiss, Defendants challenge the allegations against SW

5   Technology, Olivon USA, Mr. Anderson, and Mr. Lupica.  In the Second Motion to Dismiss,

6   Defendants challenge the allegations against Pacific Telescope, Nantong Schmidt, Olivon

7   Manufacturing, and Suzhou Synta.  In its separate motion, Synta Canada challenges the

8   allegations against it.  The allegations against all of the corporate entities are substantially similar,

9   and the arguments both parties raise regarding those allegations are identical.

10          As to each corporate entity, Plaintiffs generally allege that the entity "directly and/or

11   through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed,

12   and/or sold telescopes that were sold and purchased throughout the United States, including in this

13   District" and that David Shen owns and/or controls the entity.  CCAC ¶¶ 52-59.  Defendants argue

14   that these allegations are insufficient as a matter of law because they do not imply any wrongdoing

15   or indicate each defendant's role in the alleged conspiracy.

16          Plaintiffs argue that the CCAC alleges that these entities are part of the Synta corporate

17   family, which "operates not as separate corporate entities but as a single enterprise." *Id.* ¶ 84.  The

18   CCAC further alleges that the "entire" Synta corporate family was "represented in meetings and

19   discussions" with the Ningbo Sunny corporate family "and was party to the agreements reached in

20   those meetings." *Id.* ¶ 88.  The "[p]articipants in the conspiratorial meetings . . . reported these

21   meetings and discussions to their respective corporate families." *Id.*  "Further, because of their

22   generic uses of Defendants' and Co-Conspirators' names, individual participants in the

23   conspiratorial meetings and discussions did not always know the specific corporate affiliation of

24   their counterparts nor did they distinguish among entities within the respective corporate

25   families." *Id.*  Indeed, "Defendants and Co-Conspirators knew the individuals at the conspiratorial

26   meetings represented their entire respective corporate family." *Id.*  Defendants argue that these

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE
     17

United States District Court
Northern District of California

allegations are insufficient when made against "Defendants" or "Synta" generally, without distinguishing any particular misconduct or participation in the conspiracy by each of the entities.

Both parties rely on *Jones v. Micron Technology Inc.*, where the defendants argued that the "grouped" pleadings in the complaint failed to allege each defendant's participation in the conspiracy. 400 F. Supp. 3d 897, 922–23 (N.D. Cal. 2019). The complaint in *Jones* alleged "the relationships between each of the individual defendants," "to which corporate family each individual defendant belongs," and "that individual corporate participants and their agents: (i) did not always know the corporate affiliation of their counterparts; (ii) acted on behalf of every company in their family; and (iii) entered into agreements on behalf of their respective corporate families." *Id.* The court held that those allegations were sufficient to please individual entity roles in a purported conspiracy:

> In [*In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 928–31 (N.D. Cal. 2015)], for example, the district court held that allegations of individual defendant participation were sufficient where the complaint alleged the corporate structure of the various defendants, that agents of the defendants acted on behalf of corporate families, and that co-conspirators did not distinguish between the specific corporate affiliations of other co-conspirators. *Id.* at 928–29. In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019–22 (N.D. Cal. 2010), the court held that referring to a corporate family by a single name was acceptable where the complaint defined corporate family members' relationships to each other, alleged that employees engaged in conspiratorial acts on behalf of members of corporate families, alleged that participants did not always know the corporate affiliations of their counterparts and did not distinguish between entities of a corporate family, and alleged that participants entered into agreements on behalf of their respective corporate families.

*Id.* at 923. The allegations in this case are just like the allegations in *Jones*, *In re Capacitors*, and *In re Cathode Ray Tube I*. *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184–85 (N.D. Cal. 2009) (finding allegations sufficient where "[t]he complaints allege that the conspiracy was implemented by subsidiaries and distributors within a corporate family, [] that 'individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families.' . . . that 'the individual participants in

*United States District Court*
*Northern District of California*

conspiratorial meetings and discussions did not always know the corporate affiliation of their

counterparts, nor did they distinguish between the entities within a corporate family").

