1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5  HIGHTOWER                      )
                                  )
6           Plaintiff,            )
                                  )
7  vs.                            )   No. C 20-03639-EJD
                                  )
8  CELESTRON ACQUISITION, LLC,
     et al.,                      )
9                                 )
            Defendants.           )
10 _____  )

11

12                                San Jose, California
                                  Tuesday, January 25, 2022

13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 10:00 - 10:26 = 26 MINUTES

15 APPEARANCES:

16 For Plaintiff:
                                  Cotchett Pitre & McCarthy, LLP
17                                840 Malcolm Road, Suite 200
                                  Burlingame, California 94010
18                           BY:  ADAM J. ZAPALA, ESQ.
                                  REID WILSON WAYMAN GAA, ESQ.
19                                ELIZABETH TRAN CASTILLO, ESQ.

20 For Orange County
     Telescopes:                  The Law Offices of Damian D.
21                                  Capozzola
                                  633 West 5th Street, Floor 26
22                                Los Angeles, California 90071
                             BY:  DAMIAN D. CAPOZZOLA, ESQ.
23

   Transcribed by:                Echo Reporting, Inc.
24                                Contracted Court Reporter/
                                  Transcriber
25                                echoreporting@yahoo.com

2

1  <u>Tuesday, January 25, 2022</u>                    <u>10:00 a.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4          THE CLERK:  Calling Case 20CV3639, Hightower

5  versus Celestron Acquisition, LLC, et al., on for discovery

6  hearing.

7      Counsel, please state your appearances beginning with

8  Plaintiff.

9          MR. GAA (via Zoom):  Reid Gaa on behalf of the

10  indirect purchaser Plaintiffs.

11          MS. CASTILLO (via Zoom):  Elizabeth Castillo, also

12  on behalf of the Indirect Purchaser Plaintiffs.

13          THE COURT:  Good morning.

14          MR. ZAPALA (via Zoom):  Good morning, your Honor.

15  Adam Zapala from Cotchett, Pitre and McCarthy, for the

16  Indirect Purchaser Plaintiffs.

17          THE COURT:  Good morning.

18          MR. CAPOZZOLA (via Zoom):  Good morning, your

19  Honor.  Damian Capozzola representing third party Orange

20  County Telescope.

21          THE COURT:  Okay.  And good morning.  Thank you

22  all very much.

23      We're here for a dispute concerning the Plaintiff's

24  subpoena to Orange County Telescope, and specifically I

25  understand the dispute concerns what the parties are

3

1  referring to as the transactional data regarding the

2  purchase and sale of certain telescope and telescope

3  products.

4      So, let me begin by sharing a couple of thoughts with

5  you.  Having read the joint submission, both sides have some

6  meritorious points.  In other words, you're both correct.

7  The document requests are too broad, and OCT's objections

8  are somewhat boilerplate in that they don't really

9  distinguish between the parts of a particular request that

10 are objectionable and the parts that are not.

11     It appears that the parties have engaged in some

12 discussions around how the request might be narrowed but are

13 having difficulty figuring out how to get that done.

14     And let me just pause there and ask if you've had any

15 further discussions and accomplished any narrowing of the

16 dispute in the couple of weeks since we were originally

17 going to have this hearing.

18     Let me ask Mr. Gaa that question first.

19         MR. GAA:  No, your Honor, we -- we have not.

20         THE COURT:  Okay.  Mr. Capozzola, no further

21 progress?

22         MR. CAPOZZOLA:  Yes, correct, your Honor.  I think

23 we're really at impasse and need your greater wisdom here.

24 There's, in our view, a chicken and an egg issue.  I mean,

25 we think that they should serve a proper and narrowly

4

1  tailored subpoena first, as we put in our papers.

2          THE COURT:  All right.  Well, yes.  As I read the

3  joint submission, it sounds like the Plaintiffs are prepared

4  to narrow their requests, but they want some information

5  from OCT first, and OCT is prepared to possibly produce some

6  information, but you want the request narrowed first before

7  you do that.

