Adam J. Zapala (SBN 245748)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Kalpana Srinivasan (Bar No. 237460)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com

Lin Y. Chan (SBN 255027)
**LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
lchan@lchb.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **IN RE TELESCOPES ANTITRUST LITIGATION** | **Case No. 5:20-cv-03639-EJD** |
| | **THIRDAMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| **THIS DOCUMENT RELATES TO:** | |
| **Indirect Purchaser Actions** | 1. **SHERMAN ACT §§ 1, 2;** |
| | 2. **CLAYTON ACT § 7;** |
| | 3. **STATE ANTITRUST LAWS; and** |
| | 4. **STATE CONSUMER PROTECTION LAWS; and for** |
| | 5. **UNJUST ENRICHMENT** |
| | **JURY TRIAL DEMANDED** |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**
10445742v1/016869

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. JURISDICTION AND VENUE ......................................................................... 3

III. PARTIES ............................................................................................................ 5

    A.  Plaintiffs ................................................................................................... 5

    B.  Defendants ................................................................................................ 8

        1.  Synta Defendants ......................................................................... 8

            a.  Corporate Defendants ...................................................... 8

            b.  Individual Defendants ..................................................... 10

        2.  The Ningbo Sunny Defendant ..................................................... 11

    C.  Agents and Co-Conspirators .................................................................. 11

        1.  Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates ............................................................................. 14

        2.  Defendants' High-Level Employees Organized the Conspiracy, and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracy ....................................... 15

        3.  Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family ........................................................................................... 16

        4.  The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms ..................... 18

IV. FACTUAL ALLEGATIONS ............................................................................ 18

    A.  Telescopes ............................................................................................... 18

    B.  Relevant Market: The Market for Telescopes in the United States ....... 19

    C.  Defendants Are Liable for the Anticompetitive Conduct Alleged Herein ........... 20

    D.  The Federal Trade Commission's Actions in the Telescope Market ................... 22

    E.  Defendant Dar Tson ("David") Shen Orchestrated and Participated in the Creation of Ningbo Sunny as a Sham Competitor for Synta, and Managed Ningbo Sunny to Promote Synta's Anticompetitive Ends .............................................................. 23

    F.  Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the Telescope Market ................................................................................... 27

G.   Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of Meade ............................................................................................................... 29

H.   Defendants and Co-Conspirators Conspired to Interfere with Orion's Acquisition of the Hayneedle Assets ......................................................................................... 31

I.   Illustrative Examples of Defendants' Anticompetitive Conduct and Conspiracy to Fix Prices, Rig Bids, and Allocate the Market....................................................... 31

J.   The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible ............................................................................................................ 39

1.   The Telescope Market Was Subject to Market Allocation ....................... 40

2.   The Telescope Market Has High Barriers to Entry ................................. 40

3.   The Telescope Market Is Highly Concentrated ......................................... 41

4.   There Is Inelasticity of Demand for Telescopes ....................................... 42

V.   CLASS ACTION ALLEGATIONS ........................................................................... 43

A.   California Law Should Be Applied to the Indirect Purchaser States' Damages Class ............................................................................................................................ 44

1.   The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators ......................................................................................... 44

2.   The Conspiracy's Contacts with California: Location of Individuals ....... 45

3.   Specific Targets of the Conspiracy Were from California ....................... 45

4.   The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California .................................................................................................... 45

5.   Defendants and Co-Conspirators Targeted California............................. 46

B.   Alternatively, Plaintiffs Seek to Certify State Damages Classes .......................... 46

VI.   PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY .................... 54

VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS .......... 57

A.   The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims .......................................................................... 57

B.   Fraudulent Concealment Tolled the Statute of Limitations .................................. 58

VIII.   CAUSES OF ACTION .............................................................................................. 62

First Cause of Action
Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) Restraint of Trade (on behalf of Plaintiffs and the Nationwide Injunctive Class) .............................. 62

Second Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class) .............................. 64

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Third Cause of Action
Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) Attempted
 Monopolization (on behalf of Plaintiffs and the Nationwide Injunctive Class) .... 66

Fourth Cause of Action
Violation of Section 7 of the Clayton Act (15 U.S.C. § 18) (on behalf of Plaintiffs
 and the Nationwide Injunctive Class) .................................................................... 67

Fifth Cause of Action
Violation of the State Antitrust Laws (on behalf of Plaintiffs and the Damages
 Class or, Alternatively, the State Damages Classes) ............................................. 68

Sixth Cause of Action
Violation of State Consumer Protection Laws (on behalf of Plaintiffs and the
 Damages Class or, Alternatively, the State Damages Classes) ............................ 93

Seventh Cause of Action
Unjust Enrichment (on behalf of Plaintiffs and the Damages Class or, Alternatively,
 the State Damages Classes) ................................................................................. 112

IX. PRAYER FOR RELIEF ...................................................................................... 112

X. JURY DEMAND ................................................................................................... 114

Indirect Purchaser Plaintiffs ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Defendants (1) Synta Technology Corp. of Taiwan (a/k/a Synta Technology Corp. and Good Advance Industries Ltd.), (2) Suzhou Synta Optical Technology Co., Ltd., (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd., (4) Synta Canada International Enterprises Ltd., (5) Pacific Telescope Corp., (6) Olivon Manufacturing Co. Ltd., (7) SW Technology Corp., (8) Celestron Acquisition, LLC, (9) Olivon USA LLC, (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson (together, "Synta" or "Synta Defendants"), and (13) Ningbo Sunny Electronic Co. Ltd. ("Ningbo Sunny" or "Ningbo Sunny Defendant") (collectively, "Defendants"). The following co-conspirator entities and individuals were engaged in and facilitated the conspiracy and conduct alleged herein: (1) Jean Shen, (2) Sylvia Shen, (3) Jack Chen, (4) Lauren Huen, (5) Corey Lee, (6) Sunny Optical Technology Co., Ltd., (7) Meade Instruments Corp., (8) Sunny Optics Inc., (9) Wenjun "Peter" Ni, and (10) Wenjian Wang ("Co-Conspirators"). Plaintiffs name the foregoing entities and individuals as Defendants or Co-Conspirators for engaging in a conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market for telescopes and customers as well as for unlawful monopolistic conduct, including attempted monopolization and conspiracy to monopolize, in the United States. Plaintiffs hereby allege, on information and behalf, except as to those allegations that pertain to themselves, as follows:



*Source:* https://www.shutterstock.com/video/search/astronomer-looking-through-telescope

# I.   INTRODUCTION

1.    Astronomy is among the oldest hobbies of mankind. Even the occasional backyard

sky watching by the unaided eye or a small telescope can be a marvelous experience. Astronomy has inspired thousands of Americans to buy telescopes and learn about the starry names and patterns overhead. These amateur astronomers have experienced joys from intellectual discovery and knowledge of the night sky. Unfortunately, Americans have collectively paid hundreds of millions of dollars in illegal overcharges for telescopes since 2005 as a result of a long-running conspiracy to unlawfully fix or stabilize prices, rig bids, and allocate the market and customers, and gain an unlawful monopoly in the United States in the market for telescopes, causing the prices of telescopes to be raised above competitive levels.

2.      In November 2016, a California-based distributor and seller of telescopes, binoculars, and accessories, Orion Technologies, Inc. ("Orion"), filed a lawsuit in this District against Ningbo Sunny and its affiliates—identifying their primary competitor, Synta Technology Corp. of Taiwan and its affiliates, including the defendants named herein—for conspiring to "divide the market, fix prices, [and] throttle competition" in violation of the Sherman, Clayton, and California Cartwright Acts, as well as California's unfair competition law. *See Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd. et al.*, No. 5:16-cv-06370-EJD-VKD (N.D. Cal.) ("*Orion* Action"). Specifically, Orion alleged the defendants conspired to: (1) fix the prices and credit terms of telescopes purchased in the United States; (2) facilitate Ningbo Sunny's purchase of Meade Instruments Corp.; and (3) divide the telescope market by product type and by customer. Additionally, Orion accused the defendants of forming, or attempting to form, a monopoly and pushing Orion out of the United States telescope market by refusing to deal with Orion and unlawfully concentrating the market for telescope manufacturing services.

3.      Following a six-week trial and two days of deliberation, the jury delivered a verdict in favor of Orion on December 5, 2019, awarding Orion $16.8 million in damages after finding that the defendants had violated the Sherman Act and the Clayton Act by engaging in anticompetitive conduct in the domestic telescope market. United States District Judge Edward J. Davila delivered a partial final judgment in the amount of $50.4 million by trebling the jury's award and granting post-judgment interest.

4.     As alleged herein, as a result of Defendants' conduct, Plaintiffs and the Classes (defined *infra*) paid artificially inflated prices for telescopes during the period from and including January 1, 2005 through the present ("Class Period") and have thereby suffered harm.

## II.     JURISDICTION AND VENUE

5.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable, including injunctive, relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 16), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337 (28 U.S.C. §§ 1331, 1337). This Court has subject-matter jurisdiction over state law claims pursuant to Title 28, United States Code, Sections 1332(d) and 1367 (28 U.S.C. §§ 1332(d) and 1367) because: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Classes are citizens of a state different from those of Defendants; and (2) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

7.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Title 28, United States Code, Sections 1391(b) through (d) (28 U.S.C. §§ 1391 (b), (c), and (d)) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants variously reside, are licensed to do business in, are doing business in, have agents in, and are found in or transact business in this District.

8.     This Court has *in personam* jurisdiction over Defendants because Defendants either

directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of telescopes throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; and (d) were engaged in an illegal conspiracy to fix or stabilize prices, rig bids, and allocate the market of telescopes, and to monopolize, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States. Furthermore, Defendants SW Technology Corp. and Celestron Acquisition, LLC are headquartered in California, and Co-Conspirator Meade Instruments Corp. is headquartered in California.

9.      Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce within the United States.

10.      The activities of Defendants and Co-Conspirators directly targeted the United States telescope market and were within the flow of, were intended to have and did have a substantial effect on the interstate commerce of the United States. Defendants' telescopes are sold in the flow of United States interstate commerce.

11.      Telescopes manufactured abroad by Defendants and Co-Conspirators and sold in the United States are goods brought into the United States for sale and therefore constitute import commerce. To the extent any telescopes are purchased in the United States and such telescopes do not constitute import commerce, Defendants' and Co-Conspirators' activities with respect thereto, as more fully alleged herein during the Class Period, had and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

12.     By reason of the unlawful activities alleged herein, Defendants' and Co-Conspirators' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants and Co-Conspirators, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for telescopes, as well as to monopolize those markets. The conspiracy unreasonably restrained trade and adversely affected the market for telescopes in the United States.

13.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased telescopes.

14.     Intra-District Assignment: Assignment to the San Jose division of the Court is proper pursuant to Northern District of California Local Rule 3-2(c) because a substantial part of the events giving rise to the claims arose in this district. Some Plaintiffs made purchases in Santa Clara County. Defendants' illegal conspiracy included acts occurring in or directed at Santa Clara County, and Defendants marketed and/or sold telescopes throughout the district during the Class Period. Orion, a target of Defendants' conduct, is headquartered in Santa Cruz County.

## III.   PARTIES

### A.     Plaintiffs

15.     Plaintiff **John Goerger** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

16.     Plaintiff **Scott Plummer** purchased at least one telescope in Arizona indirectly from Defendants or Co-Conspirators during the Class Period.

17.     Plaintiff **Donnie Houston** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

18.     Plaintiff **Ronald Troillett** purchased at least one telescope in Arkansas indirectly from Defendants or Co-Conspirators during the Class Period.

19.     Plaintiff **Sigurd Murphy** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

20.     Plaintiff **Thien Ngo** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

21.     Plaintiff **Arthur Sines** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

22.     Plaintiff **Jesse Smith** purchased at least one telescope in California indirectly from Defendants or Co-Conspirators during the Class Period.

23.     Plaintiff **Austin Griffith** purchased at least one telescope in Florida indirectly from Defendants or Co-Conspirators during the Class Period.

24.     Plaintiff **Keith Uehara** purchased at least one telescope in Hawaii indirectly from Defendants or Co-Conspirators during the Class Period.

25.     Plaintiff **Richard Bekielewski** purchased at least one telescope in Illinois indirectly from Defendants or Co-Conspirators during the Class Period.

26.     Plaintiff **Michael Price** purchased at least one telescope in Iowa indirectly from Defendants or Co-Conspirators during the Class Period.

27.     Plaintiff **Brian Murphy** purchased at least one telescope in Maine indirectly from Defendants or Co-Conspirators during the Class Period.

28.     Plaintiff **Timothy McQuaid** purchased at least one telescope in Massachusetts indirectly from Defendants or Co-Conspirators during the Class Period.

29.     Plaintiff **Sara Day Brewer** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. She is currently a Utah resident.

30.     Plaintiff **Robert Welsh** purchased at least one telescope in Michigan indirectly from Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

31.     Plaintiff **Bentaro Huset** purchased at least one telescope in Minnesota indirectly from Defendants or Co-Conspirators during the Class Period.

32.     Plaintiff **Jason Glydewell** purchased at least one telescope in Mississippi indirectly from Defendants or Co-Conspirators during the Class Period.

33.     Plaintiff **Deborah Lemar** purchased at least one telescope in Missouri indirectly

1   from Defendants or Co-Conspirators during the Class Period.

2   34.     Plaintiff **James Riley** purchased at least one telescope in Missouri indirectly from

3   Defendants or Co-Conspirators during the Class Period.

4   35.     Plaintiff **David Dick** purchased at least one telescope in Montana indirectly from

5   Defendants or Co-Conspirators during the Class Period. He is currently a Utah resident.

6   36.     Plaintiff **Leon Greenberg** purchased at least one telescope in Nevada indirectly

7   from Defendants or Co-Conspirators during the Class Period.

8   37.     Plaintiff **Anthony Di Mambro** purchased at least one telescope in New Hampshire

9   indirectly from Defendants or Co-Conspirators during the Class Period.

10   38.     Plaintiff **Steven Zellers** purchased at least one telescope in New Mexico indirectly

11   from Defendants or Co-Conspirators during the Class Period.

12   39.     Plaintiff **Michael Liskow** purchased at least one telescope in New York indirectly

13   from Defendants or Co-Conspirators during the Class Period.

14   40.     Plaintiff **Philip Moore** purchased at least one telescope in North Carolina indirectly

15   from Defendants or Co-Conspirators during the Class Period.

16   41.     Plaintiff **Doug Lundy** purchased at least one telescope in Oregon indirectly from

17   Defendants or Co-Conspirators during the Class Period.

18   42.     Plaintiff **John Maurice** purchased at least one telescope in Oregon indirectly from

19   Defendants or Co-Conspirators during the Class Period.

20   43.     Plaintiff **David Kerber** purchased at least one telescope in Rhode Island indirectly

21   from Defendants or Co-Conspirators during the Class Period.

22   44.     Plaintiff **Thomas Berta** purchased at least one telescope in South Carolina

23   indirectly from Defendants or Co-Conspirators during the Class Period.

24   45.     Plaintiff **Greg Ross** purchased at least one telescope in Tennessee indirectly from

25   Defendants or Co-Conspirators during the Class Period.

26   46.     Plaintiff **Vincent Catanzaro** purchased at least one telescope in Utah indirectly

27   from Defendants or Co-Conspirators during the Class Period.

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    7

47.     Plaintiff **David Quaglietta** purchased at least one telescope in Vermont indirectly from Defendants or Co-Conspirators during the Class Period.

48.     Plaintiff **Herbert Nelson** purchased at least one telescope in Wisconsin indirectly from Defendants or Co-Conspirators during the Class Period.

**B.     Defendants**

**1.     Synta Defendants**

**a.     Corporate Defendants**

49.     The Synta Defendants that are entities are the parents, subsidiaries, affiliates, predecessors, and/or successors of each other (collectively, "Synta Corporate Defendants").

50.     Defendant **Synta Technology Corp. of Taiwan** ("Synta Technology") is a Taiwanese company with its principal place of business at No. 89 Lane 4 Chia-An W. Road, Lung-Tan, Taoyuan, 32546 Taiwan, China. Synta Technology is also known as **Synta Technology Corp.** and **Good Advance Industries Ltd.** ("Good Advance"). During the Class Period, Synta Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and/or controls Synta Technology. Synta Technology was listed as a "Celestron Party" in Celestron Acquisition, LLC's settlement agreement with Orion. *Orion* Action, ECF No. 301-30 ("Settlement Agreement"). David Shen signed the settlement agreement with Orion on behalf of Good Advance. *Id.*

51.     Defendant **Suzhou Synta Optical Technology Co., Ltd.** ("Suzhou Synta") is a Chinese company with its principal place of business at No. 65 Yushan Road, New District, Suzhou, China 215011. During the Class Period, Suzhou Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Suzhou Synta. Suzhou Synta is Synta Technology's primary manufacturing subsidiary. Synta Canada (*see supra*) owns 20 percent of Suzhou Synta. David Shen signed the settlement agreement with Orion on behalf of Suzhou Synta. Settlement

Agreement, *Orion* Action.

