1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5   HIGHTOWER,                      )
                                    )
6            Plaintiff,             )
                                    )
7   vs.                             )   No. C 20-03639-EJD
                                    )
8   CELESTRON ACQUISITION, LLC,     )
    et al.,                         )
9                                   )
             Defendants.            )
10  _____ )
                                    )
11  SPECTRUM SCIENTIFICS, LLC,      )
    et al.,                         )
12                                  )
             Plaintiffs,            )
13                                  )
    vs.                             )   No. C 20-03642-EJD(VKD)
14                                  )
    CELESTRON ACQUISITION, LLC,     )
15  et al.,                         )
                                    )
16           Defendants.            )
17  _____ )

                                    San Jose, California
18                                  Tuesday, August 29, 2023

19

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
20          RECORDING 10:56 - 12:05 = 69 MINUTES

21

22

23              (APPEARANCES CONTINUED ON NEXT PAGE)

24

25

*Echo Reporting, Inc.*

2

1 <u>APPEARANCES</u>:

2 For Plaintiff:

BraunHagey & Borden, LLP
3                                       351 California Street
10th Floor
4                                       San Francisco, California
94104
5                               BY:  MATTHEW BROOKS BORDEN, ESQ.
BY:  RONALD JAMES FISHER, ESQ.
6
Lief Cabraser Heimann &
7                                         Bernstein, LLP
275 Battery Street, 29th Floor
8                                       San Francisco, California
94111
9                               BY:  LIN YEE CHAN, ESQ.

10                                      Cotchett Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
11                                      Burlingame, California 94010
BY:  JAMES GERARD BEEBE DALLAL,
12                                        ESQ.

13 For Defendants:

Frost, LLP
14                                      10960 Wilshire Boulevard
Suite 1260
15                                      Los Angeles, California 90024
BY:  JOSHUA STEWART STAMBAUGH, ESQ.
16
Transcribed by:                 Echo Reporting, Inc.
17                                      Contracted Court Reporter/
Transcriber
18                                      echoreporting@yahoo.com

19

20

21

22

23

24

25

3

<u>Tuesday, August 29, 2023</u>                              <u>10:56 a.m.</u>

      P-R-O-C-E-E-D-I-N-G-S

        --oOo--

    THE CLERK:  Calling cases 20-CV-03639, Hightower versus Celestron Acquisition, LLC, et al., and case 20-CV-03642, Spectrum Scientifics, LLC, et al. versus Celestron Acquisition, LLC, et al., on for discovery hearing re Defendants' production of transactional data.

  If the parties could state their appearances, please, beginning with Plaintiffs.

    THE COURT:  Let's have the direct purchaser Plaintiffs first.

    MR. BORDEN:  Good morning, your Honor.  Matt Borden on behalf of direct purchaser Plaintiffs.

    THE COURT:  Good morning.

    THE CLERK:  Speak into the microphones.

    THE COURT:  Oh, you can all sit down.

    THE CLERK:  If you can repeat that for the record. I'm sorry.

    MR. BORDEN:  Good morning, your Honor.  Matt Borden on behalf of DDPs.

    THE COURT:  Good morning.

    MR. FISHER:  And Ronald Fisher on behalf of DPPs. Good morning, your Honor.

    THE COURT:  Good morning.  And indirect purchaser

4

1  Plaintiffs?

2          MS. CHAN:  Good morning, your Honor.  Lin Chan on

3  behalf of IPPs.

4          THE COURT:  Okay.  Good morning.

5          MR. DALLAL:  And James Dallal on behalf of IPPs.

6          THE COURT:  Okay.  Good morning.

7          MR. DALLAL:  Good morning, your Honor.

8          THE COURT:  For Defendants?

9          MR. STAMBAUGH:  Good morning, your Honor.  Josh

10  Stambaugh for the Defendants.

11          THE COURT:  Okay.  Good morning.

12      So, we have two agenda items this morning.  The first

13  is the discussion of transactional data and, specifically,

14  the status and sufficiency of the Defendants' production of

15  Celestron profit margin data and the Nantong-Schmidt data

16  source material.  And then the second agenda item, which I

17  think probably didn't show up anywhere on the docket, but I

18  hope you're all prepared to talk about it, is the remaining

19  disputes about deposition scheduling.

20      So, I hope that's not a huge surprise.  I did get your

21  last status report and wanted to see if we could wrap that

22  up today as well.

23      We will start with the first matter, which is the

24  transactional data.  And, so, let me just find out the

25  deadline for making available the source material for the

5

1  Nantong-Schmidt cost summary data was Friday.

2      So, let me ask Mr. Stambaugh, have the Defendants made

3  that source material available?

4          MR. STAMBAUGH:  We have, your Honor.

5          THE COURT:  Okay.

6          MR. STAMBAUGH:  I explained in a meet and confer

7  it took three people 18 days to compile the data, which was

8  produced to them in 208 spreadsheets.  The original hard

9  copy documents I explained were made available in China.

10 Otherwise, it will take months and months to scan it all in.

11         THE COURT:  Okay.  Let me hear from the -- I don't

12 know who's going to speak, if you're going to speak

13 collectively on behalf of the Plaintiffs, but, Mr. Stambaugh

14 has shared with me that the source material has been made

15 available as ordered.

16     Do the Plaintiffs agree?

17         MR. BORDEN:  We disagree, your Honor.

18         THE COURT:  Why -- why is that?

19         MR. BORDEN:  It is true that they produced 208

20 PDFs, but they have said that there's a thousand binders of

21 material that they have not produced.

22         THE COURT:  They made it available to you in

23 China.

24         MR. BORDEN:  They haven't copied it and produced

25 it to us.

6

1          THE COURT:  That's okay.  That's not what I -- I
2  did not order that it be copied and produced.  I asked that
3  the source material be made available for inspection, and
4  because it was going deep into the weeds and you wanted to
5  spot check it and make sure that their cost summary data was
6  accurate, that's what I had in mind.  So --
7          MR. BORDEN:  Well, it's somewhat of a black box to
8  us, your Honor, still.
9          THE COURT:  Have you looked at the binder?
10          MR. BORDEN:  We have not seen any of the binders.
11          THE COURT:  Okay.  Have you looked at the PDFs?
12          MR. BORDEN:  We have looked at the PDFs.  We
13  haven't fully analyzed all the information, but we do know
14  from talking to Defendants that they have an ERP system
15  where some of these materials came from.  They have binders
16  where some of these materials came from.  We can't tell from
17  the PDFs that they've produced which came from which or how
18  -- how these materials are derived.  There's no metadata
19  associated with the stuff that came from the ERP system.
20  So, it's hard for us to understand how it takes three people
21  18 days to produce 208 PDFs.  It seems like they're sifting
22  through the binders for something or they're going through
23  the materials.  We just don't have any clarity as to what
24  that is.
25      And this is not an insignificant issue to our client

7

1 because, specifically for DPPs, like, our -- our burden in

2 this case is to show that direct purchasers paid an

3 overcharge, which means that we need to understand what's

4 going on at the factory level in a lot more detail than the

5 information that Defendants have provided to us. And, as a

6 result, like, my fear is that we will end up in trial.

7 Their summary exhibit is going to get introduced as some

8 type of accurate piece of information, and we won't have the

9 ability to go behind that and to challenge the -- the -- the

10 general summary that they've provided because we don't have

11 the underlying materials. We don't have the backup. We

12 don't have -- we have what they've sort of picked and chosed

13 over -- chosen over an 18-day period. We don't understand

14 where the data came from or what it is.

15      And, if you just look historically, when we started

16 this whole process, they said the data didn't exist at all.

17 Then they said that the data, you know, was a Chinese

18 government secret. Well, that wasn't true either. And now

19 we're sort of at this stage where they're picking and

20 choosing stuff, and we don't understand what it is.

21      So, it keeps getting dribbled to us, and this is the

22 same thing when we get to the Celestron side of things.

23          THE COURT: Okay. Well, we're not going to get

24 there quite yet.

25          MR. BORDEN: Yeah.

1          THE COURT:  But let me just make an observation,
2  which is I think we had an issue like this before where
3  there -- there was paper in a warehouse in China, and I kind
4  of remember that it was IPPs who had this concern, and, you
5  know, my resolution of that dispute was something along the
6  lines of if you want everyone on the Defense side to copy
7  all the pieces of paper, you can pay for that or you can go
8  to China and look at it.  And, somehow, miraculously, IPPs
9  and Defendants worked that one out.  I'm not sure how that
10 happened.  I don't know if this is a comparable dispute, but
11 it doesn't seem to me like -- well, let me hear from IPPs
12 first, and then I will -- I will share some thoughts about
13 how we might resolve this one.
14          MR. BORDEN:  Can I make one more comment before we
15 switch over, which is just typically in civil litigation,
16 the burden is on the producing party.
17          THE COURT:  Yes.
18          MR. BORDEN:  When we had hard copy documents, we
19 went and gathered them up and produced them, and I don't
20 think it's unreasonable to expect the same thing, especially
21 when the documents are far away.
22          THE COURT:  Yes.  But there's a -- there's a
23 proportionality idea here, and that's what I'm trying to
24 focus on.  So -- so, let me hear from IPPs next.
25          MR. BORDEN:  Okay.

9

1          THE COURT:  Thank you.

2          MR. DALLAL:  Thank you, your Honor.  So, first of

3 all, just to address that last point, I don't think that

4 these are very comparable situations.  The prior question

5 about hard copy records had to do with paper records that

6 weren't on live systems, that were from an absolved entity.

7 Defendants didn't believe there had been that material.

8 They found out there was.  We got a sample of it.  It didn't

9 look like it was anything that was very relevant to live

10 systems and current operations.

