1  Adam J. Zapala (SBN 245748)
   **COTCHETT, PITRE & McCARTHY, LLP**
2  840 Malcolm Road
   Burlingame, CA 94010
3  Telephone: (650) 697-6000
   azapala@cpmlegal.com
4
   Kalpana Srinivasan (SBN 237460)
5  **SUSMAN GODFREY L.L.P.**
   1900 Avenue of the Stars, Ste. 1400
6  Los Angeles, CA 90067
   Telephone: (310) 789-3100
7  ksrinivasan@susmangodfrey.com
8  Lin Y. Chan (SBN 255027)
   **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**
9  275 Battery Street, 29th Floor
   San Francisco, CA 94111
10 Telephone: (415) 956-1000
   lchan@lchb.com
11
   *Settlement Class Counsel for the Indirect Purchaser Plaintiffs*
12
   [Additional Counsel Listed on Signature Page]
13

14                 **UNITED STATES DISTRICT COURT**
15               **NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN JOSE DIVISION**
16

17  IN RE TELESCOPES ANTITRUST
    LITIGATION                          **Case No. 5:20-cv-03639-EJD**
18

19  THIS DOCUMENT RELATES TO:           **INDIRECT PURCHASER PLAINTIFFS'**
20                                      **NOTICE OF MOTION; MOTION; AND**
    All Indirect Purchaser Actions      **MEMORANDUM OF POINTS AND**
21                                      **AUTHORITIES IN SUPPORT OF**
                                        **MOTION FOR AWARD OF**
22                                      **ATTORNEYS' FEES, REIMBURSEMENT**
                                        **OF COSTS, AND SERVICE AWARDS**
23

24                                       **Dept.: Courtroom 4**
                                         **Judge: Hon. Edward J. Davila**
25                                       **Date: April 3, 2025**
                                         **Time: 9:00 AM**
26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 3, 2025 at 9:00 AM the Honorable Edward J. Davila will hear this Motion and the Motion for Final Approval of Settlement at the United States District Court of the Northern District of California, located in Courtroom 4, 280 South 1st Street, San Jose, California. Indirect Purchaser Plaintiffs ("IPPs") move the Court pursuant to Fed. R. Civ. P. 23(h) and 54(d) for an award of $10,666,667 in attorneys' fees (a third of the gross Settlement Fund[1]) along with proportional interest and reimbursement of $771,461 in litigation costs. IPPs also move the Court for a $3,000 service award for each of the 35 named class representatives.

The motion should be granted because (a) the $32 million settlement is an excellent result that amounts to as much as 110% recovery of possible damages; (b) the requested attorneys' fees are fair and reasonable considering Class Counsel's (defined *infra*) extensive and longstanding efforts litigating this international case on behalf of indirect purchasers; (c) the requested fees comport with Ninth Circuit case law regarding attorneys' fees in similar common fund litigation; (d) the requested costs were reasonably and necessarily incurred; and (e) the requested service awards for each of the 35 class representatives fairly compensate them for their time and effort spent on behalf of the classes and are below the presumptively reasonable $5,000 amount.

This motion is based on this Notice of Motion and Motion; the below Memorandum of Points and Authorities; the concurrently filed Joint Declaration of Kalpana Srinivasan, Lin Y. Chan, and Adam J. Zapala ("Joint Decl."); the Proposed Order; all pleadings, briefs, and orders on file in this action; and such other materials as the Court may wish to consider.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether the Court should award a third ($10,666,667) of the $32 million non-reversionary common Settlement Fund to Class Counsel as attorneys' fees along with proportional interest;

2.  Whether the Court should award $771,461 in unreimbursed costs that Class Counsel reasonably and necessarily incurred in furtherance of the litigation; and

---

[1] "Settlement Fund" refers to the $32 million common fund established by the settlement agreement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3.   Whether the Court should award a service award of $3,000 to each of the 35 class representatives for their time and effort in pursuing this action.

1

## **TABLE OF CONTENTS**

2

I.      INTRODUCTION ................................................................................................ 1

II.     RELEVANT BACKGROUND ........................................................................... 2

    A.      Investigation, Initial Filing, Consolidation, and Service on Foreign
        Defendants.................................................................................................... 2

    B.      Motions to Dismiss the Pleadings ............................................................. 2

    C.      Discovery ................................................................................................... 3

    D.      Mediation and Settlement ....................................................................... 13

    E.      Preliminary Approval, Notice, and Claims ............................................. 14

III.    ARGUMENT .................................................................................................... 14

    A.      IPPs' Request for Attorneys' Fees is Fair and Reasonable.................... 14

        1)The Court Should Utilize a Percentage of the Common Fund Method............14

        2)The Court Should Award a Third of the Fund as Attorneys' Fees.................15

            i.      Class Counsel Achieved an Excellent Result for Indirect
                Purchasers ................................................................................. 16

            ii.     Class Counsel Faced Massive and Unique Risks, Including
                Financially, in Litigating This Case ............................................... 17

            iii.    Class Counsel Relied on Their Vast Experience and Skill to
                Achieve the Settlement ............................................................... 18

            iv.     The Requested Fee Is in Line with Awards in Similar Cases ........ 19

    B.      A Lodestar Crosscheck Demonstrating a *Negative* Multiplier Supports the
        Requested Fee .......................................................................................... 21

    C.      The Court Should Grant Class Counsel's Request for Reimbursement of Litigation
        Costs......................................................................................................... 23

    D.      The Requested Service Awards Are Reasonable and Warranted ......................... 24

IV.     CONCLUSION ................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007) ................................................................ 17

6

*In re Auto. Refinishing Paint Antitrust Litig.*,
MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ................................ 20

7

8

*Barbosa v. Cargill Meat Solutions Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013) ...................................................................... 19

9

*Barnes v. The Equinox Group, Inc.*,
No. C 10-3586-LB, 2013 WL 3988804 (N.D. Cal. Aug. 2, 2013) ................... 15

10

11

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015) ...................................................................... 25

12

13

*In re Bluetooth Headset Prods. Liab. Litig.*,
54 F.3d 935 (9th Cir. 2011) ............................................................................... 21

14

15

*Bond v. Ferguson Enters., Inc.*,
No. 1:09-cv-1662 OWW MJS, 2011 WL 2648879 (E.D. Cal. June 30, 2011) ..... 21

16

*In re Capacitors Antitrust Litig.*,
No. 17-md-02801, 2020 WL 13201507 (N.D. Cal. July 17, 2020) ................... 21

17

18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. C-07-5944 JST, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ................... 16

19

20

*In re Cathode Ray Tubes (CRT) Antitrust Litig.*,
No. 07-cv-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016) ........................... 16

21

*Chun-Hoon v. McKee Foods Corp.*,
716 F. Supp. 2d 848 (N.D. Cal. 2010) .............................................................. 21

22

23

*Craft v. Cnty. of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ............................................................ 15

24

25

*In re Dairy Farmers of Am., Inc.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) .................................................................. 19

26

*In re DRAM Antitrust Litig.*,
No. 02-md-1486, 2013 WL 12387371 (N.D. Cal. Nov. 5, 2013) ...................... 21

27

28

*In re Facebook Internet Tracking Litig.*,
No. 12-md-02314, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) .................. 22

*Fleming v. Impax Labs. Inc.*,
No. 16-cv-06557, 2022 WL 2789496 (N.D. Cal. July 15, 2022)......................................22, 23

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) ................................................................................. 20

*Fowler v. Wells Fargo Bank, N.A.*,
No. 17-cv-02092, 2019 WL 330910 (N.D. Cal. Jan. 25, 2019)............................................ 22

*Garcia v. Schlumberger Lift Sols.*,
No. 18-cv-01261, 2020 WL 6886383 (E.D. Cal. Nov. 24, 2020)......................................... 15

*Gutierrez v. Amplify Energy Corp.*,
No. 21-01628, 2023 WL 6370233 (C.D. Cal. Sept. 14, 2023) ............................................ 22

*Harbour et al., Plaintiff, v. Cal. Health & Wellness Plan, et al.*,
No. 21-cv-03322, 2024 WL 171192 (N.D. Cal. Jan. 16, 2024)............................................ 25

*Hefler v. Wells Fargo & Co.*,
No. 16-cv-05479, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018)....................................22, 24

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ........................................................................................................... 16

*In re Heritage Bond Litig.*,
No. 02–ml–1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................................19, 20

*In re High-Tech Emp. Antitrust Litig.*,
No. 11-CV-02509-LHK, 2015 WL 5159441 (N.D. Cal. Sept. 2, 2015)............................... 16

In re Online DVD-Rental Antitrust Litig.,
779 F.3d 954 (9th Cir. 2015)............................................................................................... 18