Synta Canada further relies on *Arandell Corporation v. Centerpoint Energy Services, Inc.*,

in which the Ninth Circuit interpreted *Copperweld Corporation v. Independence Tube*

*Corporation*, 467 U.S. 752 (1984) as follows:

> If "a parent and a wholly owned subsidiary *always* have a 'unity of
> purpose'" and act as a "single enterprise" whenever they engage in
> "coordinated activity," then a subsidiary such as [defendant] as a
> matter of law *cannot* innocently advance an anticompetitive scheme
> . . . for a legitimate business purpose, while its parent and sister
> companies purposely advance the very same scheme . . . for an
> illegal, anticompetitive purpose.
> . . .
> In sum, *Copperweld* supports the following rule: A wholly owned
> subsidiary that engages in coordinated activity in furtherance of the
> anticompetitive scheme of its parent and/or commonly owned
> affiliates is deemed to engage in such coordinated activity with the
> purposes of the single "economic unit" of which it is a part.

900 F.3d 623, 630–32 (9th Cir. 2018) (emphases original).  While *Arandell* concerned summary

judgment and not a motion to dismiss, the Court nevertheless finds it instructive.  Defendants do

not address *Arandell* in their reply brief, relying instead on case law that predates it.  *See* Dkt. No.

176, Reply in Supp. of Synta Canada Mot.

Although Plaintiffs have not alleged specific facts tending to prove that each entity, for

example, received reports about "conspiratorial meetings" or was "party to agreements reach in

those meetings," Plaintiffs need not prove their case at this stage.  Accepting the allegations about

the Synta corporate family as true and taking them as a whole in the context of the full CCAC, the

Court finds that such allegations serve as sufficient allegations against Pacific Telescope, Nantong

Schmidt, Suzhou Synta, Olivon Manufacturing, and Synta Canada.

As to Mr. Anderson and Mr. Lupica, Celestron's former CEOs, Defendants argue that

neither may be held liable for antitrust violations simply because he was the CEO at the time.

First Mot. to Dismiss at 17.  To state a claim against an individual, Plaintiffs are required to plead

that the individuals actively participated in "inherently wrongful conduct."  *Murphy Tugboat Co.*

United States District Court
Northern District of California

1   *v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 853 (N.D. Cal. 1979), *aff'd sub nom.*

2   *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981) (emphasis added) (describing

3   personal liability for officers, directors, and agents who actively participate in "inherently

4   wrongful conduct" constituting antitrust violations by the corporation); *see also Coastal Abstract*

5   *Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (a corporate officer who is

6   an "actual participant in the tort" may be personally liable).

7          The allegations in the CCAC as to Mr. Anderson include:

8   • "Regarding the horizontal competitors' conspiracy to acquire Meade for Ningbo
        Sunny, Ningbo Sunny's Mr. Ni confirmed to Celestron's then-CEO Mr. David
9        Anderson and directors, Mr. Shen, Mr. Huen, Mr. Chen, and Ms. Sylvia Shen, that
        Ningbo Sunny would purchase Meade to prevent JOC (Jinghua) from doing so per
10       the parties' discussion and indicated that Celestron and Synta should provide the
        financial support to Ningbo Sunny." CCAC ¶ 124. Mr. Ni addresses the letter to
11       Mr. Anderson, and refers to him personally throughout (e.g., "As you[] mention,
        the $10 million[] that you support us is included the payment of goods" and "I
12       discussed with you about the case of purchasing meade in USA."). *Id.*

13  • "A California law firm represented Ningbo Sunny in the acquisition of Meade.
14       According to its engagement letter, however, the law firm was required to take
        instructions from Synta's Mr. Shen and his executives, including Celestron's Joe
15       Lupica and Dave Anderson. Messrs. Lupica and Anderson helped Sheppard Mullin
16       negotiate and structure the transaction and instructed it to keep Messrs. Shen and
        Ni updated. This is not the kind of arrangement that would occur amongst normal
17       horizontal competitors." *Id.* ¶ 126.

18  • "Meade's then Vice-President of Sales Victor Aniceto wrote to then-Meade CEO
19       Joe Lupica, 'Mr. Ni. . . . doesn't want to disrupt Synta business. However, this
20       promo will not be disruptive to Celestron business.'" *Id.* ¶ 90.

21  • "In a June 13, 2014 email, Synta's Mr. Shen informed Ningbo Sunny's Mr. Ni and
22       Celestron's David Anderson, 'The best way in the future is to divide the products
        and sell them into different markets to reduce conflicts.'" *Id.* ¶ 131.