8      So, yes, this impasse does seem to be a bit

9  unfortunate, and it appears that the principal objection is

10 that the third party is concerned about the burden that the

11 discovery places on it as a nonparty.  So, I think our

12 discussion should start there.

13     Let me start with some questions for the Plaintiffs.

14 Mr. Gaa, what information do the IPPs already have about

15 OCT's transactions?  There's a reference to the $3,000,000

16 during an eight-year period.

17          MR. GAA:  Thank you, your Honor.  So, what we do

18 know really is just that -- that figure, that $3,000,000

19 figure which we were able to obtain based on our own

20 investigation from transactional-level data that we received

21 from one of the parties in the case.  But that's about the

22 extent of it so far.  We don't know, first and foremost,

23 whether OC Telescope's data is maintained in hard copy paper

24 format, if it's maintained on an electronic database of some

25 kind, the scope of that data in terms of its temporal scope

5

1  and the -- the categories of data that are maintained, if,

2  in fact, that data is maintained in an electronic capacity.

3         THE COURT:  Right.  But with respect to the

4  $3,000,000, do you just have that at sort of a high level or

5  do you have transaction-specific information as to those

6  sales?

7         MR. GAA:  We really just have it at a high level.

8  I mean, we are able to determine that there are sales

9  totaling that amount between OC Telescope and the Celestron

10 Defendants, the Cinta (phonetic) family of Defendants, but

11 that's about the extent of it.  We aren't able to get to a

12 more granular level, particularly in the sense of, you know,

13 linking that sales information to purchasers to members of

14 our class.

15        THE COURT:  I see.  Okay.  Now, the Plaintiffs

16 made a proposal, as I understand it, to OCT in October, and

17 that's reproduced in your joint submission.  And I

18 understand that the key features of that are that you're

19 willing to accept data that can be exported out of whatever

20 database this transaction data is maintained in, and you're

21 willing to limit the scope of the transactional data to

22 products sold by the Defendants and Co-Conspirators that are

23 enumerated in the subpoena, and I count 23 people and

24 entities.  You're willing to limit the time period to the

25 data that is electronically available, and then there's a

6

1  last item which says:

2            "Upon receiving additional

3        information regarding OCT's

4        transactional data, IPPs would further

5        narrow the subpoena."

6      What do you mean by that?

7            MR. GAA:  Sure, your Honor.  So, what we're

8  referring to there really is -- when we look at the

9  subpoena, we've listed obviously out several subcategories

10 of information under RFP's 2 and 3.  To the extent that OC

11 Telescopes is able to tell us that it simply doesn't

12 maintain those fields, they don't exist or it would be

13 incredibly burdensome for them to reproduce any of those

14 categories, we would be willing to discuss foregoing them as

15 long as we were able to determine that we had sufficient

16 information for our experts to perform their analysis.  But,

17 we would be willing to forego some of the subcategories

18 listed in those two RFPs with -- with further information

19 about what OC Telescope's database maintains and does not

20 maintain.

21            THE COURT:  So, let me ask you about those

22 categories and subcategories.  There are quite a number of

23 them listed, and I'm just looking, for example, at request

24 number two, which has a long list of different pieces of

25 information.  Which of those do you really need?

7

1          MR. GAA:  Well, your Honor, in all candor, you

2    know, it's hard for us to say what we do and don't need.  We

3    developed that list in conjunction with our experts.  That

4    list is what they've told us they need.  In a perfect world,

5    we would get everything there, and that would be the most

6    comprehensive, most effective way for our -- our experts to

7    go perform their analysis with the greatest amount of

8    accuracy possible.