52.  Defendant **Nantong Schmidt Opto-Electrical Technology Co. Ltd.** ("Nantong Synta") is a Chinese company with its principal place of business at No. 399 West Zhongshan Road, Rugao City, Jiangsu, China. During the Class Period, Nantong Synta—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen owns and controls Nantong Synta. David Shen signed the settlement agreement with Orion on behalf of Nantong Synta. Settlement Agreement, *Orion* Action.

53.  Defendant **Synta Canada International Enterprises Ltd.** ("Synta Canada") is a Canadian company with its principal place of business at 7531 Lucas Road, Richmond, BC V6Y1G1, Canada. During the Class Period, Synta Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Canada owns 20 percent of Suzhou Synta. David Shen and/or his family own and control Synta Canada.

54.  Defendant **Pacific Telescope Corp.** ("Pacific Telescope") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, British Columbia V7A 5C8, Canada. During the Class Period, Pacific Telescope—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Pacific Telescope was established in 1997 to sell Synta's Sky-Watcher brand of telescopes in Canada. David Shen is a co-owner of Pacific Telescope.

55.  Defendant **Olivon Manufacturing Co. Ltd.** ("Olivon Canada") is a Canadian company with its principal place of business at 11880 Hammersmith Way, Richmond, BC V7A 5C8, Canada. During the Class Period, Olivon Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen

controls Olivon Canada and Olivon USA LLC .

56.     Defendant **SW Technology Corporation** ("SW Technology") is a Delaware corporation with its principal place of business at 2835 Columbia Street, Torrance, California 90503. SW Technology is a subsidiary and wholly owned and/or controlled by its parent, Synta Technology. During the Class Period, SW Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. In 2005, David Shen established SW Technology to acquire Celestron Acquisition, LLP as a wholly owned subsidiary. He continues to operate SW Technology.

57.     Defendant **Celestron Acquisition, LLC** ("Celestron") is a Delaware limited liability company with its principal place of business at 2835 Columbia Street, Torrance, California 90503. Celestron is a subsidiary of and is wholly owned and/or controlled by its parent, SW Technology. During the Class Period, Celestron—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. Synta Technology was listed as a "Celestron Party" in Celestron's settlement agreement with Orion, rendering Synta Technology an affiliate of Celestron. Settlement Agreement, *Orion* Action.

58.     Defendant **Olivon USA, LLC** ("Olivon USA") is a Nevada corporation with its principal place of business at 5525 Coley Avenue, Las Vegas, Nevada 89146. During the Class Period, Olivon USA, LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District. David Shen controls Olivon USA and Olivon Canada.

### b.     Individual Defendants

59.     Defendant **Dar Tson ("David") Shen** is the founder, owner, and chairman of the aforementioned Synta Corporate Defendants, unless otherwise noted. Mr. Shen personally participated in the conspiracy alleged herein. He owns and/or controls the Synta Corporate

Defendants during the Class Period, unless otherwise noted. Mr. Shen is a member of Celestron's board, the Executive Management Group. He signed the settlement agreement with Orion on behalf of Synta Technology. Although Mr. Shen founded and oversees the Synta Corporate Defendants, he was concurrently an officer of Ningbo Sunny, a direct horizontal competitor, from 2001 to 2005. In fact, Mr. Shen held a 26 percent ownership interest in Ningbo Sunny until 2005, when Synta Technology acquired Celestron through SW Technology. Mr. Shen regularly comes to this District to meet with distributors of Synta telescopes.

60.   Defendant **Joseph Lupica** is Celestron's former CEO. Through the collusive arrangements of Defendants and Co-Conspirators, he became CEO of Meade Instrument Corp. ("Meade")—Celestron's main competitor. Mr. Lupica resides in Palm Springs, California. He personally participated in the conspiracy alleged herein. He began replacing Meade's management with Celestron's officers, directors, employees, and/or agents, including Celestron's Vice President of Sales, Victor Aniceto, who was hired as Meade's Vice President of Sales. Later, when Mr. Lupica retired, Mr. Aniceto was promoted to Meade's President. Mr. Lupica has admitted that Ningbo Sunny could not have acquired Meade but for the collusive assistance it received from Synta Corporate Defendants.

61.   Defendant **Dave Anderson** is Celestron's former CEO. He resides in or near Minneapolis, Minnesota. Mr. Anderson personally participated in the conspiracy alleged herein.

### 2.     The Ningbo Sunny Defendant

62.   Defendant **Ningbo Sunny Electronic Co. Ltd.** is a Chinese company with its principal place of business at 199 An Shan Lu, Yuyao, Ningbo, Zhejiang, China 315400. During the Class Period, Ningbo Sunny—directly and/or through its subsidiaries, which it wholly owned and/or controlled, and through Defendant Celestron (*see supra*) and other distributors— manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District.

### C.     Agents and Co-Conspirators

63.   Co-Conspirator **Jean Shen** owns and controls Olivon Canada and Olivon USA and

is Mr. Shen's sister. She represented to telescope distributors that the Synta Corporate Defendants' competitor, Ningbo Sunny, was one of "my family's companies[.]" Mr. Shen also exercises control over Olivon Canada and Olivon USA through her.

64.     Co-Conspirator **Sylvia Shen** is the co-owner of Pacific Telescope along with Mr. Shen and Mr. Chen (*see infra*), a member of Celestron's Executive Management Group, SW Technology's CEO, CFO, and Secretary, Mr. Shen's sister, and Mr. Chen's wife. Mr. Shen also exercises control over Pacific Telescopes through her. She signed the settlement agreement with Orion on behalf of SW Technology.

65.     Co-Conspirator **Jack Chen** is the co-owner of Pacific Telescope along with Mr. Shen and Ms. Sylvia Shen, a member of Celestron's Executive Management Group, and Ms. Sylvia Shen's husband. Mr. Shen also exercises control over Pacific Telescopes through Mr. Chen.

66.     Co-Conspirator **Laurence Huen** is a member of Celestron's Executive Management Group and Mr. Shen's close advisor and confidante. He resides in British Columbia, Canada. Mr. Huen assisted Joseph Lupica (*see infra*) and acted as a conduit of information between Synta Defendants and Ningbo Sunny Defendant.

67.     Co-Conspirator **Corey Lee** is Celestron's CEO. He resides in California.

68.     Co-Conspirator **Sunny Optical Technology Co., Ltd.** ("Sunny Optical") is a Chinese company with its principal place of business at 27-29 Shunke Road, Yuyao, Zhejiang, China. Sunny Optical is Ningbo Sunny's affiliate. Sunny Optical manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, Sunny Optical's activities in the United States were under the control and direction of Ningbo Sunny at all times during the Class Period.

69.     Co-Conspirator **Sunny Optics Inc.** ("Sunny Optics") is a Delaware corporation formed for the purpose of Ningbo Sunny's acquisition of Meade. Upon information and belief, Sunny Optics is Ningbo Sunny's subsidiary.

70.     Co-Conspirator **Meade Instruments Corp.** is a Delaware corporation with its principal place of business at 27 Hubble, Irvine, California 92618. Meade is a subsidiary and wholly-owned and/or controlled by its parent, Ningbo Sunny. Meade manufactured, marketed, and/or sold telescopes that were sold and purchased throughout the United States, including in this District, during the Class Period. On information and belief, Meade's activities in the United States were under the control and direction of Ningbo Sunny at all times during the Class Period. Meade has filed for bankruptcy (*see* Case No. 8:19-bk-14714-CB (C.D. Cal.)), is subject to the bankruptcy stay, and is not named as a defendant.

71.     Co-Conspirator **Wenjun ("Peter") Ni** is the founder, owner, and CEO of Ningbo Sunny and Meade. On information and belief, Mr. Ni controlled Sunny Optical, Meade, and Sunny Optics during the Class Period.

72.     Co-Conspirator **Wang Wenjian** is Sunny Optical's director and controlling shareholder and Mr. Ni's uncle.

73.     As indicated above, Defendants and Co-Conspirators shared certain executives that facilitated the conspiracy. For example, although Mr. Shen founded Synta Technology in 1980, he also served as an officer and vice chairman of its direct competitor, Ningbo Sunny, from November 2001 to July 2005. Mr. Shen also owned 26 percent of Ningbo Sunny until 2005, at which time he transferred his shares to his sister-in-law, Dong Yun Xue, who continues to hold that interest. As another example, Joe Lupica was the CEO of both Celestron and Meade, and his transition from Celestron's CEO to Meade's CEO is part of the conspiracy alleged herein.

74.     Defendants acted as the principals of or agents for the unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

75.     Various persons, partnerships, sole proprietors, firms, corporations, companies, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy or the anticompetitive conduct. The co-conspirators committed overt acts and communicated with

others in the conspiracy to restrain, restrict, exclude, and foreclose competition in the telescope market (*see infra*) in every state and territory of the United States. Celestron and Meade are headquartered in California. Ningbo Sunny's and Synta's conduct in California, and related conduct occurring in every other state and territory, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in every state and territory of the United States.

76.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, limited liability entity, or company, the allegation means that the corporation, limited liability entity, or company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the business or affairs of the corporation, limited liability entity, or company.

> 1.     **Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates**

77.     When Defendants reached agreement on fixing or stabilizing prices, rigging bids, or allocating the market of telescopes—whether as a result of formal or informal meetings or discussions arranged to implement or enforce cartel purposes and agreements—Defendants and Co-Conspirators meant for their collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive efforts regardless of where they were sold.

78.     As part of a single, integrated, global enterprise, Defendants and Co-Conspirators manufacture, market, and/or sell telescopes. They sell their telescopes around the world, including in the United States. Accordingly, to achieve the cartel's anticompetitive aims, Defendants and Co-Conspirators effectuated the cartel by establishing pricing and allocating the market in which they compete.

79.     Foreign-based Defendants and Co-Conspirators established United States (and other North American) subsidiaries not only to market and sell their telescopes in the United States but also to effectuate and achieve the cartel's aims and purposes. Without doing so, these corporate

1  entities would have had to perform such functions themselves. These corporate entities chose not

2  to do so and instead established corporate subsidiaries and affiliates that perform functions at the

3  direction of and are controlled by their officers in China.

4      80.  These United States (and other North American) subsidiaries have no authority to

5  set prices below the prices for telescopes agreed to among the cartel's members. For these

6  subsidiaries, pricing authority largely was held by their Chinese corporate parent or affiliate.

7      81.  Because their foreign-based corporate parent or affiliate had significant control over

8  all aspects of their business (*e.g.*, type of telescopes, prices, supply, business strategy, customer

9  development and relations, sales, personnel decisions), the United States (and other North

10  American) subsidiaries operated as little more than distribution and sales units of their foreign-

11  based corporate parents or affiliates. Indeed, the foreign-based corporate parent and affiliates

12  named their own family members as employees and officers of their United States subsidiaries.

13  As a result, the United States (and other North American) subsidiaries were—as intended—able

14  to advance the cartel aims in the United States.

      **2.  Defendants' High-Level Employees Organized the Conspiracy, and
15            Their Subordinate Employees—Including Those of Their U.S.
16            Subsidiaries—Executed the Conspiracy**

17      82.  Defendants and Co-Conspirators organized the telescope conspiracy at a high-level

18  within their respective corporate families. Both executives and subordinate employees carried out

19  the conspiracy. Additionally, given the nature of the industry, the subsidiaries and affiliates

20  implemented the conspiratorial agreements within their respective corporate families.

21      83.  Each of the corporate families alleged herein (*i.e.*, Synta and Ningbo Sunny)

22  operates not as separate corporate entities but as a single enterprise. Each corporate family holds

23  itself out to the public as a single, integrated enterprise. Each of the parent and/or foreign entities

24  named in this case operate a hierarchical corporate structure wherein it treats subsidiaries not as

25  separate corporate entities under their own control but as mere divisions of the corporate parent.

26      84.  Each corporate parent alleged herein also coordinates and manages the finances and

27  meetings among officers from each of the different subsidiaries to facilitate an integrated

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                  15

enterprise to link the various supply chains to the corporate families' clients. The parent defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the United States subsidiaries.

85.     In light of the fact that the United States subsidiaries named in this Complaint were treated as mere distribution and sales units of the Chinese parent or foreign affiliate, they were generally kept informed about the competitor meetings and discussions occurring abroad and were not permitted to undercut the pricing and market allocation agreements reached during those meetings and discussions.

86.     By virtue of their integrated enterprises, and by virtue of the other allegations in this complaint, each Defendant and Co-Conspirator entered into the conspiracy alleged herein on behalf of, and reported these meetings and discussions to, its respective corporate family and United States subsidiaries. In fact, Chinese-based parents and affiliates often provided pricing instructions to their United States subsidiaries, which acted as their distribution and sales arms in the United States.

### 3.     Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family

87.     In meetings and discussions between Defendants and Co-Conspirators in furtherance of the telescope conspiracy (*see infra*), Plaintiffs allege generally which corporate family was represented in a particular meeting or communications. The individual participants in the conspiratorial meetings and discussions did not distinguish among entities within a particular corporate family, referring to themselves or others, for example, merely as "Synta," "Celestron," "Sunny," or "Meade." Indeed, the officers from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective United States' subsidiaries. Further, because of their generic uses of Defendants and Co-Conspirators' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts nor did they distinguish

among entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and United States affiliates. As a result, the entire corporate family was represented in meetings and discussions by its agents and was party to the agreements reached in those meetings.

88.     For example, in an email from Peter Ni to Celestron's former CEO, Dave Anderson, and Celestron's board members, Laurence Huen, Mr. Chen and Ms. Sylvia Shen, Mr. Ni wrote "But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY" and "[a]t present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny." *See infra*.

89.     Similarly, Meade's then Vice-President of Sales Victor Aniceto wrote to then-Meade CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business." *See infra.*

90.     Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email to Sunny Optics and Meade, "On the other hand if we take advantage of the strong relationships among Ningbo Sunny, Synta, Celestron and Meade (under Peter's ownership) ***we can quickly turn the company around and the four companies can dominate the telescope industry***" (emphasis added). Further revealing the interrelatedness of Ningbo Sunny and its affiliates is the manner in which invoices were paid. For example, Sunny Optical's financial statements reflect Meade paying invoices issued by the law firm which represented Ningbo Sunny in the acquisition of Meade.

91.     Further, Defendants and Co-Conspirators knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants and Co-Conspirators would not have entered into the agreements if affiliates could simply undercut the agreements reached.

/ / /

**4.      The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms**

92.    Defendants and Co-Conspirators' United States subsidiaries are wholly-owned and/or controlled by their foreign parents or affiliates. As part of each Defendant's global enterprise, its United States subsidiary or affiliate assists the foreign parent or affiliate with the distribution and/or sale of telescopes to consumers in the United States. In most cases, the United States subsidiaries carry out the distribution and/or sales of telescopes to customers in the United States after obtaining telescopes manufactured at the foreign parent or affiliate's factories located abroad. Generally, United States' subsidiaries facilitate direct purchaser orders for telescopes with parents or affiliates overseas. That is, the foreign parent or affiliate manufactures telescopes abroad and sends the telescopes directly to the United States, often through its United States (or other North American) subsidiaries or affiliates. Indeed, the foreign parents and affiliates make millions—if not, billions—of dollars of "sales" annually to their United States' (and other North American) subsidiaries and affiliates as part of their global business.

93.    In sum, the foreign-based Defendants and Co-Conspirators sell directly to the United States and operates their telescope business as a single global enterprise with their subsidiaries and affiliates in the United States and North America generally.

## IV.    FACTUAL ALLEGATIONS

### A.      Telescopes



*Source:* https://particle.scitech.org.au/space/best-telescope-buy/

94.     Humans have looked up at the heavens and wondered what is out there for millennia. Thousands of amateur astronomers grab their telescope and aim it towards the open sky each day. There is never a shortage of interesting sights in the vast universe. For example, despite the fact that it is only a mere blip on the cosmic scale, the Milky Way galaxy contains over 100 billion stars, and one can uncover the tiny details and see what the naked eye cannot with the help of a telescope.