11          THE COURT:  Okay.

12          MR. DALLAL:  What we're talking about right now is

13 an issue that does pertain to current business operations

14 and systems that are live.  So, you know, building off what

15 Mr. Borden said, we have these 208 files.  We're basically

16 analyzing them as texts.  They don't compile readily into

17 any type of database format.  To be able to do that would

18 require a pretty heavy lift and some guessing and, you know,

19 some making of judgment calls.

20     This dispute concerns both the actual production

21 material and the explanations of that material that were

22 given in Rog 5 that the Court has ordered Defendants to

23 update twice.  The second update did come in on August 14.

24 We believe, again, that that second update was insufficient

25 and doesn't get us to where we need to be.  The Rog calls

10

1  for them to disclose how costs are calculated, how they do

2  their calculations to determine their costs associated with

3  their products and just how they do it in the ordinary

4  course of business, whether it's by product, whether it's by

5  product category.  And we're not taking a, you know, hard

6  view on that in particular.

7      But what we're really looking at here is Defendants

8  giving us something in text form when it clearly exists.  I

9  mean, in the latest Rog response, they say --

10          THE COURT:  What do you mean giving us something

11  in text form because it clearly exists?

12          MR. DALLAL:  Well, they're PDFs --

13          THE COURT:  Yeah.

14          MR. DALLAL:  -- that essentially list out texts.

15          THE COURT:  You want them in a different format?

16          MR. DALLAL:  We want them in a format that's at

17  least as good as they keep them in, and their Rog response

18  states that for three of the categories, they pull stuff

19  from the ERP system.

20          THE COURT:  Um-hmm.

21          MR. DALLAL:  For at least another nine categories,

22  they refer to an Excel that's generated monthly.  And then

23  for other categories, there's pay request documents,

24  invoices and tax filing and reporting docs.  Perhaps those

25  are hard copy.  We don't know.

1          THE COURT:  Um-hmm.

2          MR. DALLAL:  We don't have very much transparency

3  into that.  We also don't know how the 208 files match up to

4  the 22 categories of costs that were on the single page PDF

5  they gave us that's supposed to be their cost data.

6          THE COURT:  Um-hmm.

7          MR. DALLAL:  So, there's certainly some

8  substructure there and some additional explanation.  It's

9  legally required, you know, responsive to the Rog, that

10  would help us understand what it is they're producing, and

11  we also think that they could produce it in a format that

12  would be more user friendly and more consistent with how

13  they keep it in the ordinary course of business.

14          THE COURT:  And have you talked with the

15  Defendants about those concerns?

16          MR. DALLAL:  We have only learned of those

17  concerns yesterday because we received the files on

18  Thursday.  And, so, we've been scrambling to access the

19  files and evaluate them.  So, I -- I agree with the

20  sentiment of the question, which is that perhaps this could

21  be better ventilated in a further meet and confer.

22          THE COURT:  All right.  So, Mr. Stambaugh, you now

23  heard possibly for the first time the concerns that the

24  Plaintiffs have about your production and its sufficiency,

25  lack thereof, inability to use it readily.

1      What is your response?

2            MR. STAMBAUGH:  It sounds like your microphone may

3 have --

4            THE COURT:  What is your response?

5            MR. STAMBAUGH:  Sure, your Honor.  I need to

6 clarify a few things, and the immediate response is we're

7 happy to continue to meet and confer.

8      These are the facts, your Honor.  We were here before

9 the Court in July talking about this data, talking about

10 it's a Chinese company, and it's held in different areas,

11 and it's not the type of data that the Plaintiffs may

12 expect.  And the Court's comment was "It is what it is."

13 And I said, "Yes, is what it is."

14            THE COURT:  Yes, but you apparently produced

15 something that isn't what it is.  You produced something

16 that comes out of an ERP system in a format that is a PDF.

17            MR. STAMBAUGH:  That's incorrect, your Honor.  So,

18 the 208 very extensive spreadsheets and Excel documents is

19 the compilation of all of that data, both from the --

20            THE COURT:  What form was it produced in?

21            MR. STAMBAUGH:  In the hard copy.

22            THE COURT:  Is it produced in native Excel?

23            MR. STAMBAUGH:  I believe some of them are Excel

24 and some of them are PDFs.  It's very detailed spreadsheets.

25 Again, the people compiled all of the information from over

13

1  a thousand binders.  So, it's incorrect for counsel to say

2  there's some other binders that we didn't produce.

3          THE COURT:  I don't think that's what they're

4  saying.

5          MR. STAMBAUGH:  They have --

6          THE COURT:  They're saying they have no idea how

7  you got the stuff that you produced in these 208 files from

8  the binders, what the relationship is or anything like that.

9  And the whole point of this exercise is there was a single

10 page cost data summary that the Defendants told me they had

11 prepared, their people, the people had prepared from some

12 source material, and the Plaintiffs questioned, Well, we

13 don't have any insight of whether this is right or not or

14 how it was prepared or anything like that.  So, we would

15 like the opportunity to inspect the source material.

16     And, so, what I'm trying to figure out is have you

17 provided them -- it wasn't intended to be a situation where

18 your clients then create something new.  It was provide the

19 source material.  So, what did you do to come up with the

20 208 files?

21         MR. STAMBAUGH:  Three people took 18 days and went

22 through all of the hard copy source material that we have

23 made available per the Court's order to Plaintiffs and put

24 it into 208 spreadsheets.

25         THE COURT:  Manual data entry?

14

1        MR. STAMBAUGH:  Manual data entry.  That's why it

2  took 18 days.

3        THE COURT:  Um-hmm.

4        MR. STAMBAUGH:  And we have made available per the

5  Court's order all of those source materials.  We have done

6  everything the Court has asked.

7        THE COURT:  So, what is the -- the basis -- well,

8  so, I don't have the interrogatory answer in front of me.

9  Let me just say that.  But the Plaintiffs tell me that your

10 Rog 5 answer says something about source material includes

11 the ERP system.  That does not sound like hard copy data.

12        UNIDENTIFIED SPEAKER:  The --

13        MR. STAMBAUGH:  They're the data that came from

14 the ERP system as well.

15        THE COURT:  I'm talking to the Defendants.

16        MR. STAMBAUGH:  Correct.  Twenty-two categories.

17 We have 10 pages of explanation.  Some categories came from

18 the ERP system.  That's clearly delineated on these

19 spreadsheets.

20        THE COURT:  Okay.

21        MR. STAMBAUGH:  The majority of it comes from hard

22 copy data.  It is incorrect when counsel perhaps misspoke

23 inadvertently.  Each of the files, the 208 files, say item

24 one, as it relates to item one on the interrogatory

25 response.

15

1          THE COURT:  So, it corresponds to your

2  interrogatory answer?

3          MR. STAMBAUGH:  Yes.

4          THE COURT:  Okay.  So -- so, then, let me ask you

5  this -- this question.  To the extent they -- and they

6  haven't had a lot of time with it, but to the extent they

7  don't understand what information you have provided, is --

8  is there a witness on the deposition scheduling list who can

9  talk intelligently about this material, and who is that?

10          MR. STAMBAUGH:  Of course, there is.  And there's

11  a 30(b)(6) from Nantong-Schmidt.  His name is Michael Sun

12  (phonetic).  We have offered dates.  And, as with all

13  transactional data, that's the most appropriate way to

14  proceed.  But, yes, they can ask him all the questions

15  regarding those 22 categories.

16          THE COURT:  Here's what I don't want to have

17  happen.  I don't want to have Mr. Sun's deposition take

18  place only for him to say, I have no idea.  I can't

19  understand this.  I don't -- it doesn't look familiar to me.

20      And keep in mind I've read Mr. Roth's (phonetic)

21  deposition transcript that you provided to me.  So, he had

22  some difficulty answering questions about the document that

23  was placed in front of him on the day of his deposition, and

24  we'll get to that.

25      But is Mr. Sun going to be able to answer questions

16

1  about the materials in these 208 spreadsheets --

2          MR. STAMBAUGH:  Yes.

3          THE COURT:  -- and the cost summary data

4  spreadsheet?

5          MR. STAMBAUGH:  Yes.

6          THE COURT:  Okay.

7          MR. STAMBAUGH:  This information came from Mr.

8  Sun, yes.

9          THE COURT:  He was among the three people?

10         MR. STAMBAUGH:  I believe he had his employees do

11 it.

12         THE COURT:  Okay.

13         MR. STAMBAUGH:  But it came directly to us from

14 Mr. Sun.

15         THE COURT:  Okay.  So, then there's a further

16 problem or further ask, which is apparently at least some of

17 the Plaintiffs want all the hard copies.

18     How many binders are there?

19         MR. STAMBAUGH:  I'm told there's over a thousand

20 binders that covers this time period.

21         THE COURT:  Um-hmm.

22         MR. STAMBAUGH:  When we had the meet and confer

23 with DPP's counsel on Thursday, we were still arguing for

24 two boxes of documents from their client, and they said that

25 was too burdensome.  We have been told this would take about

17

1  40 to 50 days to compile all of this.  We --

2           THE COURT:  And what --

3           MR. STAMBAUGH:  -- manually compiled it to make it

4  available, as the Court has said, on three occasions, make

5  it available.  They will pay the costs.  They've refused to

6  do that.  Instead, they misrepresent --

7           THE COURT:  Okay.  I don't want to hear about

8  misrepresentations.

9           MR. STAMBAUGH:  -- that we haven't made them

10 available.

11          THE COURT:  Okay.  Hang on.  Hang on.  So, here's

12 what I'm asking.  So, where exactly are the binders?