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009).................................................................................. 20

*Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*,
No. 16-cv-03698, 2018 WL 2183253 (N.D. Cal. May 11, 2018)......................................... 24

*Kendall v. Odonate Therapeutics, Inc.*,
No. 20-cv-01828, 2022 WL 1997530 (S.D. Cal. June 6, 2022)............................................ 23

*Korean Air Lines Co. Antitrust Litig.*,
No. 07-cv-05107, 2013 WL 7985367, (C.D. Cal. Dec. 23, 2013) ........................................ 14

*In re LDK Solar Sec. Litig.*,
No. 07–cv–5182, 2010 WL 3001384 (N.D. Cal. July 29, 2010)........................................... 17

*In re Lenovo Adware Litig.*,
No. 15-md-02624, 2019 WL 1791420 (N.D. Cal. Apr. 24, 2019) ........................................ 19

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

*In re Linerboard Antitrust Litig.*,
    296 F. Supp. 2d 568 (E.D. Pa. 2003) ......................................................................... 17

*In re Linerboard Antitrust Litig.*,
    No. Civ. A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................ 17

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-md-02420, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020), *aff'd*, 2022
    WL 16959377 (9th Cir. Nov. 16, 2022) ..................................................................... 16

*Low v. Trump Univ., LLC*,
    246 F. Supp. 3d 1295 (S.D. Cal. 2017) ...................................................................... 25

*In re MacBook Keyboard Litig.*,
    No. 18-cv-02813, 2023 WL 3688452 (N.D. Cal. May 25, 2023) ............................... 22

*In re Med. X-Ray Film Antitrust Litig.*,
    No. 93-cv-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ..................................... 20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................ 18

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 13-md-02420, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F.
    App'x 651 (9th Cir. 2019) ........................................................................................... 16

*Nelson v. Avon Prods.*,
    No. 13-cv-02276, 2017 WL 733145 (N.D. Cal. Feb. 24, 2017) ................................. 20

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................... 17, 18, 19, 23

*In re Pac. Enters. Secs. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ........................................................................................ 20

*In re Portal Software, Inc. Sec. Litig.*,
    No. 03-cv-5138, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ............................... 22

*In re Potash Antitrust Litig.*,
    No. 08-cv-06910, 2013 WL 12470850 (N.D. Ill. June 12, 2013) .............................. 20

*In re Prandin Direct Purchaser Antitrust Litig.*,
    No. 10-cv-12141, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) ............................ 20

*Reed v. 1–800 Contacts, Inc.*,
    No. 12–cv–02359, 2014 WL 29011 (S.D. Cal. Jan. 2, 2014) .................................... 17

*Ridgeway v. Wal-Mart Stores, Inc.*,
    269 F. Supp. 3d 975 (N.D. Cal. 2017) ........................................................................ 25

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE
AWARDS**

*Rodriguez v. Nike Retail Services, Inc.*,
  2022 WL 254349 (N.D. Cal. 2022)......................................................................... 20

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009)................................................................................. 24

*In re Se. Milk Antitrust Litig.*,
  No. 2:07-CV 208, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) ........................ 20

*Six Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990)............................................................................... 14

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-md-1819 (N.D. Cal. Oct. 14, 2011), ECF No. 1407 ................................... 20

*Syed v. M-I, L.L.C.*,
  No. 12-cv-01718, 2017 WL 3190341 (E.D. Cal., July 27, 2017) ........................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 07–md-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ............................. 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. 07-md-1827, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) .............................. 21

*Thieriot v. Celtic Ins.*,
  No. 10-cv-04462, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011)............................ 25

*Thomas v. MagnaChip Semiconductor Corp.*,
  No. 14-cv-01160, 2018 WL 2234598 (N.D. Cal. May 15, 2018)............................ 24

*In re Toys R Us–Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA)
  Litig.*,
  295 F.R.D. 438 (C.D. Cal. 2014) ........................................................................... 17

*In re Urethane Antitrust Litig.*,
  No. 04-cv-1616, 2016 WL 4060156 (D. Kan. July 29, 2016) ................................ 19

*Van Vranken v. Atl. Richfield Co.*,
  901 F. Supp. 294 (N.D. Cal. 1995) ....................................................................... 21

*In re Vitamins Antitrust Litig.*,
  MDL No. 1285, 2001 WL 34312839 (D.D.C. July 16, 2001)................................. 20

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002)................................................................................ 15

*In re Volkswagen "Clean Diesel" Marketing*,
  MDL No. 2175, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) ............................. 22

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)..................................................................................... 15

**Rules**

Fed. R. Civ. P. 23(h) and 54(d) ..................................................................... 2

Rule 23 .......................................................................................................... 1

Rule 30(b)(1) ................................................................................................. 4

Rule 30(b)(6) ................................................................................................. 4

Rule 31 .......................................................................................................... 4

Rule 33 .......................................................................................................... 4

Rule 34 .......................................................................................................... 4

Rule 36 .......................................................................................................... 4

Rule 45 ........................................................................................................ 11

Rules 4(e) and 4(f)(3) .................................................................................... 2

**Other Authorities**

*Manual for Complex Litigation*, §21.71 (4th ed. 2004) ................................ 16

NEWBERG ON CLASS ACTIONS § 14.7 .......................................................... 21

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

After years of hard-fought litigation, Indirect Purchaser Plaintiffs ("IPPs") and Class

4

Counsel[2] reached an agreement with Defendants[3] to resolve this matter in exchange for $32 million.

5

This settlement represents an excellent result for the indirect purchasers and required considerable

6

time, effort, and skill to achieve. IPPs respectfully move the Court for an award of $10,666,667 in

7

attorneys' fees (along with proportional interest), reimbursement of $771,461in litigation costs, and

8

a $3,000 service award for each of the 35 class representatives ($105,000 total).

9

Class Counsel assumed great risk taking on this challenging international cartel case on a

10

pure contingency basis. Over the course of the litigation, Class Counsel dedicated 20,536 hours to

11

pursuing relief on behalf of the IPP classes, resulting in $14,550,720 in lodestar through December

12

1, 2024. *See* Joint Declaration of Kalpana Srinivasan, Lin Y. Chan, and Adam J. Zapala ("Joint

13

Decl."), filed concurrently. The $32 million is an outstanding result considering the facts and

14

circumstances, including vigorous, often contentious litigation, unique challenges obtaining data

15

from Defendants and numerous third parties, and significant risks from litigating against and

16

collecting from foreign defendants.

17

Pursuant to Rule 23, the guiding case law, and the Northern District's Procedural Guidance

18

for Class Action Settlements, IPPs respectfully request that this Court (1) grant an award of

19

_____

20

[2] "Class Counsel" collectively refers to Cotchett, Pitre & McCarthy, LLP, Susman Godfrey LLP,

21

and Lieff Cabraser Heimann & Bernstein, LLP, which serve as the Court-appointed Interim Co-

22

Lead Counsel for the Proposed Indirect Purchaser Plaintiff Classes.

23

[3] "Defendants" collectively refer to Synta Technology Corp. of Taiwan, Suzhou Synta Optical

24

Technology Co., Ltd., Nantong Schmidt Opto-Electrical Technology Co. Ltd., Synta Canada

25

International Enterprises Ltd., Pacific Telescope Corp., Olivon Manufacturing Co. Ltd., SW

26

Technology Corporation, Celestron Acquisition, LLC, Olivon USA, LLC, Dar Tson ("David")

27

Shen, Joseph Lupica, and Dave Anderson.

28

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

$10,666,667 in attorneys' fees plus proportional interest; (2) approve reimbursement of $771,461 in litigations costs; and (3) issue a service award of $3,000 for each of the 35 Class Representatives.

## II.   RELEVANT BACKGROUND[4]

### A.  Investigation, Initial Filing, Consolidation, and Service on Foreign Defendants

After months of investigating and developing claims, including consultation with experts, the first IPP complaint was filed on June 16, 2020. Joint Decl. ¶1. Several other IPP complaints followed.[5] Following consolidation of the related cases and a September 17, 2020 hearing related to motions to appoint lead counsel, the Court appointed interim Class Counsel. ECF No. 91. Class Counsel subsequently filed a consolidated IPP class action complaint on October 19, 2020, and filed an amended consolidated complaint on November 6, 2020. ECF Nos. 105, 113.

On September 28, 2020, IPPs filed an opposed motion for an order authorizing alternative service on twelve foreign-based Defendants pursuant to Rules 4(e) and 4(f)(3). The Court granted IPPs' motion on December 2, 2020, thereby allowing all Defendants (as defined in this Motion) to proceed on the same case schedule. ECF No. 124.