23  • "Synta and Ningbo Sunny attempted to conceal the existence of their transactions
24       in connection with Ningbo Sunny's acquisition of Meade. David Anderson
        revealed in an email recently disclosed in pending litigation that "Since July
25       Celestron has made $10 million in anticipated payments to Ningbo Sunny. This
        represents a majority of the monies that will be paid to Ningbo Sunny this year. If
26       Celestron continues with this payment pattern it will need to disclose this
        arrangement to its auditors and its bank. Though we see this as temporary an

27
    ORDER GRANTING IN PART MOTS. TO DISMISS
28  AND MOT. TO STRIKE

outside group (such as the bank or auditing firm) will interpret it as a significant change due to the fact that the majority of payments for the last 7 months were made in anticipation with no discernable benefit to Celestron." *Id.* ¶ 207.

Defendants ignore all but the last of these allegations in their moving papers. First Mot. to Dismiss at 18 ("The only specific conduct alleged by Anderson is limited to a single email exchange in connection with the 2013 Meade acquisition.").

The additional allegations as to Mr. Lupica include:

- "Defendant Joseph Lupica is Celestron's former CEO. Through the collusive arrangements of Defendants and Co-Conspirators, he became CEO of Meade Instrument Corp. ('Meade')—Celestron's main competitor. . . . He personally participated in the conspiracy alleged herein. He began replacing Meade's management with Celestron's officers, directors, employees, and/or agents, including Celestron's Vice President of Sales, Victor Aniceto, who was hired as Meade's Vice President of Sales. . . . Mr. Lupica has admitted that Ningbo Sunny could not have acquired Meade but for the collusive assistance it received from Synta Corporate Defendants." CCAC ¶ 61.

- "Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email to Sunny Optics and Meade, 'On the other hand if we take advantage of the strong relationships among Ningbo Sunny, Synta, Celestron and Meade (under Peter's ownership) we can quickly turn the company around and the four companies can dominate the telescope industry.'" *Id.* ¶ 91 (emphasis removed).

The Court finds that Plaintiffs have alleged sufficient facts concerning Messrs. Anderson and Lupica's individual roles in the alleged conspiracy. The CCAC suggests that Mr. Anderson was directly involved in negotiating Celestron's role in Ningbo Sunny's 2013 acquisition of Meade (*id.* ¶ 124), that he was aware of and approved of Celestron's payments to Ningbo Sunny (*id.* ¶ 207), and that he was aware of Mr. Ni's desire to "divide the products" (*id.* ¶ 131). Taking these allegations as true, the Court finds that they plausibly allege Mr. Anderson's involvement in the alleged conspiracy.

Similarly, Mr. Lupica was involved in advising Ningbo Sunny's legal team on the acquisition of Meade and is alleged to have become Meade's CEO following Ningbo Sunny's acquisition of Meade. He appears on a number of communications in which the conspiracy is

United States District Court
Northern District of California

United States District Court
Northern District of California

1   referenced.  Again, taking these allegations as true, the Court finds it plausible that Mr. Lupica

2   was individually involved in the alleged conspiracy based on the allegations in the CCAC.

3          Thus, the Motions to Dismiss specific corporate entities and individuals from the case is

4   DENIED.

5          **D.      Sherman Act § 1 Claim**

6          Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of

7   trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

8   with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  A plaintiff asserting a claim under

9   § 1 must plead: (1) a contract, combination or conspiracy among two or more persons or distinct

10  business entities (2) which is intended to restrain or harm trade (3) which actually injures

11  competition, and (4) harm to the plaintiff from the anticompetitive conduct.  *Name.Space, Inc. v.*

12  *Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quoting

13  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)).  But "[b]ecause § 1 . . .

14  does not prohibit all unreasonable restraints of trade but only restraints effected by a contract,

15  combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct

16  stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at

17  553.