9          That being said, we, in discussions with them, have

10   been able to determine that upon receiving data from some of

11   these third parties, analyzing it, there are ones that they

12   understand that they can let go as long as they have other

13   categories of data also available that might serve a similar

14   purpose.  It is just hard in the abstract to know without

15   knowing what they are -- they would receive and what they

16   wouldn't receive in order to determine, you know, where the

17   gaps would be if anything were to be missing.

18          THE COURT:  Okay.  And why do you need data back

19   to January 1st of 2003 assuming it's available if your class

20   is limited to January 1st, 2005 to the present?

21          MR. GAA:  The purpose for that two-year window,

22   your Honor, is basically to provide the experts with a time

23   period where there would be clean data so to speak.  It

24   essentially allows them to have a comparison period of time

25   where they can look at where the conspiracy wasn't in effect

8

1  and be able to compare that period of time to when the

2  conspiracy was in effect to see what the -- the effects were

3  of the conspiracy.

4         THE COURT:  And could you limit the scope of what

5  you're requiring in terms of production to representative

6  products instead of literally every single product?  Is it

7  possible to use representative products to investigate this

8  issue that you flagged for me in the joint submission, which

9  is the question of whether there is a super competitive

10 overcharge that's being passed through?

11        MR. GAA:  Your Honor, one of the issues we've

12 encountered so far in our discussions with all third parties

13 is that, simply put, we just don't have a comprehensive list

14 of each and every telescope or -- or the code that

15 identifies the telescope produced by -- or manufactured by

16 every Defendant and sold by every Defendant entity that

17 operates in the United States.  So, we drafted it broadly in

18 this way to try to get that type of information.  That is

19 why we've endeavored to limit it, though, only to the

20 Defendant entities, the Co-Conspirators and their

21 subsidiaries in the United States, because that's what we've

22 found is the only way that we can guarantee we're getting

23 the data we need for all the telescopes we think may have

24 been effected but is more limited in its scope only to those

25 that we think were, in fact, effected and is not just

9

1  broadly seeking data on every single telescope a third party

2  potentially sells.

3          THE COURT:  Right.  I understand that, but within

4  the domain of the ones that were sold to someone like OCT by

5  the Defendants or Co-Conspirators, are there representative

6  telescopes or telescope components within that category?

7  So, in other words, what I'm asking is, you know, there

8  might be certain categories of kinds of telescopes, and then

9  there might be very similar telescopes within that category,

10  but you wouldn't necessarily need literally every single

11  transaction for every single telescope in that subcategory.

12  And I just wondered if in the course of developing the

13  evidence in this case, there is a sort of representative set

14  of telescope -- telescopes or telescope components that you

15  could go after that would be a subset.

16          MR. ZAPALA:  Your Honor, if I may address this.

17          THE COURT:  Sure.

18          MR. ZAPALA:  This is Adam Zapala.  Apologies, Mr.

19  Gaa.

20      I really don't think so.  The allegations in the case

21  are regarding the price fixing conspiracy, and, of course,

22  discovery is progressing in the underlying case.  We may

23  learn more about the scope of the conspiracy as we go along

24  here, but currently the complaint alleges that all

25  telescopes manufactured by these Defendants are affected by

10

1  the conspiracy.

2      Our firm and the firms that are litigating this case on

3  the Plaintiff's side have done a lot of these kind of cases.

4  It's -- I've never been in a case where you -- what you're

5  subpoenaing from a non-party is a representative sample.

6  And, candidly, this is one of the reasons why, you know, we

7  do think that the meet and confer process broke down, and I

8  understand what Mr. Capozzola is saying in terms of the

9  chicken and the egg issue, but it is really why we need

10 information from the non-party in order to effectively meet

11 and confer because it's often -- usually, what's you're

12 dealing with is an Enterprise software system that tracks

13 the transactions.  That's almost always the case.  You've

14 presided over many of these disputes.  You know that.