95.     A telescope is an optical instrument that magnifies and enhances the view of faraway objects. Most telescopes available for purchase to consumers fall into one of two main categories, refractor or reflector, though a combination of the two, Schmidt-Cassegrain telescopes, are also available.

96.     A refractor telescope contains convex (bending outwards) lenses to collect, focus, and magnify light. Rays of light travel through the objective (main) lens where they are focused at the focal length of the eyepiece.

97.     A reflector telescope, contains concave (bending inwards like a cave) mirrors. Light travels down the tube where it is reflected (hence the name reflector) up to a secondary mirror near the top of the tube, which directs the light into the eyepiece. This exact system is known as a Newtonian reflector.

98.     The Schmidt-Cassegrain telescope has gained immense popularity over the last 30 years. This type of telescope uses both lenses and mirrors in a compound system.

**B.     Relevant Market: The Market for Telescopes in the United States**

99.     The relevant market is the market for telescopes in the United States. The telescopes at issue in this case are those used by amateur astronomers rather than those found at observatories and universities. This market is $250 million to $500 million annually. The Synta and Ningbo Sunny Defendants control the market for telescopes in the United States.

100.   Ningbo Sunny and Synta together control 80 percent of the market for telescopes in the United States. Together, they have engaged in exclusionary conduct that has harmed competition and caused purchasers of telescopes to pay supra competitive prices.

101.   For example, as described elsewhere in this complaint, although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures and sells higher-end telescopes, while Ningbo Sunny manufactures and sells lower-end telescopes. Both higher-end telescopes and lower-end telescopes are part of the same overall market for telescopes in the United States.

102.   Pursuant to that unlawful agreement or understanding, Synta will not manufacture, sell, or respond to a request for quotation ("RFQ") for telescopes offered by Ningbo Sunny, and *vice versa*. As a result of their understanding, Ningbo Sunny and Synta can and do fix and stabilize prices thereby charge supracompetitive prices, rig bids, restrict supply, and engage in other anticompetitive conduct that artificially increases the prices of telescopes purchased by American consumers from Defendants and Co-Conspirators.

103.   Ningbo Sunny and Synta have faced limited competition in the market for telescopes in the United States because of their unlawful agreements and their conspiracies to monopolize.

104.   Moreover, as described further in this complaint, in 2005 Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States though Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and assistance and became the dominant lower-end telescope distributor in the United States.

**C.   Defendants Are Liable for the Anticompetitive Conduct Alleged Herein**

105.   Orion's claims withstood motions to dismiss and summary judgment before proceeding to trial in November 2019. As mentioned, *supra*, Orion won a $16.8 million jury verdict against Ningbo Sunny and its subsidiaries, which was statutorily trebled under 15 U.S.C. § 15(a) to $50.4 million.

106.   In the *Orion* Action, the jury unanimously found, *inter alia*:

    a.     Ningbo Sunny agreed with its competitors to fix or stabilize the prices and
           credit terms for telescopes and accessories in violation of Section 1 of the

Sherman Act;

b.    Ningbo Sunny agreed with a third party, other than a competitor, to fix the price or credit terms for telescopes and accessories in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

c.    Ningbo Sunny agreed with a competitor or potential competitor either (a) not to compete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them, in violation of Section 1 of the Sherman Act;

d.    Ningbo Sunny agreed with a third party, other than a competitor or potential competitor, either (a) not to complete with each other in the market for telescopes and accessories, or (b) to divide customers or potential customers between them in a manner that unreasonably restrained trade, such that the anticompetitive effects outweighed any procompetitive effects, in violation of Section 1 of the Sherman Act;

e.    Ningbo Sunny engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act;

f.    Ningbo Sunny had a specific intent to achieve monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

g.    There is or was a dangerous probability that Ningbo Sunny could achieve monopoly power in violation of Section 2 of the Sherman Act;

h.    Ningbo Sunny knowingly entered into an agreement with another person or entity to obtain or maintain monopoly power in the telescope market in violation of Section 2 of the Sherman Act;

i.    Ningbo Sunny specifically intended that one of the parties to the agreement would obtain or maintain monopoly power in the telescope market in

violation of Section 2 of the Sherman Act;

j.      Ningbo Sunny committed an overt act in furtherance of the conspiracy in violation of Section 2 of the Sherman Act; and

k.      Ningbo Sunny and Sunny Optical's acquisition of Co-Conspirator Meade created a reasonable likelihood of substantially lessening competition or creating a monopoly in the telescope market in violation of Section 7 of the Clayton Act.

*See* Verdict Form*, Orion* Action (Nov. 26, 2019), ECF No. 501.

## D.    The Federal Trade Commission's Actions in the Telescope Market

107.    Antitrust concerns in the telescope market are not new; indeed, they arose in 2005, when Synta acquired Celestron, the largest distributor of telescopes in the United States at the time and a rival of Meade, another telescope distributor. In May 2002, Meade had itself attempted to acquire Celestron. The parties abandoned the deal, however, after the Federal Trade Commission ("FTC") authorized staff to seek a temporary restraining order and a preliminary injunction in federal district court to stop any attempt by Meade to purchase all, or certain assets, of Tasco Holdings, Inc.'s Celestron International, the number two performance telescope provider in the United States and the only other supplier of Schmidt-Cassegrain telescopes. According to the FTC's complaint, Meade's acquisition of Celestron assets would adversely impact the telescope market by eliminating substantial actual competition between the two companies and by creating a monopoly in the market for telescopes.[1]

108.    Similarly, in 1991, the FTC gave final approval to a consent agreement settling charges that a proposed joint venture between Meade and Celestron would have created a virtual monopoly in the manufacture and sale of certain telescopes. The agreement placed a 10-year requirement on Harbour Group Investments, L.P. and Diethelm Holding Ltd. (the former parents

---

[1] FTC Authorizes Injunction to Pre-empt Meade Instruments' Purchase of All, or Certain Assets, of Tasco Holdings, Inc.'s Celestron International, Fed. Trade Comm'n (May 29, 2002), *available at* https://www.ftc.gov/news-events/press-releases/2002/05/ftc-authorizes-injunction-pre-empt-meade-instruments-purchase-all.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                           22

of Meade and Celestron, respectively) to obtain FTC approval before acquiring any company that manufactures or sells certain telescopes in the United States. This consent agreement followed a decision by the United States District Court for the District of Columbia granting the FTC's motion for a preliminary injunction barring the acquisition of any assets or other interest in Celestron International by Harbour Group (Meade's parent) and further barring Diethelm (Celestron's parent) from acquiring any assets or other interest in Meade.[2]

**E.     Defendant Dar Tson ("David") Shen Orchestrated and Participated in the Creation of Ningbo Sunny as a Sham Competitor for Synta, and Managed Ningbo Sunny to Promote Synta's Anticompetitive Ends**

109.   Ningbo Sunny was not formed as a new business venture by independent investors, but rather was created to serve as a sham competitor to Synta at the direction of Defendant Dar Tson ("David") Shen. Mr. Shen had earlier been acquainted with Co-Conspirator Wenjun ("Peter") Ni, and in or around 2001 provided Mr. Ni with a large share of the seed capital necessary for Ningbo Sunny's formation. At the time, Mr. Ni did not have significant available financial resources or the ability to adequately capitalize Ningbo Sunny. In exchange for this infusion of funds, Mr. Shen was granted a 26 percent ownership stake in the new company, an arrangement that gave him significant influence over Ningbo Sunny's affairs and the ability to control and direct the manner in which it pretended to compete with its nominal rival, the by-then well-established, Synta. The creation of Ningbo Sunny gave Mr. Shen the ability to coordinate the activities of a much larger share of the industry's sales than would have been achievable otherwise.

110.   At all times relevant here, and beginning at least as early as 2001 and extending to the present, Ningbo Sunny and Synta coordinated their actions in the consumer telescope market, instead of acting as true competitors.  Indeed, Mr. Shen and Mr. Ni have been close personal friends who met and spoke regularly with each other.

111.   In 2004, Mr. Shen and Mr. Ni deepened their ties by collaborating to form a new

---

[2] *FTC v. Harbour Grp. Invs.*, Civil Action No. 90-2525, 1990 US Dist. LEXIS 15542 (D.D.C. Nov. 19, 1990).

1   entity they named Sky-Rainbow, which would later serve as a conduit used by the Defendants to

2   transfer funds between Celestron and Ningbo Sunny to acquire Meade.

3       112.   Synta's 2005 acquisition of Celestron marked a major step in Synta and Ningbo

4   Sunny's coordinated effort to dominate and exert control over the U.S. telescopes market. In

5   preparation for this step, Mr. Shen resigned from his position as Vice Chairman of Ningbo Sunny.

6   As Laurence Huen explained in an August 2013 email: "David resigned this position on July 2005,

7   in order to avoid any concern of conflict of interest after he acquired Celestron on April 2005."

8   Mr. Shen also nominally divested himself of his interest in Ningbo Sunny by transferring his 26

9   percent ownership interest to his brother and sister-in-law. This resignation and transfer was, in

10  fact, a sham and Mr. Shen thereafter continued to exert his influence over the management of

11  Ningbo Sunny.

12      113.   In May 2005, one month after the acquisition, Sylvia Shen of Synta informed Joe

13  Lupica of Celestron and later Meade that it was David Shen's decision to allocate higher-end and

14  lower-end telescopes: "David decided to move all the production for 114mm or smaller items to

15  Sunny" and "Synta will concentrate on bigger and higher end products[.]"

16
----- Original Message -----
From: sylvia
To: JOE LUPICA
Cc: Sylvia Chen
Sent: Tuesday, May 24, 2005 12:14 PM
Subject: Re: Telephone Conversation with Joe Messner

Dear Joe,
Thank you for your message.
David thinks that you have a very good understanding about his thoughts. He would like you to keep in touch with Joe Messner from time to time to maintain a friendly relationship. To keep the business from Bushnell is one concern, but David is more concern about the potential lawsuit in patent conflict.
I think it is also important to have face-to-face communications with Joe Messner, I'll check with David to see his opinions and availability.
David decided to move all the production for 114mm or smaller items to Sunny, except Bushnell's. It's a sensative moment, we would keep Bushnell's as is.
Sytna will concentrate on bigger and higher end products, thus we can support Celestron better.
We appreciate your understanding and efforts.
Thank you and best regards,
Sylvia
----- Original Message -----

22      114.   In February 2007, Laurence Huen of Celestron wrote: "The facts supporting the

23  movement were well received by David … knowing that he has got certain 'strategic alignment'

24  with Sunny. So shifting to Sunny, if suggested by him, will never be a problem."

25      115.   In November 2008, Joe Lupica emailed David Shen, Sylvia Shen, and Laurance

26  Huen:

27          Dear David, Sylvia and Laurence:

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 24

10445742v1/016869

> I have reviewed the nondisclosure agreement sent by Baird to Sunny regarding the Meade transaction. … David, are you and Mr. Ni interested in buying Meade jointly?
>
> I would recommend David or Mr. Ni sign this agreement and have them send the financial packet to Laurence. Laurence can make copies and send one copy to David, Mr. Ni and myself. We can then evaluate the possibility of acquiring Meade.

116.   In October 2010, Joe Lupica emailed Laurence Huen:

> We may have to do this through Sunny because of legal issues associated with Celestron and Meade. …
>
> If David and his family are looking out five to seven years this would be a very advantageous acquisition. Over the first two years we would probably make less than Celestron as a stand-alone company. The other thing for David and his family to consider is that this transaction would complicate our business beyond its current level of complexity. Would the family feel comfortable adding more complexity to the operation beyond what we current have? I don't know the answer to this but they would have to place more faith and trust into others outside the family for the overall success of their business empire. Only the family can answer if this is the approach they want to take.

117.   In October 2010, Corey Lee of Celestron emailed Victor Aniceto of Celestron and later Meade: "I think Sunny will *only* do something like that if it was a deal brokered by David."

118.   In August 2011, Joe Lupica emailed Dave Anderson of Celestron, Corey Lee, Victor Aniceto:

> The visit to Sunny was beneficial in understanding Sunny and Synta's relationship. … I was told that David visits at least 1x a month. … I asked Junwen about the pricing they charge these smaller brands and he thinks that they pay 10 – 15% higher but these are all quoted by Synta. It looks like Synta is Sunny's sales arm.

119.   Moreover, in November 2005, the shareholder equity interest of Mr. Shen's brother, Dagong Shen, grew from 10% to 26%. That 26% equity interest remains in the Shen family today, now under the name of David Shen's sister-in-law and Dagong Shen's wife, Yongxue Dong.

120.   The interconnections between Mr. Shen and Mr. Ni only deepened when Synta acquired Celestron in 2005.

---

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 25

121.   Following Synta's acquisition of Celestron, Synta personnel conducted regular weekly calls with Celestron personnel  in the United States in order to manage Celestron's affairs. In addition, starting at least as early as 2008, employees and managers within the Quality Assurance department at Celestron traveled at regular intervals several times a year to China to inspect operations at the manufacturing facilities operated at the direction of Synta (until recently at Suzhou, later at Rugao) and Ningbo Sunny (at Ningbo), Celestron's two most significant suppliers of telescopes. These facilities were located within a few hours' drive of each other, within Jiangsu Province in cities surrounding greater Shanghai. It was the customary practice of Celestron personnel to conduct their inspection activities first at Synta and then on subsequent days at Ningbo Sunny, or vice versa, but always with visits to both suppliers scheduled as part of the same trip from California to China.

122.   On these occasions, Celestron's hosts at Synta or Ningbo Sunny would entertain their guests in the evening. If the event took place in Suzhou or Rugao, senior Ningbo Sunny executives (including Mr. Ni) would travel from Ningbo to Suzhou or Rugao to meet with attendees from Celestron **_and_** Synta; if at Ningbo, senior Synta executives (including Mr. Shen) would travel from Suzhou or Rugao to Ningbo to meet with their counterparts at Celestron **_and_** Ningbo Sunny. At Celestron-Synta-Ningbo Sunny dinners, and at continuation sessions later at nightclubs, Mr. Shen and Mr. Ni generally sat at the same table, and had face-to-face discussion providing them ample opportunities to confirm their ongoing loyalty and discuss the coordinated management of their telescopes businesses.

123.   Upon information and belief, at all times relevant and beginning at least as early as 2008, and extending to at least the period when Orion initiated suit in 2016, Messrs. Shen and Ni met together and traveled together elsewhere as well. Mr. Ni would often accompany Mr. Shen on trips to Taiwan, where Mr. Shen operated another telescopes company, so that the pair could meet for several rounds of golf. These trips provided Synta and Ningbo Sunny further opportunities to coordinate the conduct of Synta and Ningbo Sunny and collude with each other.

124.   In November 2013, Ningbo Sunny executives inspected Meade's facilities and

operations in Southern California and Mexico as part of their research related to Ningbo Sunny's planned acquisition of Meade. A delegation of seven executives, including Mr. Shen and Mr. Ni, traveled from China to North America for the inspections. The group first flew to Los Angeles, then visited Meade headquarters in Irvine, California, and continued on to Meade's facilities in Tijuana, Mexico. From there, Mr. Shen and Mr. Ni split off from the group and traveled together to play golf in San Diego, traveled together to Tucson, Arizona, and finally returned to Los Angeles before their return flight to China. Their joint traveling together provided further opportunities for them to collude over the marketing and sales of telescopes in the United States.

125.   The foregoing conduct including their shared travel strongly supports the allegations that strong bonds existed between Mr. Shen and Mr. Ni long before 2013, when Ningbo Sunny made its collusive acquisition of Meade.

126.   The Synta assistance to and coordination with Ningbo Sunny in connection with its acquisition of Meade was not an isolated event; it was merely in furtherance of longstanding cooperation between the entities. Indeed, Mr. Shen's coordination of business activities with Ningbo Sunny, including the formation of Ningbo Sunny, began long before the acquisition of Meade. This conduct is part and parcel of related and similar efforts to set up additional telescopes manufacturers who were made to appear to the outside world as rival competitors, but which were, in fact, influenced by Mr. Shen. These manufacturers included Sky-Watcher, a company so closely affiliated with Celestron that its offices were located within Celestron's offices, and Viewway, another manufacturer Mr. Shen formed in Guangzhou, China.

## F.   Defendants and Co-Conspirators Agreed to Sell Different Telescopes in the Telescope Market

127.   Through their unlawful agreements with horizontal competitors, Synta and Ningbo Sunny effectively divided the telescope market. As alleged above, Synta and Ningbo Sunny agreed that Synta would manufacture and supply higher-end telescopes and Ningbo Sunny would manufacture and supply lower-end telescopes and that they would not compete.