13          MR. STAMBAUGH:  In the Nantong-Schmidt factory in

14 China.

15          THE COURT:  Okay.  Where in China?  Beijing?

16 Where is it?

17          MR. STAMBAUGH:  I don't have the address off hand,

18 your Honor, but I can pull it up.  It's in --

19          THE COURT:  And here's -- here's where I'm going

20 with this.  So, if the Plaintiffs really really want to look

21 at the thousand binders, can you not combine that look with

22 your trip to Asia?  I know you're not going to China.

23 You're going to Taiwan I think.  But can you make a little

24 excursion and go to China and look t the binders?  Because

25 if you want to satisfy yourself that the files that the

18

1  Defendants provided accurately represent what's in the

2  binders, that seems like the best way to do it.

3          MR. BORDEN:  Well, DPPs counsel are not going to

4  be going to Taiwan to take the depositions.  We're going to

5  do it remotely.

6          THE COURT:  Great.

7          MR. BORDEN:  But I think that, you know, maybe --

8  maybe a compromise solution would be some kind of scan of,

9  you know, 100 of the binders or some sampling of --

10          THE COURT:  A hundred binders scanned?  That's

11  what you -- that's what you want?

12          MR. BORDEN:  Yeah or, you know, just a sampling so

13  that we can, you know, go through it and look and see, you

14  know, the source materials ourselves and understand where

15  this information is coming from, and -- and it's not -- I

16  mean, if they went through it for 18 days to make a

17  compilation, I don't think it's going to take very long for

18  a person to scan that information into, you know, just a

19  scanner.

20          THE COURT:  How -- what's in the binders?  What

21  kind of documents are they?

22          MR. STAMBAUGH:  As described in detail in our

23  supplemental response, we've got invoices, batch materials,

24  payroll materials, information on tariffs, labor costs, all

25  of the categories that we outlined.

19

1          THE COURT:  Is there a correspondence between a

2  given binder and one of these 2008 spreadsheets?

3          MR. STAMBAUGH:  That I don't know.  There's over a

4  thousand binders.

5          THE COURT:  Okay.  IPPs are going to Taiwan,

6  right?

7          MR. DALLAL:  We are, your Honor.

8          THE COURT:  And you can detour and go look at the

9  thousand binders?

10         MR. DALLAL:  Don't know that we would particularly

11  want to take a trip up to Nantong.  I think for us, our

12  greater concern is that  there are other source materials

13  that are maintained in electronic form that we don't appear

14  to have.  So, if we could get it in the native form, I mean

15  -- and then I think the solution of a sampling, I mean,

16  perhaps for some subset, some, you know, category maybe

17  showing the backup for some small sampling -- I don't know

18  if it would be 100 binders --

19         THE COURT:  Yeah.

20         MR. DALLAL:  -- for some of it that might be a

21  workable solution, but I think our concern is less, you

22  know, boiling the ocean in terms of these thousand binders

23  and more if there's better, more reliable data in electronic

24  form that doesn't need to be manually keyed in to be less

25  usable than it would be in the ordinary course, we'd like

20

1  the original source material.

2      THE COURT:  Okay.  So, on that point, I'm going to

3  require you to talk about that issue.  If there's a concern

4  that there is better, more reliable electronic data that

5  doesn't have to involve manual entry that is not being

6  produced, you should talk about that first.  And if there is

7  such, I would be receptive to requiring it be produced, just

8  like all other electronic data you all have been producing.

9  But if it's not like that, if it's different, if it really

10  does require some manual entry, then -- then we're kind of

11  back to where we are right now.

12      The other thing I think that would be really important

13  here is -- and not burdensome -- is if there were a way to

14  say this binder or this binder corresponds to this chunk of

15  or this -- this file.  There's some correspondence between

16  the information in the binder and something that your client

17  has put on the -- one of the 2008 spreadsheets.

18      If you just have an example where the Plaintiffs can

19  test that, not 100 binders.  I think that's not reasonable.

20  Something smaller, but there has to be -- so, if they look

21  at the source material and then they look at your client's

22  summary and they find lots of problems, well, then we can

23  have another conversation.  But at least if you have one

24  example, one sample of the underlying paper documents and

25  you have these 2008 files and you have the original cost

21

1  summary spreadsheet and then you have Mr. Sun's deposition

2  and you can ask him questions about it, if there's a

3  problem, well, then Mr. Sun will be testifying again, and

4  there'll be more production and all of those things are

5  potential outcomes.  So, you want to be really, you know,

6  confident in -- in the work.  But I think that a limited

7  sampling of the paper documents might just address the

8  concerns that the Plaintiffs have.

9      So, is that something that could be done is just here's

10 -- here's a correspondence, here's an example of what the

11 three employees working 18 days did.  This is what they

12 looked at, and here's the output.  Is that something that

13 the Defendants could produce?

14         MR. STAMBAUGH:  We'd be happy to look into that,

15 your Honor.

16         THE COURT:  Okay.

17         MR. STAMBAUGH:  And meet and confer with them.  My

18 concern is that we will be back here again in --

19         THE COURT:  Well, no doubt you'll be back here

20 again because you all always come back here again, but I'm

21 really -- I'm encouraging you all to find some reasonable

22 way to accommodate the Plaintiffs' concerns without copying

23 the thousand binders and shipping them from China to the

24 Plaintiffs.  That's -- I don't think -- I mean, that would

25 be a last resort that I would order that.  That just seems

22

1  like a huge waste of paper or to scan them in.  I mean,

2  somebody's going to sit at a scanner and do that?  I just --

3  no.  There's got to be a better way to assess the -- to

4  address the concerns.  You may be pleasantly surprised that

5  the information is accurate and that Michael Sun can testify

6  as to the foundational requirements necessary to support

7  this summary is evidentiary value for you all to use in the

8  case.  That's what I'm hoping.  And if it doesn't work out

9  that way, then we will address it.

10       I see that his deposition is not until December.

11            MR. BORDEN:  I think that's --

12            MR. STAMBAUGH:  As are many other depositions

13  unfortunately at this point, including DPPs Plaintiff.

14            THE COURT:  But that doesn't mean you all wait

15  until December to figure this out.  You need to talk to each

16  other first.  So, there's an assessment that I think the

17  lawyers and their experts on the Plaintiffs' side can make

18  looking at the sample of paper and the prepared summary of

19  that sample and can make some assessment, if you left off a

20  zero or something like that, you know.  Like those kinds of

21  errors could be -- could be ferreted out.  And if they're --

22  if there's a lot more explanation required, as there may

23  well be, about how and what's the business process behind

24  here and all of those things that are appropriate for a fact

25  witness to answer, then fine.  You have the -- the

23

1  opportunity to take the deposition of the fact witness.

2  Okay?

3        MR. STAMBAUGH:  I do think that further analysis

4  of the spreadsheets -- and I understand Plaintiffs haven't

5  had a chance to do that -- will go a long way, because it

6  categorizes both the source material and the category of --

7        THE COURT:  Okay.  Well, maybe all it takes, Mr.

8  Stambaugh, is you to sit down and walk them through your

9  interrogatory and your document production.  And if you

10 think that's the most efficient way to address the concerns

11 you're hearing right now, then great.  I encourage you all

12 to do that.

13    So, I'm going to leave Nantong-Schmidt cost data alone

14 for the moment and require further meeting and conferring on

15 this issue, and I will ask the Defense to select a sample

16 that corresponds with some discrete chunk of the summary,

17 something that's reasonable to tell -- you understand the

18 objective here.  It has to be a reasonable sample so they

19 can test the accuracy of what's been prepared and provided.

20 Okay?

21        MR. STAMBAUGH:  Okay.

22        THE COURT:  Okay.  So, I don't want to have any

23 debate about that.  You all should be able to figure out

24 what -- what that is, but it's I hope something less than

25 100 binders.

24

1          MR. DALLAL:  Your Honor, if I may?

2          THE COURT:  Okay.

3          MR. DALLAL:  So, our other concern with Mr. Sun is

4    that he's the verifier of the interrogatory response, and we

5    still think the interrogatory response should be updated

6    because it asks for -- for each product line, for each cost

7    type, state how each relevant cost type is calculated for

8    the product line, including all the individual cost

9    components.  We don't have any calculations here.  We don't

10   have any explanation of how the cost types match up with the

11   product lines.  So --

12         THE COURT:  That wasn't part of your dispute last

13   time I had to deal with Interrogatory Number 5, was it?

14         MR. DALLAL:  In fact, it was, your Honor.

15         THE COURT:  I don't have that in front of me.

16         MR. DALLAL:  Well, I do have it available.  I

17   could pass it up if -- if your Honor likes.

18         THE COURT:  No.  Do you have my order?  My order

19   -- if I recall, my order said you have to answer these three

20   questions.

21         MR. DALLAL:  I think it was 2, 3, and 5.  So, we

22   had 1 through 5, something, you know, small Roman i through

23   v.

24         THE COURT:  Yeah.

25         MR. DALLAL:  So, they answered 2 and 3.  So,

1  instead of 1 through 5, they do (a) through (d).  They put 2

2  and 3 behind (b).  And for their 1(b), which they refer back

3  to 21 more times for each of the 22 categories, their 1(b)

4  response essentially says how it's calculated and the

5  percentage are complicated.  "It's a complicated formula.

6  We can't tell you."  That's what Mr. Sun verified.  And, so,

7  there's not really any useful information there.

8           MR. STAMBAUGH:  That's not true.  Can I -- I'm

9  happy to give the Court a copy.

10          THE COURT:  You know, I'm not going to -- you guys

11 didn't -- I realize I've been doing this on the basis of

12 status reports.  If there's a problem with the answer, I can

13 tell.  I need you to submit it to me in the normal way.  I

14 probably don't need a hearing.  I just need to see it.  So,

15 just submit it.  If you're confident in your answer, great.