### B.  Motions to Dismiss the Pleadings

Class Counsel successfully defended against Defendants' motions to dismiss and strike. Defendants filed four separate motions to dismiss and two motions to strike IPPs' claims, resulting in the operative complaint's amendment four separate times. Joint Decl. ¶¶2-13. Across these motions, Defendants' arguments included: untimeliness, failure to state a federal or state claim, lack of personal jurisdiction, and failure to adequately allege claims of pre-2013 conduct. *Id*. at ¶¶7-13. The Court granted Defendants' motion to dismiss and strike in part, but it denied the motions as to the core of IPPs' allegations and allowed amendment as to IPPs' antitrust claims that pre-dated 2013. *Id*. On December 5, 2022, subject to a stipulation that Defendants' pending April

---

[4] Below is a streamlined narrative of Class Counsel's efforts. The Joint Decl. provides a more complete and detailed account.

[5] Additional IPP complaints were filed on July 17, 20, and 31, 2020, August 4, 2020, and September 2, 14, and 17, 2020.

28, 2022 motion to dismiss would apply to the amended complaint, IPPs filed their Fourth Amended Consolidated Class Action Complaint, including extensive allegations of pre-2013 alleged cartel conduct. ECF No. 300.

### C. Discovery

The parties proceeded apace to discovery. The parties vigorously contested discovery throughout this litigation, including through extensive motion practice, including motions regarding entry of protective, discovery, and scheduling orders, and at least fourteen discovery dispute briefs. Typically, motion practice on these issues followed weeks and months of meeting and conferring and resulted in numerous hearings before Magistrate Judge DeMarchi.

**Discovery Orders and Protocols.** Nearly every facet of this litigation was fiercely contested and required court intervention, including entry of discovery orders and protocols. From February 10, 2021 through March 24, 2021, the parties met and conferred, filed multiple briefs, and presented argument before Magistrate Judge DeMarchi on the ESI Order, Protective Order, and other discovery protocol orders. ECF Nos. 141, 150, 152, and 159.

**Written Discovery.** IPPs served at least 140 document requests and 18 interrogatories on Defendants. Joint Decl. ¶15. IPPs conducted extensive discovery negotiations with Defendants, including weekly meet-and-confers, on topics ranging from (1) production of documents and transactional data, (2) the identification of appropriate document custodians, (3) the use of search terms, (4) the completeness of discovery responses, and (5) deposition scheduling. *Id.* Additionally, IPPs reviewed and analyzed a significant portion of more than 3.9 million documents Defendants produced, as well as voluminous electronic transactional and cost data from Defendants and non-parties that would be crucial for class certification and damages modeling. *Id.* Because the millions of documents produced included many Chinese language documents, IPPs retained Chinese language specialists and purchased Chinese-English translation software for efficient document review and analysis. *Id.*

IPPs conducted similar extensive discovery efforts with non-parties, including issuing over 30 subpoenas to non-parties to obtain substantial structured data regarding these intermediaries' direct purchases of telescopes from Defendants and their sales to the IPPs. IPPs engaged in this

non-party discovery to demonstrate "pass through" and economic harm and identify settlement class members. *Id.*

**Depositions.** IPPs defended 23 class representative depositions, largely in person – a substantial number for a class case. *Id.* ¶17. Additionally, IPPs took depositions of Defendants' senior executives, including Celestron's CFO, Paul Roth, whose testimony helped IPPs to determine the availability of transactional data, and Celestron's CEO Corey Lee. The depositions also required obtaining certified translations of numerous documents. *Id.*

**Discovery Motion Practice Regarding Documents and Depositions.** The parties brought at least fourteen discovery disputes before Magistrate Judge DeMarchi. Joint Decl. ¶14; Almost all of these disputes followed weeks, if not months, of hotly contested meet and confer efforts resulting in numerous hearings. *Id.* The motions included, among other things, successfully compelling Defendants to (1) utilize IPPs' proposed search terms, (2) produce all non-privileged documents that hit on one or more of those search terms, (3) produce documents improperly withheld as privileged, (4) collect and produce transactional and cost data, (5) answer numerous interrogatories and other queries regarding Defendants' transactional data and the destruction of other potential data, and (6) schedule Defendants' depositions. *Id.* ¶18. These motions also entailed numerous letter briefs and hearings on general discovery scheduling matters.

*Discovery Coordination.* On April 30, 2021, the parties submitted a joint letter detailing their proposed coordinated discovery schedule and raising a dispute regarding the location of Rule 30(b)(6) depositions. ECF Nos. 171 & 171-1. The proposed stipulated discovery order detailed agreement on the discovery schedule generally, coordination of written discovery Rules 31, 33, 34, and 36, fact deposition under Rule 30(b)(1), translation of documents and depositions, remote depositions, and lime limits of depositions. ECF No. 171-1. On May 4, 2021, Magistrate Judge DeMarchi adopted IPPs' position that Rule 30(b)(6) depositions of party witnesses should presumptively occur in the Northern District and instructing the parties to submit an amended discovery proposal reflecting the court's order by May 10, 2021. ECF No. 172. Magistrate Judge DeMarchi approved the parties' amended stipulated order regarding discovery on May 11, 2021. ECF No. 174.

*Loss of Synta Tech and Suzhou Synta Documents.* The parties continued to meet and confer regarding search terms and custodians for document requests. On May 26, 2021, during a recorded meet-and-confer, counsel for the Defendants informed IPPs that Synta Technology Corp and Suzhou Synta Optical Technology Co. Ltd. destroyed or lost all custodial documents during the companies' dissolution in 2016. ECF No. 198. IPPs served a 30(b)(6) deposition notice regarding the document destruction on July 2, 2021. *Id*. On September 1, 2021, the parties filed a joint discovery letter brief regarding the 30(b)(6) deposition topics, timing, and location. *Id*. Plaintiffs filed two additional joint letter briefs on September 2, 2021. ECF Nos. 199 & 200. Specifically, IPPs sought to question Synta Tech and Suzhou Synta regarding employee Joyce Huang and the issues surrounding the destruction of documents. ECF No. 198. IPPs also proposed a protocol for the deposition to occur in compliance with Taiwan's COVID-19 quarantine requirements, but Defendants refused to agree to a set timeline. *Id*.

On September 13, 2021, the court issued an order allowing IPPs to take the 30(b)(6) deposition on the disputed topics. ECF No. 201. The order also urged the parties to be mindful of public health concerns but cautioned against using them as an excuse to delay the timely production of witnesses. *Id*. On December 2, 2021, IPPs requested via email that Defendants identify the individuals whom they intended to designate. ECF No. 237. Defendants refused to do so. *Id*. Plaintiffs filed a joint discovery letter on February 9, 2022, regarding Defendants' failure to identify the person or country of residence of the designated 30(b)(6) witness. *Id*. On February 16, 2022, Magistrate Judge DeMarchi issued an order requiring Plaintiffs to first notify Defendants of possible dates and whether the 30(b)(6) depositions would be in person or by Zoom and giving Defendants 14 days to identify witnesses and note any possible travel restrictions. ECF No. 239.

*Search Terms and Technology-Assisted Review ("TAR").* The parties filed a joint discovery letter brief regarding Defendants' use of TAR in violation of the ESI Order on September 13, 2021. ECF No. 202. From March 27 to August 4, 2021, the parties conducted at least fourteen meet-and-confers regarding search terms and custodians. ECF No. 202-6. Magistrate Judge DeMarchi issued an order after a hearing requiring the parties to further meet and confer on the issues and submit any remaining disputes concerning search terms, TAR, and related deadline extensions by October

- 5 -

26, 2021. ECF No. 209. On October 27, 2021, Magistrate Judge DeMarchi approved the parties' stipulated order regarding production of documents. ECF No. 220. The stipulated order required Defendants to run search terms without TAR and make a substantial document production by November 15, 2021 and complete transactional data production by December 1, 2021. *Id*. Additionally, the order provided phased substantial completion deadlines for various custodians. *Id*. All responsive non-privileged documents had to be produced by February 15, 2022. *Id*.

*Interrogatory Responses.*  On March 21, 2022, the parties filed a joint discovery letter brief regarding Defendants' failure to properly respond to IPPs' interrogatory on Defendants' decision to discontinue business operations and destroy records. ECF No. 247. IPPs repeatedly tried in good faith to reach a sensible agreement with Defendants regarding their response before filing a letter brief. *Id*. On May 25, 2022, the court issued an order requiring Defendants to provide substantive responses to the interrogatory by June 8, 2022. ECF No. 262. Defendants eventually served a compliant response to IPPs' interrogatory subject to that order.