18         Defendants argue first that Plaintiffs fail to allege which Defendants reached what

19  agreements.  The Court disagrees.  The CCAC raises numerous allegations that plausibly suggest a

20  tacit or express agreement to restrain trade.  *See, e.g.*, CCAC ¶ 78 ("When Defendants reached

21  agreement on fixing or stabilizing prices, rigging bids, or allocating the market of telescopes—

22  whether as a result of formal or informal meetings or discussions arranged to implement or

23  enforce cartel purposes and agreements—Defendants and Co-Conspirators meant for their

24  collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive

25  efforts regardless of where they were sold."); *id.* ¶ 131 (alleging that Synta's Mr. Shen informed

26  Ningbo Sunny's Mr. Ni and Celestron's David Anderson, "The best way in the future is to divide

27

28  Case No.: 5:20-cv-03639-EJD
    ORDER GRANTING IN PART MOTS. TO DISMISS
    AND MOT. TO STRIKE

1    the products and sell them into different markets to reduce conflicts"); *id.* ¶ 136 (alleging that

2    Ningbo Sunny's Mr. Chiu also explained to Synta's Ms. Sylvia Shen that Ningbo Sunny "will take

3    prompt action to avoid conflict in the astronomical market," including "abandoning the small

4    OEM customers so as to protect big customers"). Thus, the Court finds that Plaintiffs allege

5    "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal

6    agreement." *Twombly*, 550 U.S. at 556; *see also In re Cathode Ray Tube I*, 738 F. Supp. 2d at

7    1022 ("Defendants' arguments for dismissal based on a failure to adequately plead against each

8    Defendant rely upon arguments more appropriate at the summary-judgment stage of these

9    proceedings when Defendants can put Plaintiffs to their burden of proof.").

10        Defendants next argue that there "there is no pre-2013 conduct forming the basis for this

11   cause of action." First Mot. to Dismiss at 19; Second Mot. to Dismiss at 16. Plaintiffs bring their

12   Sherman Act claim on behalf of the proposed Nationwide Injunctive Class, which is defined in

13   part by a class period stretching back to January 1, 2005. The only pre-2013 conduct alleged in

14   the CCAC, however, is Synta's acquisition of Celestron in 2005. *See, e.g.*, CCAC ¶ 109. As

15   discussed above, the CCAC alleges no specific misconduct in connection with that transaction, nor

16   does the CCAC allege any particular misconduct occurring between 2005 and the Meade

17   acquisition in 2013. Thus, the Court agrees with Defendants that Plaintiffs fail to sufficiently

18   allege any violation of § 1 before the Meade acquisition in 2013.

19        Defendants' Motion is GRANTED as to Plaintiffs' Sherman Act § 1 claim to the extent it

20   is based on pre-2013 conduct. The Court otherwise DENIES Defendants' Motion as to the

21   Sherman Act § 1 claim.

22        **E.    Clayton Act § 7 Claim**

23        "The Clayton Act § 7 prohibits a corporation from acquiring the stock or assets of another

24   corporation 'in any line of commerce' in which the effect 'may be substantially to lessen

25   competition, or to tend to create a monopoly.'" 15 U.S.C. § 18. When examining a § 7 claim, a

26   court must be mindful that "[e]very merger of two existing entities into one, whether lawful or

27

28   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE

1    unlawful, has the potential for producing economic readjustments that adversely affect some

2    persons." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977). "But Congress

3    has not condemned mergers on that account; it has condemned them only when they may produce

4    anticompetitive effects." *Id.*

5        Plaintiffs bring a claim under § 7 arising out of Ningbo Sunny's acquisition of Meade,

6    alleging that Defendants helped to facilitate that transaction. For the same reasons stated above,

7    the Court finds that Plaintiffs have failed to allege any conduct giving rise to a § 7 claim before the

8    Meade transaction in 2013.

9        Defendants further argue that Plaintiffs fail to raise a claim for injunctive relief against

10   Defendants where the offending acquisition was by Ningbo Sunny, not Defendants. Plaintiffs

11   bring their claim for injunctive relief pursuant to § 16 of the Clayton Act, which permits injunctive

12   relief to redress an antitrust conspiracy, "even when the conspiracy involves multiple levels of

13   producers, distributors, and sales." *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,

14   933 F.3d 1136, 1158 (9th Cir. 2019), *cert. denied sub nom. Nat'l Football League v. Ninth Inning,*

15   *Inc.*, 141 S. Ct. 56 (2020).

16       Thus, the Court GRANTS Defendants' motion as to Plaintiffs' Clayton Act § 7 claim to

17   the extent that claim is based on conduct occurring prior to 2013, but DENIES the Motion to

18   dismiss the claim in all other respects.