15     Oftentimes, it's, frankly, harder for the non-party to

16 limit the information that they're providing as opposed to

17 just giving you what the Enterprise software system tracks,

18 because they have to end up writing a script to exclude this

19 column or exclude that.  And, so, it's often actually more

20 work for the nonparty to try to kind of, you know, slice and

21 dice, if you will, rather than saying, Look, these are the

22 telescopes that we bought from these Defendants.  Here's the

23 data that we have.

24     Again, we don't know what the burden is associated with

25 doing that because, frankly, we haven't got an explanation

11

1  of what those Enterprise software systems are, if any.

2  Perhaps they're kept in hard -- you know, paper copy.  But

3  -- but in terms of a representative sample, you know, our

4  expert's going to be running a regression on the pass-

5  through data to demonstrate that the overcharge has been

6  passed through.  The Defendants' attack is going to be, as

7  it always is at class certification, that wasn't sufficient.

8  You needed to do more.  And, so, in our experience, the kind

9  of pass-through regression that you run in these kind of

10  cases is on all of the available data.  The more data you

11  have, the more precise the regression becomes in terms of

12  its estimates.  So --

13          THE COURT:  All right.

14          MR. ZAPALA:  Thank you, and I apologize for

15  interrupting.

16          THE COURT:  No, that's okay.  That's okay.  Thank

17  you for that, and let me just ask one further follow-up

18  question, and I'm referring to page two of the joint

19  submission where the Plaintiffs set out their proposal.

20  Leaving aside the fourth item, which is sort of, you know,

21  an opportunity to obtain additional data, but the first

22  three limitations I'm going to call them, are those still

23  acceptable to the Plaintiffs?

24          MR. GAA:  Yes, they are, your Honor.  We would

25  certainly accept a export of the -- the purchase and sales

1  information from the database that OC Telescopes maintains,

2  and we would accept it for the time period for which it is

3  maintained within the -- the period that we requested.

4          THE COURT:  Okay.  And if you obtain that

5  information, does that resolve the subpoena?  The subpoena I

6  noticed is broader than transactional data, but if you get

7  what you have asked for in the discovery letter, will that

8  resolve the subpoena with respect to OCTG?

9          MR. GAA:  It may, your Honor.  We would have to

10 review it.  We have to confirm that what was produced to us,

11 if it is, in fact, a limited subset of the categories that

12 we've requested, is, in fact, sufficient for our experts to

13 perform the analysis that -- that they need to.  And, so,

14 what we've done in the past successfully with -- with many

15 different third parties that we've subpoenaed is we've

16 accepted that initial production.  Our experts have reviewed

17 it.  We've come back with follow-up questions either to --

18 you know, to confirm what certain fields mean, to clarify

19 how -- how the data was exported, and we'll follow up

20 essentially with the third party as necessary.  But, in all

21 likelihood and in many situations, that has been a

22 sufficient -- those exports have been sufficient to have

23 satisfied the request in the subpoena.

24          THE COURT:  So, for example, you wouldn't need

25 contact information class members, which is request number

13

1   seven, or all bills of material, which is request number

2   six?

3           MR. GAA:  We could -- your Honor, if -- if we

4   found out that the third party does not manufacture

5   telescopes, we could forego that request without the

6   exports.  But, yes, there are certain categories -- or

7   there's certain requests that we could forego just by

8   receiving those exports.  In all likelihood, those would

9   satisfy requests two and three.  They have in many

10  situations, barring some limited follow up that we've been

11  asked to -- to engage in by our experts.  But, for the most

12  part, it's been able to resolve the subpoena with many other

13  entities.

14          THE COURT:  All right.

15          MR. ZAPALA:  One caveat, your Honor.  I think you

16  -- bills of lading and things like that I'll let Mr. Gaa

17  address, but class member contact information, aside from

18  the analysis that our experts are going to have to do in the

19  case, is going to be required, frankly, in -- in either the

20  scenario of a settlement or in the case of a litigation

21  class motion, because we're going to have to notify the

22  class of either a settlement or the fact that there's been a

23  class certified and you have the right to opt out.