128.   They also agreed that Synta would not manufacture or respond to RFQs for

telescopes manufactured by Ningbo Sunny and *vice versa*. Both adhered to their agreements. As a result of their respective market shares, agreements not to compete, and significant barriers to entry (*see infra*), Synta and Ningbo Sunny both have engaged in conduct to control the respective telescopes that each sell. Ningbo Sunny and Synta therefore can and do limit supply, fix or stabilize prices, rig bids, and charge supracompetitive prices, and engage in other anticompetitive conduct that artificially increases the prices of telescopes.

129.   In the years following Ningbo Sunny's formation, Synta and Ningbo Sunny manufactured telescopes for distributors like Meade and Orion.  During this period, while both Synta and Ningbo enjoyed some success, Defendants were unable to obtain a dominant market share as a number of unaffiliated telescope manufacturing competitors remained.

130.   In 2005, Defendants identified an opportunity to avoid this competition. Celestron, a major telescope distributor, was looking to be acquired by a purchaser that could provide additional capital.  If Defendants purchased Celestron, they could then just direct all Celestron manufacturing to Synta and Ningbo Sunny rather than having to compete with other manufacturers for Celestron's business. This would effectively preclude any other telescope manufacturer from being able to compete for Celestron's business.

131.   Accordingly in April 2005, it was announced that Synta would acquire Celestron. And in May 2005, Celestron's manufacturing of higher-end telescopes was allocated to Synta and Celestron's manufacturing lower-end telescopes was allocated to Ningbo Sunny.

132.   In 2004, Synta Technology began marketing and selling Ningbo Sunny telescopes to U.S.-based purchasers including Orion, an arrangement that was a product of the close coordination between Synta and Ningbo Sunny.

133.   Contemporaneously with Synta's 2005 acquisition of Celestron, Synta announced to U.S.-based purchasers, including Orion, that it would no longer manufacture certain telescopes that it had manufactured and supplied to these customers in the past. Synta recommended that these U.S. purchasers acquire the models that Synta had previously supplied from Ningbo Sunny instead. Synta's withdrawal from the market with respect to these product lines and urging

purchasers to acquire these products to Ningbo Sunny was made pursuant to a market allocation agreement that was part and parcel of their overarching agreement to suppress competition by dividing up the markets between them.

134.   In a December 7, 2007 SEC Form S-1 filing, Meade reported that it "has begun to see increased pricing pressure from Celestron as a result of this change in ownership and a substantial capital infusion by Synta." Meade added: "We have experienced, and continue to experience, difficulties with these manufacturers, including reductions in the availability of production capacity, failure to meet our quality control standards, failure to meet production deadlines and increased manufacturing costs."

135.   By 2009, Synta Technology employee Joyce Huang had abandoned pretense of working only for Synta-affiliated companies, and began issuing invoices to telescope purchasers on behalf of Ningbo Sunny.

136.   In 2010, Synta informed U.S. retailer customers, including Orion, that some of its low-end telescope products would thenceforth be produced by Ningbo Sunny.

137.   As of 2012, Synta employee Ms. Huang was coordinating meetings between Mr. Shen of Synta, Mr. Ni of Ningbo Sunny, and at least one U.S. customer, Peter Moreo of Orion.

## G.   Defendants and Co-Conspirators Colluded on Ningbo Sunny's Acquisition of Meade

138.   Meade was a leading American telescope manufacturer and supplier for many years. It owned critical patents, had a manufacturing facility in Mexico, and manufactured high- and low-end telescopes. One of the patents was for GoTo technology, a highly valued type of telescope mount and related software that can automatically point a telescope at astronomical objects that the user selects. GoTo technology was also the subject of extensive litigation between Meade and Celestron.

139.   When Meade was offered for sale in 2013, Jinghua Optical Co. Ltd. ("Jinghua"), a smaller manufacturer of telescopes and competitor of Ningbo Sunny and Synta, made a bid to purchase it. If Jinghua had been able to purchase Meade, it would have gained critical knowledge

about the manufacture of telescopes and accessories as well as Meade's patent portfolio, permitting it to better compete with Ningbo Sunny and Synta in the telescope market.

140.    Ningbo Sunny and Synta colluded to prevent Jinghua's acquisition of Meade, which would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry. Ningbo Sunny and Synta were motivated to scupper the Jinghua deal and to conspire because the FTC had blocked Meade and Celestron's merger in 1991 and 2002. Additionally, Synta could not acquire Meade due to its ownership of Celestron. As a result, Ningbo Sunny's Mr. Ni and Synta's Mr. Chen agreed that if Ningbo Sunny moved to acquire Meade, Celestron and Synta would provide financial and other assistance to complete the acquisition. This is not the kind of arrangement into which true competitors enter.

141.    Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. These payments were documented, for example, in an accounting provided by Celestron's CFO, Paul Roth. As part of this unlawful agreement, Celestron took equity in Meade, which is memorialized in shadow books kept by Defendants and Co-Conspirators.

142.    On information and belief, in exchange for this support, Ningbo Sunny concealed Synta's and Celestron's involvement or assistance in its acquisition of Meade from the FTC; Ningbo Sunny offered Celestron equity in Meade; Ningbo Sunny provided Celestron and Synta with access to Meade's intellectual property rights, thereby ensuring that Celestron no longer needed to compete with Meade (previously an independent company); and Ningbo Sunny shared its customers' data—including pricing data—with Celestron and Synta, thus enabling them to coordinate their prices and strategies. This cooperation reinforced Synta and Ningbo Sunny's control in the United States for their telescopes, further enabling the price fixing in which they engaged.

143.    Synta and Ningbo Sunny's combination and conspiracy eliminated competitors and increased market concentration. Specifically, the effect of Ningbo Sunny's acquisition of Meade lessened competition, raised the already-high barriers to entry (*see infra*), and tended to allow Synta and Ningbo Sunny to obtain control over the telescope market in the United States. All of

1  this conduct facilitated and made possible the circumstances for the price-fixing in which they

2  engaged.

3      144.   After the Meade acquisition, Messrs. Shen and Huen continued to provide advice

4  and assistance to horizontal competitors Ningbo Sunny and Meade, met with Mr. Ni about these

5  issues, and toured Meade's facilities. Mr. Huen also instructed Ningbo Sunny to remove Meade's

6  CEO and to replace him with Celestron's former CEO, Mr. Lupica. Again, these are not the

7  actions in which true competitors would engage. These are, instead, the actions of two corporate

8  families that have decided to collaborate instead of compete.

9    **H.**    **Defendants and Co-Conspirators Conspired to Interfere with Orion's**

10             **Acquisition of the Hayneedle Assets**

11      145.   Synta and Ningbo Sunny also colluded to prevent a competitor, Orion, from

12  acquiring various valuable assets. In 2014, Orion attempted to acquire certain assets, including

13  web domains like telescopes.com, from online retailer, Hayneedle ("Hayneedle Assets").

14  Defendants and Co-Conspirators used their market power to fix credit terms to prevent Orion from

15  acquiring the Hayneedle Assets. Specifically, they coordinated timing to cut off Orion's credit

16  with the respective businesses when they learned that Orion sought to acquire these assets.

17      146.   On May 12, 2014, Orion sent a letter of intent to Hayneedle indicating that Orion

18  sought to purchase the Hayneedle Assets. On June 14, 2014, Synta sent Orion's CEO, Peter

19  Moreo, an email that threatened to terminate Orion's credit, stating, "if Orion really buys

20  Hayneedle, this will be the beginning of hazard, we could not trust Orion's credit any more."

21  Synta then forwarded this email to Ningbo Sunny and requested that Ningbo Sunny also withdraw

22  Orion's line of credit. Ningbo Sunny then sent Orion an email nearly identical to Synta's email to

23  Orion. With its supplier credit cut off, Orion could not move forward with the asset acquisition.

24  Synta and Ningbo Sunny therefore sabotaged Orion's purchase of the Hayneedle Assets that

25  would have allowed it to better compete with them in supplying telescopes.

26    **I.**    **Illustrative Examples of Defendants' Anticompetitive Conduct and**

27             **Conspiracy to Fix Prices, Rig Bids, and Allocate the Market**

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**            31

147. In the *Orion* Action, evidence demonstrated defendants' anticompetitive conduct which includes, without limitation:

    a.    Fixing or stabilizing the prices of telescopes;

    b.    Rigging bids for telescopes;

    c.    Allocating the market for telescopes;

    d.    Jointly working together to aid and abet Ningbo Sunny's acquisition of Celestron's horizontal competitor, Meade;

    e.    Exchanging non-public, material information with each other, including Meade's intellectual property, business plans, and telescope pricing strategies;

    f.    Exchanging non-public, material information about competitors' businesses, including intellectual property, business plans, and telescope pricing strategies; and

    g.    Aiding and abetting each other's consolidation and maintenance of monopoly power.

148. Through these activities, the Ningbo Sunny and Synta corporate families illegally combined and conspired with each other instead of competing against one another. Celestron has amassed at least 70 percent of the telescope market in the United States as a result of Defendants' and Co-Conspirators' anticompetitive conduct.

149. Illustrative examples of Defendants' and Co-Conspirators' conspiratorial conduct in the telescope market that, among other things, facilitated and made possible the circumstances for the market allocation and price fixing in which they engaged, includes, but are not limited to:

150. Regarding the horizontal competitors' conspiracy to acquire Meade for Ningbo Sunny, Ningbo Sunny's Mr. Ni confirmed to Celestron's then-CEO Mr. David Anderson and directors, Mr. Shen, Mr. Huen, Mr. Chen, and Ms. Sylvia Shen, that Ningbo Sunny would purchase Meade to prevent JOC (Jinghua) from doing so per the parties' discussion and indicated that Celestron and Synta should provide the financial support to Ningbo Sunny.

From: nbsunny <nbsunny@vip.sina.com>
Sent: Friday, December 13, 2013 12:43 AM
To: DAVE ANDERSON
Cc: david shen; Laurence Huen; Jack chen; shentakuo1
Subject: Fw: Fw: Celestron Payments星特朗付款

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

At present, Sunny has already paid more than $10 millions to MEADE. According to your email, you said you will not provide the financial support to sunny in 2014. It will not maintain MEADE's operation, if only support them by sunny. We had borrowed a lot of money from bank for MEADE. Moreover, Meade still needs to addition $3.5 millions working capital to support their normal operation work at the first of 2014.

As your mention, the $10 millions that you support us is included the payment of goods that the terms of payment is 100days. But so far, CELESTRON is total paid $4.5 millions  if we calculated based on the term of payment is 100 days.

In 2014, we hope the term of payment that CELESTRON pay to sunny will less than 50 days form shipping. And maybe you can pay the SYNTA later; I think Mr. Shen will agree it. At present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny. I think it will help to cushion MEADE if Meade get this money from bank.

Best regards,

Ni Wen Jun

151.   In the *Orion* Action*,* the jury found that Ningbo Sunny and Synta conspired to acquire Meade. Synta made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition. Celestron took equity in its competitor, Meade, as part of this unlawful arrangement between Ningbo Sunny and Synta.

152.   Additionally, a California law firm represented Ningbo Sunny in the acquisition of Meade. According to its engagement letter, however, the law firm was required to take instructions from Synta's Mr. Shen and his executives, including Celestron's Joe Lupica and Dave Anderson. Messrs. Lupica and Anderson helped Sheppard Mullin negotiate and structure the transaction and instructed it to keep Messrs. Shen and Ni updated. This is not the kind of arrangement that would occur amongst normal horizontal competitors.

1.    <u>Scope of Representation</u>.  Except as we may agree otherwise in writing, we will be representing only the Client and will not be representing any parent, subsidiary or other affiliated entity nor any shareholder, partner, member, director, officer, employee, agent or insurer of the Client.  Except as we may otherwise agree, the terms of this letter apply to other engagements for the Client that we may undertake.  You have advised us that you will obtain tax advice regarding the Matter from a third party; accordingly, our firm will not be providing any tax advice in connection with the Matter, including, without limitation, tax structuring or tax consequences arising out of the Matter.  You have instructed us to take direction from and communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica.

153.   Ningbo Sunny's Mr. Ni and Synta's Mr. Shen also agreed that Celestron's then-CEO, Joe Lupica, would be transferred to Ningbo Sunny, and after Ningbo Sunny's acquisition of Meade, Joe Lupica would become Meade's CEO. He and others acted as a conduit of information between Ningbo Sunny and Synta.

154.   When the FTC inquired into whether Synta's Mr. Shen was involved in any way in Ningbo Sunny's Meade acquisition, but the FTC was advised by the law firm that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade" on August 22, 2013. This statement was false given that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen had agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

155.   The FTC was also concerned that Synta's Mr. Shen was previously a Ningbo Sunny shareholder. To allay the FTC's concerns, Ningbo Sunny's Mr. Ni formed Sunny Optics, Inc., the entity used to acquire Meade and became its sole shareholder. Ningbo Sunny represented to the FTC that it had nothing to do with the Meade acquisition. Then, after the acquisition closed, Mr. Ni transferred his interest in Sunny Optics to Ningbo Sunny for the nominal amount of $1.

156.   After Ningbo Sunny acquired Meade, Ningbo Sunny and Synta agreed not to compete with each other, which noncompetition was the entire purpose of this charade from the beginning. For example, a December 12, 2013 email thread between the entities reflects a request from Synta's Mr. Shen to Ningbo Sunny's Mr. Ni to reach an understanding with Celestron's then-CEO about not competing against Celestron for sales:

> - Bidding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This needs Director Ni to communicate face-to-face with DAVE when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? All products are produced by sunny. Following a conflict, celestron would not trust sunny any longer.
> - Going back to the risk arising out of forwarding SYNTA's order to Boguan Jinghua 8 years ago, it maybe not happen. But they would think that there is no value to fight for the Company. Most of CELESTRONs senior executives left because they are Americans who live for their dreams.
> - we recommend that Director Ni  personally take the two actions concurrently, by selling the products to outside China and the United States, or meet with CELESTRON DAVE to resolve difficulties and make every effort to get order from COSTCO.
> - it is worth it to affect the whole thing and personal communication is more important.

157.   In a June 13, 2014 email, Synta's Mr. Shen informed Ningbo Sunny's Mr. Ni and Celestron's David Anderson, "The best way in the future is to divide the products and sell them into different markets to reduce conflicts":

-------- 转发邮件信息 --------                    Forwarded email

发件人 : "david shen" <syntadavid@163.com>

发送日期 : 2014-06-13 07:04:18

收件人 : "Laurence Huen" <vancouver_blue_junior@yahoo.com>,DAVE <danderson@celestron.com>,sylvia <shentakuo@gmail.com>

主題 : Re:Laurence 回 复關於David 電話 re:Hayneedle          Re: Laurence's reply about David's phone

Laurence & Dave

感 谢您的 回 复，由 於收 到您的 信晚 了，再加 上沒有 Dave指導性内容,我 也 無法向peter致信

> Thank you for your reply. Since it was late when I received your letter, and I was not given with Dave's guiding information, I was therefore unable to write to Peter. Letters communicated to and from me and Peter should be brief and to the point, so I need to wait for Dave's comments for reference before sending it out.
>
> The materials provided by Dave today are extremely important for reference. Meanwhile, my worries concerning the issue have been also reduced greatly. Since most of Telescope's business comes from Celestron, Celestron deems purchase of Hayneedle by Orion is positive at some points (the positive is more than the negative). But rising of the sales website may harm the business of the other traditional fields. The best way in the future is to divide the products and sell them into different markets to reduce conflicts.
> Following purchase of Hayneedle by Orion, what makes it more concerned about is its ability to pay products payable. I suggest that Dave may propose to Orion that if business is continued, we need to know the financial condition of investors behind imaginova. If the fund is the cash increased by the company, then it would be safe. If the fund is borrowed, causing worse situation  considering the current heavy debt, we need to deal with it carefully.
> Viewing its current suppliers, JOC/GSO/BOSMA/IOPTRON.... no company can replace CELESTRON...SKYWATCHER...MEADE...
> If we don't supply products, Hayneedle invested by Orion with $4.5 million would immediately value at less than $2 million. This is my opinion.

158.   Defendants and Co-Conspirators' conduct was in furtherance of their efforts to eliminate competition and fix prices. Ningbo Sunny (and, as a consequence, Meade) agreed not to compete against Celestron. As Meade's then-Vice President of Sales, Victor Aniceto, explained the strategy to Meade's then-CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business."