16 Just -- just send me a letter, say here is the

17 interrogatory, here's the -- here's the answer that we don't

18 like.  It doesn't have to be a long letter, shouldn't take

19 you long to do it, and attach what it is, and I'll look at

20 it.  If you need to supplement before that happens, you have

21 an opportunity to do it.  Okay?

22          MR. STAMBAUGH:  Your Honor, may I briefly respond

23 at least to make our record?

24          THE COURT:  You're not -- nobody's making a record

25 here.  I haven't decided anything, and we're not even having

26

1   this conversation on this dispute.  I'm not -- I'm not

2   hearing this dispute.  You can make your record by filing

3   your part of the letter.  Okay.

4           MR. STAMBAUGH:  Okay.

5           THE COURT:  So, we're not making records right

6   now.  Okay.

7       The Celestron profit margin information, so, this was

8   discussed in the report in the 20-3639 case.  This is at

9   Docket 370.

10      Okay.  So, as I indicated, I have read Mr. Roth's

11  deposition, including the highlighted portions, and I'd just

12  like to get some clarity on what the Defendants have

13  produced with respect to the general ledger and what Mr.

14  Roth refers to as the subledgers.

15          MR. STAMBAUGH:  Your Honor, Defendants have

16  produced every single scrap of the general ledger.

17          THE COURT:  Okay.

18          MR. STAMBAUGH:  We also have met and conferred and

19  made very clear, and Plaintiffs have taken out of context

20  the term "subledger".  Subledger data is simply subsets of

21  the general ledger data, all of which has been produced to

22  them in its native format as requested for the entire

23  relevant time period.

24          THE COURT:  And have you told them the Bates

25  numbers that correspond to that production?

1          MR. STAMBAUGH:  Yes -- no, there -- this was a

2    subsequent production.  Last time we were here, the Court

3    said you need to give them margin data or, you know,

4    something equivalent so that they can calculate margins or

5    the general ledger.  We elected to produce the entire

6    general ledger.  The Court had required some sampling.  We

7    produced the whole thing.  They have the entire general

8    ledger and --

9          THE COURT:  No, no, no.  What --

10          MR. STAMBAUGH:  -- and all subledger data.

11          THE COURT:  Wait.  Here's what I'm -- here's what

12    I'm referring to.  The Plaintiffs expressed some difficulty

13    figuring out whether they have all of the things that you

14    say they have.

15          MR. STAMBAUGH:  Um-hmm.

16          THE COURT:  And they have asked for a couple of

17    things.  They've asked for the Bates numbers that correspond

18    to whatever you believe you've produced.  They've asked for

19    some additional explanation from Mr. Ayers (phonetic).  But

20    essentially, they're trying to figure out if they have what

21    you say they have.  And, so, what I'm -- again, I'm

22    referring to the filing that you all made at Docket 370 in

23    case 20-3639 at pages -- Plaintiff's portion of this

24    submission, pages four and five, and my question is just

25    have you identified the base numbers?

28

1            MR. STAMBAUGH:  Yes.  Yes, we have, your Honor.  I
2  apologize.

3            THE COURT:  When did you do that?

4            MR. STAMBAUGH:  Prior to the -- well, I believe we
5  did it over email immediately after the Court's order.
6  Also, prior to the submission of the 8/16 status report,
7  Docket Number 476, and I'm also looking at an email that I
8  sent and we discussed during the meet and confer last
9  Thursday, so many different Bates numbers.  They've asked
10 for different kinds of Bates numbers.  But, yes, we have
11 complied with the Court's order identifying where the margin
12 data can be found.  We then produced the general ledger data
13 and gave further answers.  As to what it contained, we also
14 produced a mapping report on August 11th, the day after the
15 general ledger data, and we've even made a further
16 production of product data sheets, even though not ordered
17 by the Court, but Plaintiff's requested that.  We produced
18 those on Friday.

19            THE COURT:  Last Friday?

20            MR. STAMBAUGH:  Last Friday.

21            THE COURT:  Okay.  So, let me ask the Plaintiffs.
22 I'm going to start with the IPPs.  Do you now have the
23 information you need to discern which part of the production
24 is the general ledger and the subsets of the general ledger
25 to which Mr. Roth was referring?  Any Plaintiffs if the IPPs

29

1    don't know the answer.

2         MR. FISHER:  Sorry.  Would you mind repeating your

3    question, your Honor?

4         THE COURT:  Yeah.  So, I'm looking at the -- the

5    submission that you made on August 16th, which says the

6    Plaintiffs want the Court to order the Defendants to

7    identify the subledgers in production by Bates number or, if

8    they haven't been produced, produce them without further

9    delay and the same thing for the general ledger.

10        Has that happened?

11        MR. FISHER:  Your Honor, the subledgers have not

12   bee identified to --

13        THE COURT:  Okay.  But they're not really

14   subledgers, and Mr. Roth used it like in air quotes, you

15   know.  So, have the subsets of the general ledger been

16   identified?

17        MR. FISHER:  They have not, your Honor.

18        THE COURT:  Okay.  Have they been identified?

19        MR. STAMBAUGH:  There are no separate subset

20   subledgers.  The general ledger itself contains that data,

21   and Mr. Roth's testimony, as he made clear, he hadn't seen

22   it in that format.

23        THE COURT:  Right.  He hadn't --

24        MR. STAMBAUGH:  They wanted -- they wanted the

25   native data.  That's how we produced it.  Mr. Ayers, the

1  30(b)(6), will be testify as to any questions they have as

2  to how to interpret the data.  There are no subledgers.

3          THE COURT:  Okay.

4          MR. STAMBAUGH:  There's no separate documents

5  to --

6          THE COURT:  Okay.

7          MR. STAMBAUGH:  -- to produce.

8          THE COURT:  So -- so, what was Exhibit 55 in Mr.

9  Roth's deposition?  Was that an extract from SAP?  What was

10 that?

11         MR. STAMBAUGH:  I was not at Mr. Roth's

12 deposition.

13         THE COURT:  Okay.

14         MR. STAMBAUGH:  I believe it was an extract from

15 the general ledger data that  we produced.

16         THE COURT:  Okay.  That's -- that's the thing that

17 was referenced in the deposition transcript that was

18 provided to me is Exhibit 55 is he was asked these questions

19 about, and he couldn't answer questions effectively about

20 it.  He just didn't recognize it in that format.  He

21 couldn't say whether it came from the general ledger or

22 anything.

23         MR. STAMBAUGH:  Um-hmm.

24         THE COURT:  So --

25         MR. STAMBAUGH:  Because Mr. Roth is the CFO.  He's

31

1  not the one who's designated to testify about this data.

2          THE COURT:  So, Mr. Ayers is an IT specialist?

3          MR. STAMBAUGH:  Correct.

4          THE COURT:  And, so, he's going to be able to --

5  to answer questions about different line items in the

6  general ledger, what they mean, how they're used in an

7  accounting sense, all those things?

8          MR. STAMBAUGH:  Correct.

9          THE COURT:  To calculate profit margin and profit?

10         MR. STAMBAUGH:  Not profit margin, but their

11 questions are about the data itself.  They want to know what

12 it represents, et cetera.

13         THE COURT:  Okay.

14         MR. STAMBAUGH:  Mr. Roth answered lots of

15 questions on margin.

16         THE COURT:  He answered lots of questions without

17 a document in front of him about how the company calculates

18 the -- calculates profit, sales less cost of goods sold, a

19 dollar amount, and gross margin, which is a percentage.  He

20 answered questions about that.  He answered questions that

21 differed based on whether any manufacturing was being done

22 by Celestron itself or whether it was just buying product

23 from the factory.

24     So, yes, he did answer those questions, but he wasn't

25 able to answer questions about the documents that reflected

32

1  those things because he didn't understand what Exhibit 55

2  was, at least in the excerpt that you -- the deposition

3  transcript that you shared with me.

4      So, is Mr. Ayers going to be able to answer those kinds

5  of questions?

6          MR. STAMBAUGH:  Yes.

7          THE COURT:  Okay.

8          MR. STAMBAUGH:  Regarding what Exhibit 55 is and

9  all other transactional data, that's correct.

10         THE COURT:  The general ledger data, is he going

11 to be able to answer questions about the general ledger

12 data?

13         MR. STAMBAUGH:  The interpretation of that data,

14 yes, an what columns mean and the abbreviations, et cetera,

15 absolutely.

16         THE COURT:  Okay.  So, let me circle back to the

17 Plaintiffs.

18     Here's what I understand.  The general ledger data that

19 you have now collectively includes everything there is to

20 have, including these subsets of data.  You say you don't

21 think it does.  The only way you're going to find out is by

22 showing it to the witness and asking questions.  That's my

23 -- that's my expectation.

24     What's wrong with that approach?

25         MR. DALLAL:  Well, first of all, your Honor, we'd

33

just note that putting Mr. Roth up to explain this stuff was
the suggestion of defense counsel, Mr. Frost. And, so, we
were surprised that he wasn't able to provide that insight.
We thought it was very helpful to have Mr. Ayers' commentary
earlier in an informal session. We think another one of
those would be helpful. We posed these two questions over
email that we think would be very easy for them to answer.
Rather than having to wait to go through a 30(b)(6) and put
everything formally on the record and, you know, formulate
formal questions, he can just explain what this stuff is,
and it's -- it's basic stuff. It's not really business
operations stuff. It's just this is what this category is.
This is how this category and this field of information
relates to this field.

          THE COURT:  Um-hmm.

          MR. DALLAL:  It was very helpful the last time we
did it. It advanced the ball quite a bit, and we think
another one of those would be helpful. We can do it via
Zoom. It wouldn't have to be in person. Last time when we
did the first part of it via Zoom, that was equally
effective.