*Scheduling Order.*  In an effort to streamline the litigation, on July 26, 2022, IPPs filed a motion for entry of a scheduling order. ECF No. 269. Discussions and meet-and-confers regarding case scheduling occurred regularly over the years of litigation, but without agreement on an omnibus schedule for case deadlines. *Id*. On June 2, 2022, IPPs proposed a case schedule to Defendants. *Id*. Defendants did not send a counterproposal and opposed setting any case deadlines until the Court ruled on the pending motion to dismiss. ECF No. 271. Prior to filing the motion, the parties met and conferred via Zoom on June 17, 2022 and exchanged numerous emails on scheduling issues to attempt to resolve the issue. *Id*. The Court issued a scheduling order, setting case deadlines through class certification on September 30, 2022. ECF No. 276.

*Chinese Search Terms.*  On September 28, 2022, Magistrate Judge DeMarchi adopted the parties' stipulation regarding Chinese search terms, providing an iterative protocol for running the terms, producing relevant documents, and sharing certain costs. ECF No. 275.

*Deposition Location.*  Issues regarding deposition locations and dates remained a point of contention throughout the litigation. The Court held a joint status conference on February 23, 2023, at which it ordered the parties to meet and confer regarding the timing and location of depositions.

On April 7, 2023, the Court issued an order specifying the locations for certain categories of witnesses. ECF No. 329. The parties filed a joint status report on July 31, 2023, detailing all outstanding requests to confirm deposition dates. ECF No. 358. On August 1, 2023, Magistrate Judge DeMarchi issued an order setting various deposition-related deadlines. ECF No. 361. The court also required the parties to confer to address travel arrangements that may have already been made to Taiwan and San Francisco. *Id*. On August 16, 2023, the parties filed a joint report updating the court on the status of deposition scheduling. ECF No. 369. The court issued an order holding that depositions with agreed dates would proceed as described unless all parties agreed to the change. ECF No. 377. The court instructed the parties to meet and confer to find new dates for four remaining unscheduled depositions. *Id*. On September 1, 2023, the parties filed a joint status report detailing agreement on new deposition dates and locations for the four remaining witnesses. ECF No. 380.

**Discovery Motion Practice Regarding Transactional Data**. Data discovery presented another pitched battleground throughout this litigation. Joint Decl. ¶¶31-46. On March 22, 2021, IPPs issued their first request for Defendants' transaction-level sales data, after which the court approved a stipulation ordering production of all such data before December 1, 2021. *See* ECF No. 277. On October 10, 2022, the parties filed a joint discovery letter brief regarding Defendants' failures to timely produce the requested transactional data. *Id*. Issues with Defendants' data included years of missing data for certain defendants, no data at all from one defendant, and massive data format issues with others. *Id*. The letter brief detailed the great lengths IPPs undertook to get Defendants to produce the requested data, including the numerous instances where Defendant promised to have a client representative attend a meet-and-confer, only to have Defendants cancel shortly before the scheduled meeting. *Id*. To resolve these issues, IPPs proposed a phased process in which Defendants would first answer five preliminary questions regarding their transactional data and provide a specific date by which they must complete the production. *Id*. IPPs also requested the court order that the parties all attend regular weekly meet-and-confers and monthly status conferences with the court until the resolution of all outstanding discovery matters. *Id*. Magistrate Judge DeMarchi issued an order the day after its November 8, 2022 hearing requiring

Defendants to (1) produce Celestron transactional data for the relevant period without filters, (2) produce samples of the physical bound records for Suzhou Synta, and (3) provide the requested information in writing regarding each defendants' data, all by November 30, 2022. ECF No. 293.

On April 4, 2023, Magistrate Judge DeMarchi held a hearing on DPPs' motion to enforce the court's discovery order regarding production of transactional data, at which IPPs participated. Magistrate Judge DeMarchi issued an order on April 5, 2023, reserving the question of whether sanctions should be imposed on Defendants, and requiring the parties to meet in-person no later than April 19, 2023, to discuss issues with Defendants' production of transactional data. ECF No. 325. The parties, along with technical and data experts, met and conferred in-person on May 9, 2023, in San Francisco. ECF No. 327. Prior to the meeting, IPPs sent Defendants a list of 25 transactional data questions to facilitate discussion and had an initial virtual meeting on April 24, 2023. On May 15, 2023, the parties filed a joint status report about production of Defendants' transactional data and progress made during the meet-and-confers. ECF No. 338. The joint status report detailed thirteen items Defendants agreed to produce and six additional issues on which Defendants promised to investigate further. *Id*. Defendants agreed to produce eleven of the thirteen items and respond to the six additional questions by May 26, 2023, subject to certain contingencies. *Id*. During the meetings, IPPs also raised concerns regarding production of sales and costs data from several Defendants other than Celestron. *Id*.

On June 7, 2023, Magistrate Judge DeMarchi issued an order requiring the parties to file a further joint status report regarding Defendants' production of transactional data. ECF No. 343. On June 14, 2023, the parties filed the requested status report. ECF No. 344. IPPs confirmed that Defendants provided satisfactory responses to their requests and that IPPs and Defendants met and conferred again with Defendants' data expert on June 12, 2023. *Id*. Defendants also confirmed that transactional data for all Defendants had been produced, but that it would supplement defendant Olivon's data "in order to better organize the previously produced" data. *Id*. Defendants made the supplemental Olivon data production on June 1, 2023. *Id*. In the joint report, IPPs stressed that, while no issues were ripe at the time, based on IPPs' analysis, additional transactional data likely existed for at least Nantong Schmidt related to cost data, sales data to entities other than Celestron

and Orion, and product descriptions. *Id*. The parties agreed to work together to provide IPPs with finality on the transactional data issue. *Id*. On June 15, 2023, Magistrate Judge DeMarchi issued an order requiring Defendants to "promptly complete their investigation of the additional data sources identified in the status report, and . . . promptly complete their production of the additional data that they indicate in the report they will produce to plaintiffs." ECF No. 346. On July 30, 2023, the parties filed a third joint status report regarding transactional data detailing disagreements about the fulsomeness of Defendants data production and responses to questions. ECF No. 347. The remaining open issues included SAP data and Atlas e-commerce data, Nantong Schmidt data, and whether Defendants general ledger constituted "transactional data" as defined by the requests for production. *Id*. On July 18, 2023, the court held a hearing and issued an order on Defendants' production of transactional data. ECF No. 350. The court required Defendants to complete their production of Nantong Schmidt cost data for all U.S. sales during the relevant time period, update their response to IPPs' interrogatory about the same, and identify by bates number Celestron's price component reports that could be used to calculate margins, all by July 21, 2023. *Id*.

On July 29, 2023, the parties filed another joint status report on Defendants' transactional data. ECF No. 355. IPPs again detailed Defendants' failure to make good on their court-ordered obligations regarding the Nantong Schmidt data, including supplementing their response to the interrogatory, and Celestron margin data. *Id*. On July 31, 2023, the court issued an order requiring Defendants to file a copy of their most recent supplemental response to IPPs' relevant interrogatory by 4:00PM that day. ECF No. 356. After holding another status conference, Magistrate Judge DeMarchi issued an order on August 1, 2023, requiring Defendants to: (1) make all the source material from which Nantong Schmidt prepared the summary of costs data available to plaintiffs for review by August 25, 2023; (2) supplement their response to IPPs' interrogatory to address the subparts by August 14, 2023; (3) by August 4, 2023, produce samples of Celestron's general ledger; or (4) identify documents from which margins could be obtained by August 10, 2023. ECF No. 362.

**Further Productions and Deposition of Celestron CFO Paul Roth.**  Over the following weeks, Defendants made further productions as required and made a witness available to answer

questions about the data. IPPs deposed Celestron's CFO, Paul Roth, on August 7 & 8, 2023. Joint Decl. ¶44. On August 16, 2023, the parties submitted another joint status report. ECF No. 370. At his deposition, Mr. Roth testified that Celestron had provided all of its transactional data, including the competent parts at issue, to counsel for the Defendants. *Id*. IPPs, however, could not question Mr. Roth about much of the general ledger data, because Defendants did not produce it until *after* the deposition. *Id.* Defendants also refused to provide Celestron's IT expert for a meeting with IPPs' data experts. *Id*. Consequently, IPPs requested that the court order Defendants to identify or produce all the requested data regarding profit margins and to confirm that they are not withholding any further ledger or subledger transaction data. IPPs also raised continuing deficiencies regarding Nantong Schmidt cost data. *Id.*

**Orders Regarding Source Material for Transactional Data.** The court issued a further order on transactional data on August 17, 2023, again demanding that Defendants (1) make the source material from which defendant Nantong Schmidt prepared the summary of cost data available for review and (2) lodge the transcripts from Mr. Roth's deposition, highlighted to illustrate the points on which the parties disagreed. ECF No. 372. On August 29, 2023, after a hearing, the court ordered Defendants to (1) explain what the 208 manually-prepared data spreadsheets for Nantong Schmidt contained, (2) identify by bates number Celestron's relevant ledger data, and (3) provide an employee knowledgeable in the data for questioning. In the alternative, the court ordered Defendants to provide another witness for deposition due to their failure to produce the data before Mr. Roth's deposition. ECF No. 378. IPPs did not participate in further disputes regarding transactional data after reaching an agreement in principle to resolve the case with Defendants on September 7, 2023. Joint Decl. ¶45.