19       **F.    Unjust Enrichment Claim**

20       Defendants argue that Plaintiffs' claim for unjust enrichment for anticompetitive conduct is

21   not a cognizable claim in California. First Mot. to Dismiss at 21–22 (citing *Lorenzo v. Qualcomm*

22   *Inc.*, 603 F. Supp. 2d 1291, 1307 (S.D. Cal. 2009); Second Mot. to Dismiss at 19.

23       Defendants are correct that "in California, there is not a standalone cause of action for

24   'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Grp.,*

25   *Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350

26   (2010)). "However, unjust enrichment and restitution are not irrelevant in California law. Rather,

United States District Court
Northern District of California

27   Case No.: 5:20-cv-03639-EJD
     ORDER GRANTING IN PART MOTS. TO DISMISS
28   AND MOT. TO STRIKE

24

they describe the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Id.* (citing 55 Cal. Jur. 3d Restitution § 2).  The return of that benefit is the remedy "typically sought in a quasi-contract cause of action." *Id.* Thus, when a plaintiff alleges unjust enrichment, a court may "construe the cause of action as a quasi-contract claim seeking restitution." *Id.*

Defendants do not contend that Plaintiffs' allegations are insufficient to state a quasi-contract claim.  Accordingly, Defendants' Motion is DENIED as to the unjust enrichment claim.

### G.    Leave to Amend

In their opposition brief, Plaintiffs request leave to amend any pleading deficiencies. "Requests for leave to amend should be granted with 'extreme liberality.'" *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  Because it is possible for Plaintiffs to allege additional conduct before 2013 which might support antitrust claims for the class period alleged, the Court finds that amendment would not be futile.  The Court, therefore, grants Plaintiffs leave to amend to allege facts, if any, to support the alleged class period between 2005 and 2012.

## IV.    MOTION TO STRIKE

A court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" pursuant to Federal Rule of Civil Procedure 12(f). Fed. R. Civ. P. 12(f).  "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds,* 510 U.S. 517 (1994)).  "'Redundant' allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action." *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002)).  "Scandalous matters are allegations that unnecessarily reflect on the moral character of an individual or state anything in repulsive language that detracts from the dignity of the court." *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009) (internal quotations and citations

1    omitted).

2        "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money

3    that must arise from litigating spurious issues by dispensing with those issues prior to trial."

4    *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  In determining whether to

5    grant a motion to strike, a district court views the pleadings in a light most favorable to the non-

6    moving party and "resolves any doubt as to the relevance of the challenged allegations" in the

7    plaintiff's favor.  *Cal. Dep't of Toxic Substances Control*, 217 F. Supp. 2d at 1033.

8        Defendants move to strike (1) allegations asserting the class period from 2005 to 2012, and

9    (2) allegations concerning the jury verdict in the *Orion* Action.

10       **A.    Class Allegations**

11       Defendants argue that the Court should strike Plaintiffs' allegations asserting a class period

12   beginning on January 1, 2005 because Plaintiffs fail to allege any actionable conduct prior to

13   2013.  Defendants argue that striking the 2005-2012 portion of the proposed class definition is

14   appropriate at this stage because it is clear from the facts alleged that no class action can be

15   maintained for that time period and because allowing discovery to move forward with an overly

16   broad class period would substantially prejudice Defendants.  Mot. to Strike at 2–3 (citing *Sanders*

17   *v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009)).

18       Plaintiffs counter that they have alleged sufficient support for a class period extending to

19   2005, but that in any event, the allegations regarding the temporal scope of the class are an

20   improper subject for a motion to strike under Rule 12(f).  Dkt. No. 130, Opp'n to Mot. to Strike, at

21   2 (citing *Forsyth v. HP Inc.*, No. 5:16-CV-04775-EJD, 2020 WL 6081719, at *5 (N.D. Cal. Oct.

22   15, 2020)).