24      And, so, you know, and, again, in most indirect

25  purchaser cases that I've been in 100 percent of them, the

14

1  notices that are sent out are notices to class members that

2  we've obtained in nonparty discovery.  So, I would venture

3  to guess that if Mr. Capozzola's client does have an

4  Enterprise Software system, the contact information is

5  included in the transactional data.  We would want that

6  included and would have to notify class members.  But it's

7  only used for that purpose.

8           THE COURT:  Yeah.  And the reason I'm asking is

9  that the dispute concerns transactional data, and I see the

10 requests are broader than that.  So, I'm trying to be

11 efficient here in wanting to know if this is the -- the only

12 dispute or whether there are more coming if we resolve this

13 one.

14          MR. ZAPALA:  I think it's safe to say that it's

15 limited to transactional data with the small caveat that,

16 you know, again, it depends on what the transactional data

17 looks like.  For example, if Mr. Capozzola was to tell us,

18 well, contact information's not included in the

19 transactional data, it may be the case that we would want

20 the contact information to the extent that's kept in some

21 other database or some other source, but -- but I think the

22 critical issue is really the transactional data, the

23 purchase data upstream and the sales data downstream.

24          THE COURT:  Okay.

25          MR. ZAPALA:  And -- and I would venture to guess

1 the contact information is included in that as it typically
2 is, but his client may be an outlier in that regard.  I just
3 don't know.

4          THE COURT:  All right.  Thank you.  I do have some
5 questions for Mr. Capozzola for OCTG, and then if anyone
6 needs to address any other matters, I'll -- I'll circle back
7 to the Plaintiffs.

8      So, Mr. Capozzola, one thing I'm wondering is why is it
9 in your client's interest to demand that the Plaintiffs
10 re-serve the subpoena in order for you to have a discussion
11 about how to accomplish the narrowing, which I understand is
12 in your client's interest, so that they have to -- they are
13 minimally burdened by the subpoena?

14          MR. CAPOZZOLA:  Because then we're starting from a
15 much more reasoned and reasonable framework.  We're not --
16 we're not starting with the moon and the stars and the sun.
17 You know, if they want to start out with the limitations
18 that you identified in that one paragraph which, in our
19 view, as I expressed in our papers, is perhaps where they
20 should have started to begin with, then we can have a
21 discussion.  But, you know, what I've heard from multiple
22 attorneys during this hearing is -- is the constant
23 caveating and refusal to say, you know, look, this is what
24 this small business needs to do to get through the subpoena.
25 You know, we're not a Defendant.  We're not part of a

16

1   conspiracy.  We're a -- we're a small company.  I'm

2   operating on a shoestring here.  My client is very concerned

3   about the costs of compliance and his attorney's fees, and

4   he's wondering, you know, who's going to reimburse me for

5   all this.  And, you know, I would ask you to consider that,

6   actually, you know, as -- as part of my proposal that they

7   should -- they should propound the subpoena that they should

8   have propounded in the first place.  And then I can go back

9   to my client with something that's minimally burdensome and

10  say, Okay.  Look, here's something surgical.  This is what

11  they're asking for.  You know, what -- what do you have?

12       So, that's -- that's why it is -- you know, it is a

13  chicken and egg issue, but it's always been in my experience

14  that the burden is on the -- the moving party or the

15  Plaintiff to get it right in the first instance.  You don't

16  just cast a 20-year net and then say, okay, let's talk about

17  reining that in.  That's not how it's supposed to work.

18            THE COURT:  Well, it does seem like it might be a

19  little more inefficient for your client to have multiple

20  rounds of subpoenas and objections and appearances before me

21  each time.  So, let's see if we can cut through all that and

22  focus on what would be a not unduly burdensome approach to

23  this existing subpoena.

24       I'm looking at the suggestion, again, made at page two

25  of the joint submission about what the Plaintiffs propose to

17

1  do in terms of narrowing the scope of what they're after.