From: "Victor Aniceto" <victor.aniceto@meade.com>
Date: November 12, 2013 at 4:54:52 PM PST
To: "Joe Lupica" <joe.lupica@meade.com>
Subject: proposed promo

Joe,
We met earlier today to discuss promotional activities to generate revenue and kick start our holiday activities.

Attached is a P & L with background on YTD sales on products we currently have instock.

For the LX850, we discussed $1000 off on the mount only. This will result in a retail price of $4999. Comparably, CGE Pro mounts have a special price of $3999 ($1,000 off). We will still be higher by $1,000 but we have Starlock. This is designed to get interest going on this mount as well as take advantage of the great review in S & T.

For the PST, we will offer $100 off which will be competitive against the Lunt offers.
The SMT90-15 needs a boost as we have only sold 3 all year that is why we are aggressive but we will still have good margins.

Lastly, the XWA eyepieces are really under performing and we just need to move the inventory out.

Mr Ni discussed with me earlier that he wants us to remain profitable and he doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business.

We plan to launch this at ASAE and sent to the dealers by Saturday, 11/16/13.

Please provide your approval.

Thanks.

**Victor Aniceto**
Vice President of Sales
Meade Instruments Corp.
victor.aniceto@meade.com
Tel - 949.451.1450, ext. 6364
Fax - 949.451.1460  www.meade.com

159.   Moreover, Celestron's current CEO, Corey Lee, conspired with Synta and Ningbo Sunny to steal competitors' key business information. Ningbo Sunny sells telescopes to Celestron's competitors. Ningbo Sunny provides Celestron with material business information on such customers, including its pricing of telescopes, credit arrangements, and order forecasts. For instance, Ningbo Sunny's James Chiu provided detailed data for several recent years of Orion orders to Celestron's CEO, Corey Lee:

From: nbsunny [mailto:nbsunny@vip.sina.com]
Sent: Friday, May 22, 2015 4:58 PM
To: COREY LEE
Subject: 回复: RE: orion 订单统计     Re: Order statistics

Dear Corey,

This is for 2014. I will send for 2013 on Monday.

Junwen

发件人： COREY LEE
发送时间： 2015-05-23 06:31
收件人： nbsunny
主题： RE: Re: orion 订单统计     Subject: Re: Order statistics

Junwen,

Thank you.  I assume this information is for Orion orders in 2015?  Can you supply sales figures for both 2014 and 2013?

Thank you.

Corey

160. Ningbo Sunny and Synta also exchanged and fixed prices. They discussed and agreed on the amount to charge distributors. For example, Ningbo Sunny's James Chiu and Synta's Joyce Huang discussed Ningbo Sunny's prices and determined they should be higher. Similarly, Ms. Huang informed Mr. Chiu that Ningbo Sunny's "payment terms should be the same with Suzhou [Synta.]"

161. In addition to the foregoing, Defendants' internal records reveal their agreement to cooperate with horizontal competitors.  In a November 2005 email to Peter Ni, Joe Lupica, Sylvia Shen, Anne Barton, and others, Joe Lupica wrote:

> I think Sunny, Synta and Celestron have a very good opportunity to increase our sales of telescopes, spotting scopes and binoculars over the next few years.
>
> We have very good distribution channels to sell Sunny and Synta products.  The quality of the products manufactured at Sunny and Synta will enable Celestron to separate ourselves from all other competitors.  I am very excited about our future and I look forward

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                    37
10445742v1/016869

to working together for the benefit of all three companies.

I believe it will be very important over the next two or three years for Sunny, Synta and Celestron to make sure we understand how we plan to distribute the products manufactured by Sunny and Synta to make sure we have the best opportunity to grow.  …

Mr. Ni, I truly appreciate your consideration of this very important issue. I think it is important for the three of our companies to look to the world as one strong group of companies.  This will better help us compete against all the other Chinese manufacturers.

162.   Peter Ni of Ningbo responded:

Sunny will try its best to work with Celestron and Synta to turn these 3 companies into the best and strongest Telescope & sport optics manufacturing and marketing group in the world. I believe we will share the great success out of joint efforts. … Dear Joe, I appreciate your confidence about our future through cooperation. And I am expecting greater success to be made by our common efforts.

163.   In December 2011, Celestron's Monthly Management Presentation similarly stated: "The relationship between Celestron, Synta and Sunny has never been stronger. … It is also well understood that each is dependent upon the other for continued growth."

164.   Defendants and Co-Conspirators' emails further reveal their agreement to allocate the market and restrict supply.  In May 2005, Sylvia Shen emailed Rob Shishino and Joe Lupica: "[T]he production for these models *will be transferred* to Sunny. … we don't want to order from Bosma any more, unless otherwise you have urgent demand in the near future before Sunny can catch up the production."

165.   In November 2005, Peter Ni of Ningbo conveyed to Joe Lupica Sylvia Shen, Anne Barton, and others of Synta: "Please be sure that Sunny *will never directly work with or supply* to any of Celestron's dealers and distributors. … And we assure you that we will *never sell* any big diameter telescopes to any third parties."

166.   In December 2005, Sylvia Shen emailed Joe Lupica, David Shen's interpreter Nancy Liu, and others: "I reminded him not to order from Bosma, Jinghua for the orders Synta/Sunny can build for you. That is for transition period, now you know clearly whom to buy

products from."

167.    In January 2006, Lupica emailed Shen and Liu: "David, Mr. Ni and I discussed the Powerseekers and Firstscope lines since we intend to discontinue both lines this year[.]"

168.    In a February 2007 "Risk Assessment Memo," Lupica wrote:

> Take Sales from Suppliers that Compete with Synta and Sunny: The additional 40,000 to 50,000 telescopes purchased from Synta/Sunny will not only provide additional work for these two factories but it will also *take business away* from the competitors of Synta/Sunny such as Jinghua and others.

169.    As Ningbo Sunny's Vice Chairman, Mr. Chiu, wrote to Ms. Sylvia Shen to discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron."

170.    Ningbo Sunny's Mr. Chiu also explained to Synta's Ms. Sylvia Shen that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers."

171.    In sum, as Synta's Mr. Shen explained in an email to Ningbo Sunny: "Director Ni will not be a competitor and is trustworthy when it comes to business."

172.    Defendants and Co-Conspirators were able to coordinate and raise telescopes prices as a result of their *per se* illegal agreements and understandings. They sought to avoid competition with each other's telescopes and developed strategies to protect each other from further competition. Mr. Lupica wrote, they did this to collectively "dominate the telescope industry."

173.    As Synta's Mr. Shen explained in an email to senior Celestron executives that he then forwarded to Ningbo Sunny, "we do not need to wage a price war with Orion head-on," because Synta and its co-conspirators could instead simply "replace them" in the marketplace.

## J.    The Structure and Characteristics of the Telescope Market Renders the Conspiracy More Plausible

174.    The telescope market is conducive to a price-fixing agreement because of its

structure and other characteristics, which have made collusion particularly attractive. Specifically, this market: (1) was the subject of market allocation; (2) has high barriers to entry; (3) is highly concentrated; and (4) has inelastic demand.

175.   Likewise, the telescope market is protected from outside competition because telescopes require heavy financial investments and intellectual property licensing. They also require scale to achieve cost efficiencies.

### 1.   The Telescope Market Was Subject to Market Allocation

176.   Through illegal allocation of the telescope market in the United States, Ningbo Sunny and Synta together have 80 percent of that market.

177.   Although Ningbo Sunny and Synta are each capable of manufacturing all types of telescopes, Ningbo Sunny and Synta have an illegal agreement or understanding that Synta manufactures higher-end telescopes, while Ningbo Sunny manufactures lower-end telescopes. Pursuant to that unlawful agreement or understanding, Synta will not compete on telescopes offered by Ningbo Sunny, and *vice versa*.

178.   This allocation of the market further enabled the price-fixing conduct described here.

### 2.   The Telescope Market Has High Barriers to Entry

179.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

180.   There are substantial barriers that preclude, reduce, or make more difficult entry into the telescope market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million-dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, intellectual property rights, and long-standing customer relationships.

181.   The high barriers to entry allow Defendants and Co-Conspirators to control prices and output for several reasons. First, manufacturing telescopes requires high capital investments, and Ningbo Sunny and Synta are vertically integrated with the largest distributors. There is an insufficient number of independent distributors to render independent manufacturing profitable. Second, manufacturing telescopes requires key intellectual property rights, such as patents on software to automatically detect celestial objects demanded by amateur astronomers. Meade invented this software and initially owned the patents. Defendants and Co-Conspirators colluded, however, so that Ningbo Sunny could acquire Meade, thereby blocking independent manufacturers that might have been able to successfully compete with Ningbo Sunny or Synta with this game-changing intellectual property.

182.   As evidence of the high barriers to entry, no new, significant telescope manufacturers have entered the market in at least a decade. Furthermore, in light of Ningbo Sunny's acquisition of Meade, which also had manufacturing capabilities, in 2013, the number of suppliers has essentially dwindled to Ningbo Sunny and Synta.

183.   Furthermore, Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrate that the barriers to entry into the telescope market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition.

### 3.    The Telescope Market Is Highly Concentrated

184.   A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

185.   Defendants and Co-Conspirators control the telescope market in the United States.

186.   Through increasing consolidation, the telescope market in the United States has become increasingly concentrated. In 2005, Synta acquired Celestron as a wholly-owned subsidiary. Celestron became the dominant higher-end telescope distributor in the United States through Defendants and Co-Conspirators' efforts. Subsequently, Ningbo Sunny acquired Meade with Synta's help and became the dominant lower-end telescope distributor in the United States.

187.   Synta and Ningbo Sunny manufacture, market, and/or sell their telescopes to distributors, including their respective wholly-owned subsidiaries Celestron and Meade, which then sell the telescopes online, in stores, and through dealers to astronomy enthusiasts in the United States. Celestron and Meade collectively account for the vast majority of telescopes sold in the United States.

188.   Synta and Ningbo Sunny have faced limited competition in the telescope market as a result of their acquisition of competitors and agreements with each other. Their anticompetitive conduct, including controlling the supply of telescopes in the United States, further facilitated and made possible the circumstances for the price fixing and market allocation in which they engaged.

189.   The telescope market was not always highly concentrated. Ningbo Sunny and Synta transformed this market, however, by colluding to prevent competitors from entering the market and thereby making sure they are the only viable sources of telescopes.

190.   As of 2012, Synta and Ningbo Sunny together controlled 80% of the global telescope manufacturing market. The associated Herfindahl-Hirschman Index ("HHI") for the industry—a key market concentration metric often considered by antitrust economists—registered at 3,200 points, well above the 2,500-point threshold generally regarded as evidencing high concentration. Moreover, industry HHI levels remained above 2,500 from 2012 through 2018, the most recent year for which Plaintiffs have collected information to date.

191.   Additionally, when Ningbo Sunny acquired Meade with the help of Synta, Defendants and Co-Conspirators removed a competitor and independent supplier from the telescope market—Meade. Neither Celestron nor Meade have seriously competed since Ningbo Sunny's acquisition of Meade or exercised their manufacturing capabilities to diversify the supply of telescopes.

192.   Furthermore, Ningbo Sunny and Synta consolidated control of the telescope market by fixing prices and engaging in anticompetitive conduct.

### 4.    There Is Inelasticity of Demand for Telescopes

193.   "Elasticity" is a term used to describe the sensitivity of supply and demand to

1    changes in one or the other. For example, demand is said to be "inelastic" if an increase in the

2    price of a product results in only a small decline in the quantity sold of that product, if any.

3    Inelasticity tends to exist when customers have nowhere to turn for alternative, cheaper products

4    of similar quality, and so continue to purchase despite a price increase.

5        194.    For a cartel to profit from raising prices above competitive levels, demand must be

6    relatively inelastic at competitive prices. Otherwise, increased prices would result in declining

7    sales and profits, as customers purchased substitute products or declined to buy altogether.

8    Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise

9    their prices without triggering customer substitution and lost sales.

10       195.    Demand for telescopes is highly inelastic because there are no close substitutes for

11   these products.

12   **V.    CLASS ACTION ALLEGATIONS**

13       196.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to

14   Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive

15   relief on behalf of the following classes ("Nationwide Injunctive Class") under Sections 1 and 2

16   of the Sherman Act (15 U.S.C. §§ 1, 2):

17       All persons and entities who indirectly purchased a telescope for their own use and
         not for resale during the period from and including January 1, 2005 through the
18       present that was manufactured or sold by Defendants or Co-Conspirators, or any
         current or former affiliate thereof.
19

20       197.    Plaintiffs also bring this action on behalf of themselves and as a class of Indirect

21   Purchaser States under Rule 23(a) and (b)(2), seeking damages pursuant to California state

22   antitrust and consumer protection laws as well as common law unjust enrichment on behalf of the

23   following class ("Damages Class"):

24       All persons and entities who indirectly purchased a telescope for their own use and
         not for resale in one of the Indirect Purchaser States during the period from and
25       including January 1, 2005 through the present that was manufactured or sold by
         Defendants or Co-Conspirators, or any current or former affiliate thereof.
26

27       198.    The "Indirect Purchaser States," for purposes of this complaint, are: Arizona,

28

---

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                          43

Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

**A.    California Law Should Be Applied to the Indirect Purchaser States' Damages Class**

199.    It is appropriate to apply California law to a class of indirect purchaser plaintiffs from the Indirect Purchaser States because many of Defendants and Co-Conspirators and their respective subsidiaries and affiliates can be found in California and have their principal place of business in California; many of the key witnesses reside in California; Defendants and Co-Conspirators carried out their conspiracy in California, *inter alia*, by coordinating it through the California offices of Ningbo Sunny's legal counsel; and much of Defendants and Co-Conspirators' sales occurred in California. California law should be applied to the Damages Class for the following reasons:

**1.    The Conspiracy's Contacts with California: Location of Defendants and Co-Conspirators**

200.    Aside from the foreign entities, the most critical corporate entities furthering the conspiracy alleged herein were incorporated in or carried out their principal place of business in California.

201.    Defendant Celestron—a major participant in the conspiracy—is headquartered and has its principal place of business in Torrance, California. Acts in furtherance of the conspiracy by Celestron were carried out in California.

202.    Co-Conspirator Meade—a major participant in the conspiracy, which would have been named as a Defendant but for its bankruptcy petition—is headquartered in Irvine, California. Acts in furtherance of the conspiracy by Meade were carried out in California.

203.    According to an April 11, 2014 email from Mr. Lupica, when Ningbo Sunny acquired Meade in 2013, Meade had over 10 legal entities formed in California that were paying

state taxes each year, including Meade Instruments Holding Corp., Meade Coronado Holding Corp., MTSC Holding Corp., MC Holding Corp., Meade Instruments Europe Corp., Meade.com, and Coronado Instruments Inc., among others.

### 2. The Conspiracy's Contacts with California: Location of Individuals

204. David Shen regularly comes to this District to meet with distributors of Synta telescopes. Acts in furtherance of the conspiracy by Mr. Shen were carried out in California.

205. Joe Lupica, Celestron's former CEO and then Meade's former CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lupica were carried out in California.

206. Corey Lee, Celestron's CEO, resides in California. Acts in furtherance of the conspiracy by Mr. Lee were carried out in California.

### 3. Specific Targets of the Conspiracy Were from California

207. A unanimous jury has already found that Orion, an American retail company that sells telescopes, was harmed by the conspiracy alleged herein.

208. Orion, which competes with Synta and Ningbo Sunny both in the supply of telescopes and filed a complaint against them in the *Orion* Action, has corporate offices in Watsonville, California and a retail store in Cupertino, California.

### 4. The Conspiracy's Contacts with California: Facilitation of the Conspiracy in California

209. The law firm that assisted Ningbo Sunny in its acquisition of Meade helped facilitate the conspiracy in California. For example, a June 6, 2013 engagement letter with Ningbo Sunny in connection with Ningbo Sunny's acquisition of Meade specifies that "this agreement will be governed by the laws of California without regard to its conflict rules."

210. The attorney who wrote the aforementioned engagement letter, is based in California. On information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from California

211. Another attorney, who worked on the deal process, is also based in California. On

information and belief, he accepted instruction from both Ningbo Sunny and Synta on structuring and negotiating Ningbo Sunny's acquisition of Meade and handled the acquisition from the San Francisco Bay Area. Indeed, a July 16, 2013 email from him to Celestron's then-CEO Mr. Lupica and Celestron's board member, Mr. Huen, regarding next steps in Ningbo Sunny's acquisition of Meade confirms as much.