          THE COURT:  So, then would you be able to forego
Mr. Ayers' 30(b)(6) deposition if you had him informally?

          MR. DALLAL:  I think we would like to hang onto it
until we've conducted the informal session, but we could

34

1  make the 30(b)(6) a lot shorter or potentially not have to

2  do it if we get the answers we need.

3          THE COURT:  Okay.  DPPs need to add anything

4  there?

5          MR. BORDEN:  I guess we have a slightly --

6  slightly different view.  I mean, one of the things that Mr.

7  Roth testified about at page 278 of his deposition was

8  product data sheets that tie to -- this is kind of the idea

9  of subledgers -- that has information on land and cost,

10  factory cost, inbound freight.  It's richer, you know, data

11  for calculating the margins.  Just last Friday, they

12  produced finally some of these product data sheets for a

13  period of 2017 to 2023.  These are materials that, you know,

14  we don't understand why we're just getting them now.  But if

15  there was a switch over from SPA to Sightline in June of

16  2015, we don't understand like what -- where this data is

17  coming from, and this is why I think it would be useful to

18  talk to Mr. Ayers informally before we go take the

19  deposition, so that we can figure out the answers to things

20  like this.

21      You know, we have asked this to the Defendants, and

22  they said that they don't want to meet and confer about

23  this.

24          THE COURT:  So, I'm looking at the transcript, and

25  the deposition describes these product data sheets are fed

35

1 into the ERP system, the SAP system, apparently not the

2 Sightline system.

3          MR. BORDEN:  I don't know if they're fed into the

4 Sightline system or not, but --

5          THE COURT:  Yeah, it's not.  The testimony only

6 refers to SAP.  I don't know either.  I can't tell from what

7 you've provided me.

8          MR. BORDEN:  And -- and then -- but the -- the SAP

9 system was online in 2016.  We don't have a product data

10 sheet for that year or for whatever period of 2015 as well.

11 We just don't understand.  I mean, again, it's like one of

12 these things that we've asked Defendants about in the meet

13 and confer process, and they're not telling us.  We don't

14 understand, given the testimony from these witnesses, that

15 everything was produced to -- they gave all this

16 transactional data to counsel.  It would be really easy for

17 them to just give it to us or let us talk to Mr. Ayers so we

18 can figure out if they have this stuff, where it is, and

19 then go get it.

20     What we don't want to do -- and this is the same for a

21 concern that we have about Mr. Sun is we don't want to get

22 all the way to the deposition, especially trying to take it

23 in Mandarin, and, you know, just have -- I mean, and with

24 all the difficulties that we're having getting these things

25 scheduled, to have to go back and get the documents and then

36

1  retake it or -- we should just get -- we should just get the

2  information.  It's -- I mean companies calculate their

3  margins as part of the normal course of business, and it

4  shouldn't --

5            THE COURT:  Yeah.  I -- I got it.

6            MR. BORDEN:  Yeah.

7            THE COURT:  All right.  So --

8            MR. DALLAL:  Your Honor, may I just respond?

9            THE COURT:  Yeah.  I am going to ask you a

10  question.  I would like to ask a question about the product

11  data sheets, because those did -- those were in the -- so,

12  you've produced some of them?

13            MR. STAMBAUGH:  No.  We produced all of them.

14            THE COURT:  Okay.  So, you've --

15            MR. STAMBAUGH:  Mr. --

16            THE COURT:  -- produced all the product data

17  sheets?

18            MR. STAMBAUGH:  Mr. Borden was not on the meet and

19  confer last Thursday in which I explained that we produced

20  all of them.

21            THE COURT:  Okay.

22            MR. STAMBAUGH:  They were never part of an order.

23  They were not part of the transactional data.  Okay.  These

24  are separate sheets.  Plaintiff said, "We think they would

25  be helpful."  We produced them all.  Mr. Ayers will be

1  testifying about it.

2          THE COURT:  Okay.  So, great.  I hope that's --

3  that's accurate, and I will assume it is.

4          MR. STAMBAUGH:  In addition, I think it's

5  important for the Court to know it is also incorrect that we

6  have refused to meet and confer.  Again, during the meet and

7  confer that Mr. Borden was not on, I made very clear on

8  numerous occasions if they would like to submit a list of

9  questions, we would be happy to meet and confer, bring them

10 to Mr. Ayers to see if they could be easily answered.  We

11 offered if they send us the questions, we'd be happy to

12 consider them.  Obviously, as the Court knows, these are

13 more appropriate for a 30(b)(6) deposition.

14         THE COURT:  Well, I'm not sure that I know that,

15 but I'm looking at two questions on page four of the Docket

16 370.  So, have you provided those to Mr. Ayers and gotten

17 his response and provided that back to the Plaintiffs?

18         MR. STAMBAUGH:  And, I'm sorry, your Honor.  Page

19 four of which document?

20         THE COURT:  Docket 370, the August 16th status

21 report.

22         MR. BORDEN:  I think it's Docket 476 in the --

23         THE COURT:  Yeah.  I'm looking at Docket 370 in

24 3639, the -- the document I've been referring to all -- all

25 during the hearing.

38

1          MR. STAMBAUGH:  Understood.  I have Doc 476 as

2  well.

3          THE COURT:  Okay.  So --

4          MR. STAMBAUGH:  So, thank -- thank you, Counsel.

5          THE COURT:  -- August 16th, 2023 status report.

6          MR. STAMBAUGH:  Yes.

7          THE COURT:  The bottom of page four, there are --

8          MR. STAMBAUGH:  Those --

9          THE COURT:  -- two questions.

10          MR. STAMBAUGH:  Those two specific questions have

11  not been discussed with Mr. Ayers, no.

12          THE COURT:  Okay.  And why not?

13          MR. STAMBAUGH:  Happy to bring those to him.  I'm

14  sorry?

15          THE COURT:  So, why not?

16          MR. STAMBAUGH:  We've had numerous questions

17  during meet and confers and emails, et cetera.  These are

18  not two that I have -- that I don't think -- I don't think

19  have been brought to his attention.

20          MR. DALLAL:  Why not is because defense counsel

21  wrote us back and said that we could wait for Mr. Ayers'

22  30(b)(6) deposition before we'd get those answers.

23          THE COURT:  Yeah, that's what it says some place

24  else.

25      Okay.  Well, you know, let me just put it to you this

39

1  way.  The way I see it is it may be in Defendants' witness

2  -- interests, rather, to share this information informally.

3  I can imagine there might be circumstances where the

4  questions are too intrusive and you'd rather have it be in a

5  deposition.  You don't want to necessarily have, you know,

6  sort of free wheeling informal discovery.  But if there's a

7  list of questions where you can prepare and there are

8  discrete answers and it's very just cut and dry, maybe

9  that's in your interest, and then you can avoid or limit the

10  amount of time the witness needs to spend in an actual

11  30(b)(6).  So, that's one option.

12      But my takeaway from this dispute is that the

13  Plaintiffs are entitled to some further information about

14  the general ledger material, and maybe these recently

15  produced cost product data sheets because they didn't have

16  them at the time that they took Mr. Roth's deposition.

17      So, they need to be able to ask someone about those

18  documents so that they understand them.  So, you know, the

19  other observation I will make is that to the extent that

20  documents aren't produced in advance of the deposition and

21  should have been or they're produced in a form that the

22  witness can't deal with, can't answer intelligently about

23  because the witness is not familiar with the document, then

24  there may be a reason for the witness to come back and

25  testify again, and there may be some cost shifting

40

1  implications for that, and this goes for both sides.

2      So, it's in everybody's interest to figure out the

3  universe of documents beforehand and for the witnesses to be

4  prepared, of course, and then to proceed with the

5  deposition.  And, like I said, if you can do it informally,

6  great.  But then I would expect a corresponding sort of

7  limitation on the amount of time you need to spend with

8  someone like Mr. Ayers in deposition.

9      I -- so, you know, on this one I'm pleased to hear that

10  the product data sheets have been produced, and if you are

11  representing that that production is complete and there are

12  no earlier or later data sheets available, then just please

13  make sure that's an accurate statement, you know.  Go back

14  and check with whoever it is that -- that provided that

15  information.  So, let's just be sure.  And then, you know,

16  if there are going to be questions of Mr. Ayers, they should

17  be in writing in advance and not just a free wheeling like

18  open ended whatever.  Okay.  You should give Defendants

19  notice of precisely what information you need.

20          MR. DALLAL:  Absolutely, your Honor.  That's how

21  we did it last time.

22          THE COURT:  Okay.

23          MR. DALLAL:  We gave Mr. Ayers 25 precise

24  questions.

25          THE COURT:  Otherwise -- otherwise, a 30(b)(6)

41

1 deposition is the conventional way of figuring that

2 information out, explaining documents to you.  That's how

3 you should do it.

4     Okay.  But just, you know, I -- to the extent we had a

5 dispute about what Mr. Roth said or didn't say in the status

6 report, I mean, I have to say that Mr. Roth seemed like a

7 very helpful witness, just not on the document because he

8 didn't understand Exhibit 55, which I think was the point

9 that the Plaintiff was making.  So, that seemed pretty

10 apparent to me from the deposition transcript.  And I don't

11 want to have to read one again.