**Motion Practice Regarding Privilege Issues**. IPPs also engaged in extensive motion practice regarding Defendants' privilege claims. *Id*. On October 28, 2022, the parties filed two joint discovery letter briefs regarding documents withheld by Defendants as privileged and other issues related to Defendants' privilege logs. ECF Nos. 287 & 288. Specifically, IPPs argued that Defendants improperly withheld several categories of documents. ECF No. 287. IPPs also argued that Defendants needed to supplement their privilege logs to provide certain categories of

information. ECF No. 288. Prior to filing the joint brief, the parties met and conferred over the course of six months at least four separate times via Zoom and exchanged emails at least ten times on the issues. *Id.* Magistrate Judge DeMarchi issued an order on November 29, 2022, granting and denying in part IPPs' requested relief. ECF No. 297. The court required Defendants to remove all tax documents from their privilege log, as well as amend the log to make clearer the nature of documents withheld and the recipients of the documents and submit certain documents of in camera review. *Id.*

On March 1, 2023, IPPs filed a motion to compel the production of documents Defendants continued to withhold as privileged (which violated the November 29, 2022 order). ECF No. 305. The court issued an order on April 25, 2023, requiring Defendants submit documents for in camera review. ECF No. 332. On April 28, 2023, Defendants submitted the requested documents for review. ECF No. 333. The court issued another order on July 20, 2023, requiring Defendants to file an amended privilege log only covering the 37 documents submitted for review. ECF No. 353.

**Motion Practice Regarding Non-Party Discovery.** IPPs conducted extensive non-party discovery for information and transactional data regarding the retail telescope market. Starting in the summer of 2021, IPPs issued at least 30 Rule 45 subpoenas to retailers that sold commercial telescopes to potential class members. Joint Decl. ¶49.

Resolving objections to some of the subpoenas required court intervention following multiple meet-and-confers, untimely objections, and, in the case of third-party Orange County Telescope ("OCT"), a proposed compromise that IPPs limit the scope of the subpoena by agreeing to cut the time period, the products for requested data, and other compromises regarding data format. *Id.* ¶50. OCT, however, refused the compromise. *Id.* Left with no choice, on January 4, 2022, IPPs filed a joint letter brief to compel OCT to produce its transactional data reflecting purchases of telescopes and accessories from Defendants and Co-Conspirators and retail sales of such products. ECF No. 227. The court held a hearing on the motion on January 25, 2022 (ECF No. 232) and issued an order the same day granting the motion to compel, limited to data "readily accessible in electronic form," detailing telescopes and accessories sold by Defendants and Co-Conspirators, dating back to January 1, 2003 or whatever date data became available. ECF No. 235.

The subpoena on non-party Levenhuk, Inc., a manufacturer customer of the Defendant also required motion practice. On March 7, 2023, IPPs and Defendants filed a joint discovery letter brief regarding the subpoena. ECF No. 307. Defendants moved to quash the subpoena, or in the alternative limit its scope. *Id.* IPPs argued that they needed Levenhuk's data to conduct overcharge pass-through analysis. *Id.* On March 7, 2023, Magistrate Judge DeMarchi issued an order denying Defendants' motion because they failed to identify "any personal right or privilege that is implicated by IPPs' document subpoena" and that the subpoena did not violate any of the court's prior orders regarding the geographic scope of discovery. *Id.*

In total, IPPs collected transactional sales data from 25 non-party entities, including large telescope retailers like Amazon and Cloud Break Optics, and small telescope retailers like Adorama and Costco. IPPs' experts used this data to conduct pass-through and damages analysis, and the data now facilitates the notice and claims process. Joint Decl. ¶52.

**Expert Work.** IPPs retained Dr. Russell Mangum, the Executive Vice President at Cirque Analytics, as an expert to research and calculate class-wide damage models. This retention required researching and developing alternative models due to Defendants' unwillingness to provide transactional data and revising those models once Defendants did produce transactional data. *Id.* ¶¶70-71. Additionally, Dr. Mangum analyzed third party retail transactional data obtained by counsel through discovery. After Defendants produced some data in 2023, IPPs' economist and his associates conducted multiple regressions and other analyses to support class certification, liability, and damages. *Id.*; ECF No. 339. Dr. Mangum and his associates were preparing their expert reports when the parties reached the agreement to settle the case. *Id.*

Further, Dr. Mangum analyzed the relevant commerce based on sales data provided through discovery from Celestron, Orion, and Meade. *Id.* His sales estimates of Telescopes to IPPs between January 1, 2005, and September 6, 2024, totaled approximately $636 million. *Id.* Dr. Mangum calculated class wide damages based on overcharges estimated from multiple regression analyses, informed by thorough literature review, and from studying the court-approved methods of Dr. Douglas Zona from the *Orion* litigation. *Id.* In sum, Dr. Mangum calculated that damages for the IPP Class amounted to approximately $29 million to $32 million (based on an overcharge of 5%

- 12 -

and the pass-through rate of between 90% and 100%), and could have been as high as $165 million (based on an overcharge of 26% and pass-through rate of 100%). *Id.*

IPPs also hired University of Arizona Optical Sciences Professor Dr. Richard Youngworth, a telescope industry expert with a Ph.D. from the University of Rochester and manufacturing experience as an engineer and research associate at Ball Aerospace & Technologies Corp. and Eastman Kodak, respectively. *Id.* ¶72. At the time of the mediation and settlement, Dr. Youngworth was researching and drafting an expert report detailing the manufacturing process of various consumer telescopes and offering an opinion on the ability of manufacturing Defendants to produce each other's telescopes. *Id.*

Due to Class Counsel's discovery efforts and expert work, IPPs were well positioned to negotiate the Settlement.

### D.  Mediation and Settlement

The parties reached the Settlement Agreement after months of contentious arm's-length negotiations, including bilateral and mediated proceedings and discussions. Joint Decl. ¶53. After years of litigation and extensive discovery described above, counsel for the parties convened multiple times over several months in 2023 to arrive at settlement terms. *Id.* Ultimately, it took two full-day mediation sessions (conducted over a year apart) with an experienced mediator, the Honorable Suzanne Segal, a former Magistrate Judge of the Central District of California, to broker the deal. *Id.* The parties agreed to settle on September 7, 2023, when both sides accepted Judge Segal's mediator's proposal. *Id.*

On September 8, 2023, IPPs filed a Notice of Settlement and requested the Court suspend all pending deadlines and discovery while the parties finalized and executed the Settlement Agreement, which the Court granted on September 19, 2023. ECF Nos. 384 & 356. The parties worked diligently to draft and execute the Settlement Agreement after reaching the agreement in principle. *Id.* ¶55. Ironing out the specifics of the Settlement Agreement was complex, covering the interplay between several corporate families across multiple continents. *Id.* Aside from the monetary consideration that had already been agreed to in principle, there were several additional provisions in the long-form agreement that were contested and took substantial time and effort to

work through. On August 31, 2024, IPPs and Defendants executed the final Settlement Agreement. Joint Decl. ¶56.

### E. Preliminary Approval, Notice, and Claims

On September 16, 2024, IPPs filed a motion for Preliminary Approval of Settlement and Issuance of Notice, along with accompanying attorney and claims administrator declarations. ECF Nos. 389, 390, & 391. The Court heard the motion on October 31, 2024. ECF No. 393. On November 4, 2024, it issued an order granting preliminary approval, authorizing the issuance of the notice program, approving Verita as the claims administrator, and setting a schedule for final approval, a fairness hearing, and motions for attorneys' fees and costs. ECF No. 397.

In advance of the final approval hearing, IPPs will provide the Court with a detailed accounting of the notice and claims program.

## III.    ARGUMENT

### A. IPPs' Request for Attorneys' Fees is Fair and Reasonable

For over four and a half years, Class Counsel litigated on behalf of telescope consumers against an anticompetitive global cartel on a pure contingency basis without any guarantee of payment. In the face of that risk, Class Counsel recovered $32 million from the Defendants to create a common Settlement Fund. The requested $10,666,667 for attorneys' fees equals one third of the Settlement Fund, compared to Counsel's $14,550,720 in unreimbursed lodestar, equaling a *negative* multiplier of .73. The request is fair and reasonable and should be granted because it satisfies all the Ninth Circuit's standards for such an outstanding result and effort.