23       Plaintiffs are correct that Defendants may not "use their motion to strike to assert

24   arguments about the temporal scope of Plaintiffs' proposed collectives and classes better suited in

25   a motion to dismiss."  *Forsyth*, 2020 WL 6081719, at *5; *see also Whittlestone, Inc. v. Handi-*

26   *Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) ("Rule 12(f) is neither an authorized nor a proper

27
28   ORDER GRANTING IN PART MOTS. TO DISMISS
     AND MOT. TO STRIKE

United States District Court
Northern District of California

1   way to procure the dismissal of all or a part of a complaint.") (internal quotation marks and

2   citation omitted).  However, Defendants did move to dismiss with respect to the alleged class

3   period between 2005 and 2012.  For the reasons stated above, the Court agrees with Defendants

4   that Plaintiffs failed to allege any actionable conduct prior to 2013.  Because the Court finds it

5   appropriate to grant Plaintiffs an opportunity to amend as to this portion of the alleged class

6   period, the Court finds the Motion to Strike moot on this point.

7      The Court DENIES AS MOOT Defendants' Motion to Strike the class period allegations,

8   without prejudice to renew should Plaintiffs fail to cure the pleading deficiencies as to the period

9   between 2005 and 2012.

10      **B.**  ***Orion* Action Allegations**

11      Defendants also seek to strike allegations relating to the *Orion* Action and its verdict.

12   They argue that because that action is not binding on Defendants, the allegations are therefore

13   impertinent and prejudicial.  Specifically, Defendants seek to strike the following allegations:

14   
- Paragraphs 2-3 (providing historical account of *Orion* Action);

15   
16   
- From Paragraph 4: "As a direct result of the anticompetitive and unlawful conduct alleged and proved in the *Orion* Action";

17   
- Paragraph 106, alleging in part, "[t]he jury in the Orion Action reached various findings of antitrust liability by defendants.";

18   
19   
- Paragraph 107, alleging that the jury in the *Orion* Action found that "[t]he defendants [in this action] engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act," that "defendants agreed. . . to fix or stabilize the prices and credit terms for telescopes and accessories in violation of Section 1 of the Sherman Act," among other things;

20   
21   
22   
- Paragraph 108: "The defendants' antitrust liability has been proven by a preponderance of the evidence.";

23   
24   
- From Paragraph 125: "In the *Orion* Action*,* the jury found that Ningbo Sunny and Synta conspired to acquire Meade."

25   
26      The Court finds that certain of these allegations provide background and context to the

27   Case No.: 5:20-cv-03639-EJD

28   ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

United States District Court
Northern District of California

27

action, while others are indeed impertinent and overly prejudicial.  Specifically, the Court finds that Paragraphs 2-3, 125, and parts of Paragraph 107 properly supply background information about the *Orion* Action.  *See In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010) ("Allegations 'supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant.'") (quoting *LeDuc v. Kentucky Cent. Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal. 1992)).  The same is not true of the allegations in Paragraphs 4, 106, 108, and other parts of Paragraph 107.  Those allegations improperly imply that the jury in the *Orion* Action found the Defendants in this action liable for misconduct, but the jury did no such thing.  While Plaintiffs argue that some of the holdings in the *Orion* Action may be admissible in this action against Ningbo Sunny, which was a defendant in the *Orion* Action, the CCAC's allegations are not specific to Ningbo Sunny.  While the factual background of the *Orion* Action is pertinent to this case, allegations suggesting specific findings of liability against Defendants are not.

Thus, the Court GRANTS IN PART Defendants' Motion.  The cited portions of Paragraphs 4, 106, and 108, as well as paragraph 107 to the extent it characterizes the jury's findings as against "the defendants," are hereby STRICKEN.

## V.    CONCLUSION

For the reasons stated above, the Court GRANTS IN PART the First Motion to Dismiss, Second Motions to Dismiss, and Synta Canada's Motion as to the Sherman Act § 1 claim and Clayton Act § 7 Claim to the extent those claims are based on conduct arising before 2013.  The remainder of Defendants' Motions are DENIED.

In light of the Court's findings on Defendants' Motions to Dismiss, the Court DENIES AS MOOT Defendants' Motion to Strike allegations regarding the alleged class period.  The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Strike allegations regarding the *Orion* Action.

Plaintiffs may file an amended complaint to add allegations relating to the time period

between January 1, 2005 and 2013, if any, by no later than **14 days** from the date of this order.

**IT IS SO ORDERED.**

Dated: June 2, 2021

EDWARD J. DAVILA
United States District Judge