2  So, let me just ask a few questions about that.

3      I agree with you that given that OCT is a nonparty,

4  that it's entitled to avoid undue burden and expense.  So,

5  let me just ask the first question.  Does OCT have

6  transaction data available in an electronic form, database

7  form, some kind of easily queriable form?

8          MR. CAPOZZOLA:  You know, your Honor, I don't mean

9  to be glib, and I don't mean disrespect.  But, again, to the

10 chicken and the egg issue here and -- and trying to avoid

11 running up fees and costs to my client, I really haven't dug

12 into these issues very much for OCT.  My suspicion is that

13 they probably do.  I would be surprised if they didn't have

14 anything that fell into that basket.  So, I think we should

15 probably operate on that assumption.  But, I mean, I haven't

16 -- I have not -- in an effort to save my client the costs

17 and fees or at least defer what may be unnecessary, I

18 haven't, you know, dug in and done a huge investigation into

19 their databases and their systems.

20         THE COURT:  For what time period does it have

21 electronic data available?

22         MR. CAPOZZOLA:  I don't know.

23         THE COURT:  All right.  Well, these are the kinds

24 of things that will help me help you respond to a subpoena

25 in the most efficient and expeditious way and cause the

18

1 least burden to your client.

2      All right.  Let me just tell the parties what my

3 initial impression was, having read the joint submission.

4 OCT is a nonparty, and it does need to be protected from

5 undue burden and expense.  So, the only data that I would

6 order that OCT would have to provide is data that is

7 available in some kind of readily accessible form.  So,

8 whether that's a database or some other electronic form or

9 system, it has to be something that can be queried or

10 exported in some sort of automatic easy way.  No -- no

11 elaborate software programming is going to be required.

12      It should be limited in scope and time.  Certainly, as

13 the Plaintiffs had proposed in their letter, there is a good

14 justification I can see for going back to 2003 given the

15 allegations in the complaint and the need to have sort of a

16 comparison period to the period in which the alleged

17 violations occurred.  So, there is a justification for that,

18 but if you only have paper records going back some period of

19 time, I'm not going to require that those be produced unless

20 they're easily accessible.

21      So --

22           MR. CAPOZZOLA:  You said paper records, your

23 Honor.  I'm sorry.  Did you mean electronic or paper and

24 electronic?

25           THE COURT:  So, if, for example, you have only

19

1 paper records up until the year 2010, unless --

2          MR. CAPOZZOLA:  I see.

3          THE COURT:  -- those are really easily accessible,

4 I wouldn't order them to be produced.

5          MR. CAPOZZOLA:  Understood.

6          THE COURT:  But I need to have the information in

7 order to help you, Mr. Capozzola, limit the burden on your

8 client.

9          MR. CAPOZZOLA:  Right.

10          THE COURT:  Right now I don't have the information

11 either in your submission or here in this hearing.  So, I am

12 prepared to limit the scope of what your client needs to

13 produce in response to the subpoena, but you are going to

14 have to investigate these issues.

15          MR. CAPOZZOLA:  Can I make a proposal, your Honor?

16          THE COURT:  Just a moment.  I also want to

17 understand -- will want to understand how long it would take

18 for your client to do this issue, and we have one other

19 issue that's raised, which is the protective order.  I don't

20 know if that's still an issue, but to the extent the

21 information is confidential, I would, of course, permit your

22 client to designate material under the existing protective

23 order in the case.

24      So, that's what I would be prepared to order.  Mr.

25 Capozzola, you had a proposal or a suggestion?

20

1          MR. CAPOZZOLA:  Perhaps we're thinking along the

2    same lines, your Honor.  I think it would actually help me

3    help everybody, help me help you with my client if I could

4    go back to him with an order and I could say, okay, we had a

5    hearing.  These issues have been discussed.  The judge has

6    effectively performed the function of all this narrowing.