### 5.  Defendants and Co-Conspirators Targeted California

212.   Defendants and Co-Conspirators directed their conduct at persons and activities within California. For example, Synta manufactures a large proportion of telescopes for California-based Orion under the Orion brand name.

213.   There are at least 73 amateur astronomy clubs in California that feature meetings, viewing nights, star parties, and stargazing programs which, on information and belief, is more than any other state.

214.   Defendants have violated California antitrust and consumer protection laws, and California has an interest in not only protecting its own consumers but in punishing businesses like Defendants that operate within its borders.

### B.  Alternatively, Plaintiffs Seek to Certify State Damages Classes

215.   As an alternative to the Damages Class, in the event California law is not applied to class members' claims residing in states that recognize a form of indirect purchaser cause of action, Plaintiffs seek certification of classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes of the following Indirect Purchaser States (collectively, the "State Damages Classes"):

**Arizona:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arizona during the period from and including January 1, 2005 through present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Arkansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Arkansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**California:** All persons and entities who indirectly purchased a telescope for their

own use and not for resale in California during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Connecticut:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Connecticut during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**District of Columbia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in the District of Columbia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Florida:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Florida during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Hawaii:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Hawaii during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Illinois:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Illinois during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Iowa:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Iowa during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Kansas:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Kansas during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Maine:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Maine during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Massachusetts:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Massachusetts during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Michigan:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Michigan during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants

or Co-Conspirators, or any current or former affiliate thereof.

**Minnesota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Minnesota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Mississippi:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Mississippi during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Missouri:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Missouri during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Montana:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Montana during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nebraska:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nebraska during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Nevada:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Nevada during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Hampshire:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Hampshire during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New Mexico:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New Mexico during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**New York:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in New York during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**North Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in North Dakota during the period from and

including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Oregon:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Oregon during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Rhode Island:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Rhode Island during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Carolina:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Carolina during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**South Dakota:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in South Dakota during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Tennessee:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Tennessee during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Utah:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Utah during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Vermont:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Vermont during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**West Virginia:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in West Virginia during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

**Wisconsin:** All persons and entities who indirectly purchased a telescope for their own use and not for resale in Wisconsin during the period from and including January 1, 2005 through the present that was manufactured or sold by Defendants or Co-Conspirators, or any current or former affiliate thereof.

216.   The Nationwide Injunctive Class, Damages Class, and the State Damages Classes are referred to herein as the "Classes" unless otherwise indicated. Excluded from the Classes are Defendants and Co-Conspirators, their parent companies, subsidiaries and affiliates, any co-

conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased telescopes directly. Plaintiffs reserve the right to amend the aforementioned definitions if discovery and further investigation reveal that they should be expanded or otherwise modified.

217.   Plaintiffs properly bring this action as a class action under Rule 23(a) for the following reasons:

a.   **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The Classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable. While Plaintiffs does not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are tens of thousands of members in each Class. The precise number of Class Members can be ascertained through discovery;

b.   **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)**): There are questions of law and fact common to the Classes which predominate over any questions that may affect particular Class Members. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

i.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of telescopes sold in the United States;

ii.   The identity of the participants of the alleged conspiracy;

iii.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

iv.   Whether the alleged conspiracy violated the Sherman Act, as alleged

1    in the First Cause of Action;

2    v.    Whether the market for telescopes in the United States is the relevant

3    market;

4    vi.    Whether the United States constitutes the relevant geographic

5    market;

6    vii.    Whether Defendants possess market or monopoly power in the

7    telescope market;

8    viii.    Whether Defendants and their alleged horizontal competitors agreed

9    or combined to restrain competition and exclude competitors from

10    the telescope market;

11    ix.    Whether Defendants entered into concerted refusals to deal to

12    foreclose competition and exclude competitors from the telescope

13    market;

14    x.    Whether the alleged monopoly and/or attempt to monopolize violated

15    the Sherman Act;

16    xi.    Whether the alleged conspiracy, monopoly, and/or attempt to

17    monopolize violated state antitrust and/or consumer protection laws;

18    xii.    Whether Defendants unjustly enriched themselves to the detriment of

19    the Plaintiffs and the members of the Damages Class, thereby

20    entitling Plaintiffs and the members of the Damages Class to

21    disgorgement of all benefits derived by Defendants;

22    xiii.    Whether the conduct of Defendants and their co-conspirators, as

23    alleged in this Complaint, caused injury to the property of Plaintiffs

24    and the members of the Classes;

25    xiv.    The effect of the alleged conspiracy on the prices of telescopes sold

26    in the United States during the Class Period;

27    xv.    Whether Plaintiffs and members of the Classes had any reason to

28

know or suspect the conspiracy, or any means to discover the conspiracy;

    xvi.   Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

    xvii.   The appropriate injunctive and related equitable relief for the Nationwide Class; and

    xviii.   The appropriate class-wide measure of damages for the Damages Class.

    c.   **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs and the Classes have been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of the Classes and are based on the same legal theories;

    d.   **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Classes in that he has no interests antagonistic to those of the other Class Members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

218. This action is properly brought as a class action under Rule 23(b) for the following reasons:

    a.   **Class Action Status (Fed. R. Civ. P. 23(b)(1)):** Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by Class Members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by Class Members would create a risk of adjudications with respect to individual

members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

b.   **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):** Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Classes as a whole.

c.   **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

d.   The Classes are ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same fashion;

219.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.   Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.   This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

c.   Without a class action, Class Members will continue to suffer damages, and

Defendant's violations of law will proceed without remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

d.      Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## VI.   PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

220.   Ningbo Sunny and Synta's anticompetitive practices have excluded competitors, suppressed innovation, and increased telescope prices.

221.   In the telescope market, price competition has been restrained or eliminated because Ningbo Sunny and Synta engaged in price-fixing, agreed to allocate the market among themselves, and limit supply, thereby raising telescope prices.

222.   By exercising their respective control in the telescope market, Synta and Ningbo Sunny have reduced competitors' sales and margins and diminished competitors' ability and incentive to invest and innovate. Several former competitors of Synta and Ningbo Sunny have sold off or shut down their telescope businesses, unable to achieve sales volumes and margins needed to sustain a viable business.

223.   Consumer choice has also been restrained due to Ningbo Sunny's acquisition of Meade. Since Ningbo Sunny acquired Meade, Meade has not significantly competed with Celestron. Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, such as Jinghua, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition.

224.      In the telescope market, price competition has also been restrained or eliminated because Ningbo Sunny and Synta allocated the market among themselves. Additionally, by fixing prices and credit terms so that unaffiliated distributors pay more than affiliated distributors, and by sharing independent distributors' confidential business information with each other, Ningbo Sunny and Synta have prevented independent distributors from fairly competing against their own affiliates and putting downward pressure on prices.

225. Defendants' conspiracy had the following effects, among others:

 a. The number of manufacturers and products for telescopes and accessories have been reduced as a result of Synta's acquisition of Celestron and Ningbo Sunny's acquisition of Meade;

 b. There have been no new entrants into the telescope market for a decade and many independent manufacturers and distributors have gone out of business as a result of Synta and Ningbo Sunny's collusion;

 c. The concentration of vital intellectual property assets within the nucleus of companies controlled by Synta and Ningbo Sunny working together has reinforced their respective control and erected additional barriers to new entrants;

 d. Price competition has been restrained or eliminated with respect to telescopes;

 e. Celestron, empowered and emboldened by its supracompetitive overcharges, now exercises control in the telescope market, including supply to major retailers such as Wal-Mart, Menards, and Costco;

 f. The prices of telescopes have been fixed, raised, maintained, or stabilized at artificially inflated levels;

 g. Indirect purchasers of telescopes have been deprived of free and open competition; and

 h. Indirect purchasers of telescopes paid artificially inflated prices.

226. These antitrust injuries are of the type that the antitrust laws were meant to punish and prevent.

227. On information and belief, Ningbo Sunny and Synta have collectively controlled at least 65 percent of the global telescope market since 2012. This figure increased to over 90 percent at certain points during the Class Period.

228. During the Class Period, Plaintiffs and the members of the Classes paid supra-

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD** 55

competitive prices for telescopes. Telescope distributors and retailers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants. Telescopes follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any cost changes attributable to telescopes can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

229.   Just as telescopes can be physically traced through the supply chain, so can their prices be traced to show that changes in the prices paid by direct purchasers affect prices paid by indirect purchasers. Here, the inflated prices of telescopes resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by distributors and retailers.

230.   The economic and legal literature has recognized that unlawful overcharges in a multiple-level distribution chain normally result in higher prices for those at the bottom of the distribution chain. Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[3]

231.   As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be

---

[3] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

1
2

passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[4]

3    232.   The purpose of the conspiratorial conduct of Defendants and their co-conspirators

4   was to raise, fix, rig or stabilize the price of telescopes. Economists have developed techniques to

5   isolate and understand the relationship between one "explanatory" variable and a "dependent"

6   variable in those cases when changes in the dependent variable are explained by changes in a

7   multitude of variables, even when all such variables may be changing simultaneously. That

8   analysis – called regression analysis – is commonly used in the real world and in litigation to

9   determine the impact of a price increase on one cost in a product (or service) that is an assemblage

10   of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of

11   telescopes to distributors and retailers on the price of telescopes to consumers while controlling

12   for the impact of other price-determining factors.

13    233.   The precise amount of the overcharge impacting the prices of telescopes can be

14   measured and quantified. Commonly used and well-accepted economic models can be used to

15   measure both the extent and the amount of the supra-competitive charge passed through the chain

16   of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be

17   quantified.

18    234.   By reason of the violations of the antitrust, consumer protection, and unjust

19   enrichment laws alleged herein, Plaintiffs and the members of the Classes have sustained injury

20   to their property, having paid higher prices for telescopes than they would have paid in the absence

21   of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered

22   damages in an amount presently undetermined. This is an antitrust injury of the type that the

23   antitrust laws were meant to punish and prevent.

24   **VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS**

25    **A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not**

26
27

[4] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

28

**and Could Not Discover Their Claims**

235.   Plaintiffs repeat and re-allege the allegations set forth above. Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 2019, when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

236.   Plaintiffs and members of the Classes are consumers that purchased telescopes not for resale. They had no direct contact or interaction with Defendants and had no means from which they could have discovered the telescopes combination and conspiracy described in this Complaint before September 2019.

237.   No information in the public domain was available to Plaintiffs and members of the Classes concerning the combination or conspiracy alleged herein prior to September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants or their co-conspirators' dealings with competitors or direct purchasers, much less the fact that Defendants and their co-conspirators had engaged in the combination and conspiracy alleged herein.

238.   For these reasons, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run until, at the earliest, September 2019.

**B.     Fraudulent Concealment Tolled the Statute of Limitations**

239.   In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 2019 when evidence of Defendants' conspiracy was first made public in the *Orion* Action.

240.   Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct and did not know before then that they were paying supra-

competitive prices for telescopes throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

241.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. The following are illustrative examples of Defendants' fraudulent concealment:

242.   Beginning with the 2005 acquisition of Celestron, Synta and Ningbo Sunny attempted to conceal that Mr. Shen would remain in control of Ningbo Sunny after the acquisition. Among other things, as discussed above, Defendants represented that Mr. Shen had resigned from his position as Vice Chairman of Ningbo Sunny following the acquisition and held no other position in Ningbo Sunny since the acquisition.  However, as Defendants' internal correspondence clearly demonstrate (*see infra*), Mr. Shen's remained firmly in control of Ningbo Sunny after the Celestron acquisition.

243.   Following the Celestron acquisition, Defendants also attempted to conceal their broader agreement to cooperate as horizontal competitors.  Among other misrepresentations, in an April 2005 press release about the acquisition, Joseph Lupica publicly stated: "This acquisition is in the best interest of Celestron dealers, employees, consumers and the telescope industry as a whole. Synta and Celestron will form a strong team to provide competitive products of the highest quality for consumers."  The release also avoided making any explicit reference to Ningbo Sunny, stating instead that Synta had "related companies" and Synta's "related companies will continue to manufacture and supply other telescopes and related products for Celestron."

244.   In the April 2005 press release, Defendants further stated: "Celestron will be in a position . . . to lead the product engineering, development and manufacturing processes from the Torrance, California headquarters. . . . Celestron's operations will remain in Torrance, the management team will stay intact[.]" ECF No. 117-5.  This was another misrepresentation as Synta had already communicated to Celestron that members of the Shen family, including David

Shen and Sylvia Shen, would oversee Celestron.

245.   In August 2006, Joe Lupica was admonished for representing Synta and Ningbo Sunny as "sister companies" and instructed "not refer to Sunny as an affiliated company again." Accordingly, in subsequent communications with competitors and customers, Mr. Lupica concealed the fact that, Synta and Ningbo Sunny were "sister companies."   However, those specific representations were false.   As a 2010 internal Celestron presentation acknowledged, Synta and Ningbo Sunny were and would remain "sister companies."



246.   Shortly after the Celestron acquisition, Defendants further concealed their intent to expand into the lower-end telescope market through their acquisition of Celestron. In an April 2005 email to Bushnell Telescopes, for example, David Shen stated:

> Thank you for your long term trust and support.  After Celestron acquisition I believe we have more areas that we can provide services to you. There are a lot of rumors spreaded around by competitors, saying Synta is going to build volume low end traditional products to compete Bushnell,.. etc.  It must cause your great concern.  It is not true, on the contrary, we are not interested in big volume chain store orders. …
>
> I have no interest to compete the volume low price products with Bushnell,  Meade or others. Celestron has good reputation in high end high price products, I'll exert all my effort in this area to maintain and strengthen its reputation. Once again, I would like to address, I have no intention to compete with you. We are looking forward to exploring more opportunties to serve you."

247.   Synta and Ningbo Sunny also attempted to conceal the existence of their transactions in connection with Ningbo Sunny's acquisition of Meade. David Anderson revealed in an email recently disclosed in pending litigation that "Since July Celestron has made $10

million in anticipated payments to Ningbo Sunny. This represents a majority of the monies that will be paid to Ningbo Sunny this year. If Celestron continues with this payment pattern it will need to disclose this arrangement to its auditors and its bank. Though we see this as temporary an outside group (such as the bank or auditing firm) will interpret it as a significant change due to the fact that the majority of payments for the last 7 months were made in anticipation with no discernable benefit to Celestron."

248.   Additionally, as stated, *supra*, when the FTC inquired into whether Synta's Mr. Shen was involved in Ningbo Sunny's Meade acquisition, it represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen *has no role* in the proposed acquisition of Meade[.]" This statement was false in light of the fact that Ningbo Sunny's Mr. Ni and Synta's Mr. Shen agreed before this that Mr. Shen and his companies would provide financial support to Ningbo Sunny in connection with the Meade acquisition.

249.   Furthermore, as part of Synta and Ningbo Sunny's collusion regarding Meade, Celestron took equity in Meade, which is memorialized in Defendants and Co-Conspirators' shadow books.

250.   Additionally, Defendants and Co-Conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Mr. Shen, Synta, and Celestron's involvement and role in the Meade acquisition.

251.   In addition to the foregoing acts of fraudulent concealment, by their very nature, Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Telescopes are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the telescopes industry to be a competitive industry. On information and belief, Defendants met and communicated in secret and agreed to keep the facts about its collusive conduct from being discovered by any member of the public or by distributors, retailers, and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy

1  of Defendants' telescope prices before September 2019, at the earliest.

2      252.   Plaintiffs and the members of the Classes could not have discovered the alleged

3  contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence

4  because of the deceptive practices and techniques of secrecy employed by Defendants and their

5  co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or

6  conspiracy.

7      253.   Because the alleged conspiracy was self-concealing and affirmatively concealed by

8  Defendants and its co-conspirators, Plaintiffs and members of the Classes had no knowledge of

9  the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent

10  person to investigate whether a conspiracy existed, until, at the earliest, September 2019 when

11  evidence of Defendants' conspiracy was first made public in the *Orion* Action.

12      254.   For these reasons, the statute of limitations applicable to Plaintiffs and the Classes'

13  claims was tolled and did not begin to run until September 2019.

14  **VIII.  CAUSES OF ACTION**

15  

**First Cause of Action**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Restraint of Trade**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

16  

17  

18      255.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

19      256.   Defendants and unnamed co-conspirators entered into and engaged in a contract,

20  combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the

21  Sherman Act (15 U.S.C. § 1).

22      257.   The acts done by Defendants as part of, and in furtherance of, its and its co-

23  conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

24  officers, agents, employees, or representatives while actively engaged in the management of their

25  affairs.