12     All right.  Can we move on to depositions?

13         MR. STAMBAUGH:  Your Honor, to be candid, so, I am

14 not the attorney who's on the front lines of the deposition

15 scheduling.  The Court had ordered to discuss the --

16         THE COURT:  Yeah, I know.  I'm sorry.

17         MR. STAMBAUGH:  -- two issues that we just --

18         THE COURT:  Oversight, yeah.

19         MR. STAMBAUGH:  And, so, we'd be happy to brief it

20 or submit a letter or something like -- happy to discuss

21 whatever the Court wants, but I have to --

22         THE COURT:  Well, let's have a discussion.  If we

23 can't reach resolution and you have to go back and do some

24 homework and you talk to each other and your witnesses,

25 that's fine.  I just wanted to see if I could figure out the

42

1  state of play.  I realize that I didn't give you adequate
2  notice to prepare on this point.  I'm sorry about that.  I
3  just -- I didn't realize that wasn't part of what I had put
4  on the docket.
5      So, okay.  Let me -- let me just find out.  From the
6  submission that was made on -- let's see, was it Friday?
7  No, Thursday -- the submission on Thursday about the
8  deposition scheduling, I understood that there -- there was
9  a dispute about four of DPP's witnesses, Ms. Fish, Mr. Fish,
10 Radio City, and Denise Rollins (phonetic).  In light of
11 Judge Davila's order, do we still need to take depositions
12 of Ms. Fish, Mr. Fish, and Radio City?
13          MR. STAMBAUGH:  From the Defendants' perspective,
14 your Honor, the answer is we don't know because of the
15 continued spoliation of evidence and documents that may or
16 may not relate to the new class representative's business,
17 who happens to be the Fish's daughter, Denise Rollins.
18          THE COURT:  Well, that's a totally different
19 business, isn't it?
20          MR. STAMBAUGH:  We don't know what's in the
21 documents because they've refused to produce them.
22          THE COURT:  I mean, Judge Davila resolved the
23 question of spoliation in favor.
24          MR. STAMBAUGH:  Correct.
25          THE COURT:  -- and -- and disqualified the

43

1    existing class rep.

2              MR. STAMBAUGH:  But --

3              THE COURT:  So --

4              MR. STAMBAUGH:  -- we still don't have the

5    documents, and they haven't looked at them.

6              THE COURT:  But why would -- this is my point.

7    Why do you need the documents if the class rep is no longer

8    the class rep?

9              MR. STAMBAUGH:  Because we don't know if they

10   relate to other businesses, including their daughter's, your

11   Honor.  They've never told us --

12             THE COURT:  But the documents are spoliated.

13   They're gone, right?

14             MR. STAMBAUGH:  I'm talking about additional

15   documents that we still haven't seen produced, that are

16   sitting in a garage and the Fishes and counsel refuses to

17   retrieve them.  It was just discussed at the meet and confer

18   last week, two boxes.

19             THE COURT:  Okay.  Is Ms. Rollins the person

20   associated with Pioneer Cycling and Fitness?

21             MR. FISHER:  Yes, your Honor.

22             THE COURT:  Okay.  So, she's --

23             MR. FISHER:  This is Mr. Fisher.

24             THE COURT:  -- she's a new -- or that entity is a

25   new class rep or new Plaintiff?

44

1          MR. FISHER:  I apologize.  I'm sorry, your Honor.

2  I didn't mean to interrupt you.  That is -- she is the

3  principal of one of the three new class reps, yes.

4          THE COURT:  All right.  So, you -- no matter what,

5  the Defendants want her deposition?

6          MR. FISHER:  I would assume so, and we offered --

7  and we offered dates in late December for her.

8          THE COURT:  Okay.  And the Defendants still want

9  her deposition, right, no matter what --

10          MR. STAMBAUGH:  Yes, of course.

11          THE COURT:  -- for sure?

12          MR. STAMBAUGH:  Of course.

13          THE COURT:  Okay.

14          MR. STAMBAUGH:  In addition to others, yes.

15          THE COURT:  So, here -- here's what I'm -- what

16  I'm trying to figure out.  It seems like the parties have

17  made a lot of progress in scheduling depositions.  I have

18  this list that I'm looking at on page six, and I'm looking

19  at, again, your status report on August 24th.  So, it's

20  Docket 374 in 2369.

21      Now, there's a -- there's a disagreement, I understand,

22  about some moving around of depositions that were previously

23  scheduled to accommodate other obligations that DPP's

24  lawyers have.

25          MR. FISHER:  That's correct, your Honor.

45

1          THE COURT:  Has that been resolved?  Has that

2  dispute been resolved?

3          MR. FISHER:  Your Honor, I think the state of play

4  there is that Defendants have indicated they will be

5  providing new dates for those witnesses.  DPPs obviously

6  think that's appropriate.  We haven't yet received those,

7  but I anticipate receiving those this week.  We've also

8  provided the dates for our witnesses, Ms. Rollins, who was

9  requested.  So, I think we're making progress along that,

10 and I think it's IPPs who have a disagreement with that.

11         THE COURT:  All right.  So, let me hear from

12 IPP --

13         MR. STAMBAUGH:  And there are additional DPP

14 witnesses whose dates have not been provided.  I just wanted

15 to make that clear.  As of Judge Davila's order, the state

16 of play was that we needed to have new dates.  It's not just

17 Denise Rollins is my point.

18         THE COURT:  Right.  There are other -- there are

19 new class reps --

20         MR. STAMBAUGH:  Correct.

21         THE COURT:  -- to be deposed.

22         MR. STAMBAUGH:  And, your Honor, I'm sorry.  I

23 don't want to interrupt your process.  Before you go on,

24 truly, because it's been so dynamic and things are changing,

25 I --

46

 1          THE COURT:  Yeah.

 2          MR. STAMBAUGH:  -- may not be fully prepared.

 3          THE COURT:  I understand.  No, I'm just --

 4          MR. STAMBAUGH:  I just want to make that

 5  reservation.

 6          THE COURT:  -- trying -- IPP --

 7          MR. STAMBAUGH:  I don't want to mislead the Court.

 8          THE COURT:  So, I -- I'm going to take as given

 9  what is represented to me in the status report on Thursday

10  of what has been scheduled and is effectively placed in

11  stone.  I noticed that there's nothing happening in October,

12  and that's because the DPP's counsel say we have obligations

13  in another case or cases.

14      IPPs have a problem with that.  And, so, I want to hear

15  from IPPs about is there still a problem and what's your

16  view?

17          MS. CHAN:  Your Honor, Lin Chan.  Thank you.  I --

18  my understanding is that there are seven depositions that

19  are currently in dispute.  Those seven are divided into two

20  groups.  Three are the Taiwan depositions, and four are the

21  depositions that were previously scheduled and noticed to

22  take place in San Francisco in October.  So, as to all seven

23  of those depositions, the three parties here had agreed to

24  the dates they were noticed, and they are controlled by the

25  stipulated order in ECF Number 326.

1      My understanding is that in the last meet and confer

2  with Defendants, there was talk of taking the Taiwan

3  depositions off schedule, which is obviously problematic for

4  us since we are making preparations to attend and -- and to

5  take those depositions.

6           THE COURT:  And the Taiwan depositions are

7  specifically David Shen?

8           MS. CHAN:  Yes.

9           THE COURT:  And who else?

10           MS. CHAN:  Da Gon Shen (phonetic) and Yung Sha Don

11  (phonetic).

12           THE COURT:  So, those are the three.  Okay.  And

13  some of those were scheduled for September or proposed --

14           MS. CHAN:  Correct.

15           THE COURT:  -- for it.  Okay.  So, which ones were

16  agreed to and on what dates and then were taken off calendar

17  or proposed to take off calendar?

18           MS. CHAN:  So, all three were agreed to.  They

19  were agreed to be taken on September 11th and 13th for Da

20  Gon Shen.

21           THE COURT:  Those are the dates shown on pages

22  three and four?  Those were the dates that were agreed to --

23           MS. CHAN:  Yes.

24           THE COURT:  -- and noticed?  Okay.

25           MS. CHAN:  Yes.  I've -- we are planning to take

48

1  them on those dates, but my understanding is that Defendant

2  stated that they -- they wish to withdraw those dates.  This

3  is -- this is obviously an issue for us.  We -- we could go

4  up to Taiwan and take a notice of -- of nonappearance, but

5  it might be preferable to get guidance from the Court here.

6          THE COURT:  Yeah.  Okay.

7      And, do the Defendants object to producing those

8  witnesses on those dates?

9          MR. STAMBAUGH:  Let me do my best with the limited

10  information I have.

11          THE COURT:  Yeah.  No, I mean, they were agreed to

12  originally.

13          MR. STAMBAUGH:  Correct.

14          THE COURT:  And is the -- I guess let me ask a

15  better question.  Are you willing to move them at DPPs'

16  request or are you objecting now to producing them as

17  previously agreed and noticed?

18          MR. STAMBAUGH:  What we objected to was the DPPs

19  taking all of their witnesses off of September based upon

20  claimed double booking or having to prep their witnesses, et

21  cetera.  That landscape has now changed because a few of

22  those witnesses have now been terminated --

23          THE COURT:  Yeah.

24          MR. STAMBAUGH:  -- from the case.

25          THE COURT:  Which is why I was asking that

49

1  question.

2          MR. STAMBAUGH:  And I understand, and I apologize,

3  your Honor.

4          THE COURT:  Okay.

5          MR. STAMBAUGH:  Because I -- I had not been

6  prepared for this.  So, I --

7          THE COURT:  I got it.  All right.

8          MR. STAMBAUGH:  I think that our position may have

9  changed.  So, I need to check with my client internally, but

10  I think there's -- all of those moving parts have sort of

11  changed in the last 48, 72 hours, including the October

12  witnesses, which was a result of the DPPs saying they're not

13  available.

14          THE COURT:  Now, who are the October witnesses?

15  Ms. Chan, were you going -- who are -- I see the ones that

16  are in Taiwan.  Those are all September.  Who -- who were

17  the ones that were going to be in October?