#### 1)  The Court Should Utilize a Percentage of the Common Fund Method

It is well-settled in the Ninth Circuit that attorneys may be paid reasonable fees as a percentage of a common fund established by a class-wide settlement. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (holding that "a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); *Korean Air Lines Co. Antitrust Litig.*, No. 07-cv-05107, 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23, 2013) (awarding attorneys' fees and recognizing that "use of the percentage-of-the-fund method in common-fund cases is the prevailing practice in the Ninth Circuit"). Awarding attorneys' fees as a percentage of

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

the common fund aligns the interests of class counsel with the interests of the class, incentivizing counsel to seek as much compensation for the class as possible. *See Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (awarding attorneys' fees based on percentage of a common fund and noting that "[t]his method aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund.); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (utilizing percentage of a common fund and noting that doing so "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation").

Because the Settlement is a non-reversionary $32 million common fund, the benefit to the class is clear and easily quantifiable. Calculating Class Counsel's fee as a percentage of that fund therefore represents a fair and straightforward way to compensate counsel for their time and effort litigating the case. *See, e.g., Barnes v. The Equinox Group, Inc.*, No. C 10-3586-LB, 2013 WL 3988804, at *3 (N.D. Cal. Aug. 2, 2013) (awarding a percentage of the fund and holding that "[t]he percentage-of-the-fund method is appropriate where—as here—the amount of the settlement is fixed without any reversionary payment to the defendant").

### 2)  The Court Should Award a Third of the Fund as Attorneys' Fees

"The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33-1/3% of the total settlement value, with 25% considered the benchmark." *Garcia v. Schlumberger Lift Sols.*, No. 18-cv-01261, 2020 WL 6886383, at *13 (E.D. Cal. Nov. 24, 2020), *report & recommendation adopted*, 2020 WL 7364769 (E.D. Cal. Dec. 15, 2020). In the Ninth Circuit, courts evaluate the reasonableness of requests for attorneys' fees under four factors:

(1) the results achieved;

(2) the effort, experience, and skill of counsel;

(3) the riskiness of the case and the financial burden shouldered by

counsel on a contingency basis; and

(4) awards made in similar cases.

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002). All four factors weigh in favor of granting Class Counsel's request.

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

i.    <u>Class Counsel Achieved an Excellent Result for Indirect Purchasers</u>

In assessing the reasonableness of a request for attorneys' fees, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see also Manual for Complex Litigation*, §21.71, p. 336 (4th ed. 2004) ("Compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The fundamental focus is the result actually achieved for class members.") (quotation omitted). The degree of success is particularly important where, as here, counsel request a fee above 25%. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 4126533, at *4 (N.D. Cal. Aug. 3, 2016) ("The most important factor is the results achieved for the class. Outstanding results merit a higher fee."). Here, the degree of recovery merits the requested upward departure, as does Class Counsel's extensive work in the case and resulting negative multiplier.

The Settlement provides direct cash relief for class members who purchased qualifying consumer telescopes during the relevant time period. Furthermore, the $32 million settlement fund represents up to *110%* of IPPs' possible recoverable damages. Joint Decl. ¶71. A review of approved class action settlements shows that a settlement with a ceiling even approaching 100% recovery is extraordinary and rare. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd,* 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (granting final approval of the settlement representing 11.7% of damages and describing the result for the class as "excellent"); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 13-md-02420, 2017 WL 6040065, at *7 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) (approving a settlement and stating that 50% of single damages is "a result almost never achieved in large, complex antitrust cases"); *In re Cathode Ray Tubes (CRT) Antitrust Litig.*, No. 07-cv-5944, 2016 WL 3648478, at *7 (N.D. Cal. July 7, 2016) (stating that a settlement representing 20% of potential single damages "is without question a good recovery and firmly in line with the recovery in other cases" and citing a law review article finding that "median average settlement recovery among a survey of 71 settled cartel cases was 37% of single damages recovery, the weighted mean . . . 19% of single damages recovery"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5159441, at *4 (N.D. Cal.

- 16 -

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

Sept. 2, 2015) (granting final approval of the settlement and stating that the "total settlements achieved in this action exceed 14 percent of Plaintiffs' proposed single damages estimate, a damages estimate Defendants were prepared to vigorously contest" and further noting that "[d]istrict courts in the Ninth Circuit routinely approve settlements with much larger differences between the settlement amount and estimated damages"); *In re Toys R Us–Del., Inc.–Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) (granting final approval of settlement representing only 3% of possible recovery); *Reed v. 1–800 Contacts, Inc.*, No. 12–cv–02359, 2014 WL 29011, at *6 (S.D. Cal. Jan. 2, 2014) (granting final approval of settlement represented 1.7% of possible recovery); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07–md–1827, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (referring to plaintiffs' settlement of "approximately 50% of the potential recovery" as "exceptional"); *In re LDK Solar Sec. Litig.*, No. 07–cv–5182, 2010 WL 3001384, at *2 (N.D. Cal. July 29, 2010) (granting final approval settlement that was 5% of possible damages); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 & n.5 (E.D. Pa. 2003) (gathering cases where courts approved settlements achieving single-digit percentages of potential recoveries).

By every objective metric, the Settlement is exceptional and merits the requested fee. Class Counsel's achievement is particularly notable given difficulties and risks they faced in litigating this international cartel against skilled and zealous opposing counsel.

        ii.  <u>Class Counsel Faced Massive and Unique Risks, Including Financially, in Litigating This Case</u>

Litigation risks bear on the reasonableness of a requested attorneys' fee. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046–47 (N.D. Cal. 2008) (granting requested attorneys' fees and holding that "[t]he risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees"). Antitrust class actions such as this one carry a recognized level of *increased* risk. *See In re Linerboard Antitrust Litig.*, No. Civ. A. 98-5055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) ("antitrust class action is arguably the most complex action to prosecute"); *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (stating that an

"antitrust class action is arguably the most complex action to prosecute" and that "[t]he legal and factual issues involved are always numerous and uncertain in outcome"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable.").

Class Counsel faced and accepted unique and substantial risks that warrant the requested upward departure. Here, Class Counsel assumed more than the common risks that any dispositive motion (motion to dismiss, class certification, or summary judgment) or trial could have resulted in the court or jury finding against them; Class Counsel faced those risks against foreign Defendants on whom, even if IPPs succeeded all the way through trial, collecting a judgment would have been extremely difficult or impossible.

In the Ninth Circuit, courts also consider whether counsel assumed further risk by taking a case on a contingency basis. *See Online DVD*, 779 F.3d at 954-55 & n.14. Class Counsel litigated this case on a purely contingent basis and advanced all necessary costs with no assurance of ever being paid, or even reimbursed their hard costs. Joint Decl. ¶64. "The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *Omnivision*, 559 F. Supp. 2d at 1047. The risk of nonpayment in contingent matters is further heightened here because of the risks of collecting a judgment against foreign defendants.

The significant and unique risks Class Counsel assumed in litigating this case support the reasonableness of the request for an award of attorneys' fees and this factor therefore strongly weighs in favor of the request.

        iii.   <u>Class Counsel Relied on Their Vast Experience and Skill to Achieve the Settlement</u>

Each firm appointed as Class Counsel brought decades of antitrust experience litigating sprawling international cartels to bear on this case. *Id*. 65; *see also* Amended Motion to Appoint Lead Plaintiff and Lead Counsel, ECF No. 38, attachments 1-10 (declarations and firm resumes describing antitrust experience). This experience was crucial to the success of this settlement. *See*

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

1   *generally* Joint Decl.; *Omnivision*, 559 F. Supp. 2d at 1047 ("The prosecution and management of

2   a complex national class action requires unique legal skills and abilities.").

3        Achieving this settlement took significant work and skill and would not have been achieved

4   by attorneys without the background in international antitrust litigation that Class Counsel possess.

5   Over the years of extremely active litigation, Class Counsel encountered vigorous defenses,

6   numerous motions to dismiss raising complex and novel legal issues while aggressively pursuing

7   discovery. Class Counsel reviewed and analyzed millions of Defendants' internal documents,

8   including thousands that had to be translated from foreign languages. Joint Decl. ¶16. These efforts

9   gave Class Counsel the leverage to achieve this recovery for the Class. *See Barbosa v. Cargill Meat*

10  *Solutions Corp.*, 297 F.R.D. 431, 449 (E.D. Cal. 2013) (class counsel's use of "specialized skill"

11  in the particular area of law was an asset to class members and weighed in favor of the fee request);

12  *Omnivision*, 559 F. Supp. 2d at 1047 (plaintiff's case withstood a motion to dismiss, "despite other

13  weaknesses, is some testament to Lead Counsel's skill" and that "[t]his factor also supports the

14  requested fee"); *In re Heritage Bond Litig.*, No. 02–ml–1475, 2005 WL 1594403, at *19 (C.D. Cal.