7    Here's -- here's where we are.  This is what we need.

8          My proposal would be to maybe continue this hearing,

9    and I can investigate these issues and come back next week

10   with answers to the extent you need questions, but I think

11   an order encapsulating what it was you just said and

12   indicating at least tentatively subject to perhaps a

13   continued hearing for next week that, you know, this is what

14   we need and the questions we need answered.  That will help

15   me with my client and help me justify a couple of hours of

16   his time.

17         I would -- I would ask that there also be some order

18   for reimbursement of at least cost of compliance for a --

19         THE COURT:  I don't have any information about

20   cost of compliance at this point, and I hope they will be

21   minimal.

22         So, let's -- let's do this, a little modification to

23   the proposal here.  I am going to order the parties to

24   confer further after Mr. Capozzola obtains the information

25   from his client.  I'll set out a timeline for doing that,

1  and I'm going to require you to report back to me.  I hope I

2  don't need another hearing because that would not be a good

3  use of my time or yours.

4       So, I will issue an order that sets out a little

5  timeline for how you all are to accomplish the next steps.

6  I'm not going to require re-service or remodification of the

7  subpoena, but I am going to set out the ground rules for

8  what I expect and what I think is the appropriate scope of

9  production based on the limited information I have.

10      Now, it may be, as the Plaintiffs' lawyers have said,

11  that they don't need literally everything that's listed here

12  in request for production number two.  But, Mr. Capozzola,

13  you can help them understand why they don't need all that

14  stuff.  Maybe you don't have it.  Maybe your client doesn't

15  have it, but maybe your client has some categories of

16  information that will allow them to produce whatever is

17  readily accessible and they don't need to produce literally

18  everything here.  But that's the discussion that you need to

19  have, and that's --

20           MR. CAPOZZOLA:  I understand, your Honor.

21           THE COURT:  -- the way that we can control the

22  costs in the case.

23      So, I plan to give you two weeks to confer.  Is that

24  sufficient?  Let me ask the Plaintiffs first.

25           MR. GAA:  I believe so, your Honor, yes.

22

1          THE COURT:  Mr. Capozzola, is that sufficient for

2   you to talk to your client and then get back with the

3   Plaintiffs' lawyers?

4          MR. CAPOZZOLA:  Your Honor, only because,

5   actually, my wife and I both have birthdays in early

6   February and we're planning to travel, I would ask for three

7   weeks if it's okay with you?

8          THE COURT:  Is there any reason why three weeks

9   would create a problem for the discovery schedule, Mr. Gaa?

10          MR. GAA:  No, not -- not to my knowledge, your

11   Honor.

12          THE COURT:  Okay.  Three weeks.  I'll ask you to

13   report back to the Court in three weeks on the status of

14   your discussion, and then we'll take it from there.  So, I

15   will issue a written order so it will be very clear what you

16   need to do.

17          MR. CAPOZZOLA:  And -- and I'm inferring, your

18   Honor, that it will be based on or include the three

19   limitations in that paragraph that we've talked about?

20   That's what I need to go back to my client with.  Here's --

21          THE COURT:  That's certainly the starting point.

22          MR. CAPOZZOLA:  Yeah.

23          THE COURT:  There may be additional limitations

24   that the parties can consider and negotiate and work out.

25   And if we need to come back, we will come back.  But -- but

23

1   I do expect that maybe with this guidance, you'll all be

2   able to work it out without any further assistance from me.

3           MR. CAPOZZOLA:  All right, your Honor.  Thank you

4   very much for your time today and your consideration.

5           THE COURT:  All right.  Thank you all very much.

6           MR. ZAPALA:  Thank you, your Honor.

7           MR. GAA:  Thank you, your Honor.

8           THE COURT:  This matter is concluded.

9       (Proceedings adjourned at 10:26 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1                    <u>CERTIFICATE OF TRANSCRIBER</u>

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16            Echo Reporting, Inc., Transcriber

17               Wednesday, January 26, 2022

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*