26      258.   During the Class Period, Defendants and their co-conspirators entered into a

27  continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise,

28

stabilize, rig bids for, or control prices for telescopes, thereby creating anticompetitive effects.

259.   The anticompetitive acts were intentionally directed at the United States market for telescopes and had a substantial and foreseeable effect on interstate commerce by stabilizing, raising, or fixing prices for telescopes throughout the United States.

260.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for telescopes.

261.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Injunctive Class who purchased telescopes have been harmed by being forced to pay inflated, supra-competitive prices for telescopes.

262.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

263.   Defendants and their co-conspirators' conspiracy had the following effects, among others:

     a.    Price competition in the market for telescopes has been restrained, suppressed, and/or eliminated in the United States;

     b.    Prices for telescopes sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

     c.    Plaintiffs and members of the Nationwide Injunctive Class who purchased telescopes indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

264.   Plaintiffs and members of the Nationwide Injunctive Class have been injured and will continue to be injured in their business and property by paying more for telescopes purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

265.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

266.   Plaintiffs and members of the Nationwide Injunctive Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**Second Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

267.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

268.   The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

269.   Defendants and Co-Conspirators have monopoly power in the market for telescopes in the United States.

270.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies in the telescope market through:

a.   Synta's acquisition of Celestron in 2005;

b.   Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

c.   Synta and Ningbo Sunny agreeing to allocate the telescope market;

d.   Synta and Ningbo Sunny agreeing not to bid on RFQs for each other's telescope offerings;

e.   Synta and Ningbo Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

f.    Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

271.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies through the aforementioned conduct plus:

    a.    Colluding to prevent Jinghua from acquiring Meade;

    b.    Making false representations to the FTC regarding Synta's involvement in Ningbo Sunny's acquisition of Meade; and

    c.    Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

272.   Defendants' acquisition or maintenance of their monopolies is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

273.   There is no procompetitive justification for Defendants' anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

274.   Defendants' willful acquisition or maintenance of their respective monopolies in the telescope market injured, and continues to injure, Plaintiffs and members of the Nationwide Class in their property by:

    a.    Restricting output and limiting consumer choice in the telescope market; and

    b.    Forcing Plaintiffs and members of the Nationwide Class to pay artificially high, supracompetitive prices for telescopes.

275.   The injury to Plaintiffs and members of the Nationwide Class was a foreseeable consequence of Defendants' willful acquisition or maintenance of its monopoly in the telescope market.

276.   Plaintiffs and members of the Nationwide Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

**Third Cause of Action**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Attempted Monopolization**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

277.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

278.   The relevant market is the market for telescopes in the United States. Plaintiffs reserve the right to redefine the relevant market following further discovery.

279.   Defendants and Co-Conspirators have monopoly power in the market for telescopes in the United States.

280.   Defendants and Co-Conspirators have acquired and maintained their respective monopolies in the market for telescopes in the United States through:

a.   Synta's acquisition of Celestron in 2005;

b.   Synta facilitating Ningbo Sunny's acquisition of Meade in 2013, thereby eliminating Meade as a competitor manufacturer and distributor and increasing market concentration;

c.   Synta and Ningbo Sunny agreeing to allocating the telescope market such that Synta manufacturers higher-end telescopes and Ningbo Sunny manufacturers lower-end telescopes;

d.   Synta and Ningbo Sunny agreeing to not to bid on RFQs for each other's telescope offerings;

e.   Synta and Ningbo Sunny exchanging their intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies; and

f.   Synta and Ningbo Sunny exchanging their competitors' (*e.g.*, Orion's) intellectual property and material, non-public information with each other, thereby enabling them to coordinate prices and strategies.

281.   Defendants and Co-Conspirators have acquired and maintained their respective monopoly through the aforementioned conduct plus:

a.   Colluding to prevent Jinghua from acquiring Meade;

---

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 66
10445742v1/016869

b.     Making false representations to the FTC regarding Synta's involvement in Ningbo Sunny's acquisition of Meade; and

c.     Colluding to sabotage Orion's acquisition of the Hayneedle Assets.

282.   The anticompetitive conduct described herein undertaken by Defendants create a dangerous probability that Defendants will achieve monopoly power in the telescope market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

283.   Defendants' predatory and anticompetitive conduct described herein, which was done with the intent of monopolizing the telescope market, injured, and continues to injure, Plaintiffs and members of the Class in their property by:

a.     Restricting output and limiting consumer choice in the telescope market; and

b.     Forcing Plaintiffs and members of the Class to pay artificially high, supracompetitive prices for telescopes.

284.   The injury to Plaintiffs and members of the Class was a foreseeable consequence of Defendants' predatory and unlawful conduct, described herein, which was done with the intent of monopolizing the telescope market.

285.   Plaintiffs and members of the Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Class seek injunctive and equitable relief.

**Fourth Cause of Action**
**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**
**(on behalf of Plaintiffs and the Nationwide Injunctive Class)**

286.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

287.   As a result of Ningbo Sunny's acquisition of Meade and Synta's facilitation thereof, Synta and Ningbo Sunny has been able to exercise market power in the market for telescopes in the United States. The acquisition created the largest syndicates of telescope manufacturers and telescope distributors in the United States. This market is highly concentrated and the acquisition further significantly increased market concentration.

288.   It is unlikely that entry into the market would remedy, in a timely manner, the anticompetitive effects from Ningbo Sunny's acquisition of Meade in 2013. Entry is difficult and likely to take years because of the intellectual property needed to manufacture telescopes, the time required to plan for and to complete manufacturing facilities, and the time required to plan for and establish the distribution channels.

289.   The effect of the mergers substantially lessens competition in the provision of in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, in the following ways:

     a.     Eliminating actual, direct, and substantial competition between Synta and Ningbo Sunny in the market for telescopes in the United States;

     b.     Increasing the ability of the merged entities to unilaterally raise prices of telescopes;

     c.     Eliminating Meade as a substantial and independent competitor in the market;

     d.     Eliminating the diversity of telescope offerings by Defendants;

     e.     Increasing the prices of telescopes to consumers; and

     f.     Reducing incentives to improve telescope quality in the relevant market.

290.   Ningbo Sunny's acquisition of Meade has substantially lessened competition in the market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 as well as decreased telescope options and increased telescope prices to consumers.

### Fifth Cause of Action
### Violation of the State Antitrust Laws
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

291.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

292.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the market for telescopes in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                       68

293.   The contract, combination, or conspiracy consisted of an agreement among Defendants and its co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for telescopes and to allocate products and customers in the United States.

294.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

        a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price telescopes at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to telescopes sold in the United States;

        b.    allocating products and customers in the United States in furtherance of their agreements; and

        c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

295.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate products and customers.

296.   Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

297.   Defendants have entered into an unlawful agreement in restraint of or to monopolize trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

        a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Arizona; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.    In violation of Arizona Revised Statutes § 44-1403, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

298.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

a.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, telescopes at supra-competitive levels; to prevent competition in the market for telescopes; and to pool, combine, and directly and indirectly unite their interests connected with the sale of telescopes to

1    elevate the price at which telescopes are sold.

2    b.    The aforesaid violations of Section 16720, California Business and

3    Professions Code, consisted, without limitation, of a continuing unlawful

4    trust and concert of action among Defendants and their co-conspirators, the

5    substantial terms of which were to fix, raise, maintain, and stabilize the

6    prices of, and to allocate markets for, telescopes.

7    c.    For the purpose of forming and effectuating the unlawful trust, Defendants

8    and their co-conspirators have done those things which they combined and

9    conspired to do, including but not limited to the acts, practices and course of

10    conduct set forth above and the following: (1) Fixing, raising, stabilizing,

11    and pegging the price of telescopes; and (2) Allocating among themselves

12    the production of telescopes.

13    d.    The combination and conspiracy alleged herein has had, *inter alia*, the

14    following effects: (1) Price competition in the market for telescopes has been

15    restrained, suppressed, and/or eliminated in the State of California; (2)

16    Prices for telescopes sold by Defendants and their co-conspirators have been

17    fixed, raised, stabilized, and pegged at artificially high, non-competitive

18    levels in the State of California and throughout the United States; and (3)

19    Those who purchased telescopes directly or indirectly from Defendants and

20    their co-conspirators have been deprived of the benefit of free and open

21    competition.

22    *e.*    By virtue of the conduct alleged herein, Defendants have entered into

23    contracts, in concerted action with others, where the effect of such contract

24    was to substantially lessen competition or tended to create a monopoly in a

25    line of trade or commerce in California in violation of Section 16720, *et seq.*

26    f.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

27    and members of the Damages Class have been injured in their business and

28

---

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                            71

property in that they paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

299. Defendants have entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes §§ 35-26 *et seq.*

a. Connecticut's legislature conferred broad standing under the Connecticut Antitrust Act based on an important principle of protecting the public from anticompetitive behavior and of promoting competition in the marketplace.

b. Under the Connecticut Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. Conn. Gen. Stat. § 35-46a.

c. Every contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-26.

d. Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful. Conn. Gen. Stat. § 35-27.

e. Every contract, combination, or conspiracy that has the purpose of effect of fixing, controlling, or maintaining prices in any part of trade or commerce; or of fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of any part of trade or commerce, is also unlawful. Conn. Gen. Stat. § 35-28.

f. Defendants made contracts or engaged in a combination or conspiracy with each other by maintaining, limiting, or discontinuing the production,

manufacture, sale, or supply of telescopes for the purpose of, and which had the desired effect of, fixing, controlling, or maintaining prices for telescopes within the intrastate commerce of Connecticut, and to monopolize and attempt to monopolize said commerce.

g.  Plaintiffs purchased telescopes within the State of Connecticut during the Class Period. But for Defendants' conduct set forth herein, the price of telescopes would have been lower, in an amount to be determined at trial.

h.  Plaintiffs and members of the Class were injured with respect to purchases of telescopes in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs, and injunctive relief.

i.  Sec. 35-44b. Judicial construction of Connecticut Antitrust Act. It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes.

300.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.  In violation of District of Columbia Code Annotated § 28-4503, Defendants monopolized, attempted to monopolize, and combined and conspired

together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.  During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

301.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS10/1, *et seq.*

a.  The Illinois Antitrust Act, 740 ILCS10/1, *et seq.*, aims to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

b.  Plaintiffs purchased telescopes within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price for telescopes would have been lower, in an amount to be determined at trial.

c.  Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint.

740 ILCS 10/7(2).

d.   Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling, or maintaining prices for telescopes sold, and/or for allocating products and customers within the intrastate commerce of Illinois.

e.   Defendants further unreasonably restrained trade or commerce and established, maintained, used, and attempted to acquire monopoly power over the market for telescopes in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/3 § 3(3).

302.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Iowa; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Iowa Code § 553.5, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Iowa, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                    75
10445742v1/016869

1  and members of the Damages Class have been injured in their business and

2  property and are threatened with further injury.

3  e.  By reason of the foregoing, Defendants have entered into agreements in

4  restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly,

5  Plaintiffs and members of the Damages Class seek all forms of relief

6  available under Iowa Code §§ 553.1, *et seq.*

7  303.  Defendants have entered into an unlawful agreement in restraint of trade in violation

8  of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

9  a.  During the Class Period, Defendants and their co-conspirators entered into

10  and engaged in a continuing unlawful trust in restraint of the trade and

11  commerce described above in violation of Kansas Statutes Annotated, § 50-

12  101. Defendants have acted in violation of § 50-101 to fix, raise, stabilize,

13  and maintain prices of, and allocate markets for, telescopes at supra-

14  competitive levels; to prevent competition in the market for telescopes; and

15  to pool, combine, and directly unite their interests in connection with the

16  sale of telescopes to elevate the price at which telescopes are sold.

17  b.  Defendants' combination or conspiracy had the following effects: (1)

18  telescope price competition was restrained, suppressed, and eliminated

19  throughout Kansas; (2) telescope prices were raised, fixed, maintained and

20  stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and

21  members of the Damages Class were deprived of free and open competition;

22  and (4) Plaintiffs and members of the Damages Class paid supra-

23  competitive, artificially inflated prices for telescopes.

24  c.  During the Class Period, Defendants' illegal conduct substantially affected

25  Kansas commerce.

26  d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

27  and members of the Damages Class have been injured in their business and

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                                          76
10445742v1/016869

1    property and are threatened with further injury.

2    e.    By reason of the foregoing, Defendants have entered into agreements in

3          restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

4          Accordingly, Plaintiffs and members of the Damages Class seek all forms

5          of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

6    304.   Defendants have entered into an unlawful agreement in restraint of trade in violation

7    of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

8    a.    Defendants entered into a combination in restraint of trade in violation of

9          Maine Rev. Stat. Ann. 10, § 1101.

10   b.    Defendants further monopolized, attempted to monopolized, and combined

11         and conspired together to monopolize trade in telescopes including with the

12         State of Maine in violation of Maine Rev. Stat. Ann. 10, § 1102.

13   c.    Defendants' combination or conspiracy had the following effects: (1)

14         telescope price competition was restrained, suppressed, and eliminated

15         throughout Maine; (2) telescope prices were raised, fixed, maintained and

16         stabilized at artificially high levels throughout Maine; (3) Plaintiffs and

17         members of the Damages Class were deprived of free and open competition;

18         and (4) Plaintiffs and members of the Damages Class paid supra-

19         competitive, artificially inflated prices for telescopes.

20   d.    During the Class Period, Defendants' illegal conduct substantially affected

21         Maine commerce.

22   e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

23         and members of the Damages Class have been injured in their business and

24         property and are threatened with further injury.

25   f.    By reason of the foregoing, Defendants have entered into agreements in

26         restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

27         Accordingly, Plaintiffs and members of the Damages Class seek all relief

28

available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

305.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

    a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Michigan; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of Michigan Compiled Laws Annotated, § 445.773, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Michigan, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

306.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.  In violation of Minnesota Statutes 325D.52, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Minnesota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.  During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

307.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

a.  Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 79

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for telescopes.

b.   In violation of Mississippi Code Annotated § 75-21-3, Defendants monopolized and attempted to monopolize the market for telescopes, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

308.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Nebraska Revised Statute § 59-802, Defendants

monopolized, attempted to monopolize, and combined or conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nebraska, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

309. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Nevada; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. In violation of Nevada Revised Statutes Annotated § 598.60(1)(e), Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Nevada, for the purpose

of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

310.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of New Hampshire Revised Statutes § 356:3, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within New Hampshire, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

311.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

a.      Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.      In violation of New Mexico Statutes § 57-1-2, Defendants monopolized, attempted to monopolize, and conspired and combined to monopolize trade or commerce in the telescope market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                 83
10445742v1/016869

1    property and are threatened with further injury.

2    e.    By reason of the foregoing, Defendants have entered into agreements in

3    restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

4    Accordingly, Plaintiffs and members of the Damages Class seek all relief

5    available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

6    312.   Defendants have entered into an unlawful agreement in restraint of trade in violation

7    of the New York General Business Laws §§ 340, *et seq.*

8    a.    Defendants' combination or conspiracy had the following effects: (1)

9    telescope price competition was restrained, suppressed, and eliminated

10   throughout New York; (2) telescope prices were raised, fixed, maintained

11   and stabilized at artificially high levels throughout New York; (3) Plaintiffs

12   and members of the Damages Class were deprived of free and open

13   competition; and (4) Plaintiffs and members of the Damages Class paid

14   supra-competitive, artificially inflated prices for telescopes when they

15   purchased telescopes, or purchased telescopes that were otherwise of lower

16   quality than they would have been absent Defendants' and their co-

17   conspirators' illegal acts, or were unable to purchase telescopes that they

18   otherwise would have purchased absent the illegal conduct.

19   b.    Defendants entered into a contract, agreement, arrangement, or combination

20   with at least one other person whereby:

21   i.    A monopoly in the telescope market, substantially affecting

22   commerce in New York, was established or maintained; (b)

23   Competition or the free exercise of conduct in the telescope market,

24   substantially affecting commerce in New York, was restrained; or

25   (c) Competition was restrained for the purpose of establishing or

26   maintaining a monopoly or unlawfully interfering with the free

27   exercise of conduct in the telescope market.