18          MS. CHAN:  The October witnesses are Jean Shen,

19  Laurence Huen, Jack Chen (phonetic) and Sylvia Shen.  So,

20  there are four.

21          THE COURT:  Okay.  So, I see that those are now --

22  the -- okay -- individual or 30(b)(6)?

23          MS. CHAN:  Individual.

24          THE COURT:  I see.  So, the 30(b)(6) are agreed

25  and set, but the individuals are the ones that were going to

50

1  happen in October?

2          MS. CHAN:  Yes.

3          THE COURT:  And those were going to be in San

4  Francisco?

5          MS. CHAN:  Correct.

6          THE COURT:  Okay.  So -- and that's -- those are

7  the ones that the DPPs have a conflict with, is that right?

8          MR. FISHER:  We have a conflict with three of

9  those, your Honor.  We had a conflict with Mr. Huen, Mr.

10 Chen, and Ms. Shen, Sylvia Shen.  Jean Shen we actually

11 don't have a conflict with.  She was set before our trials

12 are set to begin, and we can proceed with that deposition.

13      Defendants articulated that they were concerned about

14 Ms. Shen traveling by herself to San Francisco.  So, to

15 accommodate that, DPPs offered to take the deposition

16 remotely, and I believe IPPs have offered to travel to

17 Vancouver where Ms. Shen is located.  We were told that's

18 not acceptable in the status report.  I don't quite know

19 why, but I think it -- we -- our position would be that Jean

20 Shen's deposition should move forward.  And then for the

21 other three witnesses, we're just simply in trial.

22          THE COURT:  Okay.  You three, meaning you, Mr.

23 Borden, and Mr. Levine are in trial?

24          MR. FISHER:  Correct.  Mr. Levine and I are in

25 trial beginning in October 9th --

51

1          THE COURT:  Okay.

2          MR. FISHER:  -- in San Francisco Superior.

3          THE COURT:  Yeah.

4          MR. FISHER:  And Mr. Borden is in trial in the

5  Northern District before Judge Tigar beginning October 10th.

6          THE COURT:  Okay.  So, there are four other people

7  on your papers, Mr. Hagey, partner, Ms. Leonida, a partner,

8  Ms. Herington an associate, and Mr. Biederman, an associate.

9          MR. FISHER:  That's correct, your Honor.

10          THE COURT:  Can some combination of those people

11  cover depositions in October while you're in trial and why

12  not, if not?

13          MR. FISHER:  Ms. Herington is on the trial team

14  with Mr. Levine and I.  So, the answer as to her would be

15  no.  Mr. Hagey, he is going to be trial counsel.  He is our

16  -- our trial attorney at the firm.  He is not involved in

17  the day-to-day running of this case.  And, as to Mr.

18  Biederman, Mr. Biederman's an excellent associate.  He

19  joined this case two weeks ago.

20          THE COURT:  But if it's in October, he has -- he

21  has more than a month to prepare.

22          MR. FISHER:  Mr. Biederman is actually who is

23  scheduled to take Ms. Shin's deposition.  So, we're -- we're

24  open to having him take depositions.  I don't think he can

25  cover three.  The problem with Mr. Biederman is that he is

52

1  the lead associate on another antitrust class action with

2  close of discovery on October 27th, in which there are

3  numerous numerous depositions in October.

4         THE COURT:  Here's the problem is you all have

5  known about your trials, I suspect, for some time, and these

6  dates got scheduled, and now they're being -- there's a

7  monkey wrench being thrown into the scheduling.  That's a

8  problem because there are so many other people who's

9  schedules have to, you know coalesce around these things.

10     So, I think -- you know, this -- this bothers me,

11 especially given that, you know, there are resources that

12 can be brought to bear to solve this problem, and --

13         MR. FISHER:  So, to speak to that, your Honor, I

14 understand the Court's concern here.  These depositions were

15 agreed to on July 31st, so just a couple of weeks before we

16 really discovered that these trials were not going to move,

17 in time, at least to where we could prepare for these

18 depositions.

19         THE COURT:  Oh, I'm pretty confident Judge Tigar's

20 trial you knew about --

21         MR. FISHER:  I --

22         THE COURT:  -- for a long time.

23         MR. FISHER:  We knew about it, yes, your Honor.

24 But the -- the issue was is we were really at that time

25 really trying to accommodate the close of discovery in the

53

1  IPP and Defendants' case, which we do not have, and we were

2  wanting -- if there's any error here, it's optimism in

3  hoping that we could get that done.

4          THE COURT:  Is there a scenario where you can just

5  rely on IPPs to take the deposition testimony that you need

6  and use it in your case?

7          MR. FISHER:  I think the problem is that Mr. Huen

8  and Ms. Sylvia Shen in particular are extremely key, like

9  among the top three or four most important Defendant

10 witnesses in this case.

11         THE COURT:  Is there a way to accommodate the

12 scheduling concerns by making it easier on the witness and

13 the parties who aren't causing disruption of the schedule,

14 so, in other words, if the deposition is taken by Zoom or

15 the deposing party travels to where the witness is located

16 or something like that?

17     What I'm trying to do is reward the cooperative

18 behavior that IPPs have engaged in and -- with Defendants on

19 this issue and not have them be prejudiced because that's

20 what I want to encourage you all to do in this case is to

21 cooperate.  And, so, I really want to make it so that IPPs

22 get what they want in terms of the schedule.  And, so, I'm

23 trying to facilitate that.

24     And maybe I'll just ask Ms. Chan, what would you like

25 me to do in -- in aid of that -- that goal?

54

1          MS. CHAN:  Our preference is for the dates to stay
2   on calendar as -- as they've been agreed to by all three
3   parties.  We -- we do have a concern that at some point
4   delay becomes prejudicial, and we're right up against that
5   point, particularly with respect to the Taiwan depositions.
6   This is something we're already securing translators for
7   that.  It's just a massive enterprise to deal with.
8        With respect to those three witnesses that DPPs have a
9   -- an issue with, we have been very cooperative, as
10  cooperative as possible in -- in coordinating those
11  depositions.  I don't know if there's a way to --
12          THE COURT:  Well, it sounds like those can
13  proceed, though.
14          MS. CHAN:  I'm sorry?
15          THE COURT:  I don't see why those -- those Taiwan
16  depositions can't proceed.  It sounds like they can, given
17  Judge Davila's order.  I -- I would hazard a guess that as
18  much as you may want to take additional depositions of the
19  Fish/Radio City folks, that probably the priority will be
20  any new class representatives, and I would -- I would be
21  inclined to order that.  But, nevertheless, I don't see any
22  reason why the Taiwan depositions can't go forward as
23  scheduled.
24          MR. BORDEN:  Just to be clear, that's our -- our
25  position too, your Honor.

 1          THE COURT:  Right.  So -- so, it -- I mean --

 2          MR. STAMBAUGH:  And I will just need to confirm

 3 again with my team.

 4          THE COURT:  Well --

 5          MR. STAMBAUGH:  My apologies.

 6          THE COURT:  -- I mean, I'm looking --

 7          MR. STAMBAUGH:  There was a lot of discussion

 8 about --

 9          THE COURT:  I'm looking at the statement --

10          MR. STAMBAUGH:  -- this last week or the two

11 previous weeks.  And, so, I don't want to misspeak or make

12 any --

13          THE COURT:  Yeah.  I -- I understand.  But, I

14 mean, that -- that would take care of David Shen, Sen Dar

15 Gong, and Don Yung Shue.  Those three depositions would go

16 forward as planned, on the dates that are represented in the

17 status report.  So, I'm just going to order that happen --

18 that it happen.  I don't see anything in the status report

19 which some -- somebody who's well informed on the Defense

20 side at the time the report was prepared, you know,

21 indicates -- doesn't indicate that's a problem except for

22 this double tracking issue, which I think now is less

23 pressing I would hope.

24      So -- okay.  So, if we take care of the Taiwan

25 depositions, then we have the San Francisco depositions.

1    And it seems that those -- those might be -- those might be

2    addressed by some accommodation to account for the

3    availability of DPPs' counsel, although I'm -- I'm confident

4    that there can be -- there can be some better effort on

5    DPPs' side to cover depositions than what's been presented

6    to the Court.

7              MR. FISHER:  So, your Honor --

8              THE COURT:  But I would like a proposal about what

9    to do with the San Francisco depositions.

10             MR. FISHER:  And, your Honor, our understanding is

11   that Defendants were going to get back to us with new

12   proposed dates for those.  We would suggest that that be

13   allowed to move forward and that the parties confer and see

14   -- see what the result is.

15             THE COURT:  How do you accommodate IPPs' concerns?

16             MR. FISHER:  Well, I mean, I think we -- we've

17   already -- it's already the case that these witnesses are

18   coming to San Francisco.  So, I think their -- their

19   location preferences are accommodated.

20        I think what I was hearing from the IPPs -- I won't

21   speak for them -- was that their particular concern was that

22   the Taiwan depositions need to move forward and that, you

23   know, if there was some sense that rescheduling October

24   depositions would endanger that, that that would be a

25   problem.  And hearing that that's not the case, you know, I

57

 1  would certainly hope that -- that IPPs would -- would work

 2  with us on that.  I know that we're actually in trial, in

 3  one of these trials with Mr. Dallal's firm.

 4        THE COURT:  Can you combine the individual

 5  depositions of Jean Shen, Laurence Huen, and Sylvia Chen --

 6  Sylvian Shen?  I guess there's a Jack Chen who is only being

 7  deposed as an individual, not as a 30(b)(6), but can you

 8  combine the other ones with their individual depositions or

 9  is there just not enough time to do that?