15  June 10, 2005) (holding that fact investigation, detailed complaints, extensive motion practice, and

16  review of numerous documents, weigh in favor of the fee request); *In re Lenovo Adware Litig.*, No.

17  15-md-02624, 2019 WL 1791420, at *8 (N.D. Cal. Apr. 24, 2019) (citing fact the case was "actively

18  litigated for the past four years, and required complex legal and factual research and analysis by

19  Class Counsel" as a reason for granting the fee request).

20       Class Counsel's skills, honed over decades of experience litigating global antirust cartel

21  cases, are another factor in favor of granting the request for attorneys' fees.

22               iv.  The Requested Fee Is in Line with Awards in Similar Cases

23       Courts regularly award a third of a gross settlement fund as attorneys' fees in antitrust class

24  actions, including in this District. *See, e.g.*, *In re Urethane Antitrust Litig.*, No. 04-cv-1616, 2016

25  WL 4060156, at *8 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement;

26  "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in

27  which the court awarded fees of 30 percent or higher.") *In re Dairy Farmers of Am., Inc.*, 80 F.

28  Supp. 3d 838, 862 (N.D. Ill. 2015) (awarding class counsel "one-third of the $46 million common

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

fund ($15,333,333.33) with interest at the same rate paid on the Settlement Fund"); *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, 2015 WL 1396473, at *5 (E.D. Mich. Jan. 20, 2015) (awarding attorneys' fees of one-third for a $19 million settlement fund); *In re Se. Milk Antitrust Litig.*, No. 2:07-CV 208, 2013 WL 2155387, at *3 (E.D. Tenn. May 17, 2013) (awarding one-third in attorneys' fees on a $158 million settlement fund and holding that "the percentage requested is certainly within the range of fees often awarded in common fund cases . . . nationwide"); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) (approving a "thirty-three and a third percent of the common fund, for a total of $50,000,000.00, in attorneys' fees"); *In re Potash Antitrust Litig.*, No. 08-cv-06910, 2013 WL 12470850, at *1 (N.D. Ill. June 12, 2013) (granting an award of one-third of the $90 million settlement fund as "reasonable and warranted"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819 (N.D. Cal. Oct. 14, 2011), ECF No. 1407 (awarding 33% in attorneys' fees for an IPP settlement); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *8 (E.D. Pa. Jan. 3, 2008) (awarding 33.33% in attorneys' fees with accrued interest on a $39 million common fund settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33.3% fee on $510 million settlement fund); *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding 34% of the $359,438,032 common fund as attorneys' fees); *In re Med. X-Ray Film Antitrust Litig.*, No. 93-cv-5904, 1998 WL 661515, at *7 (E.D.N.Y. Aug. 7, 1998) (approving a request for 33.33% in attorneys' fees from a $39 million common fund as "reasonable and is well within the range accepted").

The same is true of attorneys' fees awards in the non-antitrust context throughout the Ninth Circuit. *See, e.g., In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund because of complexity and risk); *Rodriguez v. Nike Retail Services, Inc.*, 2022 WL 254349, at *6 (N.D. Cal. 2022) (approving attorneys' fees, which are 33% of the gross settlement fund and a 1.7 lodestar multiplier); *Nelson v. Avon Prods.*, No. 13-cv-02276, 2017 WL 733145, at *6 (N.D. Cal. Feb. 24, 2017) (awarding 33.3% and collecting cases awarding 30% or more); *Syed v. M-I, L.L.C.*, No. 12-cv-01718, 2017 WL 3190341, at *7 (E.D. Cal., July 27, 2017) (attorney's fees of $2,333,333.33 equal to one-third of gross settlement); *Heritage Bond*

*Litig.*, 2005 WL 1594403, at \*19 (granting 33.33% of common fund as the attorneys' fees for a $27,783,000 settlement).

Because attorneys' fees representing a third of the gross common fund are routinely granted for settlements of similar size in cases of similar complexity and scope, this factor weighs in favor of granting Class Counsel's motion.

## B. A Lodestar Crosscheck Demonstrating a *Negative* Multiplier Supports the Requested Fee

The purpose of using a lodestar cross-check is to assess whether counsel will receive a windfall compared to the amount of time actually devoted to litigating the case. *See In re Bluetooth Headset Prods. Liab. Litig.*, 54 F.3d 935, 945 (9th Cir. 2011) (lodestar cross-check "can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate") (quotation omitted). Where a lodestar is merely being used as a cross-check, the court "may use a rough calculation of the lodestar." *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662 OWW MJS, 2011 WL 2648879, at \*12 (E.D. Cal. June 30, 2011) (quotation omitted).

Courts in the Ninth Circuit generally find "[m]ultipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation." *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995); *see also* 4 NEWBERG ON CLASS ACTIONS § 14.7 (stating courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by the courts"). A cross-check resulting in a negative multiplier weighs even heavier in favor of a requested fee's reasonableness. *See In re Capacitors Antitrust Litig.*, No. 17-md-02801, 2020 WL 13201507, at \*1 (N.D. Cal. July 17, 2020) (granting requested attorneys' fees and holding that the negative lodestar multiplier "further supports the reasonableness of the attorneys' fees request"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827, 2013 WL 149692, at \*1 (N.D. Cal. Jan. 14, 2013) (citing the negative .86 multiplier as confirmation that the amount of attorneys' fees requested was fair and reasonable); *In re DRAM Antitrust Litig.*, No. 02-md-1486, 2013 WL 12387371, at \*12-13 (N.D. Cal. Nov. 5, 2013) (observing that a negative multiplier "is virtually sufficient to satisfy the cross-check requirement"); *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 853–54 (N.D.

Cal. 2010) (granting attorneys' fees and stating that a "resulting multiplier of less than one, (sometimes called a negative multiplier) suggests that the negotiated fee award is a reasonable and fair valuation of the services rendered to the class by class counsel"); *In re Portal Software, Inc. Sec. Litig.*, No. 03-cv-5138, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (granting requested attorneys' fees and holding that a "negative multiplier suggests that the percentage-based amount is reasonable and fair based on the time and effort expended by class counsel").

In determining the reasonableness of counsel's hourly rates, courts look to "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Fowler v. Wells Fargo Bank, N.A.*, No. 17-cv-02092, 2019 WL 330910, at *6 (N.D. Cal. Jan. 25, 2019). Class Counsel's hourly rates are well within the range of rates approved in other class action fee awards. *Compare* Joint Decl. Exs. A-C *with In re MacBook Keyboard Litig.*, No. 18-cv-02813, 2023 WL 3688452, at *15 (N.D. Cal. May 25, 2023) (approving a $863 blended rate); *In re Facebook Internet Tracking Litig.*, No. 12-md-02314, 2022 WL 16902426, at *12 (N.D. Cal. Nov. 10, 2022) (finding hourly rates up to $1,200 "reasonable and commensurate with those charged by attorneys with similar experience in the market"); *Fleming v. Impax Labs. Inc.*, No. 16-cv-06557, 2022 WL 2789496, at *9 (N.D. Cal. July 15, 2022) (finding rates of $760 to $1,325 for partners to be reasonable); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (finding rates up to $1,250 for "partners or senior counsel," $650 for associates, and $350 for paralegals reasonable); *In re Volkswagen "Clean Diesel" Marketing*, MDL No. 2175, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (finding rates up to $1,600 for partners, $790 for associates, and $490 for paralegals reasonable). Courts have also specifically found Lieff Cabraser's hourly rates "consistent with market rates in their area." *Gutierrez v. Amplify Energy Corp.*, No. 21-01628, 2023 WL 6370233, at *7 (C.D. Cal. Sept. 14, 2023). If the requested fee of $10,666,667 is awarded, the blended hourly rate for all work performed by lawyers and staff litigating this case will be $443.52.

Here, Class Counsel and its staff spent 20,536 hours through December 1, 2024 litigating this case, demonstrating both the persistence of opposing counsel and the complexity of this case. Each firm exercised billing judgment and carefully reviewed their time as it was submitted to reduce

1    inefficient or duplicative entries. Joint Decl. ¶¶61-62. The reported lodestar does not include any

2    time of attorneys or staff who billed fewer than 20 hours. *Id*. Class Counsel excluded all staff and

3    attorney time devoted to the present motion for attorneys' fees, costs, and services awards. Joint

4    Decl. ¶61. Consistent with the Northern District of California's Guidance, Class Counsel submitted

5    summaries of the number of hours spent on various categories of activities related to the action by

6    each biller, together with hourly billing rate information. *Id*. Exs. A-C. Applying Class Counsel's

7    current billing rates results in $ \$14,550,720$ of lodestar and a blended average \$709 rate for all

8    counsel and staff. *Id*. If the Court grants the requested \$10,666,667 in fees, it will result in a .73

9    negative multiplier.

10        Courts in the Ninth Circuit have granted attorneys' fees representing similar percentages of

11   the common fund on multipliers more than triple what the crosscheck calculates here. *See, e.g.*,

12   *Fleming v. Impax Lab'ys Inc*., No. 16-cv-06557, 2022 WL 2789496, at *9 (N.D. Cal. July 15, 2022)

13   (awarding 30% in attorneys' fees on a \$33 million common fund and noting that 2.6 lodestar

14   multiplier confirmed reasonableness of the request); *Kendall v. Odonate Therapeutics, Inc.*, No.

15   20-cv-01828, 2022 WL 1997530, at *7 (S.D. Cal. June 6, 2022) (33.3% fee representing a 2.36

16   multiplier was reasonable for a \$12.8 million settlement).

17        Because the requested attorneys' fees result in a negative multiplier, the rates changed by

18   Class Counsel are within the range of others recently approved, and the resulting hourly rate is

19   reasonable, this factor also weighs in favor of granting Class Counsel's requested fees.

20        **C.  The Court Should Grant Class Counsel's Request for Reimbursement of Litigation**
         **Costs**

21

22        Since June 2020, Class Counsel have advanced all costs required litigating this case without

23   any guarantee of repayment. Joint Decl. ¶69. Courts typically reimburse counsel from the

24   settlement fund for costs reasonably incurred for the benefit of the class. *See In re Omnivision*, 559

25   F. Supp. 2d at 1048 (reimbursing all requests litigation costs and holding that "[a]ttorneys may

26   recover their reasonable expenses that would typically be billed to paying clients in non-

27   contingency matters"). Costs regularly deemed to be reasonable include, but are not limited to,

28   "photocopying, printing, postage, court costs, research on online databases, experts and consultants,

1  and reasonable travel expenses." *Thomas v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160,

2  2018 WL 2234598, at \*4 (N.D. Cal. May 15, 2018).

3      All Class Counsel's costs submitted with this motion were necessary to litigate this case.

4  Joint Decl. ¶69. As noted in the Joint Decl., the most significant costs are expert witness fees, court

5  reporting services, translation services, and electronic document review hosting, without which the

6  Settlement would not have been possible. *Id.* (itemized expense chart); *see also Hefler v. Wells*

7  *Fargo & Co.*, No. 16-cv-05479, 2018 WL 6619983, at \*16 (N.D. Cal. Dec. 18, 2018) (Courts in

8  this District typically require "an itemized list of their expenses by category, listing the total amount

9  advanced for each category, allowing the Court to assess whether the expenses are reasonable.").

10  Here, all reasonable costs Class Counsel advanced total $771,461, representing just 2.4% of the

11  gross Settlement Fund.

12      Because all the requested costs were reasonable and necessary to achieve the Settlement,

13  the motion should be granted.

14      **D.  The Requested Service Awards Are Reasonable and Warranted**

15      The Court should also grant the requested $3,000 service award for each of the 35 Class

16  Representatives. Service awards are "intended to compensate class representatives for work done

17  on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action,

18  and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v.*

19  *W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (citations omitted). In determining the

20  amount for a service payment, courts typically consider "the actions the plaintiff has taken to protect

21  the interests of the class, the degree to which the class has benefitted from those actions . . . and the

22  amount of time and effort the plaintiff expended in pursuing the litigation." *Johnson v. Fujitsu*

23  *Tech. & Bus. of Am., Inc.*, No. 16-cv-03698, 2018 WL 2183253, at \*8 (N.D. Cal. May 11, 2018)

24  (cleaned up and citation omitted).

25      Each Class Representative was an active participant in the litigation. Joint Decl. ¶73. Class

26  representatives assisted in many aspects of the litigation, including agreeing to serve as named

27  Plaintiffs and undertaking the responsibilities that come with the role; reviewing and approving

28  pleadings, briefs, and other court documents; staying in close contact with counsel throughout the

litigation to monitor progress; preserving and diligently searching for documents and other sources of information relevant to their claims; meeting with counsel to prepare IPPs' extensive discovery responses, preparing and sitting for depositions, and carefully reviewing, considering, and approving the final Settlement Agreement. Joint Decl. ¶73.

This settlement likely presents the only opportunity for Class Representative service awards. The requested $3,000 service awards compensate Class Representatives for the substantial time and effort they spent on behalf of the class participating in the litigation, preparing and sitting for depositions, and searching for and collecting documents. This amount is reasonable considering the excellent result achieved through this settlement and because the amount requested is "under the presumptively reasonable amount of $5,000 and [is] consistent with precedent." *Harbour et al., Plaintiff, v. Cal. Health & Wellness Plan, et al.*, No. 21-cv-03322, 2024 WL 171192, at *9 (N.D. Cal. Jan. 16, 2024); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (granting a $15,000 service award and observing that a "$5,000 payment is presumptively reasonable," and awards in the Ninth Circuit "typically range from $2,000 to $10,000").

The requested total of $105,000 in service awards for the 35 Class Representatives is also reasonable because, at only 0.3%, it represents a *de minimis* amount of the $32 million gross Settlement Fund. *See Thieriot v. Celtic Ins.*, No. 10-cv-04462, 2011 WL 1522385, at *7–8 (N.D. Cal. Apr. 21, 2011) (approving service awards totaling 1.8% of gross settlement fund); *Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975, 1002 (N.D. Cal. 2017) (granting service awards that combined for 0.22% of $60 million settlement ($15,000 for each of 9 class representatives); *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1299 (S.D. Cal. 2017) (awarding $15,000 for each of 5 class representatives and 0.3% of $25 million settlement fund).

The requested service awards are reasonable, warranted, below the suggested benchmark, and should be granted.

## IV.  CONCLUSION

For all the reasons set forth above, Class Counsel respectfully request that the Court (1) grant an award of $10,666,667 in attorneys' fees; (2) approve reimbursement of $771,461 in litigations costs; and (3) issue services awards of $3,000 for each of the 35 Class Representatives.

1    Dated:  January 9, 2025

2                                    Respectfully Submitted,

3                                      */s/ Kalpana Srinivasan*_____

4                                      Kalpana Srinivasan (SBN 237460)
Marc M. Seltzer (SBN 54534)

5                                      Steven Sklaver (SBN 237612)
Michael Gervais (SBN 330731)

6                                      **SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Ste. 1400

7                                      Los Angeles, CA 90067
Phone: 310-789-3100

8                                      ksrinivasan@susmangodfrey.com

9                                      mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

10                                     mgervais@susmangodfrey.com

11                                      Alejandra C. Salinas (*pro hac vice*)

12                                      Texas SBN 24102452
**SUSMAN GODFREY L.L.P.**

13                                      1000 Louisiana Street, Suite 5100
Houston, Texas 77002

14                                      Telephone: (713) 651-9366
Facsimile: (713) 654-6666

15                                      asalinas@susmangodfrey.com

16                                      Thomas K. Boardman (SBN 276313)

17                                      **SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor

18                                      New York, New York 10001
Phone: 212-336-8330

19                                      tboardman@susmangodfrey.com

20                                      */s/ Lin Y. Chan*_____

21                                      Lin Y. Chan (SBN 255027)
Eric B. Fastiff (SBN 182260)

22                                      Reilly T. Stoler (SBN 310761)

23                                      **LIEFF CABRASER HEIMANN &**
**BERNSTEIN LLP**

24                                      275 Battery Street, 29th Floor
San Francisco, California 94111

25                                      Telephone: (415) 956-1000
Facsimile: (415) 956-1008

26                                      lchan@lchb.com

27                                      efastiff@lchb.com
rstoler@lchb.com

28

**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE AWARDS**

1

2

*/s/ Adam J. Zapala*
Adam J. Zapala (SBN 245748)

3

Elizabeth T. Castillo (SBN 280502)
Christian S. Ruano (SBN 352012)

4

**COTCHETT, PITRE &
McCARTHY, LLP**

5

840 Malcolm Road
Burlingame, CA 94010

6

Telephone: (650) 697-6000

7

Facsimile: (650) 697-0577
azapala@cpmlegal.com

8

ecastillo@cpmlegal.com
cruano@cpmlegal.com

9

10

*Settlement Class Counsel for the
Indirect Purchaser Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 27 -
**MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF COSTS, AND SERVICE
AWARDS**