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                                84

c.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

313.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

a.      Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.      In violation of North Carolina General Statutes § 75-2.1, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within North Carolina, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.      During the Class Period, Defendants' illegal conduct substantially affected

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                              85
10445742v1/016869

North Carolina commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

314.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    In violation of North Dakota Code § 51-08.1-03, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

315.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

a.     Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Oregon; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.     In violation of Oregon Revised Statutes § 646.730, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief

1                available under Oregon Revised Statutes §§ 646.705, *et seq.*

2       316.   Defendants have entered into an unlawful agreement in restraint of trade in violation

3 of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

4             a.     Defendants' combination or conspiracy had the following effects: (1)

5                  telescope price competition was restrained, suppressed, and eliminated

6                  throughout South Dakota; (2) telescope prices were raised, fixed, maintained

7                  and stabilized at artificially high levels throughout South Dakota; (3)

8                  Plaintiffs and members of the Damages Class were deprived of free and open

9                  competition; and (4) Plaintiffs and members of the Damages Class paid

10                  supra-competitive, artificially inflated prices for telescopes.

11             b.     In violation of South Dakota Codified Laws § 37-1-3.2, Defendants

12                  monopolized, attempted to monopolize, and combined and conspired

13                  together to monopolize trade or commerce in the telescope market, a

14                  substantial part of which occurred within South Dakota, for the purpose of

15                  excluding competition or controlling, fixing, or maintaining prices in the

16                  telescope market.

17             c.     During the Class Period, Defendants' illegal conduct had a substantial effect

18                  on South Dakota commerce.

19              d.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

20                  and members of the Damages Class have been injured in their business and

21                  property and are threatened with further injury.

22             e.     By reason of the foregoing, Defendants have entered into agreements in

23                  restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1,

24                  *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

25                  relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

26       317.   Defendants have entered into an unlawful agreement in restraint of trade in violation

27 of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

28

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within Tennessee, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market, such that in place of a free, open and competitive market, a monopoly in the Tennessee market has been maintained.

c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

318.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

a.    Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Utah; (2) telescope prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   In violation of Utah Code Annotated § 76-10-3104, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c.   During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

e.   By reason of the foregoing, Defendants' have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

319.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

a.   Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Vermont; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for telescopes.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

320. Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

a. Defendants' combination or conspiracy had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) telescope prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b. In violation of West Virginia Code § 47-18-4, Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the telescope market, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

c. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

1    and members of the Damages Class have been injured in their business and

2    property and are threatened with further injury.

3        e.    By reason of the foregoing, Defendants have entered into agreements in

4              restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

5              Accordingly, Plaintiffs and members of the Damages Class seek all relief

6              available under West Virginia Code §§ 47-18-1, *et seq.*

7    321.   Defendants have entered into an unlawful agreement in restraint of trade in violation

8    of the Wisconsin Statutes §§ 133.01, *et seq.*

9        a.    Defendants' combination or conspiracy had the following effects: (1)

10             telescope price competition was restrained, suppressed, and eliminated

11             throughout Wisconsin; (2) telescope prices were raised, fixed, maintained

12             and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs

13             and members of the Damages Class were deprived of free and open

14             competition; and (4) Plaintiffs and members of the Damages Class paid

15             supra-competitive, artificially inflated prices for telescopes.

16       b.    In violation of Wisconsin Statutes § 133.03, Defendants monopolized,

17             attempted to monopolize, and combined and conspired together to

18             monopolize trade or commerce in the telescope market, a substantial part of

19             which occurred within Wisconsin, for the purpose of excluding competition

20             or controlling, fixing, or maintaining prices in the telescope market.

21       c.    During the Class Period, Defendants' illegal conduct had a substantial effect

22             on Wisconsin commerce.

23       d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

24             and members of the Damages Class have been injured in their business and

25             property and are threatened with further injury.

26       e.    By reason of the foregoing, Defendants have entered into agreements in

27             restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    92
10445742v1/016869

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

322. Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for telescopes than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

323. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from its anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

324. Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### Sixth Cause of Action
**Violation of State Consumer Protection Laws**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

325. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

326. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

327. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

    a. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which telescopes were sold, distributed, or obtained in Arkansas and took efforts to conceal

its agreements from Plaintiffs and members of the Damages Class.

b.   The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.   During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

328.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

a.   During the Class Period, Defendants marketed, sold, or distributed telescopes in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices

1    specified above.

2    b.    Defendants established, maintained, or used a monopoly, or attempted to

3          establish a monopoly, of trade or commerce in the telescope market, a

4          substantial part of which occurred within California, for the purpose of

5          excluding competition or controlling, fixing, or maintaining prices in the

6          telescope market.

7    c.    This claim is instituted pursuant to Sections 17203 and 17204 of the

8          California Business and Professions Code, to obtain restitution from

9          Defendants for acts, as alleged herein, that violated Section 17200 of the

10         California Business and Professions Code, commonly known as the Unfair

11         Competition Law.

12   d.    Defendants' conduct as alleged herein violated Section 17200. The acts,

13         omissions, misrepresentations, practices and non-disclosures of Defendants,

14         as alleged herein, constituted a common, continuous, and continuing course

15         of conduct of unfair competition by means of unfair, unlawful, and/or

16         fraudulent business acts or practices within the meaning of California

17         Business and Professions Code, Section 17200, *et seq.*, including, but not

18         limited to, the following: (1) the violations of Section 1 of the Sherman Act,

19         as set forth above; (2) the violations of Section 16720, *et seq.*, of the

20         California Business and Professions Code, set forth above;

21   e.    Defendants' acts, omissions, misrepresentations, practices, and non-

22         disclosures, as described above, whether or not in violation of Section

23         16720, *et seq.*, of the California Business and Professions Code, and whether

24         or not concerted or independent acts, are otherwise unfair, unconscionable,

25         unlawful or fraudulent;

26   f.    Defendants' acts or practices are unfair to purchasers of telescopes in the

27         State of California within the meaning of Section 17200, California Business

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                    95

and Professions Code;

g.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i.     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.     The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for telescopes. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

k.     The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

l.     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

329.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce

1  by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

2  competitive levels, the prices at which telescopes were sold, distributed or

3  obtained in the District of Columbia.

4  b.  The foregoing conduct constitutes "unlawful trade practices," within the

5  meaning of D.C. Code § 28-3904. Plaintiffs were not aware of Defendants'

6  price-fixing conspiracy and were therefore unaware that they were being

7  unfairly and illegally overcharged. There was a gross disparity of bargaining

8  power between the parties with respect to the price charged by Defendants

9  for telescopes. Defendants had the sole power to set that price and Plaintiffs

10  had no power to negotiate a lower price. Moreover, Plaintiffs lacked any

11  meaningful choice in purchasing telescopes because they were unaware of

12  the unlawful overcharge and there was no alternative source of supply

13  through which Plaintiffs could avoid the overcharges. Defendants' conduct

14  with regard to telescopes, including its illegal conspiracy to secretly fix the

15  price of telescopes at supra-competitive levels and overcharge consumers,

16  was substantively unconscionable because it was one-sided and unfairly

17  benefited Defendants at the expense of Plaintiffs and the public. Defendants

18  took grossly unfair advantage of Plaintiffs. The suppression of competition

19  that has resulted from Defendants' conspiracy has ultimately resulted in

20  unconscionably higher prices for consumers so that there was a gross

21  disparity between the price paid and the value received for telescopes.

22  c.  Defendants' unlawful conduct had the following effects: (1) telescope price

23  competition was restrained, suppressed, and eliminated throughout the

24  District of Columbia; (2) telescope prices were raised, fixed, maintained,

25  and stabilized at artificially high levels throughout the District of Columbia;

26  (3) Plaintiffs and the Damages Class were deprived of free and open

27  competition; and (4) Plaintiffs and the Damages Class paid supra-

28

competitive, artificially inflated prices for telescope.

d.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

330.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

a.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Florida; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

331.   Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

    a.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    In violation of Hawaii Revised Statutes § 480-9, Defendants monopolized, attempted to monopolize, and combined and conspired together to monopolize trade or commerce in the telescope market, a substantial part of which occurred within Hawaii, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the telescope market.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

    d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

    e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes §§ 480-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

332.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

    a.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

    b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling

and/or maintaining at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Massachusetts and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

c.    Defendants' unlawful conduct had the following effects: (1) telescopes price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

e.    Defendants have been or will be served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to Defendants not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

f.    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

333.   Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

    a.    Plaintiffs and the Damages Class purchased telescopes for personal, family, or household purposes.

    b.    Defendants engaged in the conduct described herein in connection with telescopes in trade or commerce in a market that includes Missouri.

    c.    Defendants agreed to, and did in fact, affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

    d.    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased.

    e.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in telescopes by making public statements that were not in accord with the facts.

    f.    Defendants' statements and conduct concerning the price of telescopes were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing telescopes at prices established by a free and fair market.

    g.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout

Missouri; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h.  The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

i.  As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

j.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

334.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

a.  Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Montana; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

b.   During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

335.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

a.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which telescopes were sold, distributed or obtained in New Mexico and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.   The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for telescopes as set forth in N.M.S.A., § 57-12-2E. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with

respect to the price charged by Defendants for telescopes. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing telescopes because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges. Defendants' conduct with regard to telescopes, including its illegal conspiracy to secretly fix the price of telescopes at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for telescopes.

c.   Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

d.   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts

1 or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and,

2 accordingly, Plaintiffs and the members of the Damages Class seek all relief

3 available under that statute.

4  336. Defendants have engaged in unfair competition or unfair, unconscionable, or

5 deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

   a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in New York and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

   b. Defendants and their co-conspirators made public statements about the prices of telescopes that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for telescopes; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

   c. Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased telescopes were misled to believe that they were paying a fair price for telescopes or the price increases for telescopes were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

   d. Defendants knew that its unlawful trade practices with respect to pricing telescopes would have an impact on New York consumers and not just Defendants' direct customers.

   e. Defendants knew that their unlawful trade practices with respect to pricing

telescopes would have a broad impact, causing consumer class members who indirectly purchased telescopes to be injured by paying more for telescopes than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.    Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout New York; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

h.    During the Class Period, Defendants marketed, sold, or distributed telescopes in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.    During the Class Period, each Defendant named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in New York.

j.    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

337.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed or obtained in North Carolina and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

b.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up its illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of telescopes created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed its unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

c.  The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d.  Defendants' unlawful conduct had the following effects: (1) telescope price

competition was restrained, suppressed, and eliminated throughout North Carolina; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e.    During the Class Period, Defendants marketed, sold, or distributed telescopes in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

f.    During the Class Period, Defendants, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed telescopes in North Carolina.

g.    Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

338.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

a.    Members of this Damages Class purchased telescopes for personal, family, or household purposes.

b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which telescopes were sold, distributed, or obtained in Rhode Island.

c. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for telescopes. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, it breached that duty by its silence. Defendants misrepresented to all consumers during the Class Period that its telescope prices were competitive and fair.

d. Defendants' unlawful conduct had the following effects: (1) telescope price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) telescope prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

e. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f. Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of telescopes, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of telescopes they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode

Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

339.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

    a.    Defendants' combination or conspiracy had the following effects: (1) telescopes price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) telescopes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for telescopes.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

340.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

1 telescopes were sold, distributed, or obtained in Vermont.

2 b. By virtue of the conduct alleged herein, Defendants and those acting in

3  concert with them entered into contracts where the effect of such contract

4  was to substantially lessen competition or tended to create a monopoly in a

5  line of trade or commerce in Vermont in violation of Section 2453, *et seq.*,

6  of Vermont Title 9.

7 c. Defendants deliberately failed to disclose material facts to Plaintiffs and

8  members of the Damages Class concerning its unlawful activities and

9  artificially inflated prices for telescopes. Defendants owed a duty to disclose

10  such facts, and considering the relative lack of sophistication of the average,

11  non-business consumer, Defendants breached that duty by its silence.

12  Defendants misrepresented to all consumers during the Class Period that its

13  telescope prices were competitive and fair.

14 d. Defendants' unlawful conduct had the following effects: (1) telescope price

15  competition was restrained, suppressed, and eliminated throughout

16  Vermont; (2) telescope prices were raised, fixed, maintained, and stabilized

17  at artificially high levels throughout Vermont; (3) Plaintiffs and members of

18  the Damages Class were deprived of free and open competition; and (4)

19  Plaintiffs and members of the Damages Class paid supra-competitive,

20  artificially inflated prices for telescopes.

21 e. As a direct and proximate result of Defendants' violations of law, Plaintiffs

22  and members of the Damages Class suffered an ascertainable loss of money

23  or property as a result of Defendants' use or employment of unconscionable

24  and deceptive commercial practices as set forth above. That loss was caused

25  by Defendants' willful and deceptive conduct, as described herein.

26 f. Defendants' deception, including its affirmative misrepresentations and

27  omissions concerning the prices of telescopes, likely misled all purchasers

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**           111
10445742v1/016869

acting reasonably under the circumstances to believe that they were purchasing telescopes at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

<u>Seventh Cause of Action</u>
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class or, Alternatively, the State Damages Classes)**

341.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

342.   Plaintiffs bring this claim under the laws of each of the Indirect Purchaser States.

343.   As a result of its unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on telescopes.

344.   Defendants have benefited from its unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and the members of the Damages Class for telescopes.

345.   Plaintiffs and the members of the Damages Class are entitled to Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

346.   Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased telescopes subject to Defendants' conspiracy would have been futile.

IX.    **PRAYER FOR RELIEF**

347.   Accordingly, Plaintiffs respectfully request that:

348.   The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Class as provided by Rule 23(c)(2).

349.   That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

    a.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    b.    A *per se* violation of Section 1 of the Sherman Act;

    c.    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and consumer protection laws as set forth herein; and

    d.    Acts of unjust enrichment by Defendants as set forth herein.

350.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

351.   Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

352.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

353.   Plaintiffs and the members of the Damages Class be awarded restitution, including

disgorgement of profits Defendants obtained as a result of its acts of unfair competition and acts of unjust enrichment;

354.   Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

355.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

356.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## X.   JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.

1

2 Dated:  March 25, 2022                    Respectfully Submitted,

3                                            /s/ Kalpana Srinivasan
                                            Kalpana Srinivasan (Bar No. 237460)
4                                           Marc M. Seltzer (Bar No. 54534)
                                            Steven Sklaver (Bar No.237612)
5                                           Michael Gervais (Bar No. 330731)
                                            **SUSMAN GODFREY L.L.P.**
6                                           1900 Avenue of the Stars, Ste. 1400
                                            Los Angeles, CA 90067
7                                           Phone: 310-789-3100
                                            ksrinivasan@susmangodfrey.com
8                                           mseltzer@susmangodfrey.com
                                            ssklaver@susmangodfrey.com
9                                           mgervais@susmangodfrey.com

10                                          Alejandra C. Salinas (*pro hac vice*)
                                            Texas SBN 24102452
11                                          **SUSMAN GODFREY L.L.P.**
                                            1000 Louisiana Street, Suite 5100
12                                          Houston, Texas 77002
                                            Telephone: (713) 651-9366
13                                          Facsimile: (713) 654-6666
                                            asalinas@susmangodfrey.com
14
                                            /s/ *Lin Y. Chan*
15                                          Lin Y. Chan (SBN 255027)
                                            Eric B. Fastiff (SBN 182260)
16                                          Jon B. Fougner (SBN 314097)
                                            **LIEFF CABRASER HEIMANN &**
17                                          **BERNSTEIN LLP**
                                            275 Battery Street, 29th Floor
18                                          San Francisco, California 94111
                                            Telephone: (415) 956-1000
19                                          Facsimile: (415) 956-1008
                                            lchan@lchb.com
20                                          efastiff@lchb.com
                                            jfougner@lchb.com
21
                                            Catherine P. Humphreville (*pro hac vice*)
22                                          **LIEFF CABRASER HEIMANN**
                                            **& BERNSTEIN LLP**
23                                          250 Hudson Street, 8th Floor
                                            New York, New York 10013
24                                          Telephone: (212) 355-9500
                                            Facsimile: (212) 355-9592
25                                          chumphreville@lchb.com

26

27

28

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT;**
**Case No. 5:20-cv-03639-EJD**                                                        115

1

2          /s/ Adam J. Zapala
           Adam J. Zapala (SBN 245748)
3          Elizabeth T. Castillo (SBN 280502)
           James G. Dallal (SBN 277826)
4          **COTCHETT, PITRE & McCARTHY, LLP**
           840 Malcolm Road
5          Burlingame, CA 94010
           Telephone: (650) 697-6000
6          Facsimile: (650) 697-0577
           azapala@cpmlegal.com
7          ecastillo@cpmlegal.com
           jdallal@cpmlegal.com

8          *Interim Co-Lead Counsel for the Indirect*
           *Purchaser Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28