10        MS. CHAN:  Your Honor, that's certainly something

11  we could consider.  It does push those depositions out to

12  December, which is concerning.  Our main concern is

13  consistency and the ability to plan for our case.  So, one

14  -- one possibility is if -- if there is a deadline for us to

15  all three parties come to an agreement about -- a very short

16  deadline -- to come to an agreement about those remaining

17  depositions and when they take place, that might assist

18  managing.

19        THE COURT:  Right.  So, maybe work on that a

20  little bit, but I -- I'm just going to put it out there.  I

21  am rewarding the prior cooperative behavior of IPPs.  And,

22  you know, that doesn't mean they get to call the shots on

23  this, but they are the ones that have impressed the Court

24  with their ability to try to compromise.  And, having done

25  that and had a schedule, I'm -- I'm really trying very hard

58

1   to ensure that that's what happens.  So, everybody else
2   needs to compromise in their direction.  That's my message,
3   and I'm going to encourage you to talk to each other, and I
4   appreciate Mr. Stambaugh is, you know, not in the position
5   to really talk in the weeds about this, and I want to give
6   that time to -- to play out as well.  But, as far as I can
7   see, you have what's set on page six of the report.  You
8   have the Taiwan depositions that are described at pages
9   three and four.  Those will go forward as scheduled and now
10  as previously noticed, and then there needs to be some
11  attention to the Defendants' need to depose the new class
12  reps, and that should not be given short shrift.  I think
13  they're -- they're entitled to -- and if they have to start
14  over -- you know if everybody's starting over with the class
15  reps, then, you know, that can't just be an after thought.
16  So --
17          MR. STAMBAUGH:  And on that note, your Honor, the
18  Defendants right before -- the Defendants?  We're the
19  Defendants.
20          THE COURT:  Yes.
21          MR. STAMBAUGH:  The DPPs right before this hearing
22  offered up Denise Rollins on December 28th and 29th.  We
23  just want to alert the Court to the fact that we may need to
24  be back talking about earlier dates for the --
25          THE COURT:  December?

1          MR. STAMBAUGH:  December 28th --

2          THE COURT:  She's already on --

3          MR. STAMBAUGH:  -- and 29th.

4          THE COURT:  So, can she not proceed on September

5    18th?  That's the same day that Mr. Yung Shue is in

6    deposition in Taiwan, but --

7          MR. STAMBAUGH:  Right, when the -- the DPPs --

8          THE COURT:  -- it is before trial.  So, are

9    Defendants going to Taiwan or are you doing that remotely?

10          MR. STAMBAUGH:  Yes.

11          THE COURT:  So, is there someone on the Defense

12    team that can take Denise Rollins' deposition on the 18th?

13          MR. STAMBAUGH:  Yes, and we intend to, and I'd

14    like the Court to keep that date.

15          THE COURT:  She's also scheduled for the 19th.

16    So, why can't those dates proceed?

17          MR. STAMBAUGH:  We think the issue is --

18          MR. FISHER:  Well, your Honor, I think the problem

19    is -- you just identified, is that the Don Yung Shue

20    deposition is going to be happening literally at the same

21    time --

22          THE COURT:  Yeah.

23          MR. FISHER:  -- the evening of the 18th all the

24    way into the early morning hours of the 19th.

25          THE COURT:  So?

60

1          MR. FISHER:  And, so -- and, so, it's prejudicial

2     to be preparing a witness and to be -- and for our team to

3     be forced to do that while at the same time taking a

4     deposition in Taiwan.

5          THE COURT:  Okay.  But here is where you get to

6     bring more than one lawyer to bear.  They're not all in

7     trial.  So, you have to double track sometimes.  So, I'm

8     inclined to let that one go forward as well.

9          MR. FISHER:  The second point, your Honor, is

10    that --

11         THE COURT:  But you're not traveling to Taiwan,

12    right?  You're --

13         MR. FISHER:  We're not traveling to Taiwan.

14         THE COURT:  Okay.  Then I think you have more

15    flexibility.

16         MR. FISHER:  And, your Honor, the other issue is

17    that, I mean, we just received requests for production for

18    -- for the Pioneer.  I mean, if they want to proceed at the

19    deposition at that time, obviously, I mean they're not going

20    to have the documents at that time.

21         THE COURT:  Um --

22         MR. STAMBAUGH:  Except for the 30(b)(6) of Pioneer

23    that will happen at a later date.

24         THE COURT:  Okay.  All right.  I -- I will just

25    observe that you got leave to amend.  But, otherwise, the

61

1   class rep that you have been using to litigate this case is

2   gone.  So, you're not really in a position I think to say,

3   Oh, well, you didn't serve discovery on my class -- you

4   know, on the class rep until yesterday.  I mean, that's --

5   that's not like super compelling to me.  So, let's not have

6   that be a feature of the argument.

7        I -- I'm inclined to suggest that given that you have

8   lawyers available who are not traveling and you have more

9   than one, that you can cover simultaneously depositions

10  happening in Taiwan and a deposition happening in San

11  Francisco.  I'm going to suggest that you do that and that

12  these dates stay.

13           MR. FISHER:  There's one more accommodation --

14           MR. STAMBAUGH:  That was Denise Rollins, your

15  Honor?

16           THE COURT:  I'm going to be clear about who they

17  are.  Denise Rollins deposition on 9/18 and 9/19 in San

18  Francisco.  Okay.

19           MR. FISHER:  May I make a request, your Honor?

20           THE COURT:  Yes.

21           MR. FISHER:  Can we at least move her to the dates

22  that were formerly for Mae Lin Fish, because those at least

23  are not double -- they're just a week later.

24           THE COURT:  If the Defendants agree to move it,

25  great.  I don't know what other constraints they have, and

62

1  I'm assuming Mr. Stambaugh doesn't either.  So, I'll let you

2  all talk about that.  But if you agree to move it, I don't

3  think IPPs care about this deposition, is that right?

4          MS. CHAN:  That's right.

5          THE COURT:  You all can work it out amongst

6  yourselves, but, otherwise, it's these dates.  Okay.

7          MR. FISHER:  The other accommodation we can offer

8  to the IPPs with respect to the October dates is for Jean

9  Shen's deposition to move forward on October 2nd and 3rd.

10          THE COURT:  Okay.  Does everybody want to do that,

11  October 2nd and 3rd, Jean Shen's individual deposition?  And

12  where will it be?

13          MS. CHAN:  We are willing to travel to Ms. Shen's

14  location to take that deposition.

15          THE COURT:  Okay.  And I'm not sure that the

16  Defendants -- the Defendants seem to have an issue with

17  that, although it didn't seem like the issue was quite

18  crystalized by the time you filed your status report.

19     So, Mr. Stambaugh, any thoughts about that?

20          MR. STAMBAUGH:  I believe it's her frail

21  condition.  So, they were all going to travel together to

22  San Francisco.

23          THE COURT:  But if she doesn't have to travel is

24  the point.  If they're going to -- if -- if IPPs are going

25  to come to her where she resides and she doesn't have to

63

1  leave at all, it might be even better than having to travel
2  anywhere.  So, consult on that point.  And if that works,
3  that's a good way.  Then we're down to two witnesses, right,
4  Mr. --
5          MS. CHAN:  Three.
6          THE COURT:  I'm sorry.  Right, because it's Jack
7  Chen -- Jack Chen, Laurence Huen, and Sylvia Shen who still
8  need to be addressed, okay.  And you are going to work
9  really hard to make sure that those individual depositions
10 can proceed at some point that doesn't throw your whole
11 schedule out of whack.
12     Okay.  Let me -- I think it's a good suggestion that
13 IPPs made that we have a deadline for completing this
14 process.
15     Oh, well, let's talk about the deadline first, and then
16 I have one other thing to address with you all.  How long do
17 you think you need to check back with your respective
18 clients and witnesses and talk to each other and put a final
19 schedule together?
20          MS. CHAN:  I would suggest end of the week.
21          THE COURT:  End of this week, will that give you
22 enough time?
23          MR. STAMBAUGH:  I think Defendants can do that.
24          THE COURT:  Okay.  Well, it's all top of mind.
25 That would be great.  So, September 1st.  Just send me

1  another status report.

2      And it does -- you know, I'm -- I'm expecting not a lot

3  of long explanation but just something concise like here's

4  what we've agreed to, and if there is a problem where there

5  is a disagreement and you can't figure it out, I guess you

6  can summarize what that is, but I don't need a history of

7  the dispute.  I have that in the status report.  Okay.

8      Okay.  The other -- the other thing that I wanted to

9  raise with you, which is deposition related, is I got this

10  discovery dispute letter brief on DPPs' Rule 30(b)(6) topic

11  16.  Might as well just deal with that now.  I'm not -- I

12  don't really think this required a hearing.  I read the

13  papers.  I read the cases.  The topic is compliance with the

14  antitrust laws and regulations and court orders of several

15  jurisdictions.

16      As drafted, that is not an appropriate deposition topic

17  for a fact witness who is a corporate representative who has

18  to prepare on that.  So, there may be some other version of

19  that that -- that could be acceptable but not this.

20      And, so, as drafted, the Defendants don't have to

21  designate a witness for that topic.  Okay.

22      That was efficient.  I don't think I need any hearing

23  on it because I don't think it will change my mind.  So --

24  so, you can proceed with all your 30(b)(6)'s.  I assume

25  there's no disputes as to any of the other matters, at least

1  as to this time.  Okay?

2         ALL:  Thank you, your Honor.

3         THE COURT:  Great.  All right.  Thank you all very

4  much.  I will issue some kind of order that summarizes all

5  of this, but I think you have your directions.

6      Thank you.

7         ALL:  Thank you, your Honor.

8      (Proceedings adjourned at 12:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17      Echo Reporting, Inc., Transcriber

18          Friday, September 1, 2023

19

20

21

22

23